RECORD NO. 06-3190(L)

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

## UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

## KEITH B. MCGILL, *et al.*,

*Defendants - Appellants*.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

––––––––––––

## PAGE–PROOF BRIEF OF APPELLANTS

––––––––––––

**Richard K. Gilbert**
LAW OFFICE OF RICHARD K. GILBERT
**601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, DC  20004
(202) 898-0857**
rkgesq@juno.com
*Counsel for Keith McGill*

**Manuel Retureta**
RETURETA & WASSEM, PLLC
**1614 20th Street, NW
Washington, DC  20009
(202) 450-6119**
mjr@returetawassem.com
*Counsel for Franklin Seegers*

**Kristen Grim Hughes**
ATTORNEY AT LAW
**1390 Chain Bridge Road
Suite 350
McLean, VA  22101
(703) 798-4444**
kghughes@hotmail.com
*Counsel for Keith McGill*

**Dennis M. Hart**
ATTORNEY AT LAW
**601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, DC  20004
(202) 347-1820**
d.m.hart@att.net
*Counsel for Kenneth Simmons*

**David Smith**
ENGLISH & SMITH
**526 King Street, Suite 213
Alexandria, VA  22314
(703) 548-8991**
dsmith@englishandsmith.com

*Counsel for Deon Oliver*

**Mary E. Davis**
DAVIS & DAVIS
**1350 Connecticut Avenue, NW
Suite 202
Washington, DC  20036
(202) 234-7300**
medavisdc@aol.com

*Counsel for James W. Alfred*

**Gregory S. Smith**
LAW OFFICES OF GREGORY S. SMITH
**913 East Capitol Street, S.E.
Washington, D.C. 20003
(202) 460-3381**
gregsmithlaw@verizon.net

*Counsel for Ronald C. Alfred*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A)  Parties and Amici.**

The parties appearing in the lower court and this appeal are Defendant-Appellants Keith McGill, Deon Oliver, Franklin Seegers, Kenneth Simmons, James Alfred and Ronald Alfred, and Plaintiff-Appellee United States of America. Undersigned counsel are unaware of any amici curiae.

**(B)  Rulings Under Review.**

The Appellants appeal the judgments of conviction entered against them in Case Nos. 00-cr-157-RCL and 02-cr-045 by the district court on January 11, 2007 and December 10, 2007.

**(C)  Related Cases.**

The Appellants' consolidated appeals are related to, but have not been consolidated with, United States v. Moore, et al. (Case No. 05-3050) and United States v. Wilkerson (Case No. 10-3037).  The judgments entered against Moore, et al. have been affirmed by this Court.  Mr. Wilkerson's appeal, however, remains pending.

**(D)  Statutes.**

Pursuant to Fed.R.App.P. Rule 28(f) and D.C. Circuit Rule 28(a)(5), the pertinent statutes and rules are set forth in an Addendum to this brief.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF CONTENTS........................................................... ii

TABLE OF AUTHORITIES ................................................. xviii

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION .................................................1

STATEMENT OF THE ISSUES ...............................................1

STATUTES AND REGULATIONS ..........................................4

STATEMENT OF THE CASE...................................................5

STATEMENT OF FACTS ........................................................8

    A.   The Atmosphere of Fear.................................................9

    B.   Government Witnesses................................................12

           1.   Maurice Andrews...............................................12

           2.   Raymond Sanders ..............................................14

           3.   Oscar Veal........................................................15

           4.   Omar Wazir.......................................................18

           5.   Steven Graham..................................................20

           6.   Frank Howard ...................................................22

           7.   Melvin Wallace..................................................25

            8.   Walter "Biggums" Fleming ..................................26

9.      Caprice Whitley .......................................................28

10.     Victoria Robles ........................................................29

11.     Lincoln Hunter ........................................................30

12.     Eugene Williams ......................................................30

13.     Quincy Thomas ........................................................31

C.    Facts Pertinent to Case Against Appellants ........................32

1.      Keith McGill ...........................................................32

        a.      The Conspiracy Charges...................................33

        b.      The Charles Schuler Shooting ..........................33

2.      Deon Oliver............................................................36

        a.      Murder of Simmons [Counts 53 and 54].......................36

        b.      Murder of Floyd [Counts 68 and 69]..............................38

        c.      Conspiracy to Commit Murder for Hire (Rah-Rah)
                [Count 3, RA 55] ...........................................38

3.      Franklin Seegers........................................................39

        a.      Government's Evidence ................................40

        b.      Defense Evidence ......................................43

4.      Kenneth Simmons ....................................................43

        a.      Evidence of Drug Conspiracy..........................43

        b.      Evidence of RICO Conspiracy ........................45

        c.      Evidence of Richard Simmons Homicide ...............46

d.      Evidence of Walker Homicide ......................................46

e.      Defense Evidence .......................................................47

5.      James Alfred .....................................................................48

a.      The Conspiracy Charge ..............................................48

6.      Ronald Alfred......................................................................50

a.      Joseph Thomas...........................................................50

b.      Carlos Cardoza, Jr.......................................................51

c.      Anthony Watkins .........................................................52

d.      Andre Sanders.............................................................53

e.      Drugs...........................................................................53

D.      Summary ...............................................................................54

SUMMARY OF THE ARGUMENT ..........................................................55

Denial of Appellants' Sixth Amendment Right to a Unanimous
Verdict .........................................................................................55

Government's Improper Use of an "Overview Witness".............................57

Other Crimes Evidence..............................................................................57

Confrontation Clause Violations ................................................................59

McGill's Stun Belt Revelation ...................................................................59

Improper Testimony by Government Witnesses that Appellants'
Co-Defendants were Previously Convicted.................................................59

Improper Denial of McGill's Presence in Court .........................................59

iv

Improper Denial of McGill's Qualified Defense Expert ..............................60

McGill's Indictment was Misjoined .................................................60

Improper Impeachment of McGill..................................................60

McGill's Sentencing Issues ........................................................61

Improper Cross-Examination of Oliver..........................................62

Government's Misrepresentation of Evidence Against Oliver ...................62

Insufficiency of Evidence to Convict Oliver Regarding Floyd Murder........63

Prosecutorial Misconduct Denied Seegers a Fair Trial .................................64

Seegers Denied Due Process as a Result of *Brady/Giglio* Violation ...........64

Denial of Seegers and James Alfred's Motions for Severance and Mistrial.....................................................................64

Insufficiency of Evidence to Convict Seegers..................................64

Denial of Simmons' Motion for Judgment of Acquittal on Drug Conspiracy ........................................................................65

Denial of Simmons' Motion for Judgment of Acquittal on RICO Conspiracy ........................................................................65

Denial of Simmons' Motion for Judgment of Acquittal on Weapons Offenses ...........................................................................65

Insufficiency of Evidence to Convict Simmons of 1959(a)(1) Homicides ..........................................................................65

Denial of Simmons' *Pro Se* Motions...........................................66

Insufficiency of Evidence to Convict James Alfred of Murders..................66

Ronald Alfred's Individual Issues ...............................................66

Cumulative Effect of Trial Errors ................................................. 68

ARGUMENT ...................................................................................... 68

I.          APPELLANTS WERE DENIED THEIR SIXTH AMENDMENT
            RIGHT TO A UNANIMOUS VERDICT ........................................ 68

    A.      Introduction .......................................................................... 68

    B.      Constitutional Basis of the Core Claim of Error ................. 69

    C.      Standard of Review .............................................................. 70

    D.      Facts Arising Prior to Deliberations ................................... 70

            1.      The Marshals and the Jury ....................................... 70

            2.      The December Incident ............................................. 71

            3.      The January Incident ................................................ 71

            4.      Juror #12's Comments on the Evidence During Trial ............. 72

    E.      Facts Arising During Deliberations ..................................... 73

    F.      The "Holdout" Juror for Acquittal Was Dismissed ............ 94

    G.      The District Court's Efforts to Achieve a Verdict Were
            Coercive ............................................................................... 95

    H.      The District Court Compounded Its Error by Invading Jury
            Deliberations ....................................................................... 96

    I.      The Holdout Juror *Did* Deliberate ..................................... 99

    J.      The Holdout Juror Did Not Commit Misconduct ............. 102

    K.      The District Court's Findings Were Flawed By Procedural
            Errors ................................................................................ 104

vi

1.    The District Court's Presence in the Jury Room ....................104

2.    The Marshal's Improper *Ex Parte* Contacts with the Jurors .......................................................................................105

3.    The Inquiry Conducted Was Inadequate ...............................106

4.    The District Court Compromised the *Appellate* Record.........106

L.    Conclusion................................................................................107

II.    GOVERNMENT'S IMPROPER USE OF AN "OVERVIEW WITNESS" ...............................................................................108

A.    Introduction ..............................................................................108

B.    Standard Of Review ................................................................108

C.    The *Moore* Case .....................................................................109

D.    Vouching For Government Witnesses  ..............................109

E.    Introduction Of Inadmissible/Improper Evidence ............112

F.    Testimony As Second Opening.................................................113

G.    Prejudice ...................................................................................113

III.    THE "OTHER CRIMES" EVIDENCE ...........................................114

A.    Introduction ..............................................................................114

B.    Standards of Review.................................................................116

C.    Reliability of the Evidence.......................................................118

D.    "Intrinsic" Evidence and the Requirement for Notice ......119

E.    Basis for Admission .................................................................123

vii

1.      General ...................................................................... 123

2.      The Trial Court's "Findings" .................................... 125

3.      Other Bases for Admission ....................................... 127

4.      Impeachment ............................................................. 129

F.    Prejudice Generally ............................................................. 130

G.    Final Instructions ................................................................ 132

1.      Defense Objections and the Government's Response ........... 132

2.      The Final Instructions .............................................. 134

3.      Argument .................................................................. 135

H.    Prosecutors' Closings ......................................................... 137

1.      Initial Closing .......................................................... 138

2.      Rebuttal Closing ....................................................... 140

3.      Argument .................................................................. 141

I.    Specific Examples – Some Notice Given ........................... 143

1.      Ronald Alfred's Earlier Bad Acts ............................ 143

a.      The 1989 Cocaine Case ................................ 143

b.      The 1991 Gun Case ...................................... 145

c.      The 1994 Gun Case ...................................... 146

2.      The Kairi Ball Murder .............................................. 148

3.      Seegers' 1993 Drug Conviction ............................... 149

J.     Specific Examples – No Notice Given ............................................... 150

    1.   McGill's Pre-Conspiracy Acts of Violence ............................ 151

    2.   Contemporaneous Acts of Violence and Intended Violence Not Part of Conspiracy ............................................. 152

    3.   Pre-Conspiracy Drug Trafficking ............................................ 155

        a.   McGill ............................................................................ 155

        b.   Ronald Alfred ................................................................ 156

        c.   James Alfred ................................................................... 156

        d.   Oliver ............................................................................. 157

        e.   Simmons ......................................................................... 157

    4.   Other Pre-Conspiracy Crimes ................................................. 158

K.     The Errors Were Not Harmless ......................................................... 159

IV.    CONFRONTATION CLAUSE VIOLATIONS ............................... 162

A.    Introduction ...................................................................................... 162

B.    Standard of Review .......................................................................... 162

C.    Confrontation Clause Violations ...................................................... 163

D.    Prejudice ........................................................................................... 164

V.    OTHER APPELLANTS' RIGHTS TO A FAIR TRIAL WERE VIOLATED BY McGILL'S STUN BELT REVELATION ............ 166

A.    Introduction ...................................................................................... 166

B.    Standard of Review .......................................................................... 166

C.    Background ........................................................167

D.    Argument...........................................................170

E.    Reversal Is Required ........................................173

VI.    APPELLANTS ARE ENTITLED TO A NEW TRIAL AS A
       RESULT    OF    TESTIMONY    BY    GOVERNMENT
       WITNESSES THAT THEIR CO-DEFENDANTS WERE
       CONVICTED AT A PREVIOUS TRIAL ........................................175

A.    Standard of Review ........................................................175

B.    Graham's Testimony ........................................................176

C.    Howard's Testimony ........................................................177

D.    Testimony was Improper....................................................178

E.    Error was Not Harmless Beyond a Reasonable Doubt ....................179

VII.    McGILL WAS IMPROPERLY DENIED THE RIGHT TO
        RECLAIM HIS RIGHT TO BE PRESENT IN COURTROOM .....182

A.    Introduction ........................................................182

B.    Basis of Right to Be Present...............................................183

C.    Standard of Review ........................................................185

D.    McGill's Right to Return....................................................186

E.    The Error Was Not Harmless ..............................................189

VIII.    McGILL WAS IMPROPERLY DENIED TESTIMONY OF A
         QUALIFED DEFENSE EXPERT ....................................190

A.    Introduction ........................................................190

B.    Standard of Review ........................................................191

C.      Legal Argument.................................................................192

IX.      MᴄGILL'S INDICTMENT WAS MISJOINED .............................193

A.      Introduction .......................................................................193

B.      Standard of Review ..........................................................194

C.      Argument............................................................................194

X.      MᴄGILL WAS IMPROPERLY IMPEACHED ...............................196

A.      The Government's Impeachment by Misconduct............................196

B.      Standard of Review ..........................................................199

C.      Argument............................................................................199

XI.      MᴄGILL'S SENTENCING ISSUES ..................................................200

A.      Introduction .......................................................................200

B.      The *Apprendi* Violation........................................................200

C.      Sentences Exceeding Permissible Maximums ..................................201

D.      Sentencing Guideline Miscalculation .................................201

E.      Arguments to Reject Guidelines .......................................202

F.      Reasonableness...................................................................203

XII.      MᴄGILL'S  JOINDER  WITH  OTHER  APPELLANTS'
ISSUES................................................................................204

XIII.    THE DISTRICT COURT COMMITTED REVERSIBLE
         ERROR BY ALLOWING THE PROSECUTION TO
         CONTINUALLY CROSS-EXAMINE OLIVER BY
         READING HIM KEY TESTIMONY OF GOVERNMENT
         WITNESSES AND ASKING HIM TO COMMENT ON THE
         TRUTH OF THEIR TESTIMONY AGAINST HIM .......................204

         A.    Standard of Review .........................................................204

         B.    Discussion of Issue .........................................................205

XIV.     THE DISTRICT COURT PERMITTED PROSECUTORS TO
         MISLEAD THE JURY BY MISREPRESENTING EVIDENCE
         CONNECTED TO THE MURDER OF DEMETRIUS
         GREEN—IN WHICH OLIVER HAD NO ROLE—AS
         RELATING INSTEAD TO OLIVER'S ALLEGED
         INVOLVEMENT IN THE MURDER OF RICHARD
         SIMMONS ..........................................................................211

         A.    Standard of Review .........................................................211

         B.    Discussion of Issue .........................................................212

XV.      THE EVIDENCE WAS INSUFFICIENT TO CONVICT
         OLIVER OF AIDING AND ABETTING THE JUNE 2, 1999
         FIRST-DEGREE MURDER OF WILLIAM FLOYD BY
         PROVIDING THE GUN USED BY JOHN RAYNOR TO
         SHOOT FLOYD, AS THERE WAS NO EVIDENCE OLIVER
         KNEW WHAT RAYNOR WAS GOING TO DO WITH THE
         GUN, OR THAT HE SHARED RAYNOR'S INTENT TO
         KILL FLOYD.  COUNTS 68, 69 AND 94 MUST BE
         REVERSED ..........................................................................220

         A.    Standard of Review .........................................................220

         B.    Discussion of Issue .........................................................220

XVI.     OLIVER'S JOINDER WITH OTHER APPELLANTS'
         ISSUES ...............................................................................225

XVII.    PROSECUTORIAL MISCONDUCT DURING CLOSING
ARGUMENTS DENIED SEEGERS A FAIR TRIAL....................225

    A.    Standard of Review ........................................................225

    B.    Improper Remarks........................................................226

    C.    Argument.......................................................................229

XVIII.    SEEGERS WAS DENIED DUE PROCESS AS A RESULT
OF *BRADY/GIGLIO* VIOLATIONS ...............................234

    A.    Standard of Review ........................................................234

    B.    Argument........................................................................234

XIX.    THE DISTRICT COURT ABUSED ITS DISCRETION
WHEN IT DENIED SEEGERS AND J.ALFRED'S MOTIONS
FOR SEVERANCE AND MISTRIAL ............................................241

    A.    Standard of Review ........................................................241

    B.    Argument........................................................................241

        1.    Seegers' Misjoinder ................................................241

        2.    Seegers and J.Alfred's Motions for Severance and
Mistrial ....................................................................245

XX.    THE EVIDENCE WAS INSUFFICIENT TO CONVICT
SEEGERS ..............................................................................250

    A.    Standard of Review ........................................................250

    B.    Argument........................................................................250

        1.    The Charges ...........................................................250

            a.    Ruling on Motion for Judgment of Acquittal..............250

        b.    The Evidence was Insufficient to Support Conviction................................................................251

   C.   Conclusion..........................................................252

XXI.    SEEGERS' JOINDER WITH OTHER APPELLANTS' ISSUES...........................................................253

XXII.   THE DISTRICT COURT ERRED WHEN IT DENIED SIMMONS' MOTION FOR JUDGMENT OF ACQUITTAL ON THE DRUG CONSPIRACY ALLEGED IN COUNT 1 ...........253

   A.   Standard of Review ...........................................254

   B.   The Evidence Established Multiple Conspiracies Rather Than the Single Conspiracy Alleged in the Indictment .............................254

   C.   The Government Evidence at Trial Was a Variance From the Indictment.............................................255

   D.   The Evidence Established Only a Buyer-Seller Relationship...........257

XXIII.  THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANT SIMMONS' MOTION FOR JUDGMENT OF ACQUITTAL ON THE RICO CONSPIRACY COUNT (COUNT 3).......................................................257

   A.   The Government Produced Insufficient Evidence to Justify Submission of the RICO Conspiracy Count to the Jury ..................258

        1.   Failure to Prove Existence of an Enterprise............................259

        2.   Failure to Prove The Existence Of A Structure Distinct From That Inherent in the Commission of the Predicate Acts ......................................................261

        3.   The Government Evidence Failed to Prove the Overt Acts Were Done in Furtherance of the Conspiracy and that Simmons Participated in Them "On an Ongoing Basis" ..................................................262

XXIV.   THE DISTRICT COURT ERRED WHEN IT DENIED
        APPELLANT SIMMONS' MOTION FOR JUDGMENT OF
        ACQUITTAL ON THE WEAPONS CHARGES (18 U.S.C.
        924(c)(1)(A)(III)) IN COUNTS 87 AND 95 ...................................263

    A.  The Government's Theory of Liability .............................................264

XXV.    THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT
        SIMMONS' 1959(a)(1) HOMICIDE CONVICTIONS ...................266

    A.  Insufficiency of the 1959 charges ....................................................266

XXVI.   THE DISTRICT COURT ERRED IN DENYING THE PRO
        SE MOTIONS OF APPELLANT SIMMONS WITHOUT A
        HEARING ...................................................................................268

    A.  Standard of Review .........................................................................269

    B.  Simmons' *Pro Se* Allegations of Government Misconduct .............269

    C.  Simmons' *Pro Se* Allegations of Ineffectiveness of Counsel ...........269

    D.  The Review of *Pro Se* Claims ..........................................................271

    E.  The Claims of Government Misconduct Should Have Been
        Examined by the District Court........................................................271

    F.  The Claims of Ineffectiveness of Counsel and Substitution of
        Counsel Should Have Been Examined by the District Court ..........272

        1.  The Substitution of Counsel Motions .....................................273

        2.  The Claims of Ineffectiveness of Counsel..............................273

XXVII.  SIMMONS' JOINDER WITH OTHER APPELLANTS'
        ISSUES .......................................................................................275

XXVIII. THERE WAS INSUFFICIENT EVIDENCE LINKING
        JAMES ALFRED TO THE MURDERS OF JOSEPH
        THOMAS AND CARLOS CARDOZA .........................................275

xv

A.    Standard of Review ..........................................................................275

B.    The Charges.....................................................................................276

C.    The District Court's Ruling on Motion for Judgment of Acquittal ........................................................................................276

D.    Insufficient Evidence of Thomas Murder .........................................277

E.    Insufficient Evidence of Cardoza Murder.........................................280

F.    The Case Must Be Remanded for Re-Sentencing.............................284

XXIX.    JAMES     ALFRED'S     JOINDER     WITH     OTHER APPELLANTS' ISSUES ................................................................285

XXX.    RONALD ALFRED'S INDIVIDUAL ISSUES ...............................285

A.    Erroneous Admission and Treatment of Pre-Conspiratorial Acts ....285

B.    Improper Admission of Post-Conspiracy "Drug" Evidence .............293

C.    Improper Bolstering of Post-Conspiracy Allegations of Violence.........................................................................................294

D.    Ineffective Assistance of Counsel ....................................................295

1.    Conflicts of Interest................................................................296

2.    Trial ........................................................................................303

3.    Sentencing ..............................................................................305

E.    Insufficient Evidence on Certain Counts ..........................................306

F.    Adopted Arguments .........................................................................307

XXXI.    CUMULATIVE EFFECT OF TRIAL ERRORS .............................307

CONCLUSION .................................................................................................309

REQUEST FOR ORAL ARGUMENT ................................................................309

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alford v. United States*,
  282 U.S. 687 (1931)..................................................................287

*Anyanwutaku v. Moore*,
  151 F.3d 1053 (D.C. Cir. 1999)..................................................271

\*Apprendi v. New Jersey*,
  530 U.S. 466 (2000)........................................................200, 305

*Arizona v. Fulminante*,
  499 U.S. 279 (1991)..................................................................175

\*Bailey v. United States*,
  416 F.2d 1110 (D.C. Cir. 1969)..................................................283

*Bailey v. United States*,
  516 U.S. 137 (1995)..................................................................264

*Berger v. United States*,
  295 U.S. 78 (1935)..............................................................213, 229

*Blunt v. United States*,
  404 F.2d 1283 (D.C. Cir. 1968)..................................................171

\*Brady v. Maryland*,
  373 U.S. 83 (1963)............................... 64, 234, 235, 236, 237, 238, 239, 240

*Braswell v. United States*,
  200 F.2d 597 (5th Cir. 1952) ....................................................173

*Brown v. United States*,
  508 F.3d 1066 (D.C. Cir. 2007)..................................................110

\* *Chief Authorities are Marked with an Asterisk*

*Bruton v. United States*,
 391 U.S. 123 (1968)....................................................................174, 177, 178

*\*Bullcoming v. New Mexico*,
 131 S. Ct. 2705 (2011).......................................................................162, 289

*California v. Trombetta*,
 467 U.S. 479 (1984)................................................................. 234-235, 236

*Carriger v. Stewart*,
 132 F.3d 463 (9th Cir. 1997) ...........................................................237, 238

*Chapman v. California*,
 386 U.S. 18 (1967)..................................................... 162, 166, 179, 180, 185

*\*Crawford v. Washington*,
 541 U.S. 36 (2004).............................................................................162, 289

*\*Cuyler v. Sullivan*,
 466 U.S. 335 (1980)...................................................................................296

*\*Daubert v. Merrell Dow Pharmaceuticals*,
 509 U.S. 579 (1993)...........................................................190, 191, 192, 193

*Deary v. City of Gloucester*,
 9 F.3d 191 (1st Cir. 1993).........................................................................199

*\*Deck v. Missouri*,
 544 U.S. 622 (2005)..............................................................170, 175, 185

*Delaware v. Van Arsdall*,
 475 U.S. 673 (1986).....................................................................................287

*Dorsey v. United States*,
 2012 WL 2344463 (2012) ..........................................................................203

*Drew v. United States*,
        331 F.2d 85 (D.C. Cir. 1964)....................................................................256

*Egan v. United States*,
        287 F.2d 958 (D.C. Cir. 1923)...............................................................307

*Estelle v. Gamble*,
        429 U.S. 97 (1976)...........................................................................271, 272

*Estelle v. Williams*,
        425 U.S. 501 (1976).................................................................................170

*Faretta v. California*,
        422 U.S. 806 (1975)........................................................................ 184-185

*Fox v. United States*,
        11 A.3d 1282 (D.C. 2011) .......................................................................265

*Frye v. United States*,
        293 F.2d 1013 (D.C. Cir. 1923)...............................................................192

*Gaither v. United States*,
        413 F.2d 1061 (D.C. Cir. 1969)...............................................................229

*Gall v. United States*,
        552 U.S. 38 (2007)...........................................................................202, 203

*General Electric Company v. Joiner*,
        522 U.S. 135 (1977).................................................................................191

*Giglio v. United States*,
        405 U.S. 150 (1972)............................................. 64, 236, 237, 238, 239, 240

*Glasser v. United States*,
        315 U.S. 60 (1942)...................................................................................242

*H.J. Inc. v. NW. Bell Tel. Co.*,
        492 U.S. 229 (1989).................................................................................263

*Haines v. Kerner*,
 404 U.S. 519 (1972)..........................................................271, 272

*Harvey v. Horan*,
 285 F.3d 298 (4th Cir. 2002) ....................................234, 235, 236

*Henderson v. George Washington University*,
 449 F.3d 127 (D.C. Cir. 2006)..................................................117

*Hicks v. United States*,
 14 S. Ct. 144 (1893)..................................................................283

*\*Holbrook v. Flynn*,
 475 U.S. 560 (1986)..........................................................170, 171

*Huddleston v. United States*,
 485 U.S. 681 (1988)..................................................................118

*Hunter v. Maryland*,
 919 A.2d 63 (Md. 2007) ....................................................207, 211

*Iannelli v. United States*,
 420 U.S. 770 (1975)..................................................................255

*\*Illinois v. Allen*,
 397 U.S. 337 (1970)..........................................................183, 184

*\*Iowa v. Graves*,
 668 N.W.2d 860 (Iowa 2003)....................................206, 207, 211

*\*Jackson v. Virginia*,
 443 U.S. 307 (1979)..........................................................250, 275

*Kimbrough v. United States*,
 552 U.S. 85 (2007)....................................................................202

*Kinsella v. United States ex rel. Singleton*,
 361 U.S. 234 (1960)..................................................................235

*Koon v. United States*,
 518 U.S. 81 (1996)..............................................................................70, 117

*\*Kotteakos v. United States*,
 328 U.S. 750, 66 S. Ct. 1239 (1946) ......................... 117, 118, 241, 242, 254

*Krulewitch v. United States*,
 336 U.S. 440 (1949)................................................................................242, 243

*Kyles v. Whitley*,
 514 U.S. 419 (1995).................................................................................236, 237

*Lancaster v. United States*,
 975 A.2d 168 (D.C. 2009) .........................................................................265

*\*Lindsey v. United States*,
 133 F.2d 368 (D.C. Cir. 1942).....................................................................287

*Marshall v. Hendricks*,
 307 F.3d 36 (3d Cir. 2002) ..........................................................................212

*McDaniel v. United States*,
 538 F.2d 408 (D.C. Cir. 1976)...............................................................192, 193

*\*Melendez-Diaz v. Massachusetts*,
 557 U.S. 1256 (2009) ........................................................................162, 289

*Moore v. Illinois*,
 408 U.S. 786 (1972)...................................................................................236

*Neder v. United States*,
 527 U.S. 1 (1999)......................................................................................166

*New Mexico v. Soto*,
 162 P.3d 187 (N.M. 2007) ..................................................................207, 211

*Ochoa v. Workman*,
 669 F.3d 1130 (10th Cir. 2012) .................................................................170

*Old Chief v. United States,*
    519 U.S. 172 (1997) ...................................................................162

*Richardson v. United States,*
    193 F.3d 545 (D.C. Cir. 1999)...................................................271

*Rincon v. United States,*
    510 U.S. 801 (1993)...................................................................192

*\*Rita v. United States,*
    551 U.S. 338 (2007)...................................................................202

*Rogers v. United States,*
    422 U.S. 35 (1975)...................................................................183

*Schaffer v. United States,*
    362 U.S. 511 (1960)...................................................172, 241, 246

*Shields v. United States,*
    273 U.S. 583 (1927)...................................................................183

*Smith v. Lockhart,*
    923 F.2d 1314 (8th Cir. 1991) ...................................................273

*Smith v. United States,*
    508 U.S. 223 (1993)...................................................................264

*Snyder v. Massachusetts,*
    291 U.S. 97 (1934)...................................................................183

*Southern Union Company v. United States,*
    2012 WL 2344465 (2012) ........................................................200

*State v. Emmett,*
    839 P.2d 781 (Utah 1992)..........................................................209

*State v. Maluia,*
    108 P.2d 974 (Haw. 2005)..........................................................207

*Strickland v. Washington,
   466 U.S. 668 (1984)..............................................269, 274, 295, 296

Sutton v. Bell,
   645 F.3d 752 (6th Cir. 2011) .......................................................173

Tatum v. United States,
   703 A.2d 1218 (D.C. App. 1997) ...............................................183

United States v. Abell,
   271 F.3d 1286 (11th Cir. 2001) .........................................100, 106

United States v. Agurs,
   427 U.S. 97 (1976)......................................................................235

United States v. Austin,
   786 F.2d 986 (10th Cir. 1986) ...................................................178

United States v. Aviles,
   274 F.2d 179 (2d Cir.), cert. denied,
   362 U.S. 974 (1960)......................................................... 172, 245-246

United States v. Baez,
   703 F.2d 453 (10th Cir. 1983) ...................................................178

*United States v. Bagley,
   473 U.S. 667 (1985)................................................236, 237, 238

*United States v. Bailey,
   319 F.3d 514 (D.C. Cir 2003)...................................................286

United States v. Baker,
   262 F.3d 124 (2d Cir. 2001) ...............................................90, 101

United States v. Bamberger,
   456 F.2d 1119 (3d Cir.), cert. denied,
   406 U.S. 969 (1973)............................................................172, 246

United States v. Becton,
   601 F.3d 588 (D.C. Cir. 2010)...................................................225

*United States v. Bell*,
    516 F.3d 432 (6th Cir. 2008) ......................................................117, 124, 131

*United States v. Benabe*,
    654 F.3d 753 (7th Cir 2011) ...................................................................184

*United States v. Bledsoe*,
    674 F.2d 647 (8th Cir.), *cert. denied*,
    459 U.S. 1040 (1982) ...............................................................................260

*United States v. Blevins*,
    960 F.2d 1252 (4th Cir. 1992) ...................................................175, 178, 179

*United States v. Booker*,
    543 U.S. 220 (2005).................................................................................202

*United States v. Bowie*,
    232 F.3d 923 (D.C. Cir. 2000).................................................................123

*United States v. Boyd*,
    54 F.3d 868 (D.C. Cir. 1995)............................................................ 205-206

*United States v. Brisbane*,
    367 F.3d 910 (D.C. Cir. 2004)................................................................307

*United States v. Briscoe*,
    798 F. Supp. 28 (D.D.C. 1992)...............................................................194

*United States v. Brown*,
    823 F.2d 591 (D.C. Cir. 1987)...............................................55, 56, 69, 70, 74,
                                     94, 96, 98, 101, 107, 132

*United States v. Brown*,
    508 F.3d 1066 (D.C. Cir. 2007)..............................................................160

*United States v. Brown*,
    597 F.3d 399 (D.C. Cir. 2010).................................................................132

*United States v. Burch*,
    156 F.3d 1315 (D.C. Cir. 1998)..............................................................135

*United States v. Burkley*,
591 F.2d 903 (D.C. Cir. 1978)....................................................................195

*United States v. Burwell*,
642 F.3d 1062 (D.C. Cir. 2011), *cert. denied sub nom.*
*Palmer v. United States*,
132 S. Ct. 329 (2011)..................................................................122, 135

*\*United States v. Carson*,
455 F.3d 336 (D.C. Cir. 2006)................................... 101, 162, 256, 267, 268

*United States v. Carter*,
566 F.2d 1265 (5th Cir. 1978), *cert. denied*,
436 U.S. 956 (1978)..................................................................................235

*United States v. Casas*,
356 F.3d 104 (1st Cir. 2004) ....................................................................108

*United States v. Catlett*,
97 F.3d 565 (D.C. Cir. 1996)...................................................................230

*United States v. Celis*,
608 F.3d 818 (D.C. Cir. 2010)...........................................................236, 307

*United States v. Childress*,
58 F.3d 693 (D.C. Cir. 1995)...................................................................255

*United States v. Ciesiolka*,
614 F.3d 347 (7th Cir. 2010) ............................................................160, 161

*United States v. Clarke*,
24 F.3d 257 (D.C. Cir. 1994)...........................................................118, 126

*United States v. Concepcion*,
983 F.2d 369 (2d Cir. 1992) ....................................................................267

*United States v. Crockett*,
586 F. Supp. 2d 877 (E.D. Mich. 2008) ....................................................293

*United States v. Crosby*,
   20 F.3d 480 (D.C. Cir.), *cert. denied*,
   513 U.S. 883 (1994)...................................................................................258

*United States v. Crowder*,
   141 F.3d 1202 (D.C. Cir. 1998)...............................................................123

*United States v. Cunningham*,
   145 F.3d 1385 (D.C. Cir. 1998).................................. 118, 185, 186, 211, 219

*United States v. Cyrus*,
   890 F.2d 1245 (D.C. Cir. 1989)................................................................274

*United States v. Davis*,
   547 F.3d 520 (6th Cir. 2008) ...................................................................137

*United States v. DeCoster*,
   487 F.2d 1197 (D.C. Cir. 1973).................................................................274

*United States v. Delgado*,
   631 F.3d 685 (5th Cir. 2011) ....................................................................257

*United States v. Deluits*,
   722 F.2d 902 (1st Cir. 1983) ....................................................................257

*United States v. Dhinsa*,
   243 F.3d 635 (2d Cir. 2001) .....................................................................267

*United States v. Durham*,
   287 F.3d 1297 (11th Cir. 2002) ........................................................171, 174

*United States v. Dykes*,
   406 F.3d 717 (D.C. Cir. 2005)..................................................................275

*United States v. Earle*,
   375 F.3d 1159 (D.C. Cir. 2004).................................................................219

*United States v. Edmonds*,
   69 F.3d 1172 (D.C. Cir. 1995)...................................................................141

*United States v. Essex,*
    734 F.2d 832 (D.C. Cir. 1984)...............................................................69, 70

*United States v. Farmer,*
    583 F.3d 131 (2d Cir. 2009) .......................................................................220

*United States v. Ferguson,*
    246 F.3d 129 (2d Cir. 2001) .......................................................................267

*United States v. Fiel*,
    35 F.3d 997 (4th Cir. 1994) .......................................................................267

*United States v. Foster,*
    557 F.3d 650 (D.C. Cir. 2009)...........................................................172, 246

*United States v. Gagnon,*
    470 U.S. 522 (1985)....................................................................................183

*United States v. Gatling,*
    96 F.3d 1511 (D.C. Cir. 1996)....................................................................282

*United States v. Gaviria,*
    116 F.3d 1498 (D.C. Cir. 1997)..................................................................254

*United States v. Ginyard,*
    444 F.2d 648 (D.C. Cir. 2006).............................................69, 70, 101, 106

*United States v. Gooch,*
    665 F.3d 1318 (D.C. Cir. 2012)..................................................................194

*United States v. Gordon,*
    829 F.2d 119 (D.C. Cir. 1987)...........................................................185, 189

*United States v. Graham,*
    83 F.3d 1466 (D.C. Cir. 1996)..........................................126, 255, 256

*United States v. Graham,*
    91 F.3d 213 (D.C. Cir. 1996)......................................................................272

*United States v. Green*,
617 F.3d 233 (3d Cir. 2010) ...............................................................120, 135

*United States v. Griffin*,
778 F.2d 707 (11th Cir. 1985) ..........................................................178, 180

*United States v. Halbert*,
640 F.2d 1000 (9th Cir. 1981) ..................................................................178

*United States v. Hale*,
448 F.3d 971 (7th Cir. 2006) ....................................................................219

*United States v. Halper*,
590 F.2d 422 (2d Cir. 1978) ...............................................................195, 196

*United States v. Hands*,
184 F.3d 1322 (11th Cir. 1999) ...............................................................9, 114

*United States v. Harris*,
471 F.3d 507 (3d Cir. 2006) .......................................................................208

*United States v. Harris*,
491 F.3d 440 (D.C. Cir. 2007), *cert. denied*,
552 U.S. 1157 (2008) .........................................................................104, 274

*United States v. Harrison*,
103 F.3d 986 (D.C. Cir. 1997)....................................................................276

*United States v. Hart*,
273 F.3d 363 (3d Cir. 2001) .......................................................................245

*United States v. Hasting*,
461 U.S. 499 (1983).....................................................................................204

*United States v. Hoover-Hankerson*,
511 F.3d 164 (D.C. Cir. 2007)....................................................................183

*United States v. Hurt*,
527 F.3d 1347 (D.C. Cir. 2008).................................................................118

*United States v. Iles*,
    906 F.2d 1122 (6th Cir. 1992) ......................................................273

*United States v. Jean-Baptiste*,
    166 F.3d 102 (2d Cir. 1999) ........................................................119

*United States v. Johnson*,
    26 F.3d 669 (7th Cir. 1994) ......................................................178

*United States v. Johnson*,
    231 F.3d 43 (D.C. Cir. 2000).............................................229, 230

*United States v. Johnson*,
    388 F.3d 96 (3d Cir. 2004) ..........................................................117

*United States v. Johnson*,
    519 F.3d 478 (D.C. Cir. 2008).............................................116, 234

*United States v. Jones*,
    482 F.2d 747 (D.C. Cir. 1973).....................................................160

*\*United States v. Jones*,
    808 F.2d 561 (7th Cir. 1986) ....................................................286

*\*United States v. Kayode*,
    254 F.3d 204 (D.C. Cir. 2001).....................................................254

*United States v. Kelly*,
    349 F.2d 720 (2d Cir. 1965), *cert. denied*,
    384 U.S. 947 (1966).....................................................................242

*United States v. Koskela*,
    86 F.3d 122 (8th Cir. 1996) .................................................173, 178

*United States v. Lathern*,
    665 F.3d 1351 (D.C. Cir. 2012).................................................269

*United States v. Latney*,
    108 F.3d 1446 (D.C. Cir. 1997) *cert. denied*,
    522 U.S. 940 (1997)......................................................................135

*United States v. Lechuga*,
    994 F.2d 346 (7th Cir. 1993) .......................................................257

*United States v. Lemire*,
    720 F.2d 1327 (D.C. Cir. 1983)..........................................109, 292

*\*United States v. Linares*,
    367 F.3d 941 (D.C. Cir. 2004)..........................................123, 124

*United States v. Lively*,
    803 F.2d 1124 (11th Cir. 1986) ...............................................255

*United States v. Lloyd*,
    515 F.3d 1297 (D.C. Cir. 2008)..............................................95

*United States v. Long*,
    905 F.2d 1572 (D.C. Cir. 1990)..............................................276

*United States v. Long*,
    328 F.3d 655 (D.C. Cir. 2003); *cert. denied*,
    540 U.S. 1075 (2003) .......................................................117, 123

*\*United States v. Lucas*,
    513 F.2d 509 (D.C. Cir. 1975)..............................................304

*\*United States v. Mannie*,
    509 F.3d 851 (7th Cir. 2007) ....................................171, 174, 175

*\*United States v. Mardian*,
    546 F.2d 973 (D.C. Cir. 1976)..........................................242, 243

*United States v. Marshall*,
    458 F.2d 446 (2d Cir. 1972) ...................................... 172-173

*United States v. Mathis*,
    216 F.3d 18 (D.C. Cir. 2000).....................................122, 123, 256

*United States v. McLendon*,
    378 F.3d 1109 (D.C. Cir. 2004)..............................166, 234, 241

*United States v. Medina*,
    32 F.3d 40 (2d Cir. 1994) ...........................................................................265

*United States v. Melvin Wallace*,
    No. 1:99-cr-215(RCL)(D.D.C.) ......................................................... 302-303

*United States v. Merriweather*,
    78 F.3d 1070 (6th Cir. 1996) ...................................................... 128-129, 137

*United States v. Mitchell*,
    49 F.3d 769 (D.C. Cir. 1995) ...................................................................128

*United States v. Molina*,
    934 F.2d 1440 (9th Cir. 1991) ..................................................................142

*United States v. Moore*,
    651 F.3d 30 (D.C. Cir. 2011) .............................. 5, 12, 18, 38, 108, 109, 112,
                                            113, 114, 118, 119, 121, 162, 170, 212,
                                            215, 225, 229, 230, 241, 289, 302, 307, 308

*United States v. Morris*,
    836 F.2d 1371 (D.C. Cir. 1988) ...............................................................257

*United States v. Morrison*,
    98 F.3d 619 (D.C. Cir. 1996); *cert. denied*,
    520 U.S. 1131 (1997) ..............................................................................199

*United States v. Moussaoui*,
    382 F.3d 453 (4th Cir. 2004) ...................................................................236

*United States v. Neapolitan*,
    791 F.2d 489 (7th Cir. 1986) ...................................................................260

*United States v. North*,
    910 F.2d 843 (D.C. Cir. 1990) .................................................................230

*United States v. Ortiz*,
    362 F.3d 1274 (10th Cir. 2004) ...............................................................111

*United States v. Paladino*,
　　401 F.3d 471 (7th Cir. 2005) ....................................................................127

*United States v. Patterson*,
　　26 F.3d 1127 (D.C. Cir. 1994)...............................................................106

*United States v. Peralta*,
　　763 F. Supp. 14 (S.D.N.Y. 1991) ..........................................................272

*United States v. Perholtz*,
　　842 F.2d 343 (D.C. Cir. 1988)........................................................258, 259

*United States v. Perkins*,
　　161 F.3d 66 (D.C. Cir. 1996)..................................................................291

*United States v. Phibbs*,
　　999 F.2d 1053 (6th Cir. 1993) .........................................................171, 245

*United States v. Polanco*,
　　145 F.3d 536 (2d Cir. 1998) ...................................................................267

*United States v. Pryce*,
　　938 F.2d 1343 (D.C. Cir. 1991)......................................................211, 287

*United States v. Pugh*,
　　436 F.2d 222 (D.C. Cir. 1970)...............................................................288

*United States v. Rashad*,
　　331 F.3d 908 (D.C. Cir. 2003)................................................................274

*United States v. Richardson*,
　　167 F.3d 621 (D.C. Cir. 1999).......................................................259, 260

*United States v. Richter*,
　　826 F.2d 206 (2d Cir. 1987) ...................................................................206

*United States v. Rivera*,
　　273 F.3d 751 (7th Cir. 2001) ..................................................................257

*United States v. Rose*,
   104 F.3d 1408 (1st Cir. 1997) ....................................................................108

*United States v. Sae-Chua*,
   725 F.2d 530 (9th Cir. 1984) .................................................................74, 95

*\*United States v. Sampol*,
   636 F.2d 621 (D.C. Cir. 1980)..........................................................243, 294

*United States v. Sanders*,
   928 F.2d 940 (10th Cir. 1991) ....................................................................262

*\*United States v. Schmitz*,
   634 F.3d 1247 (11th Cir. 2011) ......................... 204, 205, 206, 207, 208, 211

*United States v. Shabban*,
   612 F.3d 693 (D.C. Cir. 2010)....................................................................275

*United States v. Shabini*,
   513 U.S. 10 (1994)........................................................................................262

*United States v. Sheehan*,
   512 F.3d 621 (D.C. Cir. 2008)............................................................185, 189

*United States v. Simmons*,
   431 F. Supp. 2d 38 (D.D.C. 2006)..............................................................295

*\*United States v. Simpson*,
   479 F.3d 492 (7th Cir. 2007) ...............................................................213, 219

*United States v. Slade*,
   627 F.2d 293 (D.C. Cir. 1980).....................................................................242

*United States v. Smart*,
   98 F.3d 1379 (D.C. Cir. 1996).....................................................................220

*United States v. Smith*,
   640 F.3d 580 (4th Cir. 2011) ...............................................................163, 273

*United States v. Solivan,*
    937 F.2d 1146 (6th Cir. 1991) ....................................................................231

*United States v. Sorrells,*
    145 F.3d 744 (5th Cir. 1998) ....................................................................265

*United States v. Spinney,*
    65 F.3d 231 (1st Cir. 1995)........................................................................265

*United States v. Stevens,*
    771 F. Supp. 2d 556 (D. Md. 2011)............................................................272

*United States v. Stewart,*
    256 F.3d 231 (4th Cir. 2001) ....................................................................171

*United States v. Stock,*
    948 F.2d 1299 (D.C. Cir. 1991)..........................................................287, 288

*United States v. Sullivan,*
    85 F.3d 743 (1st Cir. 1996)........................................................................207

*United States v. Symington,*
    195 F.3d 1080 (9th Cir. 1999) ....................................................................98

*United States v. Tarantino,*
    846 F.2d 1384 (D.C. Cir. 1988)..........................................................254, 255

*United States v. Taylor,*
    139 F.3d 924 (D.C. Cir. 1998)............................................................301, 302

*United States v. Teffera,*
    985 F.2d 1082 (D.C. Cir. 1993)..........................................................278, 283

*United States v. Thai,*
    29 F.3d 785 (2d Cir. 1994) ........................................................................268

*United States v. Thomas,*
    114 F.2d 228 (D.C. Cir. 1997)....................................................257, 286, 301

*United States v. Thomas,
   116 F.3d 606 (2d Cir. 1997) .......................................................70, 96, 97, 98

United States v. Thomas,
   284 F.3d 746 (7th Cir. 2002) ....................................................................257

United States v. Thomas,
   449 F.2d 1177 (D.C. Cir. 1971)............................................................74, 96

United States v. Tillett,
   763 F.2d 628 (4th Cir. 1985) ....................................................................260

United States v. Toms,
   396 F.3d 427 (D.C. Cir. 2005)...................................................................295

United States v. Tse,
   135 F.3d 200 (1st Cir. 1998) .....................................................................267

*United States v. Turkette,
   452 U.S. 576 (1981)..........................................................................258, 260

United States v. U.S. Gypsum Co.,
   438 U.S. 422 (1978)...................................................................................104

United States v. Valenzuela-Bernal,
   458 U.S. 858 (1982)..........................................................................235, 236

United States v. Varoudakis,
   233 F.3d 113 (1st Cir. 2000) .....................................................................121

*United States v. Vesaas,
   586 F.2d 101 (8th Cir. 1978) ....................................................................286

United States v. Wahl,
   290 F.3d 370 (D.C. Cir. 2002)...................................................................220

United States v. Ward,
   598 F.3d 1054 (8th Cir. 2010) ..................................................................184

*United States v. Washington*,
   705 F.2d 489 (D.C. Cir. 1983)...................................................................184

*\*United States v. Watson*,
   171 F.3d 695 (D.C. Cir. 1999)......................................................9, 114, 213

*United States v. Watson*,
   409 F.3d 458 (D.C. Cir. 2005)...................................................................120

*United States v. Weaver*,
   265 F.3d 1074 (D.C. Cir. 2001)..................................................................301

*United States v. West*,
   877 F.2d 281 (4th Cir. 1989) ...............................................172, 173, 175, 246

*United States v. Wexler*,
   522 F.3d 194 (2d Cir 2009) .......................................................................257

*United States v. White*,
   116 F.3d 903 (D.C. Cir.), *cert. denied*,
   522 U.S. 960 (1997).........................................................................199, 259

*United States v. Whitmore*,
   359 F.3d 609 (D.C. Cir. 2004)...................................................118, 288, 289

*United States v. Williams*,
   338 F.2d 530 (D.C. Cir. 1964)....................................................................95

*United States v. Wilson*,
   26 F.3d 142 (D.C. Cir. 1994)....................................................................194

*\*United States v. Wilson*,
   135 F.3d 291 (4th Cir. 1998) ..............................................................151, 213

*\*United States v. Wilson*,
   160 F.3d 732 (D.C. Cir. 1998).............................................................223, 279

*United States v. Wilson*,
   605 F.3d 985 (D.C. Cir. 2010)..................................................................162

*United States v. Yarborough*,
     400 F.3d 17 (D.C. Cir. 2005)......................................................................104

*\*United States v. Young*,
     470 U.S. 1 (1985)........................................................................................230

*Vazquez v. United States*,
     130 S. Ct. 1135 (2010).................................................................................202

*W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*,
     235 F.3d 629 (D.C. Cir. 2001)....................................................................263

*Wade v. United States*,
     441 F.2d 1046 (D.C. Cir. 1971)...................................................................189

*Wheat v. United States*,
     486 U.S. 153 (1988).....................................................................................272

*\*Williams v. Cavazos*,
     646 F.3d 626 (9th Cir. 2011), *cert. granted on other grounds*,
     132 S. Ct. 1088 (2012)............................................................................70, 98

*Williams v. Illinois*,
     2012 U.S.Lexis 4658 (June 18, 2012) .................................................164, 165

*\*Wilson-Bey v. United States*,
     903 A.2d 818 (D.C. 2006) ...........................................................................223

*Wogenstahl v. Mitchell*,
     668 F.3d 307 (6th Cir. 2012) .......................................................................143

*\*Zafiro v. United States*,
     113 S. Ct. 933 (1993)............................................................................241, 243

## CONSTITUTIONAL PROVISIONS

*U.S. CONST. amend. V .................................................................170, 234

U.S. CONST. amend. VI .................................. 1, 55, 68, 69, 162, 183, 187, 272, 308

U.S. CONST. amend. XIV ...............................................................170, 234

## STATUTES

18 U.S.C. § 924(c) ................................................. 2, 3, 43, 47, 61, 63, 200, 224,
252, 264, 265, 276, 278, 279, 295, 305

18 U.S.C. § 924(c)(1)(A) .............................................................200, 201

18 U.S.C. § 924(c)(1)(A)(iii) ........................................................200, 263

18 U.S.C. § 1512(a)(1)(C) ................................................................306

18 U.S.C. § 1512(a)(3)(B)(i)........................................................3, 61, 201

18 U.S.C. § 1959 .........................................................................223

18 U.S.C. § 1959(a) .....................................................................266

18 U.S.C. § 1959(a)(1)..........................................................65, 223, 266

18 U.S.C. § 1959(a)(1)(2) ................................................................201

18 U.S.C. § 1959(a)(1)(3) .........................................................3, 61, 201

18 U.S.C. § 1961 .........................................................................258

18 U.S.C. § 1962(c) ................................................................258, 260

18 U.S.C. § 1962(d) ................................................................258, 260

18 U.S.C. § 3231 ...........................................................................1

18 U.S.C. § 3553(a) ................................................................203, 306

18 U.S.C. § 3553(c) ...................................................................202

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 3742(a) ......................................................................1

22 D.C. Code § 4504(b) .............................................................265

**RULES**

Fed. R. Crim. P. 13..........................................................194, 195

*Fed. R. Crim. P. 23(b) .......................................................69, 70

Fed. R. Crim. P. 23(b)(2)(B) .....................................................93

Fed. R. Crim. P. 29....................................39, 223, 306, 307

Fed. R. Crim. P. 35.................................................................109

Fed. R. Crim. P. 43(a) ............................................................184

Fed. R. Crim. P. 43(a)(1)-(3) ................................................183

Fed. R. Crim. P. 43(c)(1)(C) ..................................................184

Fed. R. Evid. 105 ...................................................................136

Fed. R. Evid. 403 ....................... 1, 58, 115, 116, 117, 121, 123, 131, 149

*Fed. R. Evid. 404(b)....................... 1, 115, 116, 119, 120, 121, 122, 123
                                    130, 144, 146, 147, 148, 149, 161, 214, 291

*Fed. R. Evid. 608 ..................................................................129

Fed. R. Evid. 608(b).......................................................129, 198, 199

Fed. R. Evid. 609 ....................................................129, 152, 197, 291

*Fed. R. Evid. 610 ........................................................................67, 294

Fed. R. Evid. 702 .................................................................60, 191, 192

**GUIDELINES**

U.S.S.G. § 2A1.1 ......................................................................284

U.S.S.G. § 2D1.1(d)(1) ............................................................284

U.S.S.G. § 2K2.4.......................................................................201

U.S.S.G. § 4B1.1.......................................................................202

U.S.S.G. § 5K............................................................................109

U.S.S.G. App. amend. 706........................................................202

U.S.S.G. App. amend. 712........................................................203

U.S.S.G. App. amend. 713........................................................203

U.S.S.G. App. amend. 716........................................................203

**OTHER AUTHORITIES**

Criminal Jury Instructions for the District of Columbia,
No. 2.321 Other Crimes Evidence (5th Ed. 2011)................................136

"Cruelty in Control?  The Stun Belt and
Other Electro-Shock Equipment in Law Enforcement," June 8, 1999.................171

Fair Sentencing Act, 120 Stat. 2372 (2010)...........................................203

Lenning, Carol, "Troublesome Juror Ousted in D.C. Drug Gang Trial"
*The Washington Post*, April 17, 2001 .....................................................92

"U.S. Prisoner Restraints Amount to Torture, Geneva Panel Says,"
*The New York Times*, May 18, 2000 ....................................................171

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

The appellants appeal from final judgments of conviction entered against them on January 11, 2007 and December 10, 2007 in the United States District Court for the District of Columbia. Timely notices of appeal were filed on December 18, 2006; December 19, 2006; December 20, 2006; December 29, 2006; January 8, 2007 and November 27, 2007. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

1.      Whether the trial court deprived appellants of their Sixth Amendment rights by dismissing a holdout juror for the defense nine days into deliberations, invading the secrecy of those deliberations, failing to declare a mistrial after an anti-deadlock charge was followed by continued impasse, allowing *ex parte* contacts with deliberating jurors, and other procedural errors?

2.      Did the district court err when it permitted the government to format its evidence against appellants through the use of a law enforcement overview witness?

3.      Whether the district court erred in permitting the government to introduce voluminous amounts of "other crimes" evidence, rarely with adequate notice to the defense or a plausible non-propensity basis for admission, in violation of Fed.R.Evid. 404(b) and without the appropriate balancing of probative value and unfair prejudice required by Fed.R.Evid. 403?

4.      Whether the government, in closing argument, erred in overly emphasizing the "other crimes" evidence and asking the jury to draw improper conclusions from it?

1

5.      Whether the district court's final instructions on "other crimes" evidence were erroneous in that they failed to identify the bulk of that evidence and explain the proper purposes, if any, for which the jury could consider it, instead merely giving the jury a theoretical "laundry list" of possible purposes, most of which were not even relevant to the case itself, thus failing completely to give the jury the needed guidance?

6.      Did the district court violate the Confrontation Clause when it permitted the government to introduce official autopsy and drug reports to establish homicides without the presence of the authors?

7.      Whether the district court committed reversible error when it failed to order a mistrial following McGill's revelation of an inherently prejudicial practice?

8.      Whether the appellants are entitled to a new trial as a result of testimony by two government witnesses that the defendants in *Moore* were all convicted at the previous trial?

9.      Whether the district court committed reversible error in refusing to permit McGill to "reclaim" his right to be present in the courtroom in the days after his initial removal, despite representations of appropriate behavior?

10.     Whether the district court improperly precluded the testimony of a qualified defense expert without a hearing on the matter?

11.     Whether McGill's separate indictment was misjoined with that of the other appellants?

12.     Whether the district court committed reversible error in permitting the prosecutor to admit extrinsic evidence of McGill's alleged prior bad acts, including acquitted and unadjudicated offenses?

13.     Whether the district court improperly sentenced McGill to a higher mandatory minimum sentence on the 924(c) count based upon a fact - discharge of the firearm - not found by the jury?

2

14.     Whether the district court improperly sentenced McGill to life sentences on two counts, Count 4, a violation of 18 U.S.C. § 1959(a)(1)(3), and Count 5, a violation of 18 U.S.C. § 1512(a)(3)(B)(i) for which a life sentence was only permissible in the case of death of the victim?

15.     Whether the district court improperly calculated McGill's sentencing guidelines by increasing the offense level for possession of a firearm when he was also convicted of a § 924(c) offense?

16.     Whether the district court erred in rejecting, without comment or explanation of any kind, McGill's counsel's request to sentence outside the guideline range by disregarding the 100-1 cocaine/crack disparity and the career offender guideline?

17.     Whether McGill's life sentence was unreasonable in light of the district court's errors in calculating the sentence and the other factors required to be considered?

18.     Whether the district court committed reversible error by allowing the prosecution to continually cross-examine Oliver by reading to him the most damning and prejudicial testimony of the government's witnesses against him and asking Oliver to comment on the truthfulness of the other witnesses' testimony?

19.     Whether the prosecution misled the jury by introducing irrelevant testimony from Victoria Robles relating her confused recollection of the murder of Demetrius Green by Timothy Handy and arguing to the jury that Robles' recollection actually related to the alleged murder of Richard Simmons by Handy and Oliver, not the Green murder?

20.     Whether the evidence was sufficient to convict Oliver of the June 2, 1999 first-degree murder of William Floyd by providing the gun used by John Raynor to shoot Floyd when there was *no* evidence that Oliver was aware Raynor intended to shoot anyone with the gun, much less William Floyd?

21.     Whether prosecutorial misconduct during closing arguments denied Seegers a fair trial?

22.     Whether Seegers was denied due process when the government failed to provide impeachment evidence contained in a Department of Corrections file that related to a central witness against him?

23.     Whether Seegers and J.Alfred were unfairly prejudiced by their continued joinder with their co-defendants?

24.     Whether there was sufficient evidence to convict Seegers of the conspiracies, weapons offense and violent crimes with which he was charged?

25.     There was insufficient evidence to support the conviction of appellant Simmons for the count 1 drug conspiracy; the RICO conspiracy charge in count 3; the weapons charges in counts 87 and 95 and the RICO homicide convictions in count 54 and 71.

26.     The district court erred in refusing to conduct a hearing and make factual findings on appellant Simmons' *pro se* allegations of ineffectiveness of counsel and prosecutorial misconduct.

27.     Whether there was insufficient evidence to convict James Alfred for the Thomas and Cardoza murders?

28.     Whether Ronald Alfred's convictions and sentences should be vacated, because of the confusing and erroneous admission and treatment of pre-conspiracy acts, the government's improper admission and bolstering of evidence related to drugs and violence post-conspiracy, and the ineffective assistance of counsel, including conflicted counsel, that Mr. Alfred received before and during trial, and at sentencing?

29.     Whether the errors committed, when viewed cumulatively, warrant reversal of appellants convictions?

## STATUTES AND REGULATIONS

Various Statutes, Federal Rules of Criminal Procedure, Federal Rules of Evidence, and Sentencing Guidelines are set forth in an addendum to this Brief.

## STATEMENT OF THE CASE

On November 17, 2000, a grand jury returned a 158-count Superseding Indictment against seventeen defendants, including all of the appellants herein except Keith McGill.[1] This Superseding Indictment alleged that the various named defendants, individually or collectively, bore responsibility for a total of thirty-one murders, plus eleven attempted murders.

Five of these defendants – Appellants Deon Oliver, Franklin Seegers, Kenneth Simmons, James W. Alfred ("J.Alfred") and Ronald C. Alfred ("R.Alfred") – were later consolidated over defense objections for a single, joint trial.[2] Specifically, these appellants were tried on Count One, Conspiracy to Distribute and Possess with Intent to Distribute 5 Kilograms of More of Cocaine,

---

[1] In an earlier case, No. 1:99-cr-355, twenty-five defendants (not including any of the appellants) were charged with a wide-ranging drug conspiracy from 1995 to 1999, plus substantive drug and weapons offenses. Many of those defendants resolved their cases without a trial – and later testified against the appellants. Those who did not were among the individuals charged in the original 78-count indictment in this case, No. 1:00-cr-157 – which alleged the same broad narcotics conspiracy, but added racketeering and continuing criminal enterprise counts, plus sixteen homicides and other charges.

[2] Due to the large number of defendants charged, the district court ordered that they be separated into groups. "Group A" defendants, which included the group's leaders, Kevin Gray and Rodney Moore, proceeded to trial first. That trial lasted eight months, resulting in guilty verdicts against each of those defendants. Most of those verdicts, as well as their resulting sentences, were affirmed by this Court in *United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011). Appellants here were designated as members of "Group B." The only remaining "Group C" defendant, Larry Wilkerson, was tried alone and convicted of six of the eight charges against him; Wilkerson's appeal is now pending before this Court.

50 Grams or More of Cocaine Base and 1 Kilogram or More of Heroin, and Marijuana; and Count Three, Conspiracy to Participate in a Racketeer Influenced Corrupt Organization. Some of the appellants were also tried on the following charges: continuing criminal enterprise; first-degree murder while armed and aiding and abetting; continuing criminal enterprise murder and aiding and abetting; first-degree felony murder while armed and aiding and abetting; assault with intent to murder while armed and aiding and abetting; tampering with a witness or informant by killing; violent crime in aid of racketeering activity and aiding and abetting; use of interstate commerce facilities in the commission of murder-for-hire; distribution of cocaine base and heroin and aiding and abetting; unlawful possession with intent to distribute cocaine base, cocaine, and heroin and aiding and abetting; illegal use of a firearm; and unlawful use of a communication facility.

Appellant Keith McGill was indicted in a separate six-count superseding indictment,[3] for offenses related to his participation in what the district court characterized as the "same" RICO and drug conspiracies on which the other five appellants were indicted. Specifically, McGill was charged with conspiracy to distribute and possess with intent to distribute crack cocaine, armed assault with intent to murder a witness, attempted murder of a witness, RICO conspiracy, and

---

[3] No. 1:02-cr-045.

attempted murder and use of a firearm in aid of the RICO conspiracy. Over objection, McGill was joined for trial with the other five appellants.

The appellants were tried from October 16, 2003 to March 31, 2004. After more than two weeks of deliberations and over objection, the district court removed a deliberating juror and seated an alternate on Friday, April 16, 2004. Deliberations were delayed for several days until the following Thursday, April 22, 2004, due to an intervening holiday. After deliberating for approximately 2½ days, the newly-constituted jury returned verdicts against four of the appellants on Monday, April 26, 2004, finding Oliver, Simmons, J.Alfred and R.Alfred guilty of all charged counts. [Docs. 1879, 1880, 1881, 1882]. The jury continued deliberating, and on May 4, 2004, it found McGill guilty of all charged counts. [02-045 Doc. 133] On May 10, 2004, the jury returned its verdicts for Seegers, finding him guilty of seven of his eleven charged counts. [Doc. 1963]. The jury was unable to reach verdicts on any of the four counts related to the sole murder with which Seegers had been charged.

Appellants subsequently filed various post-trial motions, which were largely denied. Appellants then were each sentenced to lengthy prison terms, with every appellant except Franklin Seegers receiving at least one sentence of life without parole. Seegers received concurrent sentences of 360 months imprisonment on his federal charges, plus 30 years-Life on a D.C. assault count. Seegers also received

7

a 10-year sentence on a weapons charge, to be served consecutively to all other counts. [Doc. 2327]

Following their separately imposed sentences, Appellants Oliver, Seegers, Simmons, J.Alfred and R.Alfred each filed timely notices of appeal. [Docs. 2318, 2320, 2325, 2354, 2312, 2355]  This Court consolidated these appeals *sua sponte* on December 10, 2007.

Appellant McGill also filed a timely notice of appeal. [02-045 Doc. 228] Shortly before Mr. McGill's brief was due in this Court, his co-defendants at trial moved to vacate his briefing schedule and join his appeal to theirs. Over McGill's objections, that motion was granted on October 15, 2008.

All of the appellants remain incarcerated on the instant charges.

## STATEMENT OF FACTS

The appellants were accused of crimes of violence and drug-related offenses. The actual triggermen were frequently their accusers, who often claimed appellants' mere "assistance" in indirect ways, hoping to reduce sentences received for serious offenses.

Undoubtedly, the government can provide vivid trial quotations, listing record citations for such "facts."  The reality is these "facts" mostly consist of nothing more than words from unreliable cooperators, with strong incentives to slant such testimony, usually describing things supposedly "heard" from others -

8

admitted under Rule 801's co-conspirator exception. Appellants' case was largely

a trial by rumor.[4]

Any objective Statement of Facts cannot be divorced from the **other** facts

that permeated the trial - facts about the atmosphere of fear that existed at all times

and the inherent mendaciousness of the government's cooperating witnesses.

### A.    The Atmosphere of Fear

The safety measures employed during appellants' trial sent a strong message

to jurors.  Appellants were required to wear stun belts, [Tr.10/1/03ampm:23], and

the jury pool and jury were seated behind a locked, Plexiglas bulletproof wall.

[Tr.10/6/03am:34-35; 10/10/03am:28-30; 10/10/03pm:7-8]  Jurors were assembled

in private locations and escorted to court each day by marshals.

Prospective jurors "got" the message.  During selection of the anonymous

jury, venire members expressed fears about being chosen, [Tr.10/14/03pm:13,17],

and having their anonymity compromised.  [Tr.10/14/03am:4]

Once impaneled, jurors learned appellants were incarcerated.  Attempts to

keep this from the jury were later abandoned, with the prosecutor openly asking

---

[4]    The issue is not whether this testimony was improperly admitted, but whether cooperator testimony alone can be deemed "overwhelming" evidence. Decidedly, it cannot; harmlessness does not exist when future jurors could readily disbelieve such evidence.  *See United States v. Watson*, 171 F.3d 695, 700 (D.C. Cir. 1999) (error not harmless where "credibility was key"); *United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999) (collecting cases) (evidence not "overwhelming" if prosecution primarily based on testimony from informants of questionable credibility).

one witness to confirm meeting appellants in jail. [Tr.2/12/04pm:135,143-44] Amazed defense counsel sought a mistrial, which was denied. The only limiting instruction told jurors there was "no evidence of … Seegers' detention status," so no inferences should be drawn *as to him*. [Tr.2/17/04am:43-44] Over objection, one government witness testified "probably [the] most important" factor in whether someone is detained is his history of violence. [Tr.10/20/03pm:12-16]

The government's presentation maximized juror fears, and went far beyond the *seven* murders charged, instead covering *all 31* murders listed in the larger *Gray/Moore* indictment (over three-quarters of which did not allegedly involve appellants). The "other crimes" evidence was breathtaking. Scores of murders were described, many never linked to any appellant, leaving the jury awash in blood. A defendant's decision not to testify mattered little - jurors were told about prior arrests and convictions regardless. Prejudicial physical evidence, such as a "street sweeper" gun, [Tr.12/2/03/am:79-80,93], wholly unrelated to this case, [Tr.12/8/03pm:122], and gruesome photographs from murder scenes were admitted for the jury's consideration.

The government also stoked jurors' fears in other ways, openly suggesting in its questioning that spectators in the courtroom were there to intimidate.

> This really should not [happen] … [T]hese people, in the jury's mind, can be connected to any defendant and it's horribly prejudicial. … [N]ow we're just cloaked in this aura of witness intimidation, unspoken but nonetheless

10

> … present in the well of the court. ...  seem[s] like our
> clients are hiring intimidators to threaten witness[es] by
> their presence.

[Tr.10/30/03am:70-75]   The district court found the government's questions improper, but denied a mistrial, acknowledging, "I don't know of any remedy that would be effective."  [*Id.* at 75] [5]

Other fear-inducing events occurred.  Marshals visibly stood between Deon Oliver and a witness, which other appellants noted was "prejudicial to all of us." [Tr.11/26/03am:145]   Additional allegations of witness intimidation related to Oliver were also admitted.

In closing, government counsel called upon jurors not to let appellants back on the street, reminding them to think of the victims and the "kilograms and kilograms of poison," so that "[t]hese men no longer get to decide who lives and who dies," and their "days of power and money are over."   [Tr.3/24/04am:74] Closing arguments concluded with McGill, during his involuntary removal from the courtroom, lifting his shirt, and yelling: "Tell them I'm wearing a belt right here - 50,000 watts," revealing the stun-belt strapped to his body for all to see.

The atmosphere of fear in which this jury was chosen and deliberated was palpable.

---

[5]  Although the district court precluded additional similar questions, [Tr.10/30/03am:70], the government later asked Frank Howard if he recognized an audience member.  [Tr.1/13/04pm:56-58]

11

### B.    Government Witnesses

Sources of the testimonial assertions the government will antiseptically characterize as "facts" must also be considered.

The government presented its overview witness, FBI Special Agent Daniel Sparks first.  Sparks improperly vouched for cooperators, creating an impression only truthful ones would testify - in the same manner condemned by this Court in *United States v. Moore*, 651 F.3d 30, 50, 54-61 (D.C. Cir. 2011).  Cloaked in this armor, numerous cooperators were then paraded before the jury, mesmerizing them with vivid descriptions of violence.

### 1.    Maurice Andrews

Andrews, a/k/a "Moe Brown," dramatically described dozens of murders, implicating virtually every appellant.  Only days later did the jury learn Andrews' street nickname:  "Lie-Lie."  [Tr.11/6/03pm:67]  Those who knew Andrews well confirmed his nickname and reputation, earned because Andrews lied repeatedly, even for no reason, and could not be trusted.  [Tr.11/6/03pm:67,97; 11/6/03pm:67; 1/12/04am:82-83; 1/12/04am:109-10; 1/12/04pm:49-50; 11/6/03pm:112-13]

Andrews had sold drugs since the age of 12, [Tr.10/22/03pm:83]; storing cocaine at his baby's mother's house and carrying guns and drugs near schools, children and the elderly, including his own mother.  [Tr.10/22/03pm:25,74-75,79-80]  Andrews admitted dating Anthony Watkins' god-sister at the ***same time*** he

was trying to **murder** Watkins. [Tr.10/23/03pm:20] He also admitted "hunt[ing]" eight individuals. [Tr.10/23/03pm:95-96; 10/27/03am:50-51] He knew he could be charged in Ronald Powell's murder, [Tr.10/27/03am:44; 10/22/03pm:106-07], and other serious crimes. *E.g.*, [Tr.10/27/03am:53] Andrews refused to turn himself in. When the FBI found him, he ran - only to be caught again. Andrews then cooperated, changing his possible life imprisonment to possible probation. [Tr.10/22/03pm:104] He was released and on the streets by May 10, 2001. [Tr.10/27/03am:56] Andrews was placed in federal witness protection, where he received a *per diem* without any job, [Tr.10/23/03pm:77; 10/27/03pm:61-65], and a car. [Tr.10/23/03pm:118] By the time of appellants' trial, his government payouts totaled $150,000-$160,000. [Tr.10/27/03pm:61-65]

Albert Freeman, Andrews' close friend, [Tr.2/11/04pm:49], testified Andrews admitted plans to testify falsely because he had no choice if he wanted to see the streets again. [Tr.2/11/04pm:50-52] Some of Andrews' claims were demonstrably false. Andrews said Gray told him "D.J." gave Oscar Veal a gun for one murder, which was impossible because "D.J." was in jail at the time. [Tr.10/22/08pm:99-103] Indeed, much of Andrews' testimony repeated Kevin Gray's statements, whom even Andrews admitted was a braggart and not always truthful. [Tr.10/23/03pm:139]

13

Andrews admitted he lied when it suited his needs.  [Tr.10/23/03pm:124; 10/23/03pm:140]  Despite such admission, and over objection, Andrews was even allowed to vouch for the credibility of other informants.  [Tr.10/28/03am:34]

    2.   <u>Raymond Sanders</u>

Sanders had held two jobs in his entire life - each lasting only a few months. [Tr.11/6/03am:82-83]  While dealing, Sanders sold fake drugs and lied to friends. [Tr.11/10/03am:42,48-49]  He lied to a court to get a reduced sentence, lied to pretrial services to get out of jail sooner, and lied while on probation. [Tr.11/10/03am:13-15,19-21,28-29]  Sanders used his family to hide from a judge the fact that he made $960,000 from illegal drugs.  [Tr.11/10/03am:30-32]  Sanders also admitted lying to law enforcement, [Tr.11/10/03am:60], and at least three Assistant United States Attorneys.  [Tr.11/10/03am:44,59]  He deliberately lied to a grand jury for over 2 hours ***under oath.***  [Tr.11/10/03am:45-48; 11/6/03am:63-66,97,126]

Sanders helped set up the murders of his friends Scott Downing [Tr.11/6/03am:114-16], Moe Reid [Tr.11/6/03am:120], Darrell Henson [Tr.11/6/03am:121], and Marvin Goodman [Tr.11/6/03am:122]; confessing Downing's murder was the "ultimate deceit." [Tr.11/6/03pm:107]  He always lied when it was in his interest to do so.  [Tr.11/6/03am:102]

14

Sanders agreed to cooperate after his arrest, then absconded, [Tr.11/10/03am:17], lying to the FBI about his willingness to cooperate. [Tr.11/10/03am:41] Rearrested, Sanders faced 10 years-Life, [Tr.11/6/03am:61], plus possible doubling of his mandatory minimum to 20 years. [Tr.11/6/03am:107] Sanders' cooperation prevented this; he faced no RICO charges or possible life sentences, despite participating in multiple murders. [Tr.11/10/03am:69-73]

Sanders claimed he, not Andrews, was Gray's right-hand man. [Tr.11/6/03am:124] Sanders admitted he cooperated because cooperation was his fastest route out of jail, [Tr.11/10/03am:53], and previous cooperation had not been enough to free him. [Tr.11/10/03am:55] Sanders acknowledged much of his testimony was rumor; and he couldn't remember sources. [Tr.1/6/03am:146] Sanders didn't know Seegers personally, never saw Simmons dealing drugs and didn't know R.Alfred at all, ultimately conceding everything he said was simply what he "heard." [Tr.11/6/03am: 23,88,142,147] Testifying in 2003, Sanders had already been out of jail for three years. [Tr.11/6/03pm:99]

3.    Oscar Veal

Veal was an avowed "hitman," [Tr.12/9/03am:66], who sold drugs on Forrester Street. After Veal "settled a beef" by killing a rival seller, Moore and Raynor gave him a .357 magnum. Less than an hour later, Veal shot Ervon

Clyburn twice in the back of the head.  [Tr.12/3/03am:84,86-87]  Moore paid Veal a "brick," and the next morning Veal returned to "making easy money" selling drugs. [Tr.12/3/03am:91]

When he first met Gray, Veal armed himself and said, "We all bleed red." [Tr.12/8/03pm:7]  Veal sold crack and killed for Gray and was usually paid $5000-$7000 per murder; for Rodney Faison's murder he was paid $1200 plus drugs. [Tr.12/1/03pm:142,146; 12/8/03pm:18]  According to Veal, "That was my job." [Tr.12/3/03am:95]  He explained his job duties, "[I] just blasted [Ricky Fletcher] with the guns" and then "shot him some more."  [Tr.12/2/03am:69]  One month after his own daughter's birth, Veal stalked Roy Cobb at *his* children's' school. After watching Cobb greet his two sons, Veal circled back to murder him. [Tr.12/3/03am:96-97]   One time, knowing he had shot the wrong man, Veal watched Jaime Pereira "gurgling blood," and then shot him again anyway.  Next, Veal tried to collect his money "real quick before anyone realized it." [Tr.12/2/03pm:100,103-05]  Veal shot Carlos Cardoza for money, heroin, and 2 bottles of Dom Perignon, one of which he gave to Maurice Andrews. [Tr.12/2/03pm:49,76]  Veal described murdering Anthony Watkins: "I just walked up to the van … just stuck the gun in the window, *whatever*, and shot." [Tr.12/3/03am:31]

16

Veal pled guilty to seven RICO first-degree murder conspiracies. [Tr.12/1/03pm:9; 12/3/03am:41]  The government agreed not to seek the death penalty - although *each* murder carried that potential penalty.  [Tr.12/3/03am:45; 12/3/03pm:43]  Veal also benefitted from a 5K1.1 motion and witness protection. [Tr.12/3/03am:44&50-52]

Veal admitted liking the easy money and attraction of women that came from murdering.  [Tr.12/3/03am:69-70,76-78; 12/8/03am:56]  Although he admitted being "dishonest" with his wife on multiple occasions, [Tr.12/9/03pm:29], appellants were prevented from asking about his 1991 and 1993 arrests for assaulting his wife.  [Tr.12/9/03pm:35-37]

Veal lied on his Marine application about having no juvenile record. [Tr.12/9/03pm:41-42]  He lied on the streets, bragging about past shootings, [Tr.12/8/03am:47-49], lied about getting paid for a murder.  [Tr.12/9/03pm:56] Veal violated various promises made to courts, [Tr.12/10/03am:33-34], and also admitted *living* a lie before his final arrest - describing himself as the type of person no one would want as a neighbor.  [Tr.12/9/03am:78]

Even after cooperating, Veal lied.  He withheld one of his shootings from authorities.  [Tr.12/8/03am:61-70]  He told police he was "sure" D.J. gave him the gun used in Clyburn's murder, [Tr.12/8/03pm:133-34], although D.J. was

17

incarcerated at the time.  At trial, Veal lied some more, swearing he never stole cars from his employer, although found guilty of car theft. [Tr.2/17/04am:117,122]

In preparation for his testimony, Veal admitted he read testimony from other proceedings, [Tr.12/8/03pm:42], and talked to other inmates about the *Moore* case while in jail.  [Tr.12/10/03pm:55]

            4.    Omar Wazir

Wazir grew up selling drugs; selling heroin even after his mother died of it. [Tr.10/29/03pm:40]  He admitted killing Kairi Ball and cooperating after facing a 20-Life sentence.  [Tr.10/29/03pm:81; 10/30/03am:28-30; 3/14/04pm:103]  Wazir, aware the government believed R.Alfred was involved in Ball's murder, [Tr.10/30/03am:104], knew it would accept his word.  [Tr.10/30/03am:35]

Wazir and his cousin, Jermaine Vick, were put in a room with Andrews more than once in 2000 to discuss Andrews becoming a cooperator. [Tr.3/15/04pm:148]  Wazir and Andrews then spent months together in custody with other cooperators.  [Tr.10/29/03pm:54-58]  The three met each Friday at Jumah services in jail, [Tr.10/29/03pm:197; 10/30/03am:63-67], where Wazir could talk to other cooperators.  [Tr.10/29/03pm:60]  Wazir worked for the chaplain, allowing him to move around freely.  [Tr.10/29/03pm:198]

Although Wazir saw other government witnesses while incarcerated - Frank Howard, Dennis Robinson, Walter Fleming, Veal, Marvin Dixon, and Steve

18

Graham - he claimed they ***never*** talked about appellants' case.  [Tr.10/30/03am:75-80]  Other witnesses disagreed.  Timothy Parker testified cooperators at CTF could get drugs, [Tr.2/12/04pm:56], and noted inmates could talk under the doors and communicate, exchanging documents and transcripts.    [Tr.2/12/04pm:40-42]  Wazir himself conceded drugs and cash were found in his D.C. jail cell, but claimed they weren't his.  [Tr.10/29/03pm:71-72]  Later, drugs were found ***again*** in Wazir's cell at CTF, [Tr.10/29/03pm:73]; once again he said he had never seen them before.  [Tr.10/29/03pm:199-200][6]

Donnell Williams said Wazir had privileges to roam CTF freely, [Tr.1/29/04am:15,38], because Wazir had a contraband  "green" pass.  [Tr.1/29/04am:70-71]  Williams claimed Wazir told him he would fabricate to get out of prison, and asked Williams to corroborate his stories, which Williams refused to do.  [Tr.1/29/04am:20,29-30]  Williams testified Wazir and Vick had approached him several times to recruit him, asked him to "make up stuff" and, promised he could get out of jail if he would "get on our team."  [Tr.1/29/04am:42-44]

Raymond Davis ("Breakfast") was incarcerated with Wazir at Lorton.  [Tr.1/28/04am:47], and testified Wazir told him the Kairi Ball murder actually

---

[6]    Donnell Williams revealed Wazir often had heroin inside the jail, and interacted with Officer McKnight, who was later convicted of drug distribution.  [Tr.1/29/04am:32,73,76]

happened because of an altercation between Wazir, Ball and Shelton Watkins. [Tr.1/28/04am:52] Jayvan Allen knew Wazir from jail Muslim services, and said Wazir told him he would lie however he needed to, and Allen should do the same. [Tr.1/28/04pm:101-02] Thaddeus Vines offered to help the defense because "I know Omar." [Tr.1/29/04am:116] He heard Wazir had a cell phone while incarcerated and about inmates sharing stories before testifying, [Tr.1/29/04am:116], and plotting to fabricate evidence "all the time." [Tr.1/29/04am:125] Vines was, however, barred from giving opinion or reputation evidence regarding Wazir's truthfulness. [Tr.1/29/04am:125]

### 5. Steven Graham

Graham quit school to sell drugs, [Tr.12/15/03am:13]; he'd committed crimes or been locked up since at the age of 15. [Tr.12/17/03am:45] Out of jail only 1 of the previous 13 years, he faced prison for 23 of the next 24 years. [Tr.12/16/03am:77] Graham described the 210-month sentence he received for drug conspiracy as "too high for me to bear." [Tr.12/15/03am13-14; 12/17/03am:44]

Graham was debriefed on multiple occasions, [Tr.12/16/03am:70-71], securing a Rule 35 motion, [Tr.12/15/03am:16],[7] after writing a letter to the

---

[7] This motion was not routine; it had to await both an amendment to Rule 35 and dubious government certification that Graham's information was not reasonably foreseeable within one year of his sentence. [Tr.12/16/03am:110-15]

government in 2002 saying he hoped to help convict Gray. [Tr.12/16/03am:84] He now looked forward to Round Two. [Tr.12/17/03am:90-92]

Graham had a history of lying. Graham once used his brother's name when arrested, jeopardizing his brother to save himself. [Tr.12/17/03am:7-8] Graham defied promises made after prior convictions, quickly returning to selling drugs. [Tr.12/16/03pm:60,76] Before cooperating, Graham voluntarily signed a statement for Raynor's defense investigator, stating, "I don't know anything about Little Willie being killed." [Tr.12/17/03am:52] At trial, Graham told the jury an entirely different story. [Tr.12/17/03am:57]

Imprisoned continuously from mid-1996 into 1999, Graham conceded he had no personal knowledge of many allegations in appellants' case, [Tr.12/17/03am:41] – but that hardly mattered. For example, Graham said he knew R.Alfred and saw him with Gray, identifying R.Alfred in court. [Tr.12/15/03pm:10] But Graham later admitted he first met R.Alfred in 1999, and never dealt drugs with him. [Tr.12/16/03pm:93-94]

Graham went to CTF in 2002, and spent weeks on the "cooperator floor" with Vick, [Tr.12/16/03pm:8], Andrews and others. [Tr.12/17/03am:11-12] He knew "hot block" people talked through the fence with those in general population during recreation, [Tr.12/17/03am:15-20], and acknowledged open discussions with other cooperators about appellants' case while in jail. [Tr.12/16/03pm:9,105]

21

Wazir was his cellmate at D.C. Jail, [Tr.12/16/03pm:9], and Graham admitted drugs were found in their cell - like Wazir, Graham denied these drugs were his. [Tr.12/16/03pm:102-03]  James Matthews, however, said Graham gave him heroin during a CTF religious service.  [Tr.2/4/04pm:28]

  6. <u>Frank Howard</u>

  Howard also sold drugs at age 15, and was first locked up in the 11th grade. [Tr.1/9/04am:91]  Of the 14 years that had transpired since, he dealt drugs at least 10 of them. [Tr.1/12/04am:70]  Howard was incarcerated several times, violated court promises, and always returned to drug sales.  [Tr.1/12/04pm:125-30,132-34; 1/9/04am:104,106-08]

  In 1992, Howard got on Moore's "payroll," [Tr.1/9/04am:106-08], handling Moore's "night shift" for crack sales.  [Tr.1/12/04pm:101-104]  Howard kept returning to drugs because he was greedy, spending money on clothes, three cars, partying and, especially, tricking.  [Tr.1/12/04pm:142-48]

  Howard admitted sticking up other drug dealers and snatching money from an old lady and dragging her down the street.  [Tr.1/12/04pm:61-62]  He robbed people at gunpoint.  [Tr.1/13/04pm:19]  Howard was charged with the murder of his 2-year old daughter, [Tr.1/12/04am:57; 1/13/04am:87-93], plus reckless endangerment and conspiracy to murder another child.  [Tr.1/12/04am:77; 1/13/04am:87-93]

A month after Joseph Thomas' murder, facing criminal charges in New Jersey, Howard gave that judge the impression he could be trusted - but then participated in the Ricardo Bailey murder just two months later, in a set-up similar to the Thomas murder.  [Tr.1/12/04pm:150-156]

Howard pled guilty to aiding and abetting the shooting of Charles Shuler, [Tr. 1/9/03:115], and the first-degree murders of Ricardo Bailey, Joseph Thomas and Ronald Powell.  [Tr.1/12/04am:45-46]  Howard knew he faced a life sentence, [Tr.1/12/04am:53], or possibly the death penalty.  [Tr.1/12/04pm:166-68]  Howard used friends' money to post bond - but broke his promise to appear and fled to California, causing them to lose $7500. [Tr.1/13/04am:96]  Thereafter, Howard assumed a fake name and lied to his grandmother about why he was there. [Tr.1/12/04pm:55-56,58-60]  Howard was arrested after a SWAT team invaded his grandmother's home.  [Tr.1/13/04am:98]

Howard testified the § 5K1.1 motion he received from the government was worth more than the half-million dollars he made selling drugs, [Tr.1/12/04pm:23,47], and that the more information he gave, the more time off he got.  [Tr.1/12/04pm:66]  The AUSA even wrote to prosecutors handling Howard's child-murder case, advising them of Howard's cooperation.  [Tr.1/12/04pm:76-78]  Howard hoped for a sentence of 15 years or less for his 3 admitted murders.

[Tr.1/12/04am:76]   An illegal alien, Howard was released from custody; no immigration detainer was lodged.  [Tr.1/9/04pm:132-45]

Multiple debriefings were held to tailor Howard's answers to the government's needs, [Tr.1/13/04am:71]; he admitted reading the indictment like a novel.  [Tr.1/13/04am:109]  Much of Howard's evidence was unreliable street talk "heard" from Gray or others; he admitted he wasn't privy to the conversations. [Tr.1/12/04am:126-27]  Some claims were demonstrably wrong.  He testified that his single drug deal with Simmons, in 1996, occurred after the Bailey murder at Simmons' store.   But the store, "Graffiti," was not established until 1998. [Tr.1/12/04am:72]  Howard then backpedaled - the store was getting *ready* to open - but the defense showed no lease was signed until 1997.  [Tr.1/12/04am:73; 1/15/04am:60-74]  Howard also told the grand jury Gray gave McGill cocaine in 1995 - at a time Gray when was locked up, and this was impossible. [Tr.1/13/04am:28]  Howard admitted memory problems from his long-term drug use, but quickly denied this meant his testimony was false.  [Tr.1/12/04am:112-15]

Howard was housed with other cooperators, with whom he could, and did, talk.   [Tr.1/13/04am:99-101&108]   Quincy Thomas confirmed speaking with Howard about appellants' case at CTF.  [Tr.1/15/04pm:62]  Timothy Parker also confirmed Howard, even in lockdown, moved around the jail freely. [Tr.2/12/04pm:87]   Sharing of documents and transcripts was so widespread,

24

Parker said, he too could have testified in this case, despite having no personal knowledge.  [Tr.2/12/04pm:71]

      7.    <u>Melvin Wallace</u>

Wallace dropped out of school to sell cocaine at age 15.  [Tr.1/6/04am:6-7,15]  By 19, he was selling drugs daily, repeatedly flouting promises not to violate the law.  [Tr.1/6/04pm:52,63]  Whenever Wallace felt like breaking a court promise, he did, [Tr.1/6/04pm:63-64], sometimes even failing to appear when ordered.  [Tr.1/6/04pm:63-64,72]  Wallace also stored crack in the drainpipe attached to his mother's house, putting her at risk.  [Tr.1/6/04pm:85-88]  He used his pregnant, employed sister to hold drugs.  When she was indicted and thrown in jail, Wallace never told police the drugs belonged to him.  [Tr.1/6/04pm:88-91]

Wallace's initial promise to cooperate was also a lie, [Tr.1/6/04pm:76-77]; he cooperated only after watching videos of his drug deals and receiving an offer he couldn't refuse.  [Tr.1/6/04pm:78-79]  Wallace faced 360 months-Life, and was told if he didn't cooperate, he was looking at Life without parole.  [Tr.1/7/04am:61-62]  Courtesy of a § 5K1.1 motion, Wallace faced three years instead of thirty, [Tr.1/7/04am:63], plus the amenities of witness protection, with payments exceeding $14,000.  [Tr.1/6/04am:13; 1/6/04pm:49]  Wallace did not work for this money; indeed, Wallace had never worked.  [Tr.1/6/04pm:51]

Wallace, debriefed on about ten occasions, said the government would tell him the facts, and then ask if he knew about them.    [Tr.1/6/04pm:39-42] Admittedly, Wallace used those questions to learn what the government was interested in.  [Tr.1/7/04pm:89]

### 8.    Walter "Biggums" Fleming

Fleming dropped out of high school to sell drugs and was incarcerated as a juvenile.  Fleming was good at cooking crack, [Tr.11/17/03pm:67], and became a large-scale dealer.  [Tr.10/19/03am:78-80]  He ordered 10-15 kilograms at a time, [Tr.11/17/03pm:77,82], making $100,000 to $125,000/month.  [Tr.11/17/03pm:87-89]  After seeing a rival with a Rolex and suspecting him of stealing drugs, Fleming and others "went around there and shot them," [Tr.11/18/03am:41-46,50], shooting through a car window with semi-automatic bullets spewing across a passenger's face.   [Tr.11/19/03am:11-12]   Fleming also intimidated Richard Simmons' mother, after helping murder her son.  [Tr. 11/24/03am:14-1.&30-33]

For his cooperation, all of Fleming's federal charges in this district were dismissed.  [Tr.11/17/03pm:30-31]  He also avoided forfeiture of his house in Bowie, Maryland.  [Tr.11/18/03pm:67]  Fleming, having received a 360-month federal sentence in Virginia after pleading guilty, [Tr.11/18/03pm:29], admitted no one was left to cooperate against there.  So, with few options, Fleming turned on those in this case.  [Tr.11/18/03pm:29,53-54]  He realized cooperating was his key

to getting less than 30 years, and vowed "to testify until [he] walk[ed] out that door." [Tr.11/18/03pm:137]

Promising to be cooperative and truthful, [Tr.11/19/03am:9-10], Fleming lied to law enforcement about Richard Simmons' murder for more than a year, [Tr.11/18/03am:75], despite himself placing the "hit." [Tr.11/19/03am:35] When confronted, Fleming cried, not based on regrets about Simmons ("fuck him"), but because of fear he would receive more prison time. [Tr.11/19/03am:26] His benefits continued, even following Fleming's similarly belated disclosure of involvement in Conrad Shelton's murder. [Tr.11/19/03am:56-59] Rather than increasing his prison time, the government instead moved to reduce Fleming's sentence. [Tr.11/19/03pm:42-47] His cars and safe deposit box were never seized. [Tr.10/19/03am:90]

Fleming was a manipulator. After a previous arrest, Fleming used his cousin's name to fool police, putting his cousin at risk. [Tr.11/18/03pm:106]. During a search of Fleming's house yielding $35,000 in cash plus cocaine, agents also discovered nine pages of internal FBI documents that even FBI agents are not permitted to take home. Although an FBI employee was later prosecuted for this severe security breach, Fleming never was. [Tr.11/19/03pm:119-20]

Fleming and Wazir spoke frequently while incarcerated at Arlington Jail for two years. [Tr.11/19/03pm:113] Fleming admitted much of his information was

hearsay and innuendo, never personally observed.  [Tr.1/18/03pm:125-26]  He was only conveying what he "heard."  [Tr.11/18/03pm:127][8]

### 9.    Caprice Whitley

Whitley was a convicted fraudster; using credit card schemes, [Tr.11/25/03am:137], she stole $90,000 and ruined a law enforcement officer's credit.  [Tr.11/25/03pm:43-45]  Previously convicted of theft via false pretenses after buying two cars using someone else's credit, [Tr.11/25/03am:10], Whitley even called police later to report one of them, a Mercedes, as stolen.  [Tr.11/25/03am:44]    Indeed, Whitley had so many convictions she couldn't remember them all.  [Tr.11/25/03am:51-52]  *See* [Tr.11/25/03pm:40] (list).

Whitley cooperated after receiving a sentence of 51 months in jail.  One month later, she contacted the FBI.  [Tr.11/25/03am:53]  Previously, Whitley had written to a judge, falsely claiming she had pancreatic cancer and only 6 to 18 months to live.  [Tr.11/25/03am:53-55; 11/25/03pm:48-49]  Whitley also told the judge she would pay $10,000 for her freedom.  [Tr.11/25/03am:94]  She lied in her Presentence Report, [Tr.11/25/03am:113], and even the government questioned her credibility.  [Tr.11/25/03pm:12-13]  She wrote to an AUSA, "desperately" seeking

---

[8]  Fleming also testified Ball and "Pop" tried to rob R.Alfred's Fresh Gear store - until it slipped out that all of this occurred "while I was in prison." [Tr.11/18/03am:32-34]

relief. [Tr.11/25/03am:132] Whitley denied being a pathological liar, but admitted that she was all about doing "whatever" to get what she wanted.

 [Tr.11/20/03am:100,112] Astoundingly, she expressed hope of working for the federal government someday. [Tr.11/25/03pm:24-25]

>  10.  Victoria Robles

The most important witness against Oliver was his young former paramour, Victoria Robles.  In its rebuttal argument, the government relied heavily on Robles' testimony about Oliver's alleged involvement in an unconsummated conspiracy to kill a person known only as "Rah-Rah," saying she was "very credible."  However, Robles was not credible at all, constantly contradicting and disavowing her own testimony, depending on who was asking.  She was a weathervane, pointing in whatever direction the wind blew her.  She even admitted she would let the government put words in her mouth that weren't true. [Tr.12/01/03am:64]  Defense counsel caught one prosecutor nodding yes or no to Robles during her cross-examination, signaling, until the district court gently told him to stop. [Tr.12/01/03am:60-61]

When recalled as Oliver's witness, Robles said she felt pressured by the government to remember things that she really didn't recall. [Tr.3/18/04pm:15] For example, contrary to her grand jury testimony, much of which was based on hearsay, Robles never saw Moore give Oliver drugs. [Tr.3/18/04pm:30-31]

29

Robles testified she never saw nor said she saw Oliver carry a gun, [Tr.3/18/04pm:78-79], and that the drugs found in the apartment she shared with Oliver belonged to **Taron** Oliver.  [Tr.3/18/04pm:26-28]   The government had ample means to exert pressure on Robles - she was dependent on it for economic support, and it held potential prosecution of her for the neglectful death of her young child over her head.

### 11.   Lincoln Hunter

Hunter was portrayed as the devoted, meek live-in boyfriend of Diane Luther who steadfastly identified Seegers as shooting him and killing her. [Tr.3/22/03pm:41-42;46-48]   In reality, Hunter was a drug-addicted, jealous and aggressive man who owned three guns.  [Seegers Exhibit 7; Tr.11/13/03pm:29-30;38-40;  1/27/04am:127,134;  2/2/04am:100-01]    Moreover, Hunter identified another as "the man that shot me 16 times, and murdered my wife and daughter" to a judge, and told prosecutors he hadn't seen Seegers shoot Luther.  [Seegers Exhibits 5,6]  Finally, Hunter's medical records proved he was not shot in the back of the head as he claimed.   [Tr.11/12/03am:116-117; Tr.11/12/03pm:27-28,45; Government Exhibit DL-501a]

### 12.   Eugene Williams

Williams was a "chronic" addict who smoked crack "24 hours a day" "every day," and, despite being a "major player," ceased selling drugs because he

"squandered" his product.  [Tr.11/13/03am:81,82,94,97; 11/13/03pm:33]   While not officially charged, Williams cooperated out of fear he would be, and had long ago professed he would use the "addict inception" to "weasel" out of the conspiracy.  [Tr.11/13/03am:131-132; 11/13/03pm:11-12,33-35]   Williams was admittedly adept at avoiding jail by "pull[ing] out one of [his] little get out of jail free cards." [Tr.11/13/03pm:36]

　　　　　13.   <u>Quincy Thomas</u>

Thomas was not a member of the Gray/Moore conspiracy.  Instead, he was the alleged number-two-man, and main witness, in the major drug conspiracy case being tried in the courtroom next to appellants' trial.  [Tr.1/15/04pm:17,32,36]  Thomas, the target of wiretaps in that investigation, faced sentencing enhancements for his leadership role and firearms.  [Tr.1/15/04pm:32]   The evidence against Thomas was so overwhelming that, facing a life sentence, he cut a deal *before* he was indicted.  [Tr.1/15/04pm:15,16]  Thomas "categorically' hoped to get less than a life sentence," [Tr.1/15/04pm:29]; he was allowed to plead to a single count of conspiracy to distribute cocaine and crack.  [Tr.1/14/04pm:100]

Thomas became a cooperator a few months after McGill's indictment was revamped in 2002.  He was brought in only to testify against McGill, the newest indictee.  Although not a co-conspirator, hearsay statements allegedly made to Thomas by McGill were admitted over objection.  [Tr.1/14/04pm:111]

31

Thomas discussed appellants' case with Howard, David Arnold, and Vick at CTF and discussed his prospective testimony with Howard.  [Tr.1/15/04pm:62,99-100]  He couldn't remember a single detail of ***any*** of his claimed drug transactions with McGill.    [Tr.1/15/04pm:80]    Thomas' testimony contradicted his prior statements to agents, and he admitted to lying "before in my time." [Tr.1/15/04pm:90]

### C.      Facts Pertinent to Case Against Appellants

Beyond its cooperators corroborating other cooperators, the government's evidence was thin.   Moreover, even cooperators' descriptions of appellants' involvement in the charged offenses often involved acts undertaken only on the edges of these crimes, not necessary to the crime's commission, and impossible to verify or rebut.

### 1.     Keith McGill

McGill was convicted of narcotics and RICO conspiracies and four counts associated with the shooting of Charles Schuler.   There was no physical or scientific evidence linking McGill to any of the charged offenses, and nothing of evidentiary value was recovered from his person or during a search of his residence.  [Tr.2/10/04pm:121-123]

32

### a.    The Conspiracy Charges

Other than testimony from cooperating witnesses, the only evidence offered for McGill's involvement in the conspiracy were two short calls, Activations 137 and 63, from the wiretap of cooperator Melvin Wallace.[9]  [Tr.1/06/04am:77-79,81-83]  McGill denied the voice on these two calls was his, [Tr.2/25/04am:125-30], but was not permitted to call a voice expert who would have testified to this.  (*See* Section VIII below.)  Notwithstanding these calls were ambiguous, Wallace was permitted to opine, without corroboration, they referenced drug transactions. [Tr.1/06/04am:81-94]

### b.    The Charles Schuler Shooting

Charles Shuler, with his own drug charge, was cooperating with the government to set up Kevin Gray.  On October 20, 1999, when Gray informed him of his location, Shuler then informed agents who arranged for Gray's arrest. [Tr.1/14/04am:124-27]  Unfortunately for Shuler, the close timing between the call from Shuler and Gray's arrest led many, including Gray, and Frank Howard, to conclude, correctly, that Shuler had informed on Gray.  [Tr.1/22/04am:33-35,55-56]

---

[9]  The government played eight calls - one (Activation 24) was unrelated to any "Keith," while four (Activations 86, 27, 51 and 18) merely have a reference to a (LNU) "Keith."  McGill admitted his voice was on one call (Activation 4), [Tr.2/23/04pm:43-46], but his portion of the call did not reference any drug dealing.  [Tr.1/06/04pm:162-163]

On December 15, 1999, Shuler was working with agents to set up a heroin dealer named Phyllis at a friend's house, Darlene, on Smith Place, S.E.  Shuler initially went by Darlene's house, later ending up on Congress Place.  There he saw Frank Howard and ***three*** other individuals.  He recognized one, but did not know his name; he did not know the other two at all.  Shuler then decided to walk back to Smith Place.  [Tr.1/21/04pm:92-98]

As Shuler got to Alabama Avenue, Howard and the ***three*** other individuals rode by him in Howard's white Lincoln.  [Tr.1/21/04pm:98-100]  Shuler went back to Darlene's house and completed the heroin transaction with Phyllis. [Tr.1/21/04pm:101-102]  As he left the house and was going down the steps, he saw a man who walked past him twice, then opened fire three times, twice hitting Shuler, once in his spinal cord.  Shuler played dead and the man left. [Tr.1/21/04pm:102-106]

Although Shuler gave somewhat inconsistent descriptions over time, he consistently could not identify the shooter who had been wearing a hockey goalie mask.  [Tr.1/21/04pm:115,117; 3/17/04am:106-107][10]  Shuler had known McGill

---

[10] Shuler testified in rebuttal that seeing a photograph of McGill had given him a "chill," because the build appeared similar to the shooter.  [Tr.3/17/04am:41-50,78-79]  On direct, however, he admitted that given the gunman's baggy clothes, an accurate description of his build was difficult.  [Tr.1/21/04pm:103-104]

34

for years and knew of no reason for McGill to shoot him.[11]  [Tr.1/22/04am:58]  He

admitted telling McGill's brother he did not think that McGill had shot him.

[Tr.3/17/04am:81-82]  Shuler and McGill had encountered each other several times

after the shooting without incident.  [Tr.3/17/04am:82-84]  Interestingly, Shuler

had seen Howard afterward and reported he "looked like he had seen a ghost."  [Tr.

1/21/04pm:112-115][12]

 The only witness who identified McGill as shooting Shuler was Howard,

who admitted participating in the shooting, but described the events differently

from Shuler.  Howard testified that he was with McGill and *one* other man,

"Punchy," when they saw Shuler on Congress Place.  [Tr.1/13/04am:51-52]  He

denied he was driving a white car at the time Shuler had testified he saw him and

three men on Alabama Avenue.  [Tr.1/13/04am:12-13]  Instead he testified he

dropped McGill off in an alley off Alabama Avenue and saw him run between

some houses.  Howard drove around to meet him on Savannah Street.  Howard

claimed he heard three shots then McGill came running between some houses and

got in his car.  [Tr.1/9/04pm:113-17]  Howard testified that McGill said he had

---

[11] The indictment for case 00-cr-157, charged Frank Howard and **Timothy Handy** with the shooting of Shuler, identified as "Witness 6."

[12] In more than one description, Shuler stated the gunman had a yellow shirt. Howard was arrested a few hours after the shooting wearing a yellow shirt. The prosecutor had concealed this fact by producing only a black and white arrest photograph of Howard.

stashed the gun at "Calloway's" house, [Tr.1/9/04pm:117], although it is unclear when McGill would have had a chance to do that.

2.    Deon Oliver

Oliver was alleged to have aided and abetted two murders (Richard Simmons and William Floyd) and to have participated in a conspiracy to murder another individual (Rah-Rah).

### a.    *Murder of Simmons [Counts 53 and 54]*

The government alleged that, on the night of 6/30/97, Timothy Handy shot and killed Richard Simmons in front of Richard Simmons' clothing store, Aztec Sports.  Handy allegedly acted at the direction of Kenneth Simmons and his drug business partner, Walter Fleming.  They allegedly wanted Richard Simmons dead because they believed he was spreading the false rumor that Fleming was cooperating with law enforcement.  On the night of the murder, Handy and Oliver were allegedly seen across from the victim's store.  Oliver allegedly drove Handy from the scene.

Richard Simmons was the father of Cheryl Pinkard's daughter.  Pinkard was not interviewed by the government until three years after the murder.  She repeatedly changed her story, alternately claiming Oliver was the associate of the alleged shooter (Handy) and that he was not.  Although claiming to witness the shooting, she couldn't identify Handy even though he was the shooter.  At the time

36

of the shooting, she had never seen Oliver before; years later, she remembered seeing him in the dark waiting to use a payphone near the murder scene. [Tr.12/11/03pm:69-70,87-90,100,104,112,152]  She previously described Oliver as "a little guy" [Tr.12/11/03pm:142]; Oliver is over 6' tall and obese.

Government witness Margarita Simmons, the decedent's mother, said she did not see who was in the getaway car with Handy.  She did not see Oliver that day or night.  [Tr.11/24/03am:19-26]   Her testimony, at odds with Pinkard's, *exculpated* Oliver.  She said Pinkard was with Richard that night and suggested Pinkard may even have been involved in the murder.  [Tr.11/20/03pm:58-60,86-91,105-110]

Walter Fleming testified that he and his partner, Simmons, were angry at Richard Simmons for putting out a rumor that Fleming was "hot."  Fleming testified that Simmons was going to pay Handy in drugs to kill Richard.  Fleming, however, while cooperating with the government, had initially concealed his role in the murder.  [Tr.11/19/03am:9]   At trial, he tried to implicate Oliver as the driver.

Maurice Andrews testified he had a conversation with Handy and Gray about what happened.  He alleged Simmons put money on the victim's head, and Handy shot him.  He claimed he was told Oliver drove the car but got no money for his part in the murder.  Andrews also alleged that he witnessed Handy tell

37

Simmons that he wanted the rest of his money for that hit.  [Tr.10/21/03pm:101-02; 10/28/03am:36-37]   Andrews conceded Oliver was not on a single wiretap. [Tr.10/23/03pm:137,155]

### b.    *Murder of Floyd [Counts 68 and 69]*

Oliver contends in Section XV that the evidence of his involvement in the Floyd murder (by John Raynor) on 6/2/99 is insufficient as a matter of law to support his conviction.  Facts regarding these counts are recounted within that argument.

### c.    *Conspiracy to Commit Murder for Hire (Rah-Rah) [Count 3, RA 55]*

The government's evidence alleged that Rodney Moore, Kenneth Simmons, Deon Oliver and other men believed that Rah-Rah, whose real name was alleged to be Robert Harris - a fact never proved at trial - killed Simmons' brother, Moustafa Miller ("Lucky"), in 1993.  Lucky was Oliver's cousin.  [Tr.2/10/04pm:48-52] The government claimed these men conspired unsuccessfully to kill Rah-Rah, long after Lucky's death.

This lack of identification of Rah-Rah makes this conviction problematic. As Oliver's PSR notes, [¶100 n.20], the charge of conspiring to kill Rah-Rah was dismissed by the district court in *Moore* after argument on motions for judgment of acquittal based on the government's failure to prove that Rah-Rah was the same person as Robert Harris.  Although the government again failed to prove this at

38

appellants' trial, the district court did not grant a Rule 29 motion this time.  The government successfully moved to "alter" the indictment by striking the name Robert Harris, leaving just Rah-Rah, [Tr.1/23/04am:15-16], arguing this was a variance that didn't affect Oliver's substantial rights.  Oliver contended, to the contrary, that the alteration of the indictment *was* a prejudicial amendment since the government had failed to prove who Rah-Rah was.  [Doc. 1858]

Oscar Veal testified that Oliver tried unsuccessfully to hire him to kill Rah-Rah in 1998, and was one of several people with whom he drove around looking for Rah-Rah after allegedly accepting Simmons' $7000 offer to kill Rah-Rah in 1999.

Veal's poor credibility is discussed elsewhere in the Statement of Facts.  Oliver testified that he did not even know Rah-Rah.  He denied attempting to hire Veal to kill Rah-Rah and riding around with Veal.  [Tr.2/10/04pm:52]

### 3.    Franklin Seegers

Franklin Seegers ("Seegers") was convicted of narcotics conspiracy, RICO conspiracy, assault with intent to murder while armed (Lincoln Hunter), attempted murder in aid of racketeering activity (Hunter), use of a firearm during and in relation to a crime of violence or drug trafficking crime (Hunter), possession with intent to distribute cocaine and possession with intent to distribute heroin.  The jury found Seegers responsible for 500 grams but less than 5 kilograms of cocaine,

50 grams or more of cocaine base, and 100 grams but less than 1 kilogram of heroin.

Notably, no verdicts were returned, and a mistrial was declared, on four counts:   (1) first-degree murder while armed (Diane Luther); (2) CCE murder (Luther); (3) killing a witness (Luther); and (4) use of a firearm during a crime of violence (Luther murder).

According to the government, Seegers joined the charged conspiracies in **November of 1996**,[13] murdered Luther because members of the Gray/Moore conspiracy believed she was cooperating, and shot Hunter during the same incident that resulted in Luther's murder. There was no physical or scientific evidence linking Seegers to any of the counts of violence or cocaine base.   Rather, the evidence against Seegers consisted almost entirely of testimony from cooperating witnesses.

### a.      *Government's Evidence*

The government's evidence that Seegers' participated in the narcotics and RICO conspiracies with which he was charged was weak – so weak that during arguments before the district court regarding Seegers' mid-trial motion for acquittal, it relied almost entirely on its allegation Seegers murdered Diane Luther in furtherance of those conspiracies.  [Tr.1/23/04pm:20-22]  As set forth above, the

---

[13]  [Tr.3/30/04am:44-46]

jury was not convinced Seegers was responsible for Luther's murder. The possession counts against Seegers were based entirely upon narcotics discovered subsequent to his 1996 arrest in the room he shared with his brother. [Tr.11/10/03pm:12-29; 11/12/03am:75-78]

The government's evidence regarding the crimes of violence with which Seegers was charged was provided through cooperating witnesses, including Lincoln Hunter. Maurice Andrews testified that Kevin Gray told him Moore gave Seegers "money and drugs," but, although he saw Seegers frequently, he never witnessed him sell drugs or saw a drug relationship between he and Moore. [Tr.10/21/03pm:65-66]   He claimed Gray also told him Moore paid Seegers $5000.00 for killing Luther and that Seegers was present after Luther's murder when Moore stated she had to be killed.  [Tr.10/21/03pm:66;81-84] Under cross-examination, however, Andrews admitted he had never before claimed Seegers was among the individuals present during that conversation.  [Tr. 10/23/03pm:110-11]

Raymond Sanders testified he never met Seegers or witnessed him selling drugs, but did see Seegers speaking with Moore on the street; he couldn't recall when that occurred.  [Tr.11/6/03am:22-23; 11/06/03pm:111-12]  Sanders claimed Moore stated Luther got what she deserved, but did not tell him what happened,

and confirmed that Ervon Clyburn's murder was unrelated to Luther's murder. [Tr.11/06/03am:28; 11/06/03pm:123]

Eugene Williams testified Seegers was in his home acting as an enforcer for Pee Wee Oliver sometime in late 1995.[14]    [Tr.11/13/03am:118-19]    He also claimed Oliver told him Seegers killed Luther and that he saw Seegers selling drugs near his home, but he did not state when that occurred.  [Tr.11/13/03am:126-27]    Williams confirmed it was rumored Seegers and Luther had a "fling." [Tr.11/13/03am:125]

Hunter testified that Seegers shot him multiple times (with the first shot being to the back of the head) and killed Luther while he had her in a headlock (although he changed his story regarding the headlock while testifying). [Tr.11/12/03pm:27-28; 11/13/03am:23-25]    The government's medical evidence unequivocally proved Hunter was not shot in the back of the head.  [DL-501a] Moreover, the government's ballistics evidence showed that the shell casings found at the scene were *identical* to those found in Hunter's home. [Tr.1/21/04pm:28]  Moreover, Luther's autopsy revealed she did not have soot or stippling on her body.  [Tr.11/24/03am:100-102]

Helen Clyburn testified that Ervon Clyburn saw Seegers, Hunter and Luther involved in "a tussle" minutes before Luther was killed.  [Tr.11/14/03am:84-85,88]

_____

[14]   Seegers was incarcerated for several years prior to May 1996, so that would be impossible.

42

### b.     Defense Evidence

John Moye testified that he witnessed Hunter murder Luther and Hunter and Seegers struggle for the gun.  [Tr.1/27/04am:134-41]  Moye also testified that Hunter confessed to killing Luther.  [Tr.1/27/04am:138-39]  Willie Fears testified that Hunter confessed to him that he murdered Luther.  [Tr.2/2/04am:102-04] Lorraine Petway testified that Seegers shared the room in which narcotics were seized with their brother, James, an addict, and when James arrived home after the seizure, he searched the room frantically.  [Tr.3/10/04pm:12-30]

### 4.     Kenneth Simmons

Simmons was convicted of 8 counts: drug conspiracy; RICO conspiracy; murder of Richard Simmons as both D.C. Code and federal offenses; murder of Thomas Walker as both D.C. Code and federal offenses; and two violations of 18 U.S.C. § 924(c) for use of a firearm during a crime of violence.

### a.     Evidence of Drug Conspiracy.

Although Simmons allegedly participated in a major drug conspiracy for twelve years, the only drug allegation charged against him in the original indictment was distribution of a kilogram of cocaine to Kevin Gray in the summer of 1999 (Overt Act 211).  The government did not pursue this allegation.  [Doc. 1947]  Simmons was found responsible for 5 kilograms or more of cocaine; 50

43

grams or more of cocaine base and less than 1 kilogram, but more than 100 grams of heroin, but not guilty of distributing marijuana. [Doc. 1879]

Maurice Andrews testified Simmons operated "Graffiti," a clothing store on "H" Street N.E. [Tr.10/21/03am:57-58] Andrews alternately claimed Rodney Moore supplied drugs to Simmons and Simmons supplied drugs to Moore's partner, Gray. [Tr.10/21/03am:54-59] Andrews further claimed Gray supplied drugs to Simmons from 1998 to 1999, but maintained that throughout this period Simmons' drug partner was "Biggums," who was not related to the Gray/Moore conspiracy. [Tr.10/21/03am:60,102-03]

Omar Wazir focused on homicides unrelated to Simmons. By a stroke of luck, however, he claimed to witness a single, heated telephone conversation between Gray and another individual whom he identified as Simmons, during which a refund was demanded from Gray for poor quality cocaine. [Tr.10/28/03pm:114-118]

Walter Fleming ("Biggums") identified Simmons as "Garma-Goo." [Tr.11/17/03pm:29; 11/18/03am:17] Fleming claimed to be Simmons' drug partner during the 1990's. He pled guilty to that drug conspiracy in the Eastern District of Virginia and received a thirty-year sentence. [Tr.11/17/03pm:38] He admittedly hoped his cooperation would lead to a sentence reduction. [11/17/03pm:38-41]

Without providing any details regarding time, place or quantity, Fleming asserted Simmons sold drugs to Gray and that Fleming began dealing drugs with Simmons in 1993.  [Tr.11/17/03pm:59,72]  In 1994, Carlos Cardoza became their supplier.  [Tr.11/17/03pm:77]  Fleming further claimed he and Simmons stored and cooked cocaine in a Silver Spring stash apartment. [Tr.11/17/03pm:87]  He also alleged that following raids in 1996 and Cardoza's death, "Geetch" became their new supplier and a Landover stash house was established. [Tr.11/17/03pm:100,126-129]   Fleming was unaware of Gray selling any drugs to Simmons.  [Tr.11/17/03pm:145]

Fleming stated "Graffiti Sports" opened in 1998 and was a regular point of sale for drugs, but was unable to provide details of these supposed transactions. [Tr.11/18/03am:15]  He narrated several May 1996 wiretaps between himself and Simmons, which he alleged reflected drug activity.  [Tr.11/18/03pm:7-16]

### b.    *Evidence of RICO Conspiracy*

The RICO conspiracy allegation was based upon four racketeering acts: the drug conspiracy outlined above; the murder of Richard Simmons; conspiracy to murder "Rah-Rah;" and conspiracy to murder Thomas and Timothy Walker and first-degree murder of Thomas Walker.

### c.    *Evidence of Richard Simmons Homicide.*

Richard Simmons operated "Aztec," a clothing store, in front of which he was killed.   Several witnesses identified people other than Simmons as the assailant(s).  [Tr.12/11/03pm:42,116,140; 11/30/03pm:58-62]

Richard Simmons allegedly spread rumors Fleming was cooperating, but he denied doing so.  [Tr.11/18/03am:55,57]  According to Fleming, he discussed the matter with Simmons, who he claimed said "he had a man," meaning Simmons would retain someone to kill Richard Simmons.  [Tr.11/18/03am:61]  At the time of the murder, Fleming and Simmons were together several blocks away. [Tr.11/18/03am:63-64]  Fleming claimed Simmons later told him he paid "Dog" and Deon to shoot Richard Simmons.  [Tr.11/18/03am:70-72]

### d.    *Evidence of Walker Homicide*

According to the government, Simmons hired individuals to kill Thomas Walker and his brother, Timothy, following a nightclub altercation in which the Walkers got the better of Simmons.  Only Thomas Walker was murdered.

Andrews testified he thought Simmons told Gray he wanted the Walkers killed because of the fight and offered to pay Gray $10,000.  [Tr.10/21/03pm:61; 10/22/03am:68,70-71]  Later, Simmons, Andrews and Gray allegedly searched for the brothers without success.  Gray subsequently told Simmons that "Little Al"

46

committed the murder, for which Andrews thought Simmons paid Gray $5,000. [Tr.10/22/03am:74,78]

Simmons was also convicted of two weapons offenses under an aider and abettor theory. An initial allegation that weapons found in "Graffiti" were utilized in drug transactions in violation of 18 U.S.C. § 924(c) was dismissed.

### e.     Defense Evidence

Fred Blanken, a real estate broker, testified "Graffiti's" location was vacant from August 1996 until Simmons inquired about it in mid-November 1997 and that it required considerable renovation.     [Tr.1/15/04am:63-70]     To dispute government claims drug activity occurred at "Graffiti" before it opened, a certificate of occupancy issued in May 1998 was presented. [Tr.1/22/04am:116][15]

To refute the theory "Graffiti" was only a drug front, Simmons presented a FBI agent who conducted a forensic audit of commercial paperwork recovered during the search of the store. He valued inventory recovered ($67,200) and reviewed over 1,600 invoices, calculating estimated gross sales to be $56,000 during a seven-month period in 1999. [Tr.1/22/04am:105-110] Several former "Graffiti" employees also testified that while working there they never saw drug transactions or weapons. [Tr.1/26/04am:34-35; 1/28/04pm:37]

---

[15] Introduced to impeach government witnesses who claimed Graffiti was open and did drug business earlier than 1998. [Tr.11/24/03pm:110-112]

Simmons made a motion for judgment of acquittal on all counts. [Tr.1/23/04am:17-26,32]  The district court granted that motion for Overt Act 227 and  Count 125, but denied the remainder.  [Tr.1/23/04pm:28-29]

The government presented no rebuttal to Simmons' defense.  Simmons was convicted of all counts with which he was charged.

### 5.    James Alfred

James Alfred ("J.Alfred") was convicted of one count of Narcotics Conspiracy, one count of RICO Conspiracy, one count of first-degree murder (Joseph Thomas), one count of CCE Murder (Thomas), one count of Using a Firearm in relation to a crime of violence, and three counts of Unlawful Use of a Communication Facility.  The jury also found as "proven" that J.Alfred agreed that he or some member of the conspiracy was involved in the first-degree murder of Thomas, and conspiracy to commit the murder of Carlos Cardoza.  There was no physical or scientific evidence linking J.Alfred to any of the charged offenses. Rather, the evidence consisted almost entirely of testimony from cooperating witnesses.

### a.    *The Conspiracy Charge*

Maurice Andrews testified that J.Alfred was involved in the drug business. [Tr.10/21/03am:84]  Although Kevin Gray allegedly fronted powder cocaine to J.Alfred, wiretapped conversations indicated that Gray was becoming increasingly

48

frustrated with J.Alfred's inability to pay. Gray was told to stop dealing with J.Alfred because he was "known for messing up" people's money. [Tr.10/22/03am:135; 10/22pm:8-19] Eventually, Gray started telling J.Alfred he had no drugs when, in fact, he did. [Tr.10/22/03pm:46-51] According to Andrews, J.Alfred was not part of the "crew," he was only a customer. [Tr.10/23/03pm:66]

Omar Wazir testified that J.Alfred made his money selling cocaine and that in 1988, *prior* to J.Alfred's alleged entry into the conspiracy, J.Alfred bought heroin for Wazir and another individual. [Tr.10/28/03pm:89-98][16] Wazir claimed he only saw one transaction between J.Alfred and Gray in 1999 and saw J.Alfred sell drugs a few times. [Tr.10/30/03am:40] According to Wazir, moreover, J.Alfred purchased his own drugs, sold to whomever he wanted, and was not a "lieutenant" in the Kevin Gray organization. [Tr.10/30/03am:48]

Walter Fleming testified that J.Alfred was not a violent person and liked to roller skate. [Tr.11/19/03am:95-97]

Frank Howard provided extensive testimony concerning J.Alfred's drug dealing from 1993 to 1996. [Tr.1/9/04pm:25-37] Nearly all of this occurred before J.Alfred allegedly joined the conspiracy. Howard also agreed none of these drug transactions had anything to do with Kevin Gray. [Tr.1/12/04pm:18]

---

[16] The parties agreed that James' alleged involvement in the conspiracy did not begin before May 15, 1995. [Tr.10/28/03am:48-49]

49

The only other evidence concerning J.Alfred's alleged role in the conspiracy consisted of three recorded cell phone conversations between Gray and J.Alfred. In each of these conversations J.Alfred is allegedly seeking to obtain drugs from Gray, but in each conversation Gray says he has no drugs. [Tr.10/22/03pm:37-57]

No firearms, drugs, cash, or items of value were observed or recovered during a search of J.Alfred's residence. [Tr.1/8/03pm:58-59]

The other evidence relevant to J.Alfred is set forth in his individual argument concerning the sufficiency of evidence in Section XXVIII.

6.    Ronald Alfred

R.Alfred was charged in the murders of Joseph Thomas, Carlos Cardoza and Anthony Watkins, attempted murder of Andre Sanders, and drug conspiracy.

### a.    *Joseph Thomas*

Thomas' benign nickname ("Froggy") belied his violence.   Thomas kidnapped and robbed Rodman Lee ("China"), then watched as a lighter was placed under China's balls. [Tr.11/6/03pm:60-61,63-64] China asked Gray to kill Thomas [Tr.1/9/04pm:82], and "that's when the hit went out." [Tr.10/21/03pm:30-31] The murder plan, Frank Howard admitted, was devised by "me and Kevin." [Tr.1/12/04am:136-37]

The government claimed R.Alfred *also* wanted Thomas killed, said he would pay, *cf.* [Tr.10/21/03pm:28] (no price mentioned), and helped look for

Thomas.  Before Thomas' murder, Howard said he came to R.Alfred's Fresh Gear store to get Bernard Franklin ("Gangster") **and R.Alfred**.  But Howard earlier told a grand jury **only** of going to Fresh Gear to get **Gangster**.  [Tr.1/12/04pm:10-11]

R.Alfred allegedly drove up and nodded, shortly before Gangster shot Thomas.  The offenders allegedly celebrated at Fresh Gear, and later split China's payment.  Gray and Gangster got money, and Howard's $9000 debt was forgiven – but no one claimed R.Alfred got paid anything.  [Tr.1/12/04am:13,133,136]  While Howard described Gangster as R.Alfred's "hitman," Gangster's only "hit" was Thomas.  [Tr.1/12/04am:131]  Howard never heard R.Alfred ask Gangster, Gray or Howard to shoot Thomas, [Tr.1/12/04am:131,135], or pay Gangster. [Tr.1/12/04am:132]  Gray spoke and interacted freely with Gangster, [Tr.1/12/04am:133], and while Andrews claimed Gray **told** him R.Alfred paid him in drugs for this hit, this information came from Gray. [Tr.10/23/03pm:54-55] Wazir also claimed R.Alfred said he got Gangster to kill Thomas – but admitted no one else heard this. [Tr.10/30/03am:22-23]

### b.    *Carlos Cardoza, Jr.*

Veal murdered Cardoza.  Veal acted at Gray's direction, and R.Alfred was not with Veal.  [Tr.10/23/03am:125]  Again, the government's theory was R.Alfred **assisted**, as a lookout, and by providing a van and gun.  Veal acknowledged R.Alfred was not a main player looking for Cardoza, but claimed R.Alfred did so

"sometimes," [Tr.12/8/03pm:50] – though Veal was never in a car with R.Alfred looking for Cardoza.  [Tr.12/8/03pm:71,93]  R.Alfred's van was *not* used by Veal during this killing, [Tr.10/23/03am:122]; indeed, it was never used in any crime. [Tr.10/23/03am:127-28]    Veal    described    R.Alfred's    van    as    blue, [Tr.12/2/03pm:35], but Howard said R.Alfred's van was grey, and anyone calling it blue was lying or "severely" mistaken.  [Tr.1/12/04pm:15]

The gun was given to Veal *by Gray*.  The government claimed Gray got this gun from R.Alfred.  [Tr.10/23/03am:115-16]  But Andrews merely said Gray emerged from the back of Fresh Gear with a gun Gray *said* came from R.Alfred. Andrews never saw R.Alfred give Gray a gun, or heard their conversations. [Tr.10/23/03am:114] ("I couldn't tell you where [Gray] got it from.")  Lionel Nunn paid Gray $100,000, [Tr.1/9/04pm:96], Gray then paid Veal and gave Andrews drugs [Tr.10/23/03am:127-29]; again, no one said R.Alfred was paid anything. [Tr.10/22/03am:29]   Veal admitted R.Alfred never asked him to kill Cardoza, never paid him money, and never celebrated the murder.  [Tr.12/8/03pm:71-72; 12/10/03pm:101] ("I'm not saying he was out killing people like Kevin.")

### c.    *Anthony Watkins*

Veal also murdered Watkins.  [Tr.10/23/03am:132]   Raynor drove the getaway car.  Again, Nunn asked Gray to kill.  Veal claimed R.Alfred was at his restaurant, Pile-em-Up Fish, when Gray and Raynor talked about this hit.

[Tr.12/3/03am:13-14]  Veal ultimately conceded:  Gray passed the gun to him, and Gray instructed him to murder Watkins.  [Tr.12/8/03pm:104]  Veal admitted R.Alfred never told Gray to give this gun to Veal.  [Tr.12/8/03pm:105]  After Watkins' murder, Veal gave the gun to Gray, not R.Alfred.  [Tr.12/8/03pm:107] *Accord* [Tr.10/23/03am:130] (no allegation R.Alfred's van or another gun given for this murder.)  Veal claimed R.Alfred helped look for Watkins, although Watkins' whereabouts were not secret.  [Tr.10/23/03am:131-32]

Nunn paid Gray, who paid Veal.  [Tr.10/22/03am:46-54]  Again, R.Alfred was paid nothing, [Tr.10/23/03am:127-28], and there was no celebration. [Tr.12/8/03pm:115]

### d.    *Andre Sanders*

The government also claimed Nunn wanted killed a person driving in a green Cherokee (allegedly Andre Sanders), and Gray enlisted Veal's help. [Tr.10/22/03am:52-53]  Again, R.Alfred's alleged role was simply looking for the target, [Tr.12/2/03pm:141-47], who was never found.

### e.    *Drugs*

R.Alfred was also charged with drug conspiracy, despite no surveillance, no video/audiotapes, no independent eyewitnesses, no confession, and no fingerprints. Despite thousands of wiretapped calls, [Tr.11/18/03pm:72], Fleming's, Wallace's and Gray's phones revealed no drug dealings with R.Alfred.  [Tr.1/14/04pm:56-59]

Howard, who went to Fresh Gear hundreds of times, never saw R.Alfred involved in drug transactions. [Tr.1/12/04am:120]  Kingpin Fleming also frequented Fresh Gear, yet never dealt drugs with R.Alfred. [Tr.11/18/03pm:127-28]

The only *tangible* drug evidence against R.Alfred consisted of a picture of one baggie of purported crack seized from his apartment [Tr.1/9/04am:37-40] – which the government agreed was never lab tested. [Tr.3/22/04am:47-48]   No scales, cutting/cooking agents, or packaging materials were found. [Tr.1/9/04am:65]  Even cooperators' allegations of R.Alfred's drug involvement often focused on pre-1995 activities, *e.g.,* [Tr.10/30/03am:9-10] (Wazir), or claims R.Alfred "knew of" his brother James' dealings.  R.Alfred had assets, but also two operating businesses, [Tr.1/12/04pm:37; 2/2/04am:24], and well-recognized prowess as a high-stakes gambler.  [Tr.11/19/03am:36-37; 12/15/03pm:11-12; 1/12/04am:121-22; 1/28/04pm:14-16; 1/29/04am:12,27]

### D.    Summary

The trial itself, and certain interactions among the district court, appellants and counsel, were extraordinary.  The district court essentially adopted a let-it-in approach when it came to the government's cooperating witnesses, restricting almost nothing.  One day, after overruling yet another defense objection seeking to exclude prejudicial government evidence, the court observed, "[a]ll the cases say that the only way for a district judge to get reversed in a case like this is to curtail

cross-examination." [Tr.1/9/04pm: 128] Voluminous evidence about countless unrelated murders and drug deals, often involving unrelated persons, was freely admitted, tainting the trial and its jury.

Further details of the facts, evidence and proceedings will be set forth as necessary for the discussions of the issues raised below.

## SUMMARY OF THE ARGUMENT

Appellants were denied their constitutional right to a fair trial as a result of errors committed during their trial.

### *Denial of Appellants' Sixth Amendment Right to a Unanimous Verdict*

Appellants were denied their Sixth Amendment right to a unanimous verdict by the jury impaneled to decide their fate. Verdicts were returned only after a known holdout juror for the defense (Juror #9) was improperly removed, and after the secrecy of jury deliberations was improperly invaded.

In its seminal decision of *United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987), this Court held that "if the record evidence discloses ***any possibility*** that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court ***must*** deny the request." *Id.* at 595 (emphasis added). Here, there was more than a "possibility" the request to discharge Juror #9 stemmed from his views about the government's evidence – his unwillingness to convict was openly described in jury notes, and the accusations against him came

55

from a juror (Juror #12) whose court activities had revealed him as hostile toward the defense.  Yet rather than "deny[ing] the request," as *Brown* requires, the district court conducted individual *voir dire* of selected jurors.  The district court then not only asked about Juror #12's allegation that Juror #9 had removed handwritten notes from the jury room, but also inquired directly about the jury's ongoing deliberations.

The district court discharged Juror #9 based only on a finding he "had a fixed view from the outset" – despite jury notes describing "good faith deliberations."  Thereafter, the judge revealed his ruling was based in part upon his own "personal observations," after he had "stepped into the open door" of the jury room a week before.  The district court specifically stated it could not find beyond a reasonable doubt that Juror #9's removal of papers from the jury room constituted misconduct, and did not remove Juror #9 on that ground.

Juror #9 was then discharged – *ex parte*.  The district court described how it privately collected Juror #9's verdict forms.  Defense requests to seal these papers for appeal were refused; instead, all of Juror #9's materials were shredded.

After a former Chief Judge of this Court was quoted in *The Washington Post* criticizing Juror #9's discharge, the government submitted, and the district court adopted, additional Findings of Fact.  In those Findings, the court also found "by a

56

preponderance of the evidence" that Juror #9's removal of notes from the jury room was misconduct, and an "independent basis" for removing Juror #9.

Not only did the district court err in finding that Juror #9 never deliberated, and committed misconduct, but also it erred in other ways. It erred by giving an anti-deadlock instruction when a defense holdout was known, and by not immediately declaring a mistrial thereafter, when the jury reported it was still unable to reach a verdict. It erred in invading the secrecy of jury deliberations. Once it decided to conduct individual *voir dire* of deliberating jurors, it also erred by conducting a selective and incomplete investigation into allegations of Juror #9's alleged misconduct. It erred in allowing numerous *ex parte* communications between marshals and deliberating jurors. And it erred by destroying Juror #9's notes, which compromised the record submitted for this Court's consideration.

### Government's Improper Use of an "Overview Witness"

The government's extensive use of a law enforcement overview witness, over objection, to pre-rehabilitate cooperating witnesses, pre-condition the jury and provide an ongoing closing argument during the presentation of evidence deprived appellants of a fair trial.

### Other Crimes Evidence

The district court permitted the government to introduce voluminous amounts of "other crimes" evidence throughout the trial. In a very few cases,

notice was given and the matters litigated; in those cases, appellants assert that the district court did not correctly identify a proper basis for admission of most of the evidence in question and got the Rule 403 balancing incorrect as to all of it. The vast majority of the "other crimes" evidence, however, was introduced without pretrial notice, normally without any clearly articulated non-propensity basis for admission and almost never with the careful balancing required by Rule 403. This evidence was not harmless and, individually and cumulatively, constituted reversible error for all appellants.

In addition, the government emphasized this evidence in its closing arguments and asked the jury to draw improper conclusions from it. In turn the final instructions given by the district court completely failed to give the jury any meaningful guidance as to how to consider the "other crimes" evidence as it generally refused to list what evidence was covered by its instructions and provided merely a "laundry list" of theoretical bases for admission, almost none of which were relevant to appellants' trial. While these errors in closing argument and final instructions contributed to the errors in admitting the "other crimes" evidence, they also constitute independent bases for reversal, even were this Court to deem the initial introduction of the evidence proper.

***Confrontation Clause Violations***

The district court violated the Confrontation Clause rights of all appellants by allowing their convictions to be based on official drug and autopsy reports, which were introduced as direct evidence despite the absence of their authors.

***McGill's Stun Belt Revelation***

As set forth above, a climate of fear permeated every stage of appellants' trial, beginning with jury *voir dire*.  When McGill revealed that the district court considered appellants so dangerous as to warrant a unique force attached to their bodies, that fear was not only confirmed, but also amplified.  Appellants Oliver, Seegers, Simmons, J.Alfred and R.Alfred assert that as a result, their trial was rendered fundamentally unfair and an unreliable vehicle for determining guilt or innocence.

***Improper Testimony by Government Witnesses that***
***Appellants' Co-Defendants were Previously Convicted***

All convictions for CCE murder and RICO conspiracy must be reversed because two government witnesses were allowed to testify that the defendants in *Moore* were all convicted.  This testimony removed elements of the offenses from the jury's consideration, requiring reversal.

***Improper Denial of McGill's Presence in Court***

The district court committed reversible error when, after removing McGill from the courtroom for being disruptive, it did not afford him the opportunity to

reclaim his right to be present by either (1) accepting counsel's representations made in McGill's presence, or (2) had the district court felt it necessary, directly inquiring of McGill as to his intentions (an opportunity given to his co-defendant).

### Improper Denial of McGill's Qualified Defense Expert

The district court improperly precluded the testimony of a qualified defense expert on voice identification without (1) a hearing on the matter and (2) making findings that the defense expert testimony did not meet the criteria of Fed.R.Evid. 702, which governs the admission of expert testimony. In determining whether the defense expert testimony was admissible, the district court applied the wrong legal standard by not considering post-*Daubert* standards to the expert testimony that was being proffered.

### McGill's Indictment was Misjoined

McGill's separate indictment was misjoined, pursuant to Fed.R.Crim.P. 13, with the indictment of the other appellants in this case. McGill's indictment does not allege any overt or racketeering act by McGill to support his participation in either conspiracy of the other indictment. Moreover, joinder of these indictments interfered with substantial justice.

### Improper Impeachment of McGill

The district court committed reversible error when it permitted the government to admit extrinsic evidence of McGill's alleged prior bad acts,

60

including acquitted and unadjudicated offenses, as part of its impeachment of McGill.

## *McGill's Sentencing Issues*

The district court improperly sentenced McGill to a higher mandatory minimum sentence on the 924(c) count based upon a fact - discharge of the firearm - not found by the jury.

The district court improperly sentenced McGill to life sentences on two counts, Count 4, a violation of 18 U.S.C. § 1959(a)(1)(3), and Count 5, a violation of 18 U.S.C. § 1512(a)(3)(B)(i) for which a life sentence was only permissible in the case of death of the victim, and the victim did not die.

The district court improperly calculated McGill's sentencing guidelines by increasing the offense level for possession of a firearm when he was also convicted of a § 924(c) offense.

The district court erred in rejecting, without comment or explanation of any kind, counsel's request to sentence outside the guideline range by disregarding the 100-1 cocaine/crack disparity and the career offender guideline.

McGill's life sentence was unreasonable in light of the district court's errors in calculating the sentence and the other factors required to be considered.

61

### Improper Cross-Examination of Oliver

Over objection, the government was permitted to repeatedly cross-examine Oliver by asking him to comment on the truth or falsity of the most damning portions of cooperating witness' testimony, including the most damaging witness against him, Victoria Robles. Every federal court that has considered this issue has condemned questioning a defendant about the truthfulness of other witnesses. The district court's error in allowing this improper cross-examination was not harmless.

### Government's Misrepresentation of Evidence Against Oliver

The government was permitted to bolster its case against Oliver regarding the murder of Richard Simmons by using Victoria Robles' misleading grand jury testimony about the murder of Demetrius Green ("a little boy"). The government purportedly believed such testimony related to the Simmons murder, despite the fact that Simmons was not a little boy and the Green murder occurred in a completely different quadrant of the District on Forrester Street. Oliver objected to its admission as irrelevant and prejudicial.[17] The objection was erroneously overruled.

Even more inexplicable was the district court's order, at the government's behest, directing that Robles' grand jury transcript be redacted to exclude any

---

[17] The government did not allege Oliver or any of his co-defendants at trial played a role in Green's murder, for which Timothy Handy was convicted in a separate proceeding.

reference to Forrester Street as the location of the Green murder so the jury would not be "confused" by such references.  The prosecution made repeated, misleading use of this evidence, including, over objection, during its rebuttal argument.

As it is impossible to dismiss this repeated prosecutorial misconduct as harmless error, Oliver's three convictions (Counts 53, 54 and 87) based on the murder of Richard Simmons should be reversed.

### *Insufficiency of Evidence to Convict Oliver Regarding Floyd Murder*

There was insufficient evidence to convict Oliver of the William Floyd murder.  Accepting as true the government's assertion that John Raynor killed Floyd using a gun obtained from Oliver, there was not a scintilla of evidence showing that Oliver knew, or even suspected, Raynor was going to shoot anyone with his gun, much less Floyd.  Without any awareness of Raynor's plans for the gun, Oliver cannot be found guilty under an aiding and abetting theory. Alternatively, the government's own evidence supported the theory that Oliver believed Raynor wanted the gun to defend himself against what he reasonably believed to be an imminent gun assault by Floyd.   Accordingly, Oliver's convictions for Counts 68, 69 and 94 (the related § 924(c) gun charge) must be reversed.

### *Prosecutorial Misconduct Denied Seegers a Fair Trial*

During closing arguments, government counsel improperly inflamed the passions of the jury, asked jurors to step into the shoes of murder victims, vouched for its own witnesses, and used a recurring, improper theme filled with hyperbole. Such improper arguments unfairly prejudiced Seegers and denied him a fair trial.

### *Seegers Denied Due Process as a Result of Brady/Giglio Violation*

The government violated its *Brady/Giglio* obligations when it failed to provide readily available impeachment evidence regarding a central witness against Seegers.

### *Denial of Seegers and James Alfred's Motions for Severance and Mistrial*

The disparity of the evidence against Seegers as compared to his co-defendants required that he be severed.

Seegers and J.Alfred were entitled to severance and mistrial as a result of the misconduct of their co-defendants during their trial.

### *Insufficiency of Evidence to Convict Seegers*

There was insufficient evidence to prove the essential elements of the narcotics conspiracy, RICO conspiracy, weapons offense and violent offenses with which Seegers was charged. The government did not present any evidence that Seegers distributed drugs as part of the charged conspiracies in or after November

1996, the date it alleged he joined such conspiracies. Moreover, its own evidence showed that Seegers did not commit the violent crimes of which he was convicted.

### *Denial of Simmons' Motion for Judgment of Acquittal on Drug Conspiracy*

The district court erred when it denied Simmons' motion for judgment of acquittal as the government failed to establish the essential elements of the narcotics conspiracy charged in Count 1 of the Indictment.

### *Denial of Simmons' Motion for Judgment of Acquittal on RICO Conspiracy*

The district court erred when it denied Simmons' motion for judgment of acquittal as the government failed to establish the essential elements of the RICO conspiracy charged in Count 3 of the Indictment.

### *Denial of Simmons' Motion for Judgment of Acquittal on Weapons Offenses*

The district court erred when it denied Simmons' motion for judgment of acquittal as, even accepting the government's theory of the case, Simmons cannot be convicted of the weapons offenses charged in Counts 87 and 95 of the Indictment under an aiding and abetting theory.

### *Insufficiency of Evidence to Convict Simmons of 1959(a)(1) Homicides*

There was insufficient evidence to convict Simmons of the alleged homicides in aid of a racketeering enterprise charged in Counts 54 and 71 of the Indictment. The homicides were not committed to further a position in the enterprise, and thus should be reversed.

### Denial of Simmons' Pro Se Motions

Prior to sentencing, Simmons moved the district court in writing for a hearing on ineffectiveness of counsel and allegations of prosecutorial misconduct. It was error for the trial court to deny the motions without a hearing or response.

### Insufficiency of Evidence to Convict James Alfred of Murders

There was insufficient evidence to convict J.Alfred of the Thomas and Cardoza murders.  In regard to Thomas, there was no evidence that J.Alfred knew that anyone wanted to murder Thomas.  Nor was there evidence that he intended to bring about the murder.  In regard to the Cardoza murder, the evidence showed nothing more than J.Alfred being merely present when there were discussions about Cardoza.

### Ronald Alfred's Individual Issues

R.Alfred's trial was marred by an inherently confusing indictment, breathtakingly broad and slanted evidence of past misconduct allowed, and ineffective assistance of counsel.

The indictment declared R.Alfred did not enter this conspiracy until 1995, yet also told jurors his 1989 and 1991 acts of drug and firearms possession were Overt Acts in furtherance of that same conspiracy.  Presentation of R.Alfred's 1989 drug case was further marred by hiding from this jury R.Alfred's *acquittal*, and allowing government proof in violation of the Confrontation Clause, with

cross-examination improperly restricted.    Presentation of R.Alfred's gun possession charges was also irreparably tainted when a government witness claimed it involved a "police shooting" – a point never proven, and presented despite direct government assurances this prejudicial allegation would never come out.

The government's thin evidence of R.Alfred's drug involvement *during* the conspiracy was bolstered by physical evidence of "crack cocaine" said to be seized from his apartment – until it was revealed *no lab even tested this substance*.  The government also repeatedly violated Rule 610, improperly supporting the credibility of its "7-time triggerman" witness who alleged R.Alfred's participation in violent acts, by stressing this witness' religious conversion.  R.Alfred also suffered from ineffective assistance of counsel, through unwaived conflicts of interest and deficiencies at trial and sentencing.  The conflicts of interest were particularly harmful, as R.Alfred's first appointed lawyer in this case abandoned him to instead represent a key witness *against* him at trial, and earlier compromised R.Alfred's defense irreparably by leaving him *alone* in a debriefing with a *known cooperator*.

Evidence on Count 66, and on the attempted murder of Andre Sanders, was also insufficient to support R.Alfred's convictions.

*Cumulative Effect of Trial Errors*

The cumulative effect of trial errors requires reversal of appellants' convictions.

## ARGUMENT

## I.    APPELLANTS WERE DENIED THEIR SIXTH AMENDMENT RIGHT TO A UNANIMOUS VERDICT

### A.    Introduction

Appellants' convictions were obtained only after a holdout juror for the defense was removed, nine days into deliberations. The jury notes made clear, and the district court's improper inquiry into the substance of jury deliberations confirmed, that the juror was both skeptical of the government's case and alone in this belief. The dismissal of this juror, over objection, deprived appellants of their Sixth Amendment right to a unanimous jury.[18]

Furthermore, the district court's handling of the matter was repeatedly erroneous. It should not have given a deadlock instruction when it was reasonably plain there was a holdout juror for the defense. Having given that instruction, it should have declared a mistrial when a subsequent jury note revealed the impasse remained. Instead, the district court committed reversible error by inquiring into the jury's actual deliberations.

---

[18]    Appellants filed numerous pleadings in the district court regarding this issue during their trial. [*See* Docs. 1813,1815,1824,1834,1835-1837]

Finally, appellants submit that the post-hoc findings of the district court concerning the holdout juror were also erroneous. The juror had deliberated and had not otherwise acted improperly. Moreover, these findings cannot stand in any event due to numerous prejudicial procedural errors committed in reaching them.

**B.     Constitutional Basis of the Core Claim of Error**

The Sixth Amendment guarantees a unanimous jury verdict in federal criminal prosecutions. *United States v. Ginyard*, 444 F.2d 648, 652 (D.C. Cir. 2006); *United States v. Brown*, 823 F.2d 591, 595 (D.C. Cir. 1987); *United States v. Essex*, 734 F.2d 832, 845 (D.C. Cir. 1984). Because of the importance of this right, the ability of a jury composed of fewer than 12 jurors to decide a case, absent consent, is limited by Federal Rule of Criminal Procedure 23(b) (prohibiting a court from discharging a juror absent "good cause"), and further circumscribed by the Sixth Amendment itself, which "restricts the exercise of Rule 23(b) dismissals." *Brown*, *supra* at 597 ("limit[ing] the ability of courts to use Rule 23(b) … by command of the constitution"). In the seminal case of *Brown,* this Court noted that "the reasons underlying a request for a dismissal will often be unclear," and held:

> [A] court may not delve deeply into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations. Thus, unless the initial request for dismissal is transparent, the court will likely prove unable to establish conclusively the reasons underlying it. Given these circumstances, we must hold that ***if the record***

69

> *evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request…* Any other holding would fail to protect adequately a defendant's right to be convicted only by a unanimous verdict.

*Brown* at 596 (emphasis added). This is precisely what occurred in appellants' case.

## C.    Standard of Review

Appellants submit this issue is properly reviewed *de novo*. *Williams v. Cavazos*, 646 F.3d 626, 642 (9th Cir. 2011), *cert. granted on other grounds*, 132 S. Ct. 1088 (2012). Even if dismissal of jurors generally is reviewed for abuse of discretion, *Ginyard*, at 651; *Essex* at 845, "by definition," a district court "abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996). Rule 23(b) dismissals are subject "to 'meticulous' scrutiny in any case where the removed juror was known to be the sole holdout for acquittal." *United States v. Thomas*, 116 F.3d 606, 624-25 (2d Cir. 1997).

## D.    Facts Arising Prior to Deliberations

### 1.    The Marshals and the Jury

Before trial, appellants requested that the district court assign different Deputy Marshals to the courtroom from those assigned to escort the jury in order to limit risks of "Marshals communicating - even inadvertently - about the parties, the witnesses or the facts of the case with the jurors." [Doc. 1444] As later events

would show, denial of this motion was unfortunate.  [Tr.1/8/04pm:139-41] ("tell it to the court of appeals.")

### 2.    The December Incident

There were early indications of problems within the jury, not due to the actions of the eventual holdout juror (Juror #9), but due to the true problem juror: Juror #12. [19]  During trial, AUSA Pan admitted a private encounter with Juror #12 at a grocery store, in violation of the rule against jurors talking privately with court participants, but Juror #12 remained on the jury.  [Tr.12/8/03pm:145-46]

### 3.    The January Incident

On January 12, 2004, Juror #12 contacted the lead marshal assigned to the jury, Marshal Aleman, and informed him that by eavesdropping on other jurors in a hallway he had learned that Alternate Juror #3's supervisor, who was R.Alfred's cousin, was attending the trial.  [Tr.1/14/04am:8,14]  Although the information about the supervisor proved correct, and resulted in the alternate being dismissed, Juror #12's allegation that he was R.Alfred's cousin was absolutely wrong. [Tr.1/14/04am:15,18]  Moreover, during the investigation of this matter, Juror #12

---

[19]    Juror #12 (Anonymous #1032) worked for a police department for ten years and lived near a location where events relevant to appellants' case occurred. [Tr.1/14/04am:15; 10/8/03am:63-66,83.]  He described crime and drugs in his neighborhood as a "very serious" problem, strongly approved of undercover informants, felt his brother's ten-year imprisonment "did him good," and felt prosecutors wouldn't bring individuals to trial for four to five months unless they were guilty.  [Tr.10/8/03am:73,76,79,81,89]

falsely accused other jurors of spreading information that in actuality he himself had spread. [Tr.1/14/04am:25-29,36] Disturbingly, the district court waited several days before notifying appellants about Juror #12's conversation with Aleman, during which time he instructed Aleman to conduct other *ex parte* inquiries, including with some jurors. [Tr.1/14/04am:7-9,15] Appellants requested a mistrial and to "put the marshal on the record about these interviews," but both requests were denied. [Tr.1/14/04am:20]

After the January individual *voir dire* of all jurors, appellants moved to strike Juror #12 and others who had heard his accusations.[20] Those motions were denied. [Tr.1/14/04am:63-66]

### 4.    Juror #12's Comments on the Evidence During Trial

Juror #12 was frequently observed discussing testimony. On February 2, 2004, he commented to other jurors about a file one of the prosecutors was handling that directly related to the witness testifying. [Tr.2/2/04pm:159-62] The district court agreed only to instruct jurors generally to keep opinions to themselves. [Tr.2/2/04pm:162-163; 2/3/04am:11]

On February 17, 2004, appellants again moved to strike Juror #12, noting his refusal to look at certain defense exhibits, and observing that he continued to speak

---

[20]    Interestingly, when asked if he could remain impartial, Juror #1 said, "I got my own opinion. I don't care what other people think." [Tr.1/14/04am:33]

72

with jurors after the district court had instructed him not to. Those motions were denied. [Tr.2/17/04am:8-9]

The following day, appellants unsuccessfully moved for a third time to strike Juror #12, after he continued talking with other jurors and reacted to testimony by calling it "BS." [Tr.2/18/04pm:53-54] The district court promised to give another instruction but never did.

### E.    Facts Arising During Deliberations

During deliberations, disagreements within the jury were revealed. In Note #3, the jury stated:

> ***One juror*** has stated categorically that he does not believe in any testimony from any of the cooperating witnesses. Therefore it is ***unlikely for this jury to reach a unanimous decision.***

> ***Upon further elaboration***, it was also stated by ***that juror*** that there is no other evidence presented by the prosecution, either direct, circumstantial, non-cooperating, etc., that would ***likely*** lead to a unanimous decision.

[Doc. 1949; Tr.4/1/04pm:25-26] (Emphasis added.) Appellants moved for a mistrial, asserting that the note revealed a split with a holdout juror. [Tr.4/1/04pm:28-29] The district court instructed the jury to continue deliberating. [Tr.4/1/04pm:31]

On April 5, 2004, another similar note (Note #5) was received: [21]

> Judge Lamberth, we have deliberated for two days and we have *one* juror that has stated from the beginning of our deliberations that he does not believe any testimony of or by the prosecution, defense or any law enforcement witness.[22]  *Furthermore, we will not be able to make any unanimous decision*. As foreman I recognize we do not have the right to break the law when we from the beginning took an oath that we would examine all the evidence in this case without prejudice or bias.  We desire to be fair and comply with the law.

[Doc 1950] (Emphasis added.)

Appellants requested a mistrial, specifically arguing that any further instruction to the jury, which had revealed in its notes that it was divided 11-to-1, would be coercive; they requested time to brief the issue overnight.[23]

[Tr.4/5/04pm:3-11; 4/6/04am:3-7]   *See also* [Doc. 1813][24]   The district court

---

[21]  The note and the district court's response are dated *March 5, 2004*, which is surely an error.

[22]   Given that defense witnesses, who were mostly called to rebut the government's "other crimes" evidence, were also heavily impeached, the fact that a juror might not believe *any* witness is not inconsistent with a reasoned examination of the evidence and testimony.

[23]  The district court had assembled counsel at 5:07 pm to discuss the jury's note.

[24]  "Any further instruction … will reasonably lead the juror referenced … to conclude that … further instruction to continue deliberation is solely aimed at him or her.  Such instruction will have an impermissibly coercive effect.  *See United States v. Sae-Chua*, 725 F.2d 530 (9th Cir. 1984)."  It also specifically directed the district court's attention to *United States v. Thomas*, 449 F.2d 1177 (D.C. Cir. 1971) and *United States v. Brown*, *supra*.

denied those motions and sent a written response instructing the jury to continue deliberations.  [Doc. 1950; Tr.4/5/04pm:3,9-10; 4/6/04:5-6]

That same day, McGill's defense counsel advised that McGill and other appellants had heard a Deputy Marshal say, "We have to get rid of that juror." [Tr.4/5/04pm:11]    Rather than inquiring about this obviously inappropriate comment, the district court almost seemed to condone such comments, blithely stating that marshals do not have that power, "so I guess they can say what they want to say."  [Tr.4/5/04pm:12] [25]

Any ambiguity about the positions of members of the jury was dispelled by the critical note issued at the end of the day on April 8, 2004 (Note #8):

> The jury has **deliberated diligently and in good faith for 5½ days**. We have had **serious and productive discussion** and have **reviewed the majority of the evidence** and testimony for all the defendants.  At this juncture we have been unable to **arrive at only a very few unanimous decisions**.  **One juror continues to refuse to accept any verdict but not guilty or not proven for any count or charge for any defendant**.  Without further guidance or instruction from you, this jury will resume deliberations on April 13, 2004.

[Doc. 1952; Tr.4/8/04:4] (Emphasis added.)

---

[25]  The trial judge later revealed that he had spoken to Aleman, *ex parte*, who had privately spoken to the deputy in question.  According to Aleman, the deputy claimed the circumstances were "the opposite" of what appellants asserted. [Tr.4/6/04am:5]  No explanation of "the opposite" was ever provided.

The import of this note was undeniable - there was a single holdout juror for the defense.  But the district court mischaracterized the note, claiming it said one juror "continuously refused to accept any *evidence*," [Tr.4/13/04am:4] (emphasis added), –although the note only referenced refusal to accept guilty verdicts.  The government requested an anti-deadlock charge.[26]  Appellants disagreed, describing any anti-deadlock instruction as coercive, and noted the jury's own acknowledged "good faith" deliberations as well as the fact that the note had not asked the district court to do anything.  In the alternative, appellants requested the district court allow the jury to render partial verdicts.  [Tr.4/13/04am:3-12]; *See also* [Doc. 1815].  The district court denied appellants' requests and gave a modified anti-deadlock charge, again after incorrectly asserting one juror "does not want to discuss or consider *evidence*."[27]  [Doc. 1953; Tr.4/13/04am:12-13]

The day after receiving the modified anti-deadlock charge, the jury issued another note at 10:51 a.m. (Note #10):

---

[26] *See* Government Motion to Instruct Jury to Exchange Views filed April 13, 2003. [J.A.]

[27] That charge read as follows:

> In response to your last note on April 8, 2004, each juror is entitled to his or her opinions.  Each juror should, however, exchange views with his or her fellow jurors. This is the very purpose of jury deliberations, to discuss and consider the evidence, to listen to the arguments of the fellow jurors, to present your individual views, to consult with one another, and to reach an agreement based solely and wholly on the evidence, if you can do so without violence to your own individual judgment.

> We're requesting the testimony of Lincoln Hunter and Helen Clyburn. In addition, we have ***one juror, Number 9,*** that refuses to participate in any and all deliberations for this trial.

[Doc. 1954; Tr.4/14/04am:4]

The district court then revealed that Aleman had spoken that morning to the jury foreman (Juror #10), *ex parte* and off the record, and requested another note, which was signed at 11:05 a.m. (Note #11):

> THE COURT:     As the jurors broke, the marshal asked the foreman if he would put in writing what his concerns were that he expressed to the marshal last night, and the following note was handed. The first part is prepared by Juror Number 12. It says:
>
>> On April 12, 2004, I, Juror Number 12, observed Juror Number 9, throughout deliberations, writing notes on things out of his jury book [with] all defendants' charges. Then at April 13, the end of deliberations he pulled three pieces of paper from that tablet, yellow, folded them in half and placed them in his eyeglass case.
>
> The foreman adds:
>
>> Note, as foreman, I am very disturbed and concerned by this action of juror Number 9. If an alternate is available, that would make me feel safer.
>
> Now, what occurred yesterday as the jurors were leaving the van at the end of their transport, the foreman advised Marshal Aleman that this incident had occurred with Juror Number 9, and had been reported to the foreman; that the jurors had been told not to take anything out of the deliberation room, and that Juror Number 9 had been observed secreting this material in his eyeglass case….

77

[Tr.4/14/04am:4-5]    The district court added that he too had held *ex parte* discussions with Aleman about his interactions with this juror.  [Tr.4/14/04am:11] ("Marshal Aleman told me the conversation was private and no one else could hear it.")

The government requested individual *voir dire* of a number of jurors, starting with Jurors #10 and #12.  [Tr.4/14/04am:6]  Appellants opposed, noting "[t]he notes reflect a poisoned and tainted atmosphere in the jury" in which "the only hold-out…is being singled out and essentially attacked by a fellow juror with allegations in an attempt to remove him."  [Tr.4/14/04am:8-9][28]  Appellants also reminded the district court of the January incident involving Juror #12 where his allegations were not corroborated by other jurors he identified as involved, expressing concern that Juror #12 may be "trying to manipulate what goes on with this jury," and noting that they did not raise this accusation "lightly." [Tr.4/14/04am:12]

Appellants further supported their position by detailing Juror #12's improper actions throughout the trial.  [Tr.4/14/04am:12,31-33]  Moreover, they noted:

> Nine has a position on the merits.  It's absolutely clear it's a position on the merits, and that the Court of Appeals is very firm that we are not to interfere with and do any *voir dire* when a juror – when a split is clear, as it

---

[28]    As is common, convincing at least one juror of reasonable doubt was central to many appellants' trial strategy.  *See*, *e.g.*, [Tr.3/24/04am:55-56]

> is here, and a juror has enunciated a position on the merits.

[Tr.4/14/04am:18]

In addition, appellants requested that Aleman be put on the record and answer questions about his interactions with deliberating jurors. [Tr.4/14/04am:13,18-19]  Not only did the district court deny this request, but also it revealed, for the first time, that after arriving home the night before, Juror #10 had also telephoned Aleman on his cell phone.  [*Id.*]  Perhaps even more surprisingly, the district court acknowledged that it was the court itself that had initiated the note from Jurors #10 and #12, via its own *ex parte* conversation with Aleman.  [Tr.4/14/04am:14]  Astonished, appellants noted that the whole purpose of requiring the jury, without prompting, to communicate only in writing was "to short-circuit getting other personnel, specifically the marshals, into the loop and into the chain of communication, and involved in jury deliberations, [either] directly or indirectly."  [Tr.4/14/04am:15]

No court instruction had directed jurors not to remove their own papers from the jury room,  [Tr.4/14/04am:16-17,19-20], although the district court advised that the marshals had done so.  The district court also conceded, "***if he wrote something of his own on blank pieces of paper, there couldn't possibly be anything improper about it***."  [Tr.4/14/04am:19-21] (Emphasis added.) Elaborating, the court added, "as long as it didn't relate to the case, it wouldn't be a problem."

79

[Tr.4/14/04am:21-22]   At one point the district court presciently stated, "For all I know, he wrote a grocery list." [Tr.4/14/04am:17]

One defense counsel who was involved in this Circuit's *Brown* case warned against *voir dire*,[29] and appellants specifically cited both *Brown* and the Second Circuit's *Thomas* case, highlighting their admonition that "if the record raises any possibility that the juror's views on the merits of the case underlay the request that he be discharged, then the juror must not be dismissed," and complained that were the district court to ask the jurors any questions, it would breach the "sanctity of the jury room."  [Tr.4/14/04am:28]

Appellants also cautioned against reading the last note in isolation:

> [T]he notes … over a period of time indicate that this jury has been deliberating, that this deliberation has been classified as diligent and in good faith.  They have asked for evidence, they have reviewed transcripts, and now suddenly, when Juror Number 12 says something, we are now moving inside of the jury room and beginning to ask questions that we object to…

[Tr.4/14/04am:34]   Earlier jury notes had not claimed failure to deliberate, but rather reflected stark disagreement about the credibility of government witnesses. Questioning what more a holdout who consciensiously views evidence differently should do, appellants noted that even had Juror #9 stopped deliberating now, "it

---

[29]   "[J]ust let them continue to work together since they're asking for more evidence.  I think that's a simple way.  I think … that's the safest way .... [A]bsolutely not to voir dire."  [Tr.4/14/04am:23]

could be based on his well-founded belief that the government did not prove its

case," and that, in any event, relevant case law held that a court "may not intrude on

the secrecy of the jury's deliberation." [Tr.4/14/04am:37]

Appellants also asked, "didn't Ms. Pan run into [Juror #12] in a store?...This

juror keeps cropping up, involved in questionable situations...."

[Tr.4/14/04am:39][30]

Granting the government's request for *voir dire*, the district court began with

Juror #12, asking him to "walk me through what you observed…"

[Tr.4/14/04am:41]  Juror #12 claimed that during deliberations he saw Juror #9

taking notes "out of the book," and, at the end of the day, "just writing stuff down"

on a "yellow pad," "copying stuff out of the book." [Tr.4/14/04am:42]  He added

that Juror #9 "took whatever he wrote on…[the] paper … folded them up and …

slid them in his eyeglass case, but admitted that the papers "were from [Juror #9's]

own note pad." *Id.*

---

[30] "Juror Number 12 ... is the juror that proclaimed in open court ... 'That's bullshit.'  I heard it, other counsel heard it.  Juror Number 12 was also the one that, after the Court instructed the jury as a whole not to converse with other members of the jury while the case was ongoing, disobeyed the Court's order....  [T]hat is a bias he has shown in court, and now is revealing in the note.  The only reason that this Court is about to step into the jury room … is Juror Number 12." [Tr.4/14/04am:33]

Once again, Juror #12 admitted snooping on his fellow jurors, stating: "at the time I was sitting right beside him, so I was able to see it." [Tr.4/14/04am:42] He also conceded that he did not know what was written on the paper, but added that Juror #9 had gone through the book containing the indictment and instructions, jotting things down on several occasions. [Tr.4/14/04am:46-47] Finally, he admitted no one else had observed any of this. [Tr.4/14/04am:43]

After Juror #9 exited the jury room, Juror #12 mentioned his observations to the foreperson, Juror #10, who said he would "check into it."[31] [Tr.4/14/04am:43-44] Juror #12 claimed Juror #9 was looking to see if anyone saw him hide paper in his eyeglass case, which is what made him suspicious. [Tr.4/14/04am:48] He further claimed the jury had been instructed not to take anything home, and said he felt Juror #9's actions violated that instruction. [Tr.4/14/04am:49]

Juror #12 said the next day, Juror #10 informed him that he "needed a note," which Juror #12 wrote "in the lobby" and provided to Juror #10. [Tr.4/14/04am:45-46] When asked whether any other juror saw that note, Juror #12 responded, "Not there, no." [*Id.*].

---

[31] Juror #12 allegedly discussed the matter with Juror #10 in the jury room, while another juror was present. He did not know whether the third juror had overheard their conversation. [Tr.4/14/04am:43-44]

Thereafter, Juror #10 was *voir dired* regarding how the events surrounding the note had unfolded.  [Tr.4/14/04am:50]  According to Juror #10, it was "brought to [his] attention" that Juror #9 had been taking notes, which he placed in his eyeglass case.  [Tr.4/14/04am:51]  He admitted to only repeating what he was "told by Number 12."  [*Id*.]

When asked what concern Juror #12 had expressed, Juror #10 said such concerns included safety because "[w]e don't know what he's doing." [Tr.4/14/04am:51]    Juror #10 then described his overall impression of deliberations, claiming Juror #9 was not participating and was distant. [Tr.4/14/04am:51]  These descriptions were inconsistent with the jury's notes, as well as Juror #10's own subsequent acknowledgements that Juror #9 did, in fact, make comments during deliberations.  *See,* [Tr.4/14/04am:52] ("He doesn't say *too much*"); [Tr.4/14/04am:52] (describing various comments made by Juror #9); *see also* [Doc. 1949] (Note #3) (describing Juror #9's "further elaboration").

Upon further questioning, Juror #10 stated the basis for his concern as "I don't know what's in his mind personally myself," and described Juror #9 as an outcast, with "everybody, to a certain degree, I think, feeling for the rest of the ten jurors, they're very uneasy because they don't know what to expect from that individual ...  I think everybody is a little - they are disturbed.  They are very

uneasy with this particular juror." [Tr.4/14/04am:52] (describing "fear of the unknown with respect to his whole demeanor, his whole attitude").

Juror #10 said he told Juror #9, "we're here to deliberate, and you refuse to deliberate with us." [Tr.4/14/04am:52] The district court then asked, "What was his response to that?" – thereby directly inquiring about the internal deliberations of the jury. [Tr.4/14/04am:52-53] Juror #10 reported that Juror #9 responded, "Whatever the judge say." [Tr.4/14/04am:53]

As the district court ventured further into jury deliberations with its questioning, Juror #10 claimed that the jury's previous notes discussing "deliberating diligently and in good faith" referred to the eleven other members of the jury, not Juror #9. [Tr.4/14/04am:53] Continuing down its improper road, the district court asked whether the other eleven jurors were talking, leading Juror #10 to further elaborate on the internal deliberative process and describing Juror #9 as "not around the table with us." [*Id.*] Without prompting, the court queried, "He sits on the back wall?," [*Id.*] Juror #10 confirmed this, stating he "refuses to join us," and "hasn't really had anything to say, any comment. He has not examined any of the evidence set forth." [*Id.*]

Delving further, the district court inquired as to whether Juror #9 had looked at any evidence or transcripts sent back. [Tr.4/14/04am:54] At first, Juror #10 responded negatively, but then clarified that Juror #9 had, in fact, spoken

*frequently* about his view of this case: "He has said repeatedly, 'I don't want to hear it. I was sitting there. I made my decision ever since day one.'"[32]  [*Id.*]

Discussing internal deliberations, Juror #10 added that he had asked Juror #9 if he was trying to hang the jury, which he advised Juror #9 would be inappropriate because they had taken "an oath." [Tr.4/14/04am:54] He also suggested Juror #9's refusal to do more meant that "he hasn't *really* participated in nothing." [*Id.*] Continuing, Juror #10 stated that the other eleven jurors had "just about finished with four" and had "two more" they were considering. [*Id.*] With only six defendants on trial, Juror #10 was revealing that if Juror #9 was removed, and (as his latest note asked) "if an alternate is available," the jury could promptly return verdicts on four defendants.

Juror #10 conceded that Juror #12 may have mentioned his allegations to other jurors when he alerted Juror #10, and that "from chitter-chatter" the remaining jurors suspected something. [Tr.4/14/04am:55] Although Juror #10 wasn't aware which other jurors knew; he said Juror #12 may have told others because "[h]e's vocal." [Tr.4/14/04am:63]

---

[32] Even assuming this is an accurate quote, which is by no means certain, it is unclear if "day one" meant the first day of trial, which is unlikely, or the first day of jury deliberations. We do know from the jury's notes that at the end of the first day of deliberations, a split had developed clearly based upon Juror #9's view of the credibility of government witnesses.

Searching for an ally, Juror #10 asked the district court for an "objective" alternate juror:

> What I said to him [Juror #12] was…I was going to bring it to Mike [Aleman]'s attention because…it's an issue that needs to be addressed, and…if he's not participating, and with this particular incident, if an alternate is available that can be objective and help us…

[Tr.4/14/04am:55]  Juror #10 also shared his personal view of Juror #9's behavior with Aleman as "kind of abnormal from what I'm used to dealing with." [Tr.4/14/04am:66]  In addition, he stated that he had "mixed emotions" about Juror #9 allegedly taking paper and putting it in his eyeglass case because he and the other jurors didn't know "what he's doing" or "what his intentions are." [Tr.4/14/04am:55-56]

Appellants renewed their objections to the *voir dire* as well as the manner in which such questioning had branched off into the deliberative process, and asserted that Juror #10's claims were inconsistent with notes describing Juror #9's belief that the cooperators weren't credible, which was "not a failure to participate." [Tr.4/14/04am:20-25,59,62]  Nevertheless, the district court refused to inquire about earlier notes or whether Juror #9 voted or shared his opinions regarding the evidence.  [Tr.4/14/04am:59,61,67]

Thereafter, Juror #10 expressed his personal belief that it was inappropriate for jurors to discredit *any* evidence."[33] [Tr.4/14/04am:63]

Individual *voir dire* of Juror #9 followed, and he explained that the paper he placed in his eyeglass case was a grocery list he wrote before leaving, and stated that no one had said anything to him about it before. [Tr.4/14/04am:69-70]

Continuing to open its improper window into jury deliberations, the district court stated that there had been concerns expressed about the manner in which the jury was proceeding, and asked Juror #9 if there was anything about deliberations he thought "appropriate to disclose." [Tr.4/14/04am:70-71]

In response, Juror #9 described how his minority opinions were criticized:

> Well, it seems as though *when anybody expresses their opinion that's different than the majority, they get shouted down for some reason…They don't get a chance to express their opinion*. There's some loud-mouths back there that seems to want to sway the vote one way, but whenever someone gets up and expresses an opinion that's different than the majority, hey, they get shouted down for some reason. I don't know why.
>
>      \*     \*     \*     \*     \*
>
> Yes, I'm able to express my own opinion, but the thing of it is, if it's not the way the majority feels, then all of a sudden, "Why do you feel that way? Why do you feel that way?"

---

[33] This statement is a distortion of the jury's true function: to decide precisely which evidence should be discredited.

87

> *I feel that way because it's based on the evidence, that's*
> *why, in my opinion.*  In my opinion.  So what's the
> problem?

[Tr.4/14/04am:71-72][34]  (Emphasis added.)

Juror #9 discarded his grocery list upon concluding his shopping the previous night.  He vehemently denied being secretive when writing it. [Tr.4/14/04am:75]  Although he admitted sitting separately from the other jurors, he stated he had reviewed the evidence sent back.  [Tr.4/14/04am:75]  When asked by the district court if he had been willing to express his opinions, Juror #9 responded:

> Yes, but that's the point I'm trying to make.
> *They – for some reason, if it's against the*
> *majority, they try to shout me down.*  I don't
> know what it is.  They don't want to hear
> it…. I don't understand why they –

The Court:  We ask jurors to be patient and listen to each other.

Juror [9]:  *But they don't want to listen*….

The Court:  All right.  And you're willing to participate in any vote that was taken?

---

[34]  At this point, appellants could only renew objections to the court invading jury deliberations, and try to make the best of it.  [Tr.4/14/04am:73-74]

Juror [9]:  ***I have participated in every single vote*** that was taken….I have not missed one single vote.

[Tr.4/14/04am:75-77] (Emphasis added.)  The district court then inquired:

***And you're willing to talk about it?***

Juror #9 responded with a clear:

***Yes***.

[*Id*.] (Emphasis added.)

Following this colloquy, the government requested that "credibility determinations" be made regarding which jurors should be believed. [Tr.4/14/04am:77-79]   Appellants objected, asserting that discharging Juror #9 would deprive them of their constitutionally protected right to a unanimous verdict because good cause for discharge did not exist.   [Tr.4/14/04am:81]

Appellants also noted that Juror #9's frustration at being shouted down was corroborated by Juror #10's description of Juror #12 as "vocal." [Tr.4/14/04am:85]  Summarizing the situation, they noted:

> [W]hat we have basically is Juror Number 12, who is outspoken and apparently adversarial to Number 9, saying that he sees some writing, but he doesn't know what's on the writing.  We have Number 10 who doesn't see anything, but couches it as a security issue because he has a fear of the unknown, which is not a legitimate legal basis for anything, and we have Number 9 who knows exactly what it was, and it's a … grocery list.

[Tr.4/14/04am,85-86]

Attempting to prevent a serious error, appellants argued:

> …The standard is, is there a reasonable possibility that this person is being removed for their views, and there's certainly that and a lot more.  This juror has expressed that he has been willing to share his opinions.  He's looked at the evidence.  He's voted.  He's been in the minority a lot, he says, and when you're in the minority, you get shouted down.  He had the demeanor and the posture of someone who is getting bullied, getting pushed around…feels as if that's what's happening to him, but he expresses that he has done everything he can.  And so there's certainly, at a minimum, the reasonable possibility that…one or more other jurors sees him as an inconvenience and that's what this is all about.

[Tr.4/14/04am:88-89] (Emphasis added.)

The next morning, the district court announced it would grant the government's motion to remove Juror #9.  The court described this case as "very similar to the case of *United States v. Baker*, 262 F.3d 124 (2d Cir.)," despite conceding that Juror #9 had not admitted to having a fixed view before deliberations, "as the juror in *Baker* did."  [Tr.4/15/04:4]  The district court found "beyond a reasonable doubt" that Juror #9 had not discussed his views or the evidence with other jurors and "had a fixed view from the outset..."[35] [Tr.4/15/04:5-6]

---

[35]    The district court had conveyed its own personal belief that appellants were guilty earlier in the trial.  During a ruling regarding admissibility of evidence appellants argued post-dated any conspiracy, the court left no doubt where it stood, declaring, "It couldn't possibly post-date the conspiracy when there are conspiratorial acts going on here in this trial."  [Tr.2/19/04pm:146]

The trial judge then described his own *ex parte* observations to justify his ruling, refusing to credit Juror #9's claims of being shouted down because "I've passed the jury room numerous times … I have never heard any shouting, and I've been very close to the jury door." [Tr.4/15/04:7] Admitting that he entered the jury room during deliberations a week earlier, the district court described "one time that I stepped into the open door," as well as the layout of the room and his own "personal observations" that "this juror was sitting on the back wall, just as the testimony was yesterday." [Tr.4/15/04:7]

The district court, however, was unwilling to find that removing the paper constituted misconduct because Juror #9's assertions that it was his grocery list and Juror #12's supposition that it was something about the case "simply cannot be resolved beyond a reasonable doubt, and I won't rely on that in determining to remove him." [Tr.4/15/04:8-9] Instead, the district court relied on its "determination that the misconduct is that he had a fixed view before deliberations began; that he's been unwilling to deliberate, and that he should be removed." [*Id*.]

Since the only basis for dismissal was failure to deliberate, appellants sought the incremental step of reinstructing jurors on their duty to deliberate, before the ultimate sanction of removal was employed. After all, Juror #9 had confirmed he was "willing to talk," and even Juror #10 confirmed that Juror #9 had told him

91

"whatever the judge say." This request was refused. [Tr.4/14/04am:53; 4/15/04:10-11]

Following a break, the district court then informed appellants he **had just dismissed Juror #9 ex parte**, as well as privately collected Juror #9's materials and notebook, upon which he noted Juror #9 had made some markings. [Tr.4/15/04:13] The court further indicated that Juror #9's materials would be shredded, and warned counsel that any attempt to talk to Juror #9 would violate Local Rules. [Tr.4/15/04:13-15]

Noting "there's no harm in having it under seal," appellants requested that all juror verdict forms be "placed under seal and made a part of the record" in case they were "relevant in the future." [Tr.4/15/04:18-19,22] This request was denied. [Tr.4/15/04:22] Requests to *voir dire* remaining jurors were also denied. [*Id.*]

The following day, April 16, 2004, an alternate juror was seated, and deliberations resumed.[36]

A day later, a former judge of this Court was quoted in *The Washington Post* as saying the district court had gone too far in its removal of Juror #9 and that the proper course would have been to declare a mistrial.[37] Following that article's

---

[36] The jurors adjourned deliberations early that day, and only resumed with a half-day on the following Wednesday as court was not in session before then.

[37] Carol Leonning, "Troublesome Juror Ousted in D.C. Drug Gang Trial," *The Washington Post*, April 17, 2004 at A01.

publication, the government requested that the court adopt written Findings of Fact, which it presented in open court to appellants on April 22, 2004. [Docs. 1826,1835] Before appellants had an opportunity to respond, those findings were adopted in their entirety by the district court the following day. [Doc. 1841] In them, the court credited Juror #12's testimony that Juror #9 had acted "in a secretive, covert manner," and found "by a preponderance of the evidence" that Juror #9's removal of papers constituted an independent basis to remove him for good cause pursuant to Rule 23(b)(2)(B). [*Id.*] No finding was made as to the note's contents. The written findings contradicted the district court's earlier acknowledgement in open court that he had not instructed the jurors that they were not to remove items from the jury room. [*Id.*, Tr.4/14/04am:19-22] Appellants filed pleadings requesting an opportunity to respond to the government's request for additional findings and then for reconsideration, all of which were denied. [Docs. 1834,1835,1837]

The next business day (April 26) the newly constituted jury returned guilty verdicts as to four defendants – just as Juror #10 had predicted. [Docs. 1879-1882] The new jury had deliberated just 2½ days before returning these verdicts; during that time, it asked only for materials involving the remaining two defendants. Verdicts regarding these other two defendants were returned weeks later. [Docs. McGill 133, 1963]

**F.      The "Holdout" Juror for Acquittal Was Dismissed**

Although not identified by number until after the district court's "deadlock" instruction, there was little doubt from the jury's notes that there was a holdout juror for appellants.  *See* [Doc. 1949] ("One juror has stated categorically that he does not believe in any testimony from any of the cooperating witnesses...it is unlikely for the Jury to reach a unanimous decision."); [Doc. 1950] ("we have one juror that has stated from the beginning of our deliberations that he does not believe any testimony of or by the prosecution, defense, or any law enforcement witness…we will not be able to make any unanimous decision."); [Doc. 1952] ("One juror continues to refuse to accept any evidence and discuss or consider any verdict but not guilty or not proven for any count or charge for any defendant.")[38]

As noted, under this Circuit's seminal *Brown* decision, a juror may not be dismissed "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the government's evidence."  Applying this *Brown* standard, it cannot be said there was not "any possibility" – that scenario was not only "possible," but plausible:  (1) Note #3 said, "One juror has stated categorically that he does not believe in any testimony from any of the cooperating witnesses," (2) a marshal was overheard saying, "We have to get rid of that juror," and (3) Note 9 stated, despite "good faith"

---

[38]  Any argument that the enumeration of "one" juror did not reveal the split to be 11 to 1, is precluded by the comments that no unanimous verdict is likely.

deliberations, "One juror continues to refuse to accept any verdict but not guilty or not proven."

Even if any such doubt existed, however, it was utterly dispelled by the jury's note of April 14, 2004 at 10:51 am: "…we have one juror #9…"  It is clear that before conducting individual *voir dire* of certain jurors, the district court also knew Juror #9 was the holdout juror.  *See* McGill's Motion to Discharge Jurors 10 and 12 for Misconduct.  [J.A.]

### G.    The District Court's Efforts to Achieve a Verdict Were Coercive

Upon revelation that there was a holdout for the defense, appellants repeatedly argued that to give any instruction to continue deliberating, and most particularly an anti-deadlock instruction as requested by the government, would be impermissibly coercive, citing *Sae-Chua*, *supra*. [Tr.4/5/04pm:3-11; 4/6/04am:3-7; 4/13/04am:3-12; Docs. 1813 and 1815; Government Motion to Instruct Jury to Exchange Views (J.A.)]  *Accord*, *United States v. Williams*, 338 F.2d 530, 532-533 (D.C. Cir. 1964) (error to give deadlock instruction when foreperson asked trial judge to replace two jurors with alternates because they were a "clear minority"). *Compare*, *United States v. Lloyd*, 515 F.3d 1297, 1303 (D.C. Cir. 2008) (not error to give anti-deadlock instruction where trial judge stopped reading as soon as jury note indicated its numerical division and told jury he had not read the note).

Appellants argued, in the alternative, that the only permissible remedy short of declaring a mistrial (since that request was denied) was simply to order the jury to continue deliberating. Nonetheless, the district court gave the anti-deadlock instruction. This alone was reversible error.

After receiving the anti-deadlock instruction, the jury issued another note clearly identifying the holdout juror – Juror #9 – and claiming he refused to participate in any and all deliberations. Because this note revealed a continued impasse, the district court was then obligated to declare a mistrial. Further proceedings after a jury announces an impasse following a deadlock instruction are inherently coercive. *See*, *Thomas*, 449 F.3d 1177 (D.C. Cir. 1977). The district court erred by failing to declare a mistrial after Note #10 was received. Short of a mistrial, the district court should only have asked the jury to continue deliberating. What it did instead was far worse.

## H.    The District Court Compounded Its Error by Invading Jury Deliberations

The district court refused to declare the required mistrial. Instead, over objection, it persisted in delving into events in the jury room, including actual deliberations. This was error. In *Brown*, *supra* at 596, this Court reversed a massive trial, after declaring in no uncertain terms that a district court "may not intrude on the secrecy of the jury's deliberations." And in an opinion deeply steeped in *Brown*, the Second Circuit in *Thomas*, 116 F.3d 606 (2d Cir. 1997),

96

addressed this very dilemma – the possibility of juror misconduct or bias that can only be investigated by probing into jury deliberations. Noting that "[t]he secrecy of deliberations is the cornerstone of the modern Anglo-American jury system," *Thomas* acknowledged:

> Courts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias during the course of a trial. This undertaking is particularly sensitive where, as here, the court endeavors to investigate allegations of juror misconduct during deliberations. As a general rule, ***no one – including the judge presiding at trial*** – has a "right to know" how the jury, or any individual juror, has deliberated ***or how a decision was reached by a jury or juror***…

*Id.* at 618. In contrast to allegations of conduct before deliberations,

> A court must limit its own inquiry of jurors once deliberations have begun … [T]he very act of judicial intervention can at times be expected to foment discord among jurors … The mental processes of a deliberating juror with respect to the merits of the case at hand must remain largely beyond examination and second-guessing, shielded from scrutiny by the court as much as from the eyes and ears of the parties and the public.

*Id.* at 620.

*Thomas* acknowledged that in some situations, "the judge may well have no means of investigating the allegation without unduly breaching the security of deliberations," *id.* at 621, but went further, holding:

> Where the duty and authority to prevent defiant disregard of the law or evidence comes into conflict with the principle of secret jury deliberations, we are compelled to

97

err in favor of the lesser of two evils by protecting the secrecy of jury deliberations at the expense of possibly allowing irresponsible juror activity. Achieving a more perfect system for monitoring the conduct of jurors in the intense environment of a jury deliberation room entails an unacceptable breach of the secrecy that is essential to the work of juries in the American system of justice. To open the door to the deliberation room any more widely and provide opportunities for broad-ranging judicial inquisitions into the thought processes of jurors would, in our view, destroy the jury system itself.

*Id.* at 623. The Ninth Circuit has also squarely adopted the reasoning of *Brown* and *Thomas*, preserving the core secrecy of juror deliberations. *See Williams v. Cavazos*, 646 F.3d 626 (9th Cir. 2011), *cert. granted on other grounds*, 2012 U.S. LEXIS 582 (2012); *United States v. Symington*, 195 F.3d 1080 (9th Cir. 1999).

As the facts of appellants' case reveal, the district court should have adhered to this guidance. The questioned jurors were asked after several weeks to interpret actions that occurred near the outset of deliberations and to speculate about Juror #9.[39] Moreover, delving into deliberations raised more questions than it answered. For example, how was the district court to decide what it means to "participate" in deliberations? Does one "participate" by expressing an opinion about the evidence or about the credibility of witnesses, by expressing an opinion on guilt or

---

[39] Juror #10, for example, suggested "the jury" in previous notes did not really mean "the jury." There was no way to reliability evaluate this assertion nine days after the fact, or even if credited, to determine if his accusations of non-deliberation meant more than simply Juror #9 disagreeing with Juror #10's peculiar view that "we can't discredit any" evidence.

innocence, or by voting?  Must a minority juror change votes to be considered "participating"?  Do majority jurors (such as Juror #1, who earlier said, "I got my own opinion" and "I don't care what other people think") who remain convinced of guilt from the beginning of deliberations not have a "fixed" view of the evidence from the start?  What is the reasonable response of a juror who remains unpersuaded by the majority?  Does it make a difference that the minority juror's decisions are derived from his opinions about the credibility of witnesses, a quintessential juror function?  When do efforts by the majority leave the realm of persuasion and enter the realm of coercion?  All of these issues were presented in this case, and when it probed the internal deliberations of the jury to answer them, the court exceeded its authority.

## I.    The Holdout Juror *Did* Deliberate

Note #3 demonstrated that Juror #9 was participating in deliberations. It reported he had expressed he did not believe the government's cooperating witnesses, a view that is constitutionally protected.  Moreover, it reflects he astutely pointed out that the remainder of the government's evidence would not otherwise provide proof of guilt beyond reasonable doubt, not that he did not believe this other evidence.  As appellants consistently assert herein, the government's entire case rested upon its cooperating witnesses.  It is, therefore,

completely understandable that a unanimous guilty verdict would not be possible where one juror found those cooperators not credible.

Note 3's statement that "it is not likely" that the jury would reach a unanimous decision reveals two things: first, that the remaining eleven jurors also must have already expressed their contrary positions, and second, more importantly, that a verdict was *not* considered *impossible* from the outset, but merely not "likely." Some deliberations were clearly occurring.

Subsequent notes echoed the same theme: the holdout juror continues to express his contrary opinions about the evidence and therefore, a unanimous verdict would not be likely. This is consistent with Juror #9's assertion that he voted every time a vote was called.[40] All of the relevant notes, as well as Juror #9's ill-advised *voir dire*, confirm that he did deliberate, to the point of being shouted down by the majority.

Unlike *United States v. Abell*, 271 F.3d 1286 (11th Cir. 2001), cited by the government below, Juror #9 never said that his mind was made up and there was

---

[40] The note's reference to the juror's unwillingness to vote anything but "not guilty" or "not proven" reflects that there had been discussion not only about the overall charges, but also about the specific factual findings – a level of detail that would only have arisen had Juror #9 expressed his opinion on those factual findings as well. [Doc. 1952]

no point in deliberating with the other jurors.[41]  Moreover, Juror #9 never indicated he made up his mind during closing arguments or would not consider the evidence, as in *Baker*, *supra*.  In fact, as Juror #10 confirmed, when expressly confronted as to whether he was trying to hang the jury – a confrontation that would only have occurred because Juror #9 was affirmatively voting, albeit not the way the rest of the jurors wanted – Juror #9 replied "whatever the judge say," exhibiting a willingness to follow the court's instructions.

Appellants' case is also distinguishable from this Court's recent decisions in *Ginyard* and *United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006).  In *Ginyard*, this Court did not reach the *Brown* issue, because it reversed on the ground that the juror was prematurely dismissed when his request "stemmed ***entirely*** from an employment-related need."  *Supra* at 652 (emphasis added).  In *Carson*, this Court similarly found no possibility the juror's dismissal arose from his view of the evidence because there was not "any suggestion in the record that the judge had the least inkling of Juror No. 3's views regarding innocence or guilt."  *Supra* at 352.  That is a far cry from appellants' case, where Juror #9's doubts about the government's proof were known to all.

---

[41]    Moreover, in Abell, "[a]ll jurors agreed … Juror Alfonso … made comments that she did not have to follow the law," and even in court, "[her] own testimony on her commitment to following the law was not certain."  *Id.* at 1303-04.

Hung juries, and their resultant mistrials, happen. That may be unfortunate from a judicial efficiency perspective, but they are a consequence of the more important, constitutional mandate of unanimous verdicts. In appellants' case, a single juror harbored serious and valid doubts about the credibility of government witnesses, and would not relinquish his beliefs, even in the face of intense pressure. The evaluation of credibility, involving as it does a myriad of factors including intangibles such as demeanor, is ultimately a deeply personal decision. A trial judge may not, simply to obtain a verdict, decide, as here, that the failure to change one's mind about such a decision constituted a failure to deliberate.

### J.     The Holdout Juror Did Not Commit Misconduct

The inquiry into events occurring in the jury room also addressed the question of whether Juror #9 committed misconduct when making some notes and removing them from the jury room. The district court initially ruled, correctly, that these actions did not serve as a basis for dismissing him. A few days after removing Juror #9, it was persuaded to change that ruling and add the removal of notes as an additional basis for dismissal, essentially as a *post hoc* rationalization.[42]

As the district court itself conceded at one point, Juror #9's removal of his own notes from the jury room did not violate any order or instruction of the ***court***.

---

[42]   Juror #10's amorphous "fear of the unknown" cannot justify Juror #9's dismissal; if it could, holdout jurors could easily be targeted by jurors in the majority invoking such concerns.

102

[Tr.4/14/04am:19-21]   Even if the marshals had told jurors not to remove items from the jury room (and the language of any such direction is unknown), this might be fairly construed to mean not taking any ***evidence or exhibits*** outside the jury room, which Juror #9 never did.  Moreover, Juror #9 was not accused of revealing the contents of his notes, or speaking to anyone about this case.  He was only accused of taking out something he wrote himself – either a grocery list, or at most, language from the indictment or instructions (items already in the public record).[43] The district court never explained why this was improper, or why taking one's own handwritten notes out of the room is fundamentally different than Juror #9 simply walking out the door with his memory. Moreover, even if removing notes had violated court instructions, the appropriate manner for the district court to respond would be to give a clear instruction to the jury as a whole, as it had done with Juror #12 on earlier occasions.[44]  If any juror dismissal was warranted, the court's failure to dismiss Juror #12 was error.

---

[43]    Ironically, if Juror #12's assertion that Juror #9 copied the court's instructions was believed, it appears to demonstrate that he was preparing to make further arguments, not withdraw from the process.

[44]    Juror #12 violated the court's stated instructions numerous times by:  (1) privately speaking to a prosecutor, (2) sharing "rumors" about the case in individualized discussions with certain jurors in January, (3) vocally commenting to fellow jurors on evidence presented in February, (4) continuing to comment during trial, even publicly calling defense evidence "BS," after being instructed by the court not to do so, and (5) conducting *ex parte* conversations with Marshal Aleman, despite instruction to communicate only in writing.

**K.    The District Court's Findings Were Flawed By Procedural Errors**

The holdout juror for the defense was removed and neither of the two stated bases for doing so (alleged failure to participate in jury deliberations, or *post hoc* claim of misconduct) is supported by the record.   In addition, the process of reaching those findings was itself flawed, not only by the fundamental error of inquiring into the jury deliberations at all, but by other errors as well.

**1.    The District Court's Presence in the Jury Room**

The trial judge admitted the discharge of Juror #9 was based in part upon his "personal observations" about what he heard and saw walking near, and *even within* the four walls of the jury's deliberation room.   The district court thereby became a fact-maker, rather than a fact-finder, which was improper.[45]

*Ex parte* communications with a deliberating jury are especially fraught with risks of coercion.   *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 460-62 (1978) (noting "hazards of *ex parte* communications with a deliberating jury" and finding the practice "pregnant with possibilities for error"); *United States v. Yarborough*, 400 F.3d 17, 20 (D.C. Cir. 2005) (*ex parte* communications between judge and deliberating jury "fraught with the potential for jury coercion").   In *United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1157 (2008), this Court cautioned against *ex parte* contacts "even if the contact is

---

[45] Also, if observed on just one occasion, it can hardly be reflective of days of deliberation.

intended merely to show gratitude for the jurors' hard work or wish them a good evening."

### 2.     The Marshal's Improper *Ex Parte* Contacts with the Jurors

Over objection, in addition to escorting the jurors, who called him "Mike," Aleman also simultaneously served in a trial capacity, which included acting as the district court's surrogate in investigating alleged misconduct by jurors and others. [Tr.4/22/04am:14]   The record reflects a high volume of *ex parte* communications between Aleman and several jurors, including during acrimonious deliberations, which violated specific instructions that the jury only communicate via written notes submitted by the foreperson.   Aleman's numerous verbal exchanges with deliberating jurors occurred off-the-record.   Notes #10 and 11 emerged shortly after at least three *ex parte* conversations were held with Aleman on the evening of and morning after the anti-deadlock charge.   At least one of those notes was admittedly ***initiated*** by Aleman at the district court's behest, before any defendant even knew an issue existed.   These were by no means casual conversations – they involved ***another deliberating juror***.   It was error for those conversations to have occurred, and when appellants sought to question Aleman about them, the district court consistently shielded him from examination.

### 3.    The Inquiry Conducted Was Inadequate

Once the district court inquired into Juror #9's conduct, he was required to conduct a full and fair inquiry.  *Cf. Ginyard*, 444 F.3d at 654; *United States v. Patterson*, 26 F.3d 1127, 1129 (D.C. Cir. 1994) (reversible error to dismiss juror without conducting adequate inquiry).  That did not occur.  Overruling defense objections, the district court ruled upon hearing ***only*** from Jurors #9, #10 and #12 and nine days into deliberations, when positions had likely hardened and any retrospective statements regarding the nature of deliberations was likely self-serving.  The remaining ***three quarters*** of the jury, each of whom would have known whether Juror #9 refused to deliberate, were never questioned.[46]

### 4.    The District Court Compromised the *Appellate* Record

For reasons that are not apparent, Juror #9 was dismissed and his notes collected *ex parte*.  The district court refused defense requests to preserve juror records under seal; instead, inexplicably, Juror #9's materials were shredded.  Since the issue was whether he had "deliberated," and Juror #9 "had made some

---

[46]    This contrasts with the January inquiry, where every juror was interviewed.  *Cf. Abell*, 271 F.3d at 1290 ("The court talked with … each member of the jury in an attempt to ascertain whether the juror's conduct warranted her dismissal.").

markings," those materials could have informed this Court's review. Instead, they were destroyed forever.[47]

### L.    Conclusion

The government failed to prove its case beyond a reasonable doubt to the jury impaneled to decide appellants' fate. When the district court dismissed the holdout juror, particularly without good cause, and at a time when that juror's views on the merits were known, it deprived appellants of their constitutional right to a unanimous verdict. The district court also specifically erred by giving a deadlock instruction when the existence of a single defense holdout juror was known; by failing to declare a mistrial when, after the deadlock instruction, the jury remained at an impasse; by inquiring into the jury's internal deliberations; by basing its decision to discharge Juror #9 on "personal observations"; by allowing multiple *ex parte* communications between a marshal and the deliberating jury; by conducting an incomplete investigation covering only a limited number of selected jurors once an inquiry began; and by shredding Juror #9's notes that would have informed this Court's appellate review. Particularly when combined with the *Brown* errors, and viewed *cumulatively*, appellants were denied their jury rights, and reversal is required.

---

[47]  The district court also prohibited counsel from speaking with Juror #9, even after it was revealed that, following his dismissal, he had expressly asked to speak to the court. [Tr.4/15/04:19; J.A.(Seegers' Motion to Allow Dismissed Juror #9 to Speak with Counsel Post-Verdict)]

## II.    GOVERNMENT'S IMPROPER USE OF AN "OVERVIEW WITNESS"

### A.    Introduction.

The government began its evidentiary presentation with FBI Special Agent Daniel Sparks, who ultimately served as its chief overview witness.    Effectively presenting a second opening statement for the government, Sparks testified regarding the investigation of appellants' case, as well as the necessity of using cooperators in conspiracy cases.  [Tr.10/20/03am:84]  Because Sparks' testimony was similar in the trial of appellants' co-defendants, this Court's opinion in *United States v. Moore*, *supra* provides an appropriate template for analyzing this issue.

### B.    Standard Of Review

Challenges to the use of "overview witnesses" are reviewed under a modified abuse of discretion standard that requires close scrutiny by the reviewing court. *United States v. Moore*, *supra* at 58.  Admission of this kind of improper testimony is harmless only where it is highly probable that the error did not influence the verdict.  *United States v. Casas*, 356 F.3d 104, 121 (1st Cir. 2004). The government, not the appellants, bears the burden of establishing harmlessness in this context.  *United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir. 1997) Appellants submit that the government cannot meet that burden in this case.

### C.    The *Moore* Case

Citing *United States v. Lemire*, 720 F.2d 1327 (D.C. Cir. 1983) and a host of other cases, this Court in *Moore* summarized the dangers of a summary witness as (1) the likelihood that a jury will treat the evidence as additional or corroborative evidence that unfairly strengthens the government's case; (2) the possibility that otherwise inadmissible evidence would be considered by the jury; and (3) that an overview witness permits the government an extra argument to the jury. *Moore*, *supra* at 56.

### D.    Vouching For Government Witnesses

Sparks improperly vouched for cooperating witnesses who would later testify, observing that they had the "right attitude" and "right demeanor."   [Tr. 10/20/03am:85].   In addition, before any cooperating witness took the stand, he explained the process by which the government made cooperators feel more "comfortable," so that they would provide ***truthful*** information. [*Id.* at 87] Moreover, Sparks identified procedures law enforcement employed to ***verify*** cooperators' information:  cross-referencing with other unnamed people, unnamed police reports and different (but unspecified) crime scenes.  [Tr.10/20/03am:89-90]

Later, he assured the jury that cooperators had to agree to tell the truth before they would be used.  [Tr.10/20/03pm:7]  Over objection, Sparks explained the role of 5K letters and Rule 35 motions as procedures designed to insure the

truthfulness of cooperators. [Tr.10/20/03pm:7-11]  Sparks' vouching did not end there.  He also explained that the appellants' original indictment had been altered because cooperating witnesses provided additional information that the grand jury presumably acted upon as truthful.  In addition, he offered that cooperating witnesses offer "good evidence" in gang cases, as they are "insiders," and are essential because conspiracies exist in secret and if you can get inside, they "start to crumble like a house of cards." [Tr.10/20/03pm:18,84,121]

Overview testimony by government agents is particularly troublesome because juries often place a greater weight upon evidence perceived to have the imprimatur of the government. *See*, *e.g.*, *Brown v. United States*, 508 F.3d 1066, 1075 (D.C. Cir. 2007).  Any doubt about this abuse in appellants' case is quickly dispelled by a review of the government's introductory questions of Sparks.

The very first facts presented to the jury informed them that the case agent (Sparks) had been assigned to Tanzania in 1998 to investigate the bombing of the U.S. embassy, spent the holidays following September 11, 2001 in Afghanistan, and, shortly before appellants' trial, been re-assigned to Afghanistan. [Tr.10/20/03am:70-71]  Over objection, Sparks then related his experience as an Army Ranger who flew attack helicopter missions patrolling the East German border during the Cold War.  [*Id*.]  When asked to describe his duties during those tours of duty, Sparks responded, "Similar to my duties here…try to figure out who

the bad guys are." [*Id.*] Thus, before one shred of relevant evidence had been presented, appellants were equated with violent terrorists before the jury, and unmistakably identified as "bad guys." As the government's case was based almost entirely upon the testimony of cooperating witnesses, whose credibility was critical, it clearly elicited this testimony in order to associate their problematic witnesses with Sparks, his credibility and his service to our nation.[48]

Sparks' vouching wasn't limited to his own views; he also improperly claimed that courts, as well as law enforcement, would monitor a witness' veracity. [Tr.10/20/04pm:7-9,97,99]  It is well settled that a witness' veracity is entirely within the province of the jury, and it is "improper to communicate that a credibility determination has been made by the AUSA, law enforcement agents or the court ...." *United States v. Ortiz*, 362 F.3d 1274, 1279 (10th Cir. 2004). The government's attempt to pre-rehabilitate the cooperating witnesses through Sparks' vouching and recital of law enforcement procedures employed to confirm their veracity was clearly improper and highly prejudicial, and it is more likely than not

---

[48]    The atmosphere of our nation at the time of Sparks' testimony is important as merely two years had elapsed since the terrorist attacks of September 11, 2001.  Fully cognizant of the impact, the government and Sparks employed *argumentum ad metum* by highlighting Sparks' contributions to the nascent war on terror and equating appellants with terrorists, thereby improperly appealing to the jury's fears and emotions and vouching for the cooperators, who benefitted from Sparks' credibility.

that it unfairly strengthened the government's case before the jury. *Moore*, *supra* at 56.

### E.    Introduction Of Inadmissible/Improper Evidence

Sparks not only improperly vouched for cooperating witnesses, he also introduced inadmissible or otherwise improper evidence before the jury. During his first appearance, Sparks offered that cooperating witnesses in cases such as appellants' need the witness protection program because of the violence involved. [Tr.10/20/03pm:14] In addition, while explaining items seized during a search of R.Alfred's apartment, he testified, over objection, that he seized what he thought to be crack cocaine. [Tr.1/9/04am:37] Defense counsel moved to strike, and later for mistrial, because the substance was never confirmed by the DEA to be narcotics. [*Id*. at 38] That motion was denied.[49]

Finally, Sparks testified that R.Alfred's vehicle was seized because "we were able to determine that illegal drug proceeds" were used to purchase it. [Tr.1/9/04am:40] He further claimed that seizures of J.Alfred's automobile and Simmons' truck were based upon investigators' conclusions that they, too, were purchased with illegal drug proceeds. [Tr.1/9/04am:49-51] Not only was no evidence ever produced at trial to support any of these summary conclusions, their repetition also inferred that investigators possessed evidence of drug activity, about

---

[49] Following that discussion, Sparks slipped into his testimony that the substance had field-tested positive, which was later stricken. [Tr.1/9/04am: 40]

112

which the jury was not privy, which demonstrated that the proceeds were used for those purchases. The inevitable conclusion: these people must be drug dealers. Under such circumstances, meaningful cross-examination was impossible as it would have merely opened the door for Sparks to bring additional, otherwise inadmissible evidence before the jury.[50]

### F.     Testimony As Second Opening

At the end of his first direct examination, and over objection, Sparks presented a second opening statement for the government by using photographs on an organizational chart to identify appellants as conspiracy members with whom he was familiar as a result of his investigation. [Tr.10/20/03pm:20-28] In addition, his recitation of Title III procedures also amounted to a second opening statement by advancing the argument that multi-layers of judicial and prosecutorial review meant that illegal activity was clearly present and that their independent decisions confirmed its existence. [Tr.10/20/03am:80-82; 10/20/03pm:121-2]

### G.     Prejudice

In *Moore*, this Court found inappropriate testimony by Sparks to be harmless for four reasons: (1) his challenged testimony was later confirmed by admissible evidence; (2) the appellants' defense consisted entirely of cross-examination of government witnesses; (3) the trial judge instructed the jury to disregard Sparks'

---

[50] As his "field-tested positive" comment reveals, Sparks was clearly adept at slipping inadmissible evidence into his testimony.

"opinions;" and (4) the government case was "overwhelming." *Moore*, *supra* at 61. None of those factors were present in appellants' case.

Several of Sparks' improper statements at appellants' trial, such as that drugs were seized from R.Alfred and vehicles were purchased with drug proceeds, were never supported by other evidence. Moreover, appellants presented affirmative defenses, including McGill and Oliver who actually testified. Further, the district court did not tell the jury to disregard the testimony of Sparks. Lastly, and most importantly, the government's case, built as it was upon cooperating witnesses, could hardly be called "overwhelming." *See United States v. Watson*, 171 F.3d 695, 700 (D.C. Cir. 1999); *United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999). Indeed, it defies logic to say that the otherwise highly impeached testimony of the cooperating witnesses rendered harmless the improper testimony of Sparks vouching for their very credibility.

## III.        THE "OTHER CRIMES" EVIDENCE

### A.    Introduction

Appellants' trial overflowed with highly prejudicial "other crimes" evidence. Not only was much of it deliberately elicited by the government in its case-in-chief, but appellants were also compelled to attempt to respond in their defense cases, resulting in the admission of additional prejudicial "other crimes" evidence. The district court erred by repeatedly allowing this evidence, generally without

114

pre-trial notice to the defense, a hearing or any other adequate opportunity to argue against its admissibility, and, most importantly, without careful consideration of the issues that must be weighed in determining whether its admission was proper under Fed. R. Evid. 404(b) and 403. Moreover, prosecutors improperly argued such "other crimes" evidence, and the court erred in rejecting defense-requested instructions regarding the proper use of this voluminous evidence, choosing instead to give a cursory, confusing and insufficient instruction. These errors - in the government's closing arguments, and the court's final instructions - were ***independently prejudicial***, even had the "other crimes" evidence been properly admitted. They can be most effectively evaluated, however, in the context of the other errors made in admitting that evidence.

Because the "other crimes" evidence was at once both voluminous and pervasive, space limitations prevent appellants from setting forth *seriatim* the complete factual and procedural context of every example of the erroneous admissions. Instead, appellants will initially discuss generally the legal issues surrounding the admission of other crimes evidence, including the standard of review. In that context, there are five basic issues in evaluating whether admission of "other crimes" evidence constitutes reversible error:

(1)  Is there sufficient reliable evidence that the other criminal conduct actually occurred?

(2)  Is the criminal conduct intrinsic evidence of the charged crimes, and if not, was proper pretrial notice provided to appellants?

(3)  Is there a proper basis to admit the other crimes evidence other than to demonstrate a mere propensity to criminal conduct?

(4)   Does the evidence's probative value substantially outweigh any confusion or unfair prejudice?

(5)  Are the cumulative errors in admitting the evidence harmless?

Appellants address each of these issues *infra*.  Although they affect the balancing required under Rule 403, appellants also separately discuss relevant errors in the prosecutors' closing arguments and the district court's final instructions.  In addition, appellants set forth some specific examples of improper admissions of "other crimes" evidence, beginning with evidence that was more fully litigated and then evidence that was simply let in.  Finally, appellants address the issue of harmless error.

## B.    Standards of Review

Admission of "other crimes" evidence under Rule 404(b) is subject to review for abuse of discretion.  *United States v. Johnson*, 519 F.3d 478, 483 (D.C. Cir. 2008).[51]   This Court has previously stated that the trial court's decision to

---

[51]   Appellants also submit that this Court should adopt the Sixth Circuit's more specific and nuanced three-part test, which reviews (1) for clear error the court's determination that the "other act" actually took place; (2) *de novo* the

admit evidence under Rule 403's balancing test is normally reviewed only for "grave abuse," *see United States v. Long*, 328 F.3d 655, 662 (D.C. Cir. 2003); *cert. denied*, 540 U.S. 1075 (2003), but later clarified that "there is no material difference" between these terms. *Henderson v. George Washington University*, 449 F.3d 127 (D.C. Cir. 2006) ("the court's use of the word 'grave' certainly does not suggest an insurmountable standard of review"). In any event, "by definition," a court "abuses its discretion when it makes an error of law." *Koon*, 518 U.S. at 100.

Where however, as often occurred during appellants' trial, the trial court fails to explain or even articulate its grounds for admitting "other crimes" evidence over objection, this Court cannot effectively review the exercise of discretion, and "may undertake to examine the record and perform the required balancing ourselves." *United States v. Johnson*, 388 F.3d 96, 101 (3d Cir. 2004).

Where error in admitting "other crimes" evidence is found, that error is presumed to be reversible unless this Court concludes "with fair assurance, after pondering all that happened, … that the judgment was not substantially swayed by error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). "If it is 'at least

---

court's legal determination that the evidence was admissible for a proper purpose; and (3) for abuse of discretion the district court's determination that the probative value of the other acts evidence is not outweighed by its prejudicial effect. *United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008). This standard more accurately apportions the responsibilities of appellate and courts.

debatable' that the erroneously admitted evidence 'tipped the scales' toward a guilty verdict, a reviewing court should not deem the error harmless." *United States v. Cunningham*, 145 F.3d 1385, 1396 (D.C. Cir. 1998).

Appellate review of allegedly improper prosecutorial arguments is for substantial prejudice where defendants lodged an objection. *United States v. Moore*, 651 F.3d 30, 50 (D.C. Cir. 2011).

Claims that the court failed to give a requested defense instruction are reviewed *de novo*. *United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008). Under *Kotteakos*, if error exists, the government bears the burden of showing it was harmless, such that it did not have "a substantial and injurious effect or influence in determining the jury's verdict." *United States v. Whitmore*, 359 F.3d 609, 622 (D.C. Cir. 2004).

## C.    Reliability of the Evidence

Evaluating the first of the five substantive factors set forth above, appellants recognize that the district court only needed to find by a preponderance of the evidence sufficient evidence to support a jury finding that the defendant committed the other crimes. *Huddleston v. United States*, 485 U.S. 681, 689 (1988); *accord United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994). Yet even giving such

deference to the district court,[52] there was at least one example where there was simply no such evidence.  Government witness Caprice Whitley testified she heard Oliver say to Simmons while at his store, "I've got *'em* in the trunk" of his car. [Tr.11/24/03PM: 127-133]    According to **Whitley**, this implied that Oliver had **someone**, rather than **something**, in the trunk.  There was absolutely no evidence presented whatsoever as to the identity of this supposed "person" in the trunk, or what incident it might have related to, much less how it related to the charged conspiracy.  Oliver could have been referring to anything - even a six-pack of beer. *See United States v. Jean-Baptiste*, 166 F.3d 102 (2d Cir. 1999) (admission of prior bad act was plain error absent evidence it actually occurred).[53]

### D.    "Intrinsic" Evidence and the Requirement for Notice

This Court has held that "intrinsic" evidence "encompasses evidence that is either 'of an act that is part of the charged offense' or is of 'acts performed contemporaneously with the charged crime … if they facilitate the commission of the charged crime.'"  *Moore*, 651 F.3d at 63.  If "intrinsic," evidence is **not** subject to the provisions of Rule 404(b), including the requirement for pretrial notice.  *Id.*

---

[52]  Appellants, of course, also submit that "other crimes" evidence admitted through the heavily impeached cooperating witnesses was inherently unreliable.

[53]   This was but one example of the court's let-it-all-in approach.  As discussed below, the district court also allowed testimony about alleged "bad acts" of R.Alfred of which he had been unanimously *acquitted* - and then prevented the jury from learning of the acquittal.

On the other hand, "[t]he courts must not treat lightly the 'surprise' introduction of evidence that leaves a criminal defendant without opportunity to prepare an effective response." *United States v. Watson*, 409 F.3d 458, 465 (D.C. Cir. 2005); *accord United States v. Green*, 617 F.3d 233, 247 (3d Cir. 2010) ("The notice requirement of 404(b) is manifestly important, and it is often crucial if the Defendant is to meet the 'bad act' evidence").

Prior to trial, each of the appellants made a written motion or letter request for notice of the government's intention to use "other crimes" evidence.[54]  In its Omnibus Response to Defendants' Pretrial Motions, [Doc. 2257], the government represented that it did not intend to introduce *any* 404(b) evidence; "all evidence it seeks to introduce will relate directly to the conspiracy."  The district court accepted the government's assurance at face value, and, therefore, denied appellants' motions.  [Doc. 1575] ("Given the breadth of information admissible to prove a conspiracy, the Court will accept the government's representation that it will not introduce any 404(b) evidence, and the defendants' motions will be denied.")  Unfortunately, the government's representation was simply a lie.

---

[54]   McGill [Doc. 43]; J.Alfred [Docs. 568,1462,1486]; Oliver [Docs. 469, 1489]; Seegers [Docs. 584, 1410]; Simmons [Doc. 585]; R.Alfred [Doc. 587]

The government has acknowledged that none of the appellants joined the conspiracy until well after its inception.[55]  Conduct allegedly committed *before* an individual appellant even joined the conspiracy cannot be intrinsic evidence of the conspiracy as to that appellant.  *See Moore*, n.11 at 64.  (Moore's involvement in earlier conspiracy and Gray's juvenile conduct not intrinsic evidence of later charged conspiracy)  The instant case is replete with such evidence - evidence of prior "bad acts" expressly elicited by the prosecutors from their many cooperating witnesses, going back years and sometimes even decades.  As noted in *United States v. Varoudakis*, courts, in ruling before trial on "other crimes" evidence, often lack sufficient context to decide correctly, and in ruling during trial, may lack adequate time to do so, while the government, knowing the totality of its case, *always* has the opportunity to "analyze rigorously whether the exceptions to Rule 404(b), and the limitations of Rule 403, apply to the facts."  233 F.3d 113, 124-125 (1st Cir. 2000).  Plainly, prosecutors in this case knew what they would be asking their witnesses and, consequently, *knew* they would be introducing significant pre-conspiracy other crimes evidence.

Furthermore, even criminal conduct allegedly committed by individual appellants *during* the period of the conspiracy is not automatically intrinsic

---

[55]  McGill - after he was released from prison in 1996; Ronald and James Alfred - after May 15, 1995; Seegers - November 1996; Simmons - 1997, Oliver - 1995.

evidence of the conspiracy. Despite the language of the indictment, the evidence presented at appellants' trial failed to demonstrate a close-knit conspiracy. While the Alfreds were brothers and Simmons and Oliver were related, there was little evidence of contact between the two pairs, or with McGill and/or Seegers. The government's theory relied essentially on a wheel-and-hub conspiracy with Gray and Moore at the center. There was little constancy in the alleged operation of the conspiracy, at least as involved these appellants. Alleged drug suppliers came and went and even switched roles. Supposed grudges held by one appellant were usually not shared with the others. In that sense this case was analogous to *United States v. Mathis*, in which the Court recognized different conspiracies and held that evidence pertaining to one conspiracy was not intrinsic evidence of the charged conspiracy. 216 F.3d 18 (D.C. Cir. 2000); *compare United States v. Burwell*, 642 F.3d 1062 (D.C. Cir. 2011), *cert. denied sub nom. Palmer v. United States*, 132 S. Ct. 329 (2011) (group of bank robbers was a close-knit organization).

Of course, the fact that "other crimes" evidence is not intrinsic to the charged conspiracy does not inevitably mean its admission is reversible error, but it does mean that its admission must be viewed through the prism of Rule 404(b), which requires pretrial notice. By failing to give proper notice in most cases, the government ensured appellants would have no opportunity to object before trial, and little opportunity to effectively marshal legal and factual objections during

trial, especially when the district court itself did not press the government for its purported basis for admission, leaving the record silent. By forestalling pretrial consideration of most "other crimes" evidence, the government not only "ambushed" appellants and their counsel, but also limited the district court's ability to give thoughtful consideration to the issues. *See United States v. Crowder*, 141 F.3d 1202, 1209 (D.C. Cir. 1998) (*en banc*) (upon objection, the court must take time to "satisfy itself" that other crimes evidence was relevant to purported issue); *Long*, 328 F.3d at 662 ("Rule 403 contemplates the ***thoughtful*** consideration of the trial court") (emphasis added).

### E. Basis for Admission

#### 1. General

Appellants acknowledge this Court has termed Rule 404(b) a "rule of inclusion." *See United States v. Linares*, 367 F.3d 941, 946 (D.C. Cir. 2004). Moreover, in conspiracy cases, the scope of admissible evidence is broader than in cases involving discrete acts. *Mathis*, 216 F.3d at 26. Nonetheless, the government still must proffer some relevant theory of admission other than what amounts to mere propensity, and the trial court must "satisfy itself that the evidence [was] relevant to that matter." *Crowder*, 141 F.3d at 1209. *See also United States v. Bowie*, 232 F.3d 923, 929-31 (D.C. Cir. 2000) (requiring that

courts stringently analyze "other crimes" evidence proffered by government before admitting it).

The nature of the case necessarily shapes what might be relevant. "The government's purpose in introducing the evidence must be to prove a fact that the defendant has placed, or conceivably will place, in issue …" *Bell*, 516 F.3d at 442. For example in *Linares,* the government's evidence showed that the defendant had grabbed a gun while inside a vehicle and started firing it. The government sought to introduce evidence of a prior gun possession, purportedly to show knowledge and absence of mistake or accident, but this Court correctly observed that if jurors accepted the government's evidence, there was no logical way for them to conclude that the possession and use of the gun was anything other than intentional. Similarly, in this case, with the exception of Seegers,[56] the government attempted to paint, almost entirely through cooperating witnesses, a picture of the appellants as large-scale drug distributors. Therefore, even were the jury to believe the government's witnesses, the common issues that arise in street-level sales and in possession cases would be inapplicable.

---

[56] The government presented absolutely no evidence that Seegers trafficked in large-scale quantities of narcotics at any time.

## 2.    The Trial Court's "Findings"

As "other crimes" evidence was offered, counsel for appellants repeatedly objected. [57]  Nonetheless, the district court usually summarily overruled defense objections without explanation, often without inquiry into the government's basis for admitting the testimony, and consequently, without affording counsel an adequate opportunity to argue the issues surrounding admissibility.[58]

The district court did provide some limiting instructions during trial, which told the jury that conduct prior to appellants joining the conspiracy "was admitted to explain why and how" they "joined the alleged conspiracy and their relationships with other members of the alleged conspiracy." [59]  Eventually, weary of repeating the same instruction, the court just referred the jury to its earlier instructions.

---

[57]    Appellants repeated and vigorously objected to the admission of the "other crimes" evidence.  For reasons of space, those objections are not set forth in this Brief.  Should the government seriously argue that a plain error standard applies in conjunction with this issue, appellants will respond in their Reply Brief.

[58]    As noted *infra*, the limited exceptions to this generalization concerned the 1995 murder of Kairi Ball, R.Alfred's other alleged criminal acts from 1989, 1991 and 1994, and Seegers' 1993 drug conviction.  *See* section I, *infra*.

[59]    Examples include: appellants generally [Tr.10/28/03am:48-49; 10/30/03am:115;      11/10/03am:130-131;      1/8/04PM:29-30];      R.Alfred [Tr.10/30/03pm:69, 98; 11/3/03am:29; 11/4/03am:40]; McGill [Tr.1/7/04pm:106-107;    1/13/04pm:97-98];    J.Alfred    [Tr.1/14/04am:84]    and    Seegers [Tr.10/30/03pm:39-40]

Since the district court made no mention of "why and how the [appellants] joined the conspiracy" in its final instructions, presumably it considered this merely to be a subset of evidence showing "their relationships with other members of the alleged conspiracy.[60]  As for establishing the relationship among appellants "and the others involved in their activities," the degree of relevance of prior other crimes evidence depends heavily on the overlap between the participants and the amount of time which has passed; such a relationship may be particularly relevant if there is a continuous "course of dealing."  *Clarke*, 24 F.3d at 265; *see also United States v. Graham*, 83 F.3d 1466, 1473 (D.C. Cir. 1996) (testimony of "other crimes" evidence went to establish "master conspiracy" of which charged conspiracy was only a part).  As indicated above, the government failed to establish that sort of continuing conspiracy or course of conduct with regard to appellants, most of whom did not interact with each other prior to joining, or even during, the alleged conspiracy.[61]  Presumably, the government was interested in

---

[60]    Should the government argue otherwise, appellants would note that "why" someone did something is essentially motive evidence, and must be viewed cautiously.  Likewise, "how" someone joined the conspiracy is likely to be intrinsic evidence of the conspiracy, but only if it truly explains the ***process*** of someone joining the conspiracy, as opposed to the mere ***motive*** for doing so.  In appellants' case, much of the "other crimes" evidence concerned events so far in the past that they could have had no relevance to the process of joining the conspiracy, except as propensity evidence.

[61]    Indeed, there was evidence of actual hostility between the Alfreds and Gray over the murder of Kairi Ball; Simmons also allegedly tried to have J.Alfred killed.

showing its cooperating witnesses knew the various appellants before the conspiracy began, and evidence of their selling drugs together as teenagers or young men would establish this link.  There was little dispute, however, that individuals growing up in the same neighborhood would have known each other, and, had the district court precluded this evidence, "it would hardly have occurred to [the jurors] that they were missing anything" and without it they would have found "any of the other evidence in the case unintelligible."  *United States v. Paladino*, 401 F.3d 471, 475 (7th Cir. 2005).

### 3.    Other Bases for Admission

In its final instructions to the jury, [Tr.3/30/04AM:44], the district court provided an exhaustive list of theoretical bases for admission:

(a) to show the relationship between the defendants and others involved in their activities;

(b) motive;

(c) opportunity;

(d) intent;

(e) preparation;

(f) planning;

(g) knowledge;

(h) identity; or

(i) absence of mistake or accident.

The last eight of these putative purposes, (b) though (i), had never even been mentioned by the district court before - for good reason, as they had no **practical** application to the charged conspiracies. Were the jury to believe the government's witnesses that appellants were large-scale drug distributors, it is impossible to see how such issues as (d) intent (to distribute),[62] (g) knowledge, (h) identity, and (i) absence of mistake or accident would realistically be at issue. Nor would (c) opportunity, (d) preparation, or (f) planning be issues upon which acts allegedly occurring years earlier would shed any light.

Unlike discrete criminal acts, usually of a violent nature - where preceding events, may indeed establish (b) motive—arguing that prior drug dealing established "motive" to later traffic in drugs is simply naked propensity evidence.[63] Simply put, these "purposes" for admission, first suggested by the district court in its final instructions, were not at issue given the evidence. *See*, *United States v.*

---

[62] Outside of **specific** events to show **specific** intent, invoking the rubric of "intent" generally is simply arguing that because a defendant intended to commit a criminal act before, he must have intended this one - in essence, propensity evidence. *See United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995).

[63] While evidence of drug trafficking **during** the charged conspiracies might well be evidence of motive for the charged murders in furtherance of the conspiracies, it does not follow that prior criminal acts, whether of violence or of drug trafficking, allegedly committed years or even decades earlier, would provide the same motive.

*Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996) (proffered purposes of opportunity, preparation, planning, knowledge, and absence of mistake ***not*** issues in dispute under facts of the case).

> 4.   Impeachment

McGill and Oliver both testified and concede that the government was entitled to some leeway in impeaching them, but such impeachment still had to comply with Federal Rules of Evidence 608 (Character Testimony) and 609 (Impeachment by Evidence of Prior Convictions). It did not. Not only was McGill impeached with his prior convictions, but the government was also permitted to cross-examine him about the ***facts*** of those cases, which had nothing whatsoever to do with the charged conspiracies. In addition, he was cross-examined about alleged acts of misconduct that had not resulted in convictions. Errors in admitting this bad acts evidence were compounded when the government was permitted to introduce extrinsic evidence in violation of Rule 608(b).

The government also argued, and the district court accepted, that evidence of prior criminal behavior was admissible to show bias on the part of McGill and Oliver against the government. Frankly, this seems preposterous; it might be arguable to suggest a defendant would testify falsely because of his interest in the

outcome of the case,[64] but to claim that the reason for false testimony was instead anger at a previous conviction or prosecution is simply far-fetched.  Moreover, even if there was a shred of probative value, it would logically only extend to bad acts which were prosecuted by the Office of the United States Attorney, not acts which were never prosecuted or were prosecuted in other jurisdictions.[65]  Finally, even were this "bias" a legitimate basis for admissibility - and it was not - the evidence should have been limited to the *fact of prosecution*.  There is no logical basis to permit the extensive examination, and extrinsic evidence, of the underlying details of the prior conduct.

### F.    Prejudice Generally

The Federal Rules contemplate that its broad definition of relevance will be tempered by exclusion in the face of unfair prejudice.  Indeed, when other bad acts evidence is introduced:

> regardless of the stated purpose, the likelihood is very great that the jurors will [use] the evidence precisely for the purpose it may not be considered; to suggest that the defendant is a bad person, a convicted criminal, and that if he "did it before he probably did it again."  That is why it is the trial court's duty to apply Rule 404(b) correctly and, before admitting such evidence, to decide carefully

---

[64]    Over objection, the district court instructed the jury that McGill and Oliver had a "*vital*" interest in the outcome.  [Tr.3/22/04am:17-18; 3/30/04am:5]

[65]    McGill was even cross-examined about a warrant that he never knew existed.

> whether it will be more substantially prejudicial than probative.

*Bell*, 516 F.3d at 444.

At appellants' trial, the district court seldom articulated any Rule 403 balancing of probative value against substantial prejudice, making it impossible to directly refute any such analysis. Most of the "other crimes" evidence was improperly admitted in the first place, but even assuming some minimal relevance, evidence of long-ago acts of drug trafficking or violence carried far more prejudice than any probative value. Likewise, admitting evidence of other acts of violence or intended violence during the time of the charged conspiracies, but unrelated to them, violated Rule 403 given the highly prejudicial nature of the accusations.

Clearly, the district court instinctively understood the prejudice resulting from the "other crimes" evidence, because it denied defense counsel the same leeway to raise misconduct of government witnesses, despite affording the government the opportunity to present extensive detail regarding appellants' bad acts. For example, when R.Alfred's counsel sought to question government witness Steven Graham about the details of his own 1991 conviction, the government's objection was sustained. [Tr.12/16/03pm:51] In addition, evidence of unadjudicated crimes was permitted during government cross-examination of defense witnesses, but was not allowed when the defense cross-examined government cooperators such as Oscar Veal. [Tr.2/23/04pm:65-68] (Complaining

of double standard.)  Another time, defense counsel was not permitted to question a government law enforcement witness regarding a disciplinary sanction he received for forging a document, an incident clearly bearing on this witness' truthfulness.  [Tr.3/15/04pm:54-55]

The degree and manner in which a prosecutor argued other crimes evidence to the jury, and instructions given by the district court, has been found by this Court to be relevant considerations when evaluating such prejudice.  *United States v. Brown*, 597 F.3d 399 (D.C. Cir. 2010).   Appellants discuss these factors separately.

### G.    Final Instructions

#### 1.    Defense Objections and the Government's Response

The government submitted an instruction on "other crimes" evidence, referred to as "instruction 10," which the court eventually gave.   Appellants objected to this:

> Specifically also with respect to instruction number 10 at page 11, where it talks about the acts not charged. During the course of the trial, specifically with Mr. Seegers, we had the 1993 conviction, and I think that Mr. Seegers, and I think a couple of other defendants, I think both James and Ronald Alfred, would like to include language in there about the conduct that was introduced against them - for Mr. Seegers specifically, the 1993 drug distribution - and have that included as an addition to instruction number 10 as kind of an example of "Mr. Seegers, your heard that in 1993 he was convicted of this crime," something like that we would request.

132

[Tr.3/22/04am:44]    This request was joined by all other defendants.[66]    The

prosecutor argued that the objections should be rejected and the district court

agreed:

> We actually - we would object to that, Your Honor,
> because it seems to me there would be a good bit of time
> spent trying to catalog and chronicle the different
> instances of misconduct in both those cases that resulted
> in charges being brought, convictions being obtained
> against defendants prior to their entry into the conspiracy.
> It seems to me that the best course is to give the general
> instruction with respect to uncharged misconduct and let
> the parties argue it.  We don't intend to misargue earlier
> instances of misconduct by the defendants, but it doesn't
> seem to be a product[ive] exercise to specifically address
> all of the different instances of uncharged misconduct.
> We think the instruction more than adequately informs
> the jury of the proper and improper uses of such
> evidence.

[Tr.3/22/04am:44-45]

Defense counsel tried again:

> I too, have - am requesting an instruction relating to other
> uncharged conduct with respect to Mr. McGill. … We
> have an enormous amount of testimony about the events
> underlying his two prior convictions, his 1989 robbery,
> for assault with intent to rob convictions. We have –
> The Court [interrupts]:  All of which is covered by 10.
> [Counsel continues]:  I guess what my concern is that
> because the jury isn't alerted as to the kinds of conduct
> which falls within that, they may not understand that
> some of the things that they have heard about are covered
> by that instruction.  For example, the warrant which Mr.

---

[66]  [Tr.3/22/04:am:47,50-51,55]

McGill and I didn't even know about relating to the Zales
Jewelry incident.

[Tr.3/22/04am:58]

2.     The Final Instructions

The district court instructed the jury on "other crimes" evidence as follows:

> You have heard evidence of criminal acts purportedly
> committed by one or more of the defendants with which
> they are not formally charged in these indictments.  That
> evidence was admitted for various collateral purposes,
> such as to show the relationship between the defendants
> and others involved in their activities, or to show motive,
> opportunity, intent, preparation, planning, knowledge,
> identity or absence of mistake or accident with respect to
> the those crimes with which a defendant is actually
> charged here.

> You are instructed that if you find that a defendant did
> engage in criminal activity not charged to him here, you
> are not to draw an inference from such a finding that the
> defendant is a person of bad character and that he must
> therefore be guilty of the crimes with which he is
> charged.

> You have heard testimony about the murder of Kairi Ball
> … [on] May 15, 1995, the 1989 seizure of a kilogram
> from Ronald Alfred and the 1991 and 1994 gun charges
> against Ronald Alfred.  The defendants, Ronald Alfred
> and James Alfred are not charged in this indictment for
> those offenses, and you are not called upon to determine
> whether they are guilty or not guilty of these offenses.
> That evidence was admitted only for your consideration
> in determining whether Ronald Alfred or James Alfred
> then became members of the Kevin Gray-Rodney Moore
> drug distribution and RICO conspiracies.

134

> During the course of the trial, the government presented evidence of Franklin Seegers' conduct prior to 1996. That evidence was admitted only in an attempt by the government to explain why and how Mr. Seegers joined the alleged conspiracies. In order to find Mr. Seegers guilty of the charged conspiracies, you must find, unanimously and beyond a reasonable doubt, that he participated in the conspiracies during the time period as charged in the indictment. Mr. Seegers is charged with joining the alleged conspiracies in November of 1996. He is not charged in the indictment with the conduct that occurred before he allegedly joined the conspiracies. Therefore, you shall not be asked to return any verdict as to this conduct.

[Tr.3/30/04am:44-46]

3.    Argument

A court can often cure or reduce the prejudice from the admission of "other crimes" evidence with "numerous and careful limiting instructions." *United States v. Burwell*, *supra* at 1068; *accord United States v. Latney*, 108 F.3d 1446, 1450 (D.C. Cir. 1997) *cert. denied*, 522 U.S. 940 (1997) ("strongly-worded cautionary instruction.") To be effective for this purpose, such instructions should have "carefully circumscribed the purpose for which the jury could consider the evidence." *United States v. Green*, 617 F.3d 233, 252 (3d Cir. 2010); *accord United States v. Burch*, 156 F.3d 1315, 1324 (D.C. Cir. 1998) (judge "crafted a careful limiting instruction to guide the jury away from drawing a conclusion on the basis of character or propensity."). At appellants' trial, the district court utterly failed in this task.

135

The district court's general instruction on other crimes evidence, and the government's proffered Instruction 10, suffered from two egregious and interrelated faults. First, the court refused defense requests to inform the jury precisely which evidence was to be considered for limited purposes. It was the height of hypocrisy for the government, having dumped vast amounts of "other crimes" evidence into the case, to then complain it would take too much time to enumerate the evidence in a proper limiting instruction, as the pattern instructions contemplate. *See* Criminal Jury Instructions for the District of Columbia (5th Ed. 2011) (the "Redbook") No. 2.321, Other Crimes Evidence (recommending that court describe the specific "other crimes" evidence for the jury and then specify the purpose for which it is being admitted).

The error in failing to specify the "other crimes" evidence was magnified by the failure of the district court to carefully explain to the jury the specific purposes for which it was being admitted. *See* Federal Rule of Evidence 105, requiring the court, when requested, to restrict evidence "to its proper scope and ***instruct the jury accordingly***." As explained in section E.2 *supra,* the district court gave limiting instructions to some, but not all of the "other crimes" evidence, to the effect that it "was admitted to explain why and how those defendants joined the alleged conspiracy and their relationships with other members of the alleged conspiracy." Yet in its final instructions to the jury, the court provided, for the first

time, an additional list of new theoretical bases for admission, including motive, opportunity, intent, preparation, planning, knowledge, identity, or the absence of mistake or accident.  [Tr.3/30/04am:44]  As set forth above, appellants submit that these theoretical bases for admission were not applicable to their cases, but even if some were marginally applicable, the district court's generic instruction provided no meaningful guidance whatsoever to the jury to assist in sorting it out.  *See Merriweather*, 78 F.3d at 1076 (after court gave instruction simply listing numerous prospective purposes, most of which did not apply to case, "the jurors could not have had the vaguest notion of the limited *proper* purpose for which they might have considered the evidence").  *See also*, *United States v. Davis*, 547 F.3d 520, 527-528 (6th Cir. 2008) (showing a pattern to prove intent is so similar to showing a pattern to demonstrate propensity, that "clear, simple, and correct" instructions to jury are essential.)  Thus, not only did this insufficient and confusing instruction fail to mitigate the prejudice from the "other crimes" evidence, it was an erroneous instruction in its own right, meriting reversal.

### H.    Prosecutors' Closings

Two different prosecutors conducted the initial and rebuttal closing arguments.  Both repeatedly reminded the jury of the "other crimes" evidence, and despite specific assurances given to the court that they would not "misargue" past misconduct evidence, they did, repeatedly.

1.     <u>Initial Closing</u>

During the initial closing argument, the prosecutor reminded the jury that McGill was selling drugs ***in the 1980's*** with Tommy Edelin, Kevin Gray and Rodney Moore even though she admitted that the men (young men actually) were selling ***independently***.  [Tr.3/22/04pm:12-14]

She mentioned the murders committed in the 1990's, stating that the organization had a "track record for violence."  [Tr.3/22/04pm:16-17]  She made specific mention of Omar Wazir killing Kairi Ball, even though he was "not part of this organization."  [Tr.3/22/04pm:18]

Turning back to McGill, she pointed out that he knew members of the organization and "did some violence with them," specifically mentioning the shooting up of "Buffy's aunt's house" (an event from the 1980's).  At the same time, the prosecutor admitted that McGill did not join the organization and "start doing deals" until 1996.  Nonetheless, she also accused McGill of planning to kill Antwuan Ball, and, without any factual basis, asserted that such a plan was part of the conspiracy.  [Tr.3/22/04pm:21]

The prosecutor then focused on R.Alfred, mentioning "Alberto Martinez, that big drug dealer from New York who had dealt with Ronald Alfred in the 80s," and calling Alfred a "big drug dealer in his own right."  [Tr.3/22/04pm:23]

The next morning the prosecutor came back to McGill, reminding the jury that he did some violence "side by side" with others such as Gray and Moore and stated the cooperating witnesses could "***tell you what these defendants were up to***." [Tr.3/23/04am:26] (Emphasis added.) After mentioning his 11-year old robbery cases, a pending case in Maryland, and a "forged GED," she then made the following argument:

> Who thought it was credible when he said he was wrongly convicted by a jury for his first robbery case. He was wrongfully convicted by a second jury in his second robbery case. He was wrongfully accused in his pending case in P.G. County, and he's been wrongfully accused in this case. Is that credible to anybody? ***This is all evidence of Keith McGill's guilt in this case***.

[Tr.3/23/04am:29] (Emphasis added.) The prosecutor made the same argument about Oliver, stating that lying about his prior conduct was evidence of his guilt in this case. [Tr.3/23/04am:30]

Directing the jury's attention back to R.Alfred, she discussed his arrest in 1989, his relationship with Martinez, and his two later arrests and plea, even while admitting that all of these events happened before R.Alfred joined the conspiracy. The prosecutor argued nonetheless that these prior acts "go to ***show you what he was up to*** and how he was ***ready willing and able to join the conspiracy***, how ***he brought a lot to the table with his experiences***." [Tr.3/23/04am:56-57] (Emphasis added.)

139

Likewise with Seegers, the prosecutor discussed his 1993 drug charges, then after admitting that this too was before Seegers joined the conspiracy, argued:

> … but this event happened in the same neighborhood where he was selling drugs in 1996, same neighborhood where he ultimately killed Diane Luther. It shows his links to the neighborhood, and it gives you some background on *why he too was someone who could join this organization and was ready willing and able to do so*.

[Tr.3/23/04am:57] (Emphasis added.)

The prosecutor closed by asking the jury to think of the victims, and the "kilos and kilos of poison on the street," and "lives crushed" by the defendants. [Tr.3/23/04am:74] Appellants objected to both the "ready willing and able" language and the improper appeal to the jury's sympathy. [Tr.3/23/04am:75-77]

2.    <u>Rebuttal Closing</u>

In rebuttal closing, the prosecutor again reminded the jury that Martinez had provided R.Alfred with "tons and tons of drugs back in the 1980s," mentioned the other bad acts and then argued that this evidence "was brought to you to show you how it is Mr. Alfred is somebody who is in a position to join and *bring something significant to the table* regarding the Kevin Gray-Rodney Moore organization." [Tr.3/29/04am:35] (Emphasis added.) Returning to the same theme, he reminded jurors how they had "heard a good bit about other incidents of criminal conduct" by R.Alfred, and argued that because of "all the drugs Ronald Alfred was involved

140

in," the jury could know "what he brought to this organization in the way of his ability to move serious quantities of drugs." [Tr.3/29/04am:38] Again, all objections were overruled. [Tr.3/29/04am:36,38]

The prosecutor also discussed at some length Oliver's alleged agreement to kill "Ken Ken" and "Stink," in exchange for Simmons paying for a lawyer, because they murdered Taron Oliver. [Tr.3/29/04pm:67-70]

### 3.    Argument

Prejudice from the admission of other crimes evidence may be ameliorated if "the prosecutor never argued an impermissible inference and did not emphasize the testimony." *United States v. Edmonds*, 69 F.3d 1172, 1176 (D.C. Cir. 1995). In appellants' cases, however, prosecutors did both. Virtually all of the "other crimes" evidence introduced against appellants was mentioned by government counsel, in some cases more than once, thereby demonstrating that the injection of this prejudicial evidence was an integral part of the government's trial strategy. Moreover, despite specific assurances to the contrary made to the district court, the prosecutors did "misargue" the earlier instances of bad acts, which would be reversible error even had the "other crimes" evidence been properly admitted.

The most egregious example is surely the government's argument that the "other crimes" evidence demonstrated that appellants "were ready willing and able" to join the conspiracy. This argument cannot be deemed anything other than

pure propensity argument: i.e., since appellants did it before, they would do it again (are "ready willing and able").  Similarly egregious were arguments about "other crimes" evidence showing what appellants "were up to," and what they could "bring to the table," implying that having committed crimes in the past, appellants were prepared to repeat them, and that prior violent acts established a "track record of violence" for the organization, which asked the jury to infer appellants were involved in the charged violent acts simply because they committed some past acts of violence.

McGill, and to a lesser extent Oliver, were additionally prejudiced by the prosecutors' use of their testimony about the other crimes to argue that they were lying about those acts, and therefore lying about their role in the charged conspiracy, categorizing this purported lying as actual evidence of their guilt. Appellants concede that prosecutors may make arguments about the credibility of testifying defendants, including the accusation, when based upon the evidence in the case, that they are lying.  *See United States v. Molina*, 934 F.2d 1440, 1444-1445 (9th Cir. 1991).  A subtle, yet important, distinction exists, however, between suggesting that a defendant is lying about his version of the facts and that his knowledge of his own guilt is the motive for his lying, as opposed to suggesting that the fact that a defendant is lying is affirmative evidence of guilt of the

crimes(s) charged.  The latter argument improperly shifts the burden of proof from the government.

This argument was particularly improper in that the prosecutor asked the jury to extrapolate from "other crimes" evidence of which McGill previously had been convicted, as well as other crimes that had not been adjudicated, that he must therefore be lying about the charged offenses.  In other words, the prosecution did not support its assertion that McGill was lying about these charges by contrasting his testimony with other government evidence, as is permitted, *see Wogenstahl v. Mitchell*, 668 F.3d 307, 331 (6th Cir. 2012) (comments tied to the evidence that had been introduced)," but instead bootstrapped on the "other crimes" evidence.

## I.    Specific Examples – Some Notice Given

Appellants first discuss the few examples of other crimes evidence that were actually litigated because the government gave some pretrial notice of them: R.Alfred's other alleged criminal acts - a 1989 cocaine offense, and handgun offenses from 1991 and 1994; the Kairi Ball murder, which allegedly involved R.Alfred and J.Alfred; and Seegers' 1993 drug conviction.

### 1.    Ronald Alfred's Earlier Bad Acts

#### a.    The 1989 Cocaine Case

On October 24, 2003, the government filed a motion *in limine* regarding R.Alfred's 1989 drug case, in which he was acquitted.  [Doc. 1621]  The motion

indicated the government intended to call two witnesses (U.S. Park Police Officer Richard Egan and Alberto Martinez) to testify about R.Alfred's alleged possession of a kilogram of cocaine on August 24, 1989. As the motion itself conceded, R.Alfred was ***acquitted*** of this alleged misconduct at trial by a unanimous jury.

In opposition, R.Alfred additionally objected that the alleged misconduct occurred ***six years prior*** to the date R.Alfred was alleged to have entered the conspiracy, and thus was "clearly extrinsic act evidence that should be excluded pursuant [to Rule] 404(b)." [Doc. 1622] Nevertheless, the district court permitted the evidence, and allowed the government, over objection, to hide R.Alfred's acquittal from the jury. [67] [Tr.10/16/03:31]

At trial, Officer Egan testified that he pulled over a Jeep, and when the driver got out he instructed him to get back in, but the driver fled. [Tr.11/3/03am:12-14] Fourteen years later, Egan said he could identify R.Alfred as the driver. [Tr.11/3/03am:21-22] Egan further stated that a red brick containing a kilogram of cocaine was seized from the Jeep, but the DEA had destroyed this evidence. [Tr.11/3/03am:18] Over objection, Egan was allowed to describe the traffic stop as "one of the largest seizures of cocaine in U.S. Park Police history." [Tr.11/3/03AM: 23] Not only was this uncharged 1989 seizure allowed into

---

[67] As noted *infra*, this ruling also violated R.Alfred's Confrontation Clause right to cross-examine Officer Egan for potential bias, particularly given Egan's later inflammatory comments about R.Alfred in connection with a separate 1994 arrest that the court also allowed into evidence. [Doc 1622]

144

evidence, but over objection, it was prominently displayed on a summary chart presented to the jury. [Tr.12/10/03pm:126; 12/11/03pm:8][68]  At the conclusion of the evidence, R.Alfred moved again to strike this evidence, but both requests were denied. [Tr.3/22/04am:49]

### b.    The 1991 Gun Case

R.Alfred also noted a continuing objection to the introduction of evidence of a 1991 gun case - which occurred *four years* before he allegedly entered the charged conspiracy. [Tr.10/27/03pm:133-34]  The district court simply gave a limiting instruction, [Tr.10/28/03am:48-49], and then allowed it all to come in. Officer George deSilva was permitted to testify that he had "arrested" R.Alfred in 1991 after he had walked towards deSilva's cruiser (which he had pulled into an alley) and dropped a silver handgun loaded with five bullets (five other black males had dispersed). [Tr.10/28/03am:52-55]  Photos of the alley, the .380 handgun, and even R.Alfred's mugshot were all introduced into evidence, [Tr.10/28/03am:55-60], as well as a certified copy of the conviction. [Tr.10/28/03pm:6-7]

---

[68]  This error was later compounded when the government was allowed, over objection, to introduce into evidence a DEA-7 showing the seized substance had tested positive for cocaine, [Tr.1/8/04am:4-5], and a summary exhibit that erroneously listed items not tested, [Tr.1/8/04am:24,123-24], through a witness *who had not performed the tests*.  *See* section IV, *infra.*

### c.     The 1994 Gun Case

R. Alfred also filed a pre-trial Motion *in Limine* seeking to exclude evidence related to a 1994 gun charge.  [Doc. 1607]  The motion noted, "the gun charge occurred more than a full year before Alfred's purported entry to the charged conspiracy," that "the Government has never given the accused written notice of intent to use this other bad act evidence pursuant to 404(b)," and in fact had first disclosed this evidence to the defense "less than five days before trial," notwithstanding R.Alfred's written demand for advance notice of any Rule 404(b) evidence the government intended to introduce at trial.  *See*, *e.g.*, [Doc. 587] (adopting co-defendant's motion for advance notice of Government's 404(b) evidence).  This motion also was denied by the district court.  [Tr.10/16/03pm:31]

Originally, R.Alfred was charged with assault on a police officer.  However, he was convicted only of possession of a weapon without a license.  At trial, defense counsel noted that this expected evidence was both highly prejudicial and disputed, and could include inflammatory statements about shooting at police.  The government assured the district court that it could avoid this prejudicial taint it if was allowed to lead its witnesses.  The court then denied the motion *in limine*, allowing the evidence for a limited purpose in light of the government's agreement that it could and would limit the evidence to the recovery of the gun, and avoid the whole fight and chase.  [Tr.10/30/03pm:6-11]

The government then called as a witness Park Police Officer John Dowd, who testified that R.Alfred had been stopped in a black sports car near a bridge, and was seen throwing a weapon off that bridge. [Tr.10/30/03pm:57-68] Defense counsel brought out on cross-examination that these events transpired more than a year before R.Alfred was alleged to have joined the conspiracy, and the district court gave a limiting instruction under 404(b). [Tr.10/30/03pm:68-69] Unfortunately, the government didn't stop there.

Not content with Dowd's testimony, the government then called a second Park Police Officer, Larry Romans. Romans testified that, in this 1994 incident, there were actually two different crime scenes, informing the jury, "(b)asically it was a police shooting." [Tr.10/30/03pm:74] Defense counsel objected strenuously, noting how this flew in the face of the district court's previous ruling and direction. Although the prosecutor responded, "I apologize," defense counsel aptly noted "we can't unring the bell," and sought a mistrial, which was denied. [Tr.10/30/03pm:75] The district court instructed the jury to disregard Roman's statement. Defense counsel sought further instructions that were not given. When later attempts were made to demonstrate that the gun had not been fired at the scene, [Tr.10/30/03pm:83], the government introduced a redacted plea transcript, which openly suggested that R.Alfred had been charged with firing a pistol.

147

[Tr.10/30/03pm:95-98]  Ultimately, the only limiting instruction provided was the general 404(b) instruction.  [Tr.10/30/03pm:98-99]

The impact of this "other acts" evidence on R.Alfred was devastating. Evidence of R.Alfred's alleged drug dealing *during* the conspiracy was quite limited and came from tainted sources; but now, based on *acquitted* acts and destroyed drugs, the government portrayed him as one of the largest drug dealers in U.S. Park Service history.  Moreover, contrary to specific government assurances, the jury heard claims he had shot at the police.  These acts, occurring long before R.Alfred allegedly joined the conspiracy, should not have been admitted to show how and why he entered the charged conspiracies, particularly on top of the Kairi Ball murder, which alone should have sufficed for that purpose.

## 2.    The Kairi Ball Murder

Before trial, R.Alfred and J.Alfred filed a motion *in limine* to exclude certain other crimes evidence, including Kairi Ball's murder on May 15, 1995, [Doc. 1430], which the district court denied.  [Doc. 1575]  During trial, the court heard additional argument by counsel with respect to this evidence, and briefly explained its ruling.  [Tr.10/16/03pm:14-31]  The government's theory was that the murder of Kairi Ball was allegedly procured by the Alfreds, which caused hostility between R.Alfred and Kevin Gray.  It also allegedly led to a meeting between the two men, which resulted in R.Alfred agreeing to supply Gray with drugs, thus

presumably joining the conspiracy. Appellants acknowledge that the murder of Ball, occurring shortly before and a direct cause of the critical meeting, was logically relevant to how and why Alfred joined the conspiracy. They submit, however, that the probative value of the *reason* for the meeting (to discuss a previous murder), rather than merely the fact that it occurred, was slight, especially when weighed against the manifestly prejudicial impact of evidence of that murder, and thus should have been excluded as a matter of Rule 403 balancing.

### 3.    Seegers' 1993 Drug Conviction

In 1993 (at least three years prior to his allegedly joining the conspiracy), Seegers pled guilty to one count of attempted distribution of cocaine after being arrested in an undercover buy/bust of a single $20 rock of crack cocaine in 800 block of Seventh Street, N.E. Incident to that arrest, 41 small Ziplocs containing crack cocaine were recovered from his person. Over defense objection, the district court granted the government's pretrial motion to introduce the 1993 uncharged conduct under two theories: that it was direct evidence tending to show Seegers was able and ready to enter the charged conspiracy and, in the alternative, that it was admissible under 404(b) because it was probative of Seegers' intent, plan and knowledge as it related to the distribution of cocaine in a particular area of Washington, D.C. [Docs. 1582,1587,1615] Seegers filed an opposition to the government's motion, which was denied. [Docs. 1587,1615] In its order, the court

149

specifically noted that Seegers was free to renew his objection mid-trial, were the government to fail to lay the proper foundation to draw the evidentiary connections required to admit the evidence.  [Doc. 1615]

At trial, Seegers renewed his objection, specifically arguing that the prejudicial effect of evidence of the 41 small Ziplocs containing crack cocaine substantially outweighed its probative value.   The district court summarily overruled that objection.  [Tr.10/30/03pm:11-12]  After undercover MPD Officer Larry Hale's testimony regarding Seegers' 1993 arrest concluded, the jury was instructed that Seegers was alleged to have joined the charged conspiracy in 1996, that he was not charged in the indictment with the 1993 act, and that the jury would not be required to render a verdict regarding that act.   [Tr.10/30/03pm:39-40]

At the close of the government's case, Seegers renewed his objection to the admission of, and moved to strike, evidence of the 1993 uncharged criminal conduct, arguing that the government had failed to lay the proper foundation for its admission.   Once again, the district court summarily denied that motion. [Tr.1/23/04pm:30]

### J.    Specific Examples – No Notice Given

The following examples of improper other crimes evidence were all introduced without the affected appellant having received any pretrial notice.

150

1.    <u>McGill's Pre-Conspiracy Acts of Violence</u>.

This type of alleged "other crimes" evidence had the least probative value and the greatest prejudicial impact. *See United States v. Wilson*, 135 F.3d 291, 299-300 (4th Cir. 1998) (the very nature of the other crimes would be "shocking to the moral sense of the community").

Cooperator Maurice Andrews testified that he, McGill and 15 other young men were "beefing" in the early 1980's with a group from Wheeler Road and in the course of the dispute, they "shot up" the house belonging to the aunt of a Wheeler Road guy named Buffy. [Tr.10/21/03pm:118-22] Since the district court overruled McGill's objection without any explanation, [Tr.10/22/03am:9-13], it is impossible to say how this was relevant at all, much less how it outweighed its obvious prejudicial impact. The prosecutor mentioned this event *twice* in closing.

McGill was convicted in 1989 of assault with intent to rob and use of a handgun in the commission of a felony stemming from an April 7, 1989 incident, but was ***acquitted*** of charges of robbery with a deadly weapon and a nolle was entered for robbery and theft arising from the same incident. In 1990, he was convicted of robbery with a deadly weapon and theft over $300 stemming from an April 14, 1989 incident. However, in the second case, he was ***acquitted*** of attempted murder, assault with intent to disable, assault with intent to avoid lawful apprehension and an assault and battery charge, all related to an allegation that

someone had tried to run over a police officer while fleeing.  McGill was also *acquitted* of assault and battery of the alleged robbery victim in the second case.

These **convictions** were the subject of both direct and cross-examination, which McGill concedes was consistent with Fed. R. Evid. 609 but contends that examination of the ***facts*** of the cases, especially the acquitted conduct, was improper.  McGill asserts it was particular error to permit cross-examination and admit extrinsic evidence about the acquitted conduct, especially since the unproven allegation that he had run over a police officer with a car was outside the scope of this case, as well as outside the scope of re-direct.  A request for a mistrial was denied.  [Tr.3/10/04am:74-75,80]   Later, the government was allowed to ask another McGill witness if he had seen "the truck run over a police officer."[69] [Tr.3/15/04am:58]  Efforts to try to show that someone else was the driver were not allowed, and a request for mistrial based on the amount of time spent on uncharged acts was denied.  [Tr.3/16/04pm:22]

> 2.    <u>Contemporaneous Acts of Violence and Intended Violence Not Part of Conspiracy</u>

Almost all of the appellants were subjects of testimony alleging that they had committed or planned acts of violence that were never connected to the

---

[69]    The witness, originally charged in the second incident, testified that McGill had not even been present at the time.

charged conspiracy.    Appellants assert that this testimony was improperly admitted, both for lacking relevance and for being too prejudicial.

Cooperator Maurice Andrews testified about James Alfred shooting at some *unidentified person* near Robinson Place.    [Tr.10/21/03pm:10-12,16-24,91-93] Without even knowing who the intended victim was, much less the reason for the shooting, it appears to have no relevance whatsoever.

Andrews also testified that he heard second-hand from Kevin Gray that McGill wanted Veal to kill Antwuan Ball, but Andrews did not know if the two actually met.  [Tr.10/22/03am:32-33]  The district court never made a finding as to whether this evidence was "intrinsic" to the conspiracy.  Certainly, a defendant's unexplained desire to kill someone, without more, does not qualify as "intrinsic" evidence, and no other relevant basis was suggested.

Finally, Andrews testified that Simmons wanted to "catch" "Beaver Teeth Kenny" but they couldn't locate him.    [Tr.10/22/03am:36-40]    No possible explanation was provided as to how this evidence was relevant to the charged conspiracies.

Cooperator Walter Fleming testified that Simmons was angry and tried to kill J.Alfred because Alfred lost $8000 gambling in Las Vegas, leaving him unable to re-pay Simmons money he was owed.  The two men later worked out their problem without violence, [Tr.11/18/03am:23-27], making evidence of the dispute

irrelevant, as an argument between two alleged members of a conspiracy normally does not ***facilitate*** the conspiracy.

Fleming testified that Simmons wanted other unnamed people murdered as part of the Fleming/Simmons conspiracy. [Tr.11/18/03am:111] By Fleming's own admission, the Fleming/Simmons drug conspiracy was separate and distinct from the Gray/Moore drug conspiracy.

Fleming also testified that Oliver would ask him if he "needed anything," which ***he took to mean*** do you need me to kill someone "or something like that"! Oliver would also ask "You alright?" and "Anybody bothering you?" Oliver's objection to this line of questions, of which he had no prior notice, was overruled. [Tr.11/17/03pm:140-143] The probative value was far outweighed by the prejudice.

Victoria Robles testified that on one occasion Oliver and Handy came back to their apartment out of breath. Oliver said that his gun jammed when he tried to shoot. He did not say who he was shooting at. No date was given, not even a year. [Tr.11/26/03am:37-42,50-51] Robles' grand jury testimony was then admitted because there she went further and said that she heard Oliver say that he fired a couple of shots and then it jammed. [Tr.11/26/03am:50]

The government was also allowed to introduce Robles' grand jury testimony that Oliver told her that Simmons was going to pay an attorney to get him out of

154

jail, after which Simmons expected Oliver to kill "Ken Ken" and "Stink" because they murdered Taron Oliver.  [Tr.2/9/04pm:126-30; 2/18/04pm:57-58,66]   The government discussed this highly prejudicial testimony at some length in rebuttal argument.  [Tr.3/29pm:67-70]

When the government cross-examined Larry Steele, Simmons' witness, it suggested that Steele shot at Andre Wright on Simmons' behalf in 1998.  Steele denied even knowing who Wright was.  [Tr.1/26/04pm:8-11,52-55]

Cooperator Raymond Sanders testified that Simmons participated in an agreement to murder an unknown person in 1996.  Simmons' objection to this uncharged event was overruled.  [Tr.11/4/03pm:149-154]

### 3.    Pre-Conspiracy Drug Trafficking

#### a.    *McGill*

No less than five cooperating witnesses were called to testify in great detail that in the early to mid 1980's, as a teenager, McGill sold powder cocaine on 15th Place and later in Congress Park along with some of these witnesses.[70]   The witnesses admitted that each person was selling independently.  The government argued that the evidence of McGill's youthful drug dealing was admissible "to explain the relationship" between the men and other conspirators and to explain "how and why" McGill joined the conspiracy.  Since, however, McGill allegedly

---

[70]   These witnesses were Maurice Andrews, Raymond Sanders, Frank Howard, Melvin Wallace and Quincy Thomas.

did not join the conspiracy until over a decade later, in mid-1996, logically, it did neither.  Certainly, the prejudice far outweighed any supposed probative value.

The government also crossed McGill on an arrest for possession with intent to distribute in 1989, which was no-papered.  [Tr.2/23/04pm:82-84]

### b.    Ronald Alfred

Cooperator Alberto Martinez identified R.Alfred as one of his "top five" customers, from about 1988 until Martinez was incarcerated in 1991, [Tr.11/3/03pm:6-8] - thus *ending* fully four years before R.Alfred's alleged involvement in the conspiracy charged in this case.  Martinez asserted R.Alfred had bought 150-200 kilograms of cocaine from him.  [Tr.11/3/03pm:34]  The government asked the jury to view this testimony together with the 1KG of cocaine it said R.Alfred had been caught with in 1989.  There was no evidence Martinez was a part of, or had anything to do with *anyone* else in the charged conspiracy, which is why the prosecutor was left to argue only that this showed what R.Alfred "could bring to the table," manifestly a propensity argument.

### c.    James Alfred

The testimony concerning J.Alfred's pre-conspiracy drug dealing came from two witnesses.  Cooperator Omar Wazir testified that James made money selling cocaine.  [Tr.10/28/03am:54-55]  He also testified that J.Alfred sold heroin to Terry Kirk and, in 1988, J.Alfred bought heroin for Wazir.  [Tr.10/28/03am:89-

156

90,92-98]  Cooperator Frank Howard testified that he bought 62 grams of crack from J.Alfred twice in 1994.  [Tr.1/9/04pm:32]  Howard also testified that he sold kilos of cocaine to J.Alfred on 10 to 15 occasions in 1995-96.  According to Howard, J.Alfred was selling wholesale.  [Tr.1/9/04pm:34]  In 1996, Howard stopped supplying J.Alfred because his source was arrested.  [Tr.1/9/04pm:37]

### d.    Oliver

Bethlehem Ayele testified she saw Oliver selling crack in $10-20 quantities in 1992-93 (when Oliver was about 15) in the 1300 block of Park Road, N.W.  She didn't claim she ever sold him drugs or had anything to do with him.  He was just in the same area as she was.  [Tr.11/19/03pm:146-62]  She did not link Oliver to any members of the conspiracy, other than his cousin Simmons.

### e.    Simmons

Fleming testified that he and Simmons engaged in drug trafficking starting in 1993, before Simmons was alleged to have joined the charged conspiracies. Moreover, Fleming himself testified that his "conspiracy" with Simmons was separate from the charged conspiracy.  The government was permitted to introduce physical evidence allegedly related to this separate conspiracy, which was the only physical evidence against Simmons.  [Tr.3/29/04pm:170]  Bethlehem Ayele testified that she was trafficking with Simmons in 1994, also in a separate conspiracy.  [Tr.11/19/03pm:156]

4.    <u>Other Pre-Conspiracy Crimes</u>

Frank Howard was allowed to testify that when he and McGill were growing up together, they would go to the mall and "steal together."  An objection was obviously raised to these "ancient other crimes," that had nothing at all to do with drugs, but the district court allowed the evidence and instructed the parties to "just move on," summarily denying a mistrial.  [Tr.1/9/04am:94-97]

On cross-examination, McGill was confronted with a warrant for theft from a Zales jewelry store by an accomplice.  McGill was never arrested on this, had never seen the warrant, and he even noted that his kids had been with him at the time.  But a bench warrant - never served on McGill - was then read into the record over objection.  [Tr.2/23/04pm:98-100]  McGill was also cross-examined about a pending case for theft from a Wal-Mart.

The district court also allowed testimony that several defendants had not filed income tax returns, [Tr.1/20/04am:18-21], and that Simmons had not been sending in sales taxes from his businesses.   [Tr.1/20/04pm:35; 1/27/04am:82]  McGill was accused of not filing tax returns.  [Tr.2/24/04am:152]

The government was even permitted to cross-examine McGill at great length about an incident involving the alleged submission of a forged GED certificate to prison authorities in 1994, a charge that McGill insisted was dismissed.

[Tr.02/23/04pm:105-123].[71]  While arguably permissible under Rule 608(b), it was error for the district court to permit the government to introduce extrinsic evidence of the allegation.

### K.    The Errors Were Not Harmless

As indicated above, the government's case against appellants stemmed in large part from the testimony of its heavily impeached cooperating witnesses. There were no controlled buys or contemporaneous seizures of large quantities of drugs or money, and the few wiretap calls were basically inconclusive.  There was little unbiased evidence that appellants had committed the acts of violence alleged against them.  In short, the government's case was a weak one, built largely on the dubious foundation of cooperators corroborating other cooperators.  Consequently, the government's purpose in deluging the trial with massive amounts of irrelevant evidence, often delivered in excruciatingly prejudicial detail, was obviously to convince jurors that appellants had a propensity toward violence and drug dealing, and therefore must be guilty of the charged offenses.  The sheer volume of

---

[71]    The government's relentless pursuit of this topic provoked an angry reaction from McGill and ultimately resulted in striking comments by him about prosecutorial misconduct.  [Tr.2/23/04pm:122-123]

inadmissible "other crimes" evidence overwhelmed this jury, particularly because so much of it involved violent acts.[72]

Moreover, the sheer volume of "other crimes" evidence means this Court need not decide if any individual errors are sufficiently harmful, standing alone, to warrant reversal, as their cumulative effect surely does warrant reversal. *United States v. Jones*, 482 F.2d 747, 749 n.2 (D.C. Cir. 1973) (critical inquiry is an analysis of the "probable impact, appraised realistically, of the particular [errors] upon the jury's fact-finding function."); *United States v. Brown*, 508 F.3d 1066, 1076 (D.C. Cir. 2007) (same). Because the volume of "other crimes evidence was so large and the court's final instruction so vague, leaving the jury to speculate about the evidence, appellants further assert they were not only prejudiced by the 404b evidence presented against them, but were also severely prejudiced by the spillover effect of the mountains of other crimes evidence admitted against the others.

Particularly applicable and persuasive is the recent Seventh Circuit's decision in *United States v. Ciesiolka*, in which it reversed without having to

---

[72]    Faced with an onslaught of "other crimes" evidence, appellants felt compelled to try and rebut these accusations by calling their own witnesses. This led to yet another torrent of "other crimes" evidence as the government was permitted to probe into topics far more prejudicial than probative, even considering the leeway allowed (the government) on cross-examination.

actually decide whether the "mountains of Rule 404(b) evidence" were "properly admissible."

> While it is true that the court elucidated to some degree the probative value of the Rule 404(b) evidence, the fact of evidence's being potentially probative does not imply– let alone ensure - that this quality is not substantially outweighed by the danger of unfair prejudice.  There is no trace of an explanation as to this crucially important consideration–one that we require courts to make when admitting evidence under Rule 404(b) ... Here, the potentially prejudicial nature of the assorted, objectionable material was grossly enhanced by the time (a full day) required to present it...[A] trial court's 'perfunctory' consideration of this critical question is inadequate and may in itself be grounds for reversal...The court allowed mountains of Rule 404(b) evidence, much of which was highly prejudicial, to be introduced in a "seemingly unconstrained way.") [73]

614 F.3d 347, 357-58 (7th Cir. 2010).

The Seventh Circuit remanded the case for a new trial with instructions to "carefully analyze each piece of proposed Rule 404(b) evidence to satisfy itself that the requirements for admissibility are satisfied.  Having done so, it should lay out its reasoning clearly for the record."  *Id.* at 359.  This Court should do likewise, for the other crimes testimony, taken as a whole, presented an unacceptable "risk that [the] jury will convict for crimes other than those charged - or that, uncertain

---

[73]  Here, the presentation of the 404(b) evidence occurred throughout the six months' long trial, and occupied ***many*** days worth of testimony.  Thus, in every way, this case is even more egregious than *Ciesiolka*.

of guilt, it will convict anyway because a bad person deserves punishment." *Old Chief v. United States*, 519 U.S. 172, 181 (1997).

## IV.    CONFRONTATION CLAUSE VIOLATIONS

### A.    Introduction

In *United States v. Moore*, 651 F.3d 30, 69-74 (D.C. Cir. 2011), this Court concluded that admission of DEA drug analysis and medical examiner reports not introduced at trial by their authors (or another witness who had significant participation in their preparation) violated the Confrontation Clause of the Sixth Amendment, citing *Crawford v. Washington*, 541 U.S. 36 (2004), *Melendez-Diaz v. Massachusetts*, 557 U.S. 1256 (2009), and *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011). In appellants' trial, as in *Moore*, such reports were admitted in violation of the Confrontation Clause.

### B.    Standard of Review

A district court's legal conclusions regarding application of the Confrontation Clause are reviewed *de novo*. *United States v. Carson*, 455 F.3d 336, 362 (D.C. Cir. 2006). This review is subject to a constitutional harmless error analysis requiring the government to establish beyond a reasonable doubt that the error was harmless. *Chapman v. California*, 386 U.S. 18, 23-24 (1967); *Moore*, *supra* at 69; *United States v. Wilson*, 605 F.3d 985, 1014 (D.C. Cir. 2010).

## C.    Confrontation Clause Violations

DEA chemist Jerry Walker reviewed *historical* DEA files (some of which he obtained from the National Archives) and prepared a chart reflecting drugs seized from members of the alleged conspiracy since 1989. [Tr.1/8/04am:17,23-24] Defense counsel objected to both Walker testifying regarding the analysis of the drugs and admission of the chart, arguing that Walker had neither performed the analysis nor significantly participated in it.[74] [Tr.12/11/03pm:6]   Over that and other objections, the chart [JW-1] was admitted as a summary exhibit and Walker was permitted to testify, despite acknowledging that he had never spoken with any of the chemists who had performed or supervised the analysis.[75] [Tr.12/11/03am:99-100; 12/11/03pm:6-13; 1/8/04am:82]  In an effort to legitimize this evidentiary effort, the government also introduced the underlying DEA drug analysis reports without their authors.  [Tr.1/8/04am:26,37].

---

[74]   Before Walker testified, the government stated that he would do so under the authority of *United States v. Smith*, which it proffered was a case from this Circuit (no cite was provided).  [Tr.12/11/03am:99]  Seegers objected, arguing that *Smith* did not provide support for the government's proposal.  [Tr.12/11/03pm:6] Other appellants joined.  [Tr.12/11/03pm:8]

[75]   Walker had been a DEA supervisor for only a few months.  While he indicated that his duties included reviewing other chemist's reports, he admitted that he had reviewed only one of the underlying reports in that capacity. [Tr.1/8/04am:21,49]   Notably, the government acknowledged that all of the chemists who had actually performed the analysis were available, but in its opinion using Walker "would be an easier way to present this evidence." [Tr.12/11/03pm:9-10]

The Confrontation Clause violations were not limited to Walker's testimony and admission of the summary exhibit. Two deputy medical examiners, Gertrude Juste and Marie-Lydie Pierre-Louis, testified regarding the autopsies of Joseph Thomas, Diane Luther and Thomas Walker. Despite not participating in those autopsies, they repeated the findings of others regarding causes of death, number and nature of entry and exit wounds, bullet travel, and stippling. [Tr.11/24/03am:45,97; 12/18/03pm:55,57-60]  Dr. Juste also opined that Luther engaged in a struggle before her death. [Tr.11/24/03am:78]

It is clear that both categories of documents were prepared for the sole purpose of providing evidence against a defendant and were used to prove the truth of the matter asserted and thus covered under the Confrontation Clause protection. *See Williams v. Illinois*, 2012 U.S. Lexis 4658 (June 18, 2012), Plurality Op at 11.

## D.    Prejudice

As to the erroneous admission of Walker's testimony, the summary exhibit and the drug analysis reports, not only were the appellants the government sought to hold directly accountable prejudiced, but ***all*** of the appellants were prejudiced because the nature and quantity of the drugs were elements of the charged conspiracies. Absent the slender amount of drugs actually recovered, there was no tangible proof, other than testimony by highly impeached cooperating witnesses, as to the nature and scope of the conspiracies at all.

164

In addition, Seegers was prejudiced by the erroneous admission of Dr. Juste's opinion that Luther engaged in a struggle before her death because it improperly bolstered the credibility of the much-impeached cooperating witnesses against him, including Lincoln Hunter (who previously told a judge that another man shot him and murdered Luther and whose medical records unequivocally proved that he lied at appellants' trial). Likewise, R.Alfred and J.Alfred were prejudiced by Dr. Juste's testimony because it established that Thomas' death was a homicide and bolstered the credibility of the government's witnesses against them.

Unlike *Williams*, supra, where the Supreme Court allowed an expert to discuss, as a basis for her opinion, the laboratory reports of others which were not admitted into evidence, the underlying DEA analysis and autopsy reports in this case were admitted and used directly as substantive evidence to obtain appellants' convictions.

Appellants submit that the government cannot show that the admission of evidence in violation of the Confrontation Clause in appellants' case was harmless beyond a reasonable doubt. Reversal of appellants' convictions, therefore, is required.

## V.        OTHER APPELLANTS' RIGHTS TO A FAIR TRIAL WERE VIOLATED BY McGILL'S STUN BELT REVELATION

### A.    Introduction

As set forth above, a climate of fear permeated every stage of appellants' trial, beginning with juror *voir dire*.   When McGill revealed the district court considered appellants so dangerous as to warrant a unique force attached to their bodies, that fear was not only confirmed, but also amplified. As a result, Oliver, Seegers, Simmons, J.Alfred and R.Alfred's trial was rendered fundamentally unfair and an unreliable vehicle for determining guilt or innocence.

### B.    Standard of Review

Where an error affects the framework in which a criminal trial proceeds and renders it "fundamentally unfair or an unreliable vehicle for determining guilt or innocent," it is considered "structural" and requires automatic reversal.  *Neder v. United States*, 527 U.S. 1, 9 (1999).

Denial of motions for mistrial is reviewed for abuse of discretion.  *United States v. McClendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004).   Constitutional errors are subject to harmless error analysis, which requires a showing "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  *Chapman v. California*, 386 U.S. 18, 24 (1967).

166

### C.    Background

Seven days before trial, the government requested stun belts be strapped to appellants' bodies for the duration of their trial.  [Government Motion to Use Stun Belts (Doc.)]  Seegers filed an opposition, which was joined by all but one of the other appellants.  [Seegers' Opposition (Doc.); Tr.9/29/03am:96-98]  Only McGill consented to wearing a stun belt, with his counsel presenting her reasons on the record.  [Tr.9/29/03am:98-99;108]  The district court granted the government's request, finding appellants required heightened security measures.

[Tr.9/30/03am:6,14; Docs. 1558, Order October 1, 2003 (Doc.)]

Every day of their six-month trial, appellants were equipped with a remote-controlled stun belt, which they secretly wore without incident.  That secret was revealed in stunning fashion on the last day of trial.  As government counsel made his hyperbole-filled rebuttal, McGill's counsel objected to what she believed were mischaracterizations of her closing argument.  [Tr.3/29/04pm:84-85]  In support, McGill forcefully voiced his opinion.  [*Id*.]  The district court directed him to shut his mouth.  [*Id*.]  Upset, McGill replied that the district court was allowing the government to "do illegal things." [*Id*.]  As he continued his comments, the district court ordered the marshals to remove him.  [Tr.3/29/04pm:85]  Immediately, McGill lifted his shirt to reveal the stun belt to the jury, shouting:

> Tell them I have a – I'm wearing a belt right here, 50,000
> watts – what they're doing ***to us***, illegal … Six months,

> you never knew it, everyday I been here, everyday … Six
> months y'all never knew that this belt everyday 50,000
> watts because you allow it …

[*Id*.] (Emphasis added.)

The district court instructed the jury *sua sponte*:  "Don't hold that outburst against any other defendant.  That's solely Mr. McGill.  Consider misconduct only in connection with Mr. McGill, not any other defendant."  [*Id*.]  Thereafter, other appellants moved for mistrial and severance from McGill.  [Tr.3/29/04pm:96-101]  The district court denied those motions, stating it believed misconduct of a defendant cannot cause a mistrial.  [Tr.3/29/04pm:97]

The following day, the district court refused to permit McGill to be present before the jury and acknowledged the stun belt revelation was "incredibly prejudicial" and McGill's co-defendants were "harmed" by his "improper actions."  [Tr.3/30/04am:10-11]  Appellants objected to any further instruction, arguing it couldn't cure the prejudice suffered by the passive defendants and would, in fact, increase it.  [Tr.3/30/04am:11]  Over objection, the following final instruction was provided:

> I want to provide you with further instruction on the
> actions of defendant Keith McGill in court yesterday …
>
> Mr. McGill displayed and made reference to a security
> device that he was wearing. ***As you know, during the
> course of this trial, the Court has determined that it was
> necessary to take certain security precautions.***

> However, the Court has never found it necessary to actually activate the device Mr. McGill was wearing.
>
> I instruct you that you are not to consider Mr. McGill's outburst in any way as evidence in this case, either with respect to him or with respect to the other defendants. Further, the Court's decision to adopt certain security precautions is not evidence in this case. You may not consider these measures at all in reaching your verdicts.

[Tr.3/30/04am:58-59] (Emphasis added.) This instruction, coupled with McGill's absence, highlighted to jurors the significance of the stun belt disclosure.[76]

Nothing in the record reflects that the jury was able to make individualized determinations as to appellants' guilt. In fact, the record supports a finding that the jury was unable to do so. Oliver, Simmons, J.Alfred, and R.Alfred, were found guilty of all counts. [Docs. 1879,1880,1881,1882] Inconsistent verdicts were returned as to Seegers, who had been charged as a lone gunman with murdering Diane Luther and shooting Lincoln Hunter during a single incident. Inconceivably, Seegers was found guilty of all charges arising from the shooting of Hunter, but the jury was unable to return any verdicts against him for the murder of Luther. [Doc. 1963]

---

[76] McGill was never again permitted to be in the presence of the jury.

**D.   Argument**

The Supreme Court has held the Constitution prohibits the use of visible restraints at trial, unless justified by an essential state interest specific to each defendant. *Deck v. Missouri*, 544 U.S. 622, 624 (2005).   The reason for that prohibition is clear:  the potential impact of visible restraints on a jury implicates the fundamental fairness of a trial. *Ochoa v. Workman*, 669 F.3d 1130, 1145 (10th Cir. 2012) (citing *Deck*, *supra*).  The right to a fair trial is perhaps the most basic tenet of our system of justice, and "is a fundamental liberty secured by the due process guarantees of the Fifth and Fourteenth Amendments." *United States v. Moore*, 651 F.3d 30, 44-45 (D.C. Cir. 2011), citing *Estelle v. Williams*, 425 U.S. 501, 503 (1976).

It is the *visibility* of restraints, including stun belts, that offends the Constitution because it "undermines the presumption of innocence." *Deck* at 630. "The actual impact of a particular practice on the judgment of jurors cannot always be fully determined," but the Supreme Court "has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny." *Williams* at 504.  Visibly restraining a defendant during trial, therefore, has been determined to be an inherently prejudicial practice. *Holbrook v. Flynn*, 475 U.S. 560, 568-569 (1986). Moreover, courts have found nontraditional restraints such as stun belts to be ***particularly prejudicial*** in that they may suggest some "unique

170

force" is necessary to control the defendant.[77]  *See United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002).

An episode in the courtroom is "deemed inherently prejudicial if 'an unacceptable risk is presented of impermissible factors coming into play.'… The toxic nature of the potential prejudice…is so inherent to the misconduct that 'little stock need be placed in jurors' claims to the contrary.'"  *United States v. Mannie*, 509 F.3d 851, 856 (7th Cir. 2007) (quoting *Holbrook* at 570).

A defendant may move for mistrial where there is a legitimate claim of serious prejudicial error such that he is unable to obtain a fair trial.  *United States v. Phibbs*, 999 F.2d 1053, 1066 (6th Cir. 1993).  When that prejudice results from his own unprovoked outburst, however, mistrial is not warranted because to grant it would be to subvert the judicial process and allow him to profit from his own misconduct.  *See United States v. Stewart*, 256 F.3d 231, 242 (4th Cir. 2001) (internal citations omitted); *contra Blunt v. United States*, 404 F.2d 1283, 1285-86 (D.C. Cir. 1968).  Likewise, allowing a defendant's outbursts to result in the very severance he sought prior to trial would permit him to obtain through his

---

[77]   Amnesty International has characterized stun belts as "cruel, inhumane and degrading."  *See* "Cruelty in Control?  The Stun Belt and Other Electro-Shock Equipment in Law Enforcement," June 8, 1999.  In addition, the United Nations Committee Against Torture has stated that the use of stun belts may violate the Geneva Convention. "U.S. Prisoner Restraints Amount to Torture, Geneva Panel Says," *The New York Times*,  May 18, 2000.

misconduct that which he was unable to obtain through his motions. *United States v. West*, 877 F.2d 281, 288 (4th Cir. 1989).

Where several defendants are tried together, the misconduct of one does not always result in mistrial because if it did, "it might never be possible to conclude a trial involving more than one defendant." *United States v. Aviles*, 274 F.2d 179, 193 (2d Cir.), *cert. denied*, 362 U.S. 974 (1960); *see also West* at 289. Courts, however, must "proceed in these situations with particular care for the rights of the 'passive' defendants." *West*, *supra* (internal citations omitted). The misconduct of one defendant in a multi-defendant trial necessitates a "delicate balancing" of the rights of the passive co-defendants and the realities of judicial administration. *See United States v. Bamberger*, 456 F.2d 1119, 1128 (3d Cir.), *cert. denied*, 406 U.S. 969 (1973). Perhaps the most important consideration in this situation is the extent to which the passive defendants suffered prejudice. *See generally United States v. Foster*, 557 F.3d 650, 656 (D.C. Cir 2009). Where passive co-defendants are impacted by an individual's outbursts, a trial judge has a continuing duty to grant severance if prejudice does appear. *See Schaffer v. United States*, 362 U.S. 511, 516 (1960).

Where a jury has been subjected to merely disruptive behavior by a defendant, courts have generally held that a cautionary instruction suffices to mitigate against undue prejudice to his co-defendants. *See United States v.*

172

*Marshall*, 458 F.2d 446, 451 (2d Cir. 1972); *United States v. Koskela*, 86 F.3d 122, 125 (8th Cir. 1996). In situations not involving constitutional error, where a jury could make individual guilt determinations, no prejudice exists. *See West* at 287-88. Courts have long recognized, however, that forceful reactions to courtroom outbursts may require a new trial even where there was "sufficient cause for the response - and thus where *Flynn* would not imply a constitutional error." *Sutton v. Bell*, 645 F.3d 752, 757 (6th Cir. 2011) (internal citations omitted); *see also Braswell v. United States*, 200 F.2d 597, 600-02 (5th Cir. 1952) (mistrial warranted after two defendants violently attacked a marshal and were forcibly subdued in front of jury).

Notably, the issue before this Court (whether a defendant's outburst resulting in revelation of an inherently prejudicial practice warrants entry of a mistrial for his passive co-defendants) appears to be one of first impression.

### E.    Reversal Is Required

Other appellants submit that when McGill revealed his stun belt and stated that for six months ***it had been done to him and his co-defendants***, they were entitled to a mistrial because it was impossible to reverse the resulting prejudice and their trial was rendered an unreliable vehicle for determining guilt or innocence. When the district court failed to enter that mistrial, their rights to a fair trial were violated. Moreover, the district court's instructions regarding McGill's

outburst merely highlighted that the district court itself found appellants so dangerous as to warrant special "security precautions," thereby compounding the violation of their constitutional rights to a fair trial by placing its imprimatur upon the government's case.  To expect the jury to disregard evidence as powerful as the district court's own findings is irrational.  *See Bruton v. United States*, 391 U.S. 123, 137 (1968); *see also Durham*, *supra*.

Even had the district court not placed its imprimatur upon the government's case, providing a cautionary instruction could not have cured the prejudice suffered by the passive appellants.  Sometimes cautionary instructions are not enough.  *See Mannie* at 857.

Due to the inherently prejudicial nature of stun belts, denial of appellants' motions for mistrial was structural error requiring automatic reversal of their convictions.  Were this Court to determine that the error was not structural and a harmless error analysis is appropriate, appellants submit denial of their motions for mistrial was not harmless beyond a reasonable doubt because: (1) the visibility of their restraints undermined the presumption of innocence in violation of their rights to a fair trial; (2) they suffered substantial prejudice as evidenced by their jury's inability to make individualized determinations regarding their guilt; and (3) the combination of what the jury was exposed to during McGill's outburst (shouting,

174

forcible removal, stun belt revelation, etc.) resulted in prejudice warranting mistrial. *See Deck*, *supra*; *West*, *supra*; *Mannie*, *supra*.

"It is axiomatic in our system of justice that an individual is entitled to a fair trial – not a perfect one. Nevertheless, the distance between the concepts of fair and perfect cannot be so great as to render the former meaningless." *Mannie* at 857. To rule that Oliver, Seegers, Simmons, J.Alfred and R. Alfred received a fair trial after McGill's outburst and revelation would be to do just that.

Under either a structural error or harmless error analysis, the convictions of Oliver, Seegers, Simmons, J.Alfred, and R.Alfred must be reversed.

**VI.    APPELLANTS ARE ENTITLED TO A NEW TRIAL AS A RESULT OF TESTIMONY BY GOVERNMENT WITNESSES THAT THEIR CO-DEFENDANTS WERE CONVICTED AT A PREVIOUS TRIAL**

**A.    Standard of Review**

Error in introducing the guilt of non-testifying co-defendants is of constitutional dimension. *United States v. Blevins*, 960 F.2d 1252, 1261 (4th Cir. 1992). A trial error occurring "during the presentation of the case to the jury, and which may be quantitatively assessed in the context of other evidence presented [is reviewed] in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.*, citing *Arizona v. Fulminante*, 499 U.S. 279 (1991).

175

## B.    Graham's Testimony

Steven Graham cooperated with the government, having been convicted in another case and hoping to receive a sentence reduction.  Prior to cooperating, he met with an investigator for John Raynor.  At trial, the following colloquy occurred between government counsel and Graham:

> Q:    Okay.  And just tell [the jury] a little bit more about the statement you gave to John Raynor's investigator about the shooting into the green Cadillac.
>
> A:    I mean, need I explain how this came about that he wanted me to give a statement?
>
> Q:    Sure. Go ahead.
>
> A:    When I came down – I was at the jail initially, and they moved me down to Lorton, to Center, in preparation to be moved to the federal system.
>
> Q:    This is after you were convicted and sentenced?
>
> A:    Yes.
>
> Q:    Go ahead.
>
> A:    **And the indictment which Kevin and them was convicted on and John Raynor was convicted on had come out…**

[Tr.12/16/03am:57-58] (Emphasis added.)

An objection was made.  The district court agreed that the testimony was improper and offered to give an instruction to disregard it.  [*Id.* at 60-61]  After

176

consultation with all defense counsel, it was decided that an instruction would only highlight the fact of the convictions.  A motion for mistrial was made and denied. [*Id.* at 73][78]

### C.    Howard's Testimony

During cross-examination of government witness Frank Howard, the following exchange transpired:

> Q:    You don't think that if things don't go well in Prince George's County your defense lawyers are going to mention [that you assisted law enforcement in a significant federal case]?
>
> A:    I'm not even worried about Prince George's County right now.  I'm worried about this.
>
> Q:    Right.
>
> A:    I'm not worried…
>
> Q:    Oh, I understand that.  But we are talking about the outcomes in Prince George's County.
>
> A:    We talked about that during the whole trial.  You all keep asking me the same thing.  Just like they tried to use that in the first repeating the same thing about the Maryland case.

---

[78]    While a jury may be presumed to follow instructions, it is not true in every situation.  In appellants' view, testimony concerning a jury verdict finding a codefendant guilty is just as indelible as testimony about a codefendant's confession.  The Supreme Court in *Bruton v. United States*, 391 U.S. 123, 137 (1968), recognized that it was irrational to expect a jury to disregard such powerful evidence.

Mr. Daniel:  Objection.

[Howard]:    **And look what happened in the first trial.**

[Tr.1/12/44pm:81-82][79]

### D.    Testimony was Improper

Evidence of a co-defendant's adjudication of guilt has no legitimate probative value as to a defendant's guilt, just as a co-defendant's guilty plea cannot be used as substantive evidence of a defendant's guilt.  *United States v. Johnson*, 26 F.3d 669, 677 (7th Cir. 1994); *United States v. Austin*, 786 F.2d 986, 991 (10th Cir. 1986); *United States v. Halbert*, 640 F.2d 1000, 1004 (9th Cir. 1981).  "There is no appreciable difference between informing a jury that a cohort has pleaded guilty and informing it that a cohort has been adjudicated guilty."  *United States v. Griffin*, 778 F.2d 707, 711 (11th Cir. 1985).  The concern with such testimony is that a guilty plea or adjudication of guilt may well lead a jury to infer that the defendant on trial is guilty as well.  *United States v. Baez*, 703 F.2d 453, 455 (10th Cir. 1983).  Thus, absent agreement, information concerning another co-defendant's finding of guilt is strictly prohibited.  *Griffin* at 710.  When such information is revealed to a jury, the government must establish that the evidence against the defendants was so overwhelming that any error is rendered harmless beyond a reasonable doubt.  *Blevins* at 1262-63.

---

[79]  Although the comment was stricken, the jury had already heard it.  It is irrational to expect it disregarded such powerful evidence.  *See Bruton*, *supra*.

Clearly, Graham's testimony that Gray, Raynor, "and them" were convicted and Howard's testimony referring to the result of that trial, were erroneous and improper.

### E.    Error was Not Harmless Beyond a Reasonable Doubt

As beneficiary of a constitutional error, the government bears the burden of establishing that it was harmless beyond a reasonable doubt.  *Chapman v. California*, 386 U.S. 18, 24 (1967).  To determine whether that burden has been met, this Court is required to conduct "a quantitative assessment of the likely impact of the error measured against the other evidence at trial."  *Blevins*, *supra* at 1263.  Indeed, in conspiracy cases this analysis can prove to be quite cumbersome; yet it is no less crucial.  *See Blevins* at 1262 ("Assessment of whether an error was harmless is certainly not an easy task in a complex conspiracy case, but to fail to apply the analysis is to risk systemic paralysis.")

Appellants submit that the evidence against them was far from overwhelming.  *See* Individual Arguments concerning sufficiency of the evidence by Appellants J.Alfred, Simmons, and Seegers and other individual and joint Arguments discussing extensive impeachment of cooperating witnesses, *infra*.  The revelation that appellants' co-defendants were found guilty, when measured against the other evidence presented at trial, therefore, had a substantial and

179

prejudicial impact that contributed to each of appellants' convictions.   *See Chapman*, *supra*.

In addition, R.Alfred and J.Alfred were charged with the Continuing Criminal Enterprise murder of Joseph Thomas.  As to that count the jury was instructed:

> In order for a defendant to be found guilty of murder while engaged in or working in furtherance of a continuing criminal enterprise, the government must prove each of the following elements beyond a reasonable doubt:
>
> 1.   That … Gray or … Moore were operating a continuing criminal enterprise.  As you know,…Gray and…Moore are co-defendants in this case.  Their cases are being handled separately…The defendants on trial here are not charged with the offense of operating a continuing criminal enterprise, but in order to find Ronald Alfred [and] James Alfred … guilty of the offense of murder while engaged in or working in furtherance of a continuing criminal enterprise, **you must first determine whether the government has proven the existence of such an enterprise as charged against … Gray and … Moore in Count 2 of the indictment."**

[Tr.3/30/04am:97-98] (Emphasis added.)

Since the jury was told that Gray and other co-defendants were already convicted, an element of the charged offense was taken away from their consideration.  This raises the very legitimate concern that R.Alfred and J.Alfred were convicted based upon another jury's adjudication of guilt.  *See Griffin* at 711 (The prejudice here is the same as where a codefendant pleads guilty; the jury may

regard the issue of the remaining defendant's guilt as settled and the trial a mere formality.)

This same argument equally applies to the RICO conspiracy count against **all** appellants. The jury was instructed that the government had to prove beyond a reasonable doubt that an enterprise headed by Gray or Moore existed. [Tr.3/30/04am:85] Since the jury had been told that Gray and Moore were convicted, this element of the offense likewise was taken from its consideration.

The jurors' bewilderment was expressed in its first note: "Please explain Jury Instruction Number 44.[80] Why do we need to determine why (sic) Kevin Gray and Rodney More ran a continuing criminal enterprise?" After discussion, [Tr.4/1/04:12,16-18], the district court sent the following instruction back:

> … There are two counts … charging Continuing Criminal Enterprise Murders, or CCE murders: Count Thirty-One charges…Ronald Alfred and James Alfred with the CCE murder of Joseph Thomas; and County Forty-Six charges…Seegers with the CCE murder of Diane Luther … In order to prove the CCE murder counts, the government must first prove that a continuing criminal enterprise existed. The existence of a CCE is an element of the CCE murder counts. You need to determine whether … Gray or … Moore ran a continuing criminal enterprise.

Having already heard that Gray and Moore were convicted, the jury obviously could not understand why it had to make the same finding. Moreover,

---

[80] The district court mistakenly referred to this note as the "second note."

the instruction did nothing to resolve the problem. Having heard from *two* witnesses that Gray and Moore were found guilty in the previous trial, it was a mere formality for this jury to find that the enterprise existed. In fact, the jury would have been hard-pressed to not find it existed after the improper testimony; there simply was no way to unring the bell.

Because the error was not harmless beyond a reasonable doubt, all convictions must be reversed.

## VII.        McGILL WAS IMPROPERLY DENIED THE RIGHT TO RECLAIM HIS RIGHT TO BE PRESENT IN COURTROOM

### A.    Introduction

McGill was not present during his own trial for (1) the completion of the government's rebuttal closing argument; (2) the entirety of the district court's final instructions to the jury; (3) the entirety of the district court's supplemental *voir dire* of jurors 9, 10 and 12—resulting in the removal of holdout Juror 9; (4) the announcement of the verdict for four of his co-defendants; nor (5) his own verdict.[81] McGill does not challenge the decision of the district court to remove him for the remainder of the government's rebuttal closing argument in response to his intemperate response to that argument. Having subsequently represented he would restrain himself, however, McGill's constitutional and statutory rights were

_____

[81] In addition, McGill was not present for the supplemental *voir dire* of Juror 8 and the new instructions given to the jury, but he had voluntarily waived his right to be present on that day due to illness.

violated when the district court refused to permit him to "reclaim" the right to be present thereafter whenever members of the jury were present.

### B.    Basis of Right to Be Present

McGill's constitutional right to be present during his trial is guaranteed by the Confrontation Clause of the Sixth Amendment, and, when not actually confronting witnesses or evidence against him, by the Due Process Clause. *United States v. Gagnon*, 470 U.S. 522, 526 (1985) citing *Illinois v. Allen*, 397 U.S. 337 (1970) and *Snyder v. Massachusetts*, 291 U.S. 97 (1934). McGill's statutory right to be present "at all stages of the trial" is guaranteed by Federal Rule of Criminal Procedure 43(a)(1-3).

McGill's right includes presence during *voir dire* of the jury, *United States v. Hoover-Hankerson*, 511 F.3d 164, 169 (D.C. Cir. 2007); jury instructions, *Rogers v. United States*, 422 U.S. 35, 38 (1975); and the return of verdicts, *Shields v. United States*, 273 U.S. 583, 589 (1927).

McGill acknowledges the district court's prerogative to remove an unruly defendant from the courtroom,[82] and that such removal may constitute waiver of

---

[82]    While McGill does not challenge his initial removal for purposes of this appeal, he does not concede that his removal was warranted. *See Tatum v. United States*, 703 A.2d 1218, 1223 (D.C. App. 1997)("[b]ehavior that is merely disruptive is insufficient under *Allen* to justify removal.").

continual presence under Rule 43(c)(1)(C): "when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom." Notwithstanding, McGill argues the imputed waiver only applies to the instance of first removal on March 29, 2004. The Supreme Court has ruled: "Once lost, the right to be present can, of course, be reclaimed as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings."[83] *Allen* at 342. *Accord United States v. Benabe*, 654 F.3d 753, 769 (7th Cir 2011); *United States v. Ward*, 598 F.3d 1054, 1059 (8th Cir. 2010).

This Court has held the "constitutionally mandated minimum protection a defendant is entitled to under rule 43(a) is fundamental fairness." *United States v. Washington*, 705 F.2d 489, 497 (D.C. Cir. 1983) citing *Faretta v. California*, 422

---

[83] Defendant Allen was initially removed for telling the judge "you're going to be a corpse here," throwing a file ripped from an attorney on the floor, and insisting there would be no trial. *Allen* at 340. He was later permitted to return based on his representations of future good behavior to the court. Due to subsequent misconduct, Allen was removed and permitted to return two more times, before finally, and quietly, attending the remainder of his trial. *Allen* at 341-42. The trial court's continuing offer to permit Allen to reclaim his right to be present prevented the specific instances of removal following misbehavior from resulting in constitutional error.

U.S. 806, 816 (1975).  Fundamental fairness was lacking in McGill's case as a co-defendant was treated differently.[84]

### C.    Standard of Review

As McGill asserts a constitutional violation, the government bears the "burden of showing that the trial court's error was 'harmless beyond a reasonable doubt.'"   *United States v. Gordon*, 829 F.2d 119, 127 (D.C. Cir. 1987) citing *Chapman v. California*, 386 U.S. 18, 21-22 (1967).  Constitutional error requires reversal unless the government can demonstrate beyond a reasonable doubt that the error "did not contribute to the verdict obtained."[85]  *United States v. Sheehan*, 512 F.3d 621, 631 (D.C. Cir. 2008).  The inquiry is not whether, absent the error, a guilty verdict nonetheless would have been reached, but whether the error "had an effect" on the verdict.  *United States v. Cunningham*, 145 F.3d 1385, 1394 (D.C. Cir. 1998).  Moreover, "where there is uncertainty as to the effect on the verdict,

---

[84]    On January 27, 2004, Simmons was threatened with duct-taping for yelling in front of the jury: "Motherfucker just mad because a black man had a fucking store."  [Tr.1/27/04am:25-26]  On February 9, Simmons was ordered removed from the courtroom after a diatribe ending with "Ya'll just killing the black man so we don't produce kids," with R.Alfred chiming in "Genocide. Genocide."  [Tr.2/9/04am:136]  After breaking for lunch, Simmons was permitted to return.  [Tr.2/9/04pm:6-13]

[85]    "At all times, the burden of proving that an error was not prejudicial rests on the government."  *Sheehan* at 631 (citations omitted); *Deck v. Missouri*, 544 U.S. 622 (2007).

the error cannot be deemed harmless; rather the court must treat the error as having affected the verdict." *Id.*

### D.    McGill's Right to Return

McGill chose to testify in his defense and was on the stand for five days. His testimony during a grueling cross-examination was characterized by heart-breaking outbursts proclaiming his innocence.   McGill, inappropriately but understandably, was visibly frustrated by an overwhelming process he did not seem to understand.   Once, after he criticized a judicial ruling during cross-examination, the district court exclaimed, before the jury, "It is not illegal if I have ruled it legal.   You can tell that to the court of appeals."   [Tr.2/23/04pm:100] McGill recognized the inherent prejudice in such a comment: "Court of appeals? Are you insinuating I'm getting found guilty?"   [*Id.*]  His frustration did not abate.

The government's rebuttal closing argument was extraordinarily provocative and arguably improper.[86]  When his counsel's objection to a misstatement of the facts was overruled by the district court, McGill uttered that the prosecutor was lying.  Despite an admonition from the district court, "Shut your mouth," McGill protested "Judge, you wrong.   I'm innocent, you not — "   The district court

---

[86]    *See* Sections III and XVII discussing prosecutorial misconduct during closing arguments.   McGill was also upset that the testimony of his voice identification expert, who would have contradicted the government's assertion, repeated during closing that it was his voice on two key calls. *See* Section VIII.

ordered the marshals to remove McGill from the courtroom.  It was during this removal that McGill revealed his stun-belt to the jury.  [Tr.3/29/04pm:84-85]

During a later bench conference, in response to counsel's inquiry, the district court announced McGill had waived his right to be present in the courtroom "when the jury is present" for the duration of the trial.  Counsel protested, but was told: "Now you sit down and shut up too."  [Tr.3/29/03pm:128-129]

The next day, March 30, McGill sat calmly through the discussion of instructions conducted outside the jury's presence.  When the district court indicated that McGill would be removed before the jury entered, his counsel renewed her request for him to remain for the jury instructions, representing that he would remain quiet.  The request was denied; although McGill was seated right next to counsel at the time, no inquiry was directed to him.  [Tr.3/30/04am:32-33] Moreover, the district court even denied McGill access to an audio-video hook-up in the back, unless McGill agreed to be bound with duct tape (he did not). [Tr.3/30/04am:35-38]   On March 31, counsel again requested that McGill be present for the jury instructions. This was denied, again without any inquiry of McGill.  [Tr.3/31/04am:6]

On April 14, the district court conducted supplemental *voir dire* of three jurors, ultimately resulting in the removal of Juror 9.  Counsel's request that McGill participate in proceedings "critical to his Sixth Amendment right to present

a defense … and to a fair trial" was denied.  [Tr.4/14/04am:38]  At the end of the day, McGill requested a brief *ex parte* with the district court to apologize.  The court simply rebuffed him.  [Tr.4/14/04pm:94]

On April 26, verdicts were read as to Simmons, Oliver and the Alfreds.  McGill's request to be present was denied, and, although Seegers was also present, no explanation was given for McGill's absence.  [Tr.4/26/04:5-6]

Finally, on May 4, after a jury note indicated a verdict for McGill, the district court ordered McGill removed from the courtroom before the jury entered.  Counsel's motion for a mistrial was denied.[87]  [Tr.04/5/04:3-4]

The critical proceedings from which McGill was excluded took place over the course of six separate days and multiple court sessions.  The district court repeatedly violated McGill's constitutional and statutory rights when it did not afford him the opportunity to reclaim his right to be present by either accepting counsel's representations made in McGill's presence, or had the district court felt it necessary, directly inquiring as to his intentions (an opportunity given to his co-defendant).

---

[87] Similarly, counsel's motions for mistrials had all been denied following each of her earlier requests for McGill to return.

### E.    The Error Was Not Harmless

This Court in *Gordon* queried "what went on in the juror's minds as they spent the first several hours of the trial wondering where the defendant was."  The jurors must have had similar questions about McGill's whereabouts during jury instructions, during supplemental *voir dire*, and during the reading of his co-defendants' verdicts.  From their perspective McGill was likely absent from the trial altogether, since they had never seen him again after he was forcibly removed from the courtroom.  Since, no explanation of his absence was ever given, how could the verdict not be affected?  It is plainly "not beyond a reasonable doubt that 'the jury speculated adversely to the defendant about his absence from the courtroom.'"  *Gordon* at 128, citing *Wade v. United States*, 441 F.2d 1046, 1050 (D.C. Cir. 1971).   And any such adverse speculation would contribute to the verdict, particularly in this case where the jury deliberated for over one month before reaching a verdict for him.  The government cannot demonstrate to the contrary.

McGill asserts the district court committed constitutional errors on March 30, March 31, April 14 and May 4, 2004 when it did not give him an opportunity to reclaim his right to be present in the courtroom.  The government cannot meet its burden of demonstrating beyond a reasonable doubt that these errors "did not contribute to the verdict obtained." *Sheehan* at 631.

# VIII.    MCGILL WAS IMPROPERLY DENIED TESTIMONY OF A QUALIFED DEFENSE EXPERT

## A.    Introduction

In apparent disregard for its obligations to timely provide discovery, the government informed McGill's counsel after the trial had begun that his voice was on several calls recorded on a wiretap.   Cooperator Melvin Wallace testified that McGill's voice was on two calls that he also claimed were drug related. [Tr.1/06/04am:77-79,81-94]    McGill was adamant that it was not his voice. [Tr.2/25/04am:125-30]

His counsel obtained court authorization for a transcriber then for a voice recognition expert, who conducted her examination of McGill during breaks in the trial.   The district court and the government were kept apprised of the expert's work, and the government received copies of her reports as they were generated. The voice expert was prepared to testify the voice on the calls attributed to McGill on the two disputed calls was not his.   The government retained its own expert who was expected to testify about perceived flaws in the defense expert's methodology and conclusions.   [Tr.3/15/04AM: 91-92]   Counsel pressed the district court to schedule a hearing on the admissibility of the expert testimony pursuant to *Daubert v. Merrell Dow  Pharmaceuticals*, 509 U.S. 579 (1993).  [Tr.2/20/04am:198-205]

On March 15, 2004, during the defense case, the district court denied the *Daubert* hearing, and precluded the testimony, primarily expressing dissatisfaction

with the timing and form of counsel's proffer.[88]  [Tr.3/15/04AM: 92-93]  However, two days later, when counsel submitted a motion for reconsideration and a written proffer from the expert, the district court ruled on the merits holding that there was not a "proper scientific basis for the expert testimony and I think the case law supports my ruling."[89]  In relying on cases decided before the Supreme Court's seminal decision in *Daubert*, the district court committed an error of law by refusing to apply the correct factors in evaluating the admissibility of expert testimony.  McGill asserts this was reversible error.

## B.    Standard of Review

A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion, *General Electric Company v. Joiner*, 522 U.S. 135, 138-139 (1977); however, the district court denied a hearing without ever making findings that the defense expert testimony did not meet the criteria of Fed.R.Evid. 702, which governs the admission of expert testimony.  McGill contends this was an error of

---

[88]  A ruling against McGill on simple procedural grounds would be hard to sustain given (1) the government did not disclose the key recordings until after the trial had begun; (2) counsel had obtained authorization from the court to engage the expert; (3) the government was on notice McGill intended to call this the expert; (4) the government had been provided with the expert's reports in a timely manner; and (5) the government was able to engage its own expert.

[89]  In open court, the district court merely denied the motion for reconsideration; [Tr.3/17/04PM: 47] however when McGill personally asked to approach the court during a then sealed, but now unsealed, bench conference to personally plead with him to permit the expert, the court stated its reasons as above.  [Supp.Tr.3/17/04PM: 6-7]

law.  Given counsel's persistent discussions and motions concerning the defense expert, plain error does not apply.

## C.    Legal Argument

The government, and implicitly the district court, relied on *McDaniel v. U.S.*, 538 F.2d 408 (D.C. Cir. 1976), to conclude voice identification testimony was not admissible in this Circuit.[90]  In *Daubert*, the Supreme Court explicitly rejected the standard for admitting expert testimony set forth in *Frye v. U.S.*, 293 F.2d 1013  (D.C. Cir. 1923).  Since issuing that decision, the Supreme Court has made it clear that it is *Daubert*, and Rule 702, not *Frye*, district courts must apply in determining whether to admit expert testimony.  For example, in *Rincon v. U.S*, 510 U.S. 801 (1993), the Supreme Court vacated a Ninth Circuit decision that had applied a pre-*Daubert* standard which upheld the exclusion of expert testimony on eyewitness identification, and remanded for further consideration in light of *Daubert.*

---

[90]    Ironically, *McDaniel* noted, the "overwhelming weight of judicial precedent" upon which the lower court relied in **admitting** the testimony (remarking that "[u]nfortunately [that precedent] has evolved outside this judicial circuit." 538 F.2d at 412.  The Court in *McDaniel* also pointed out that "numerous other courts have examined the questions of whether so-called voiceprints are sufficiently reliable to justify their admissibility, and all but a few have concluded that they are." *Id.* at 413.  It noted that two of the three federal circuits that have considered the question ruled favorably on admissibility, as had eight of nine state appellate courts.  *Id.*  It remarked that the government had informed it that 14 of the 15 United States District judges who had ruled on the issue had accepted such evidence, and that "all but two of the state tribunals" that have reached this issue have found such evidence admissible." *Id.*

In order to determine whether the defense expert testimony was admissible, the district court should have considered and applied post-*Daubert* standards to the expert testimony that was being proffered in the instant case, not simply apply, without meaningful analysis, a pre-*Daubert* case. In the years since the *McDaniel* case, the methodology for voice identification has advanced, and those who practice the discipline, the defense expert among them, it know that it has. McGill does not contend that this Court should order that the testimony be admitted. McGill concedes that *Daubert* hearing at which both sides may present their case for or against admission is the appropriate next step.

Given the emphasis placed by the prosecutor in closing argument on the telephone calls in question, coupled with the prosecutor's unequivocal assertion that it was McGill's voice on them, the error cannot be considered harmless, especially given there was no other evidence which the jury could see or hear in the jury room which directly implicated McGill in drug trafficking.

## IX.    McGILL'S INDICTMENT WAS MISJOINED

### A.    Introduction

In February 2002, McGill was indicted on two Counts: tampering with a witness and possession of a firearm on December 15, 1999. [02-045 Doc. 7] A superseding indictment filed on March 13, 2002 added four Counts: drug

conspiracy, RICO, violent act in aid of RICO, and a D.C. Code assault.  [02-045 Doc. 12]

Fed.R.Crim.P. 13 provides the court may join two or more indictments for trial if the offenses and/or defendants could have been joined in a single indictment under Rule 8.  *United States v. Briscoe*, 798 F. Supp. 28, 31 (D.D.C.  1992).  The court is permitted to consult the indictment and other pretrial evidence offered by the government.  *United States v. Wilson*, 26 F.3d 142, 153 (D.C. Cir. 1994).

The district court granted the government's motion [02-045 Doc. 11] to join McGill's indictment with that of the Gray/Moore conspiracy (00cr0157), rejecting McGill's opposition [02-045 Doc. 18-19], following a hearing on November 8, 2002.  The "other evidence" considered by the district court was the trial testimony of cooperator Frank Howard in 00cr0157 on ***July 17, 2002***, submitted with the government's reply to McGill's opposition on ***July 18, 2002***.  [02-045 Doc. 21]

### B.    Standard of Review

Joinder of defendants or offenses before trial is reviewed *de novo* and is subject to the harmless error rule.  *United States v. Gooch*, 665 F.3d 1318, 1326-26 (D.C. Cir. 2012).

### C.    Argument

The language of Rule 13 is permissive, and "all offenses which could be tried together thereunder ***need not be***;" the court should consider prejudice to the

194

defendant.  *United States v. Burkley*, 591 F.2d 903, 919 (D.C. Cir. 1978) (emphasis added).  The Second Circuit holds the permissive aspect of Rule 13 tempers the underlying doctrine of judicial efficiency.  Thus joinder is only permissible where it does not "interfere[ ] with substantial justice."  *United States v. Halper*, 590 F.2d 422, 428-429 (2d Cir. 1978).

The joinder of these indictments interfered with substantial justice.  The ***sole*** evidence against McGill in these offenses was the word of cooperator Frank Howard.  Howard was arrested in September 2000.  Two months later, the primary superseding indictment in 00cr0157 issued.  [Doc. 102]  It named Kevin Gray, ***Frank Howard*** and Timothy Handy as complicit in the December 15, 1999 attempted murder of a witness in Counts 83, 84 and 123.[91]  [*Id.* at 147-48,152] McGill's name does not appear anywhere in the 159 page indictment.  Howard testified before a grand jury on January 30, 2002, the day before McGill's initial indictment.  Based on the initial indictment alone, the district court said it would ***not*** have granted the joinder.  [02-045 Tr.11/8/02pm:4-7]  Yet even the second indictment does not allege any overt or racketeering act by McGill to support his participation in either conspiracy.  [02-045 Doc. 12]

---

[91]    Although not relevant to the joinder, McGill notes that based on a description of a car broadcast in a lookout, Howard was stopped by police at a car wash a mile from the scene, vacuuming his car within hours of the shooting. [Tr.2/11/04pm:125-129]  In a police photograph of the stop, Howard is wearing a yellow shirt, exactly as the shooter was described by the victim. [Tr.2/17/04pm:45-46]

Grave injustice is done to McGill when, after years of investigation, of amassing crime scene and forensic evidence, and countless debriefings, he is shoehorned into a massive drug conspiracy at the last minute on the questionable claims of a desperate cooperator.  Such an error "can be harmless only if [it] did not influence jury or had only very slight effect, otherwise, judgment of convictions must be reversed and case must be remanded."  *Halper* at 43.

## X.        McGILL WAS IMPROPERLY IMPEACHED

### A.    The Government's Impeachment by Misconduct

Well before his alleged involvement in the charged conspiracies, McGill had two robbery trials in Maryland, which resulted in both convictions and acquittals. He was convicted in 1989 of assault with intent to rob and use of a handgun in the commission of a felony stemming from an April 7, 1989 incident, but was ***acquitted*** of charges of robbery with a deadly weapon and a *nolle* was entered for robbery and theft arising from the same incident.  In 1990, he was convicted of robbery with a deadly weapon and theft over $300 stemming from an April 14, 1989 incident; however, he was also ***acquitted*** of assault and battery of the alleged robbery victim in the second case.  Significantly, he was also simultaneously

*acquitted* of attempted murder, and three assault charges, all related to a separate allegation that someone had tried to run over a police officer while fleeing.[92]

When McGill testified, these *convictions* were the subject of both direct and cross-examination, which McGill concedes was consistent with Fed. R. Evid. 609, but he was also cross-examined extensively about the *facts* of the cases, including the acquitted conduct.[93]   In addition, he was cross-examined about other alleged acts of misconduct that had not resulted in any convictions, such as a warrant for theft from of a Zales Jewelry store which he had never seen or had any notice of, an alleged theft from a Walmart on which he had never been arrested, and an incident involving the alleged submission of a forged GED certificate to prison authorities in 1994, a charge that McGill insisted was dismissed.

[Tr.02/23/04pm:105-123].[94]

---

[92]   In addition, a *nolle* was entered for three counts, but the record does not indicate the substance of those charges.

[93]   McGill has argued in Section III above that the scope of the government's impeachment resulted in the improper admission of "other crimes" evidence.  The government argued, and the court accepted, that evidence of prior criminal behavior was admissible to show **bias** on the part of McGill against the government; such an argument would logically only extend to bad acts which were prosecuted by the Office of the United States Attorney, not acts which were never prosecuted or were prosecuted in other jurisdictions.  Manifestly, it would not include **acquitted** conduct in other jurisdictions.

[94]   The government's relentless pursuit of this topic provoked an angry reaction from McGill and ultimately resulted in striking comments by him about prosecutorial misconduct.  [Tr.2/23/04pm:122-123]

McGill asserts it was reversible error to permit the government to introduce the following extrinsic evidence about the alleged bad acts, especially the acquitted conduct, in violation of Fed.R.Evid. 608(b):

(a)    The ***entire*** trial transcript of the July 1990 Maryland trial, with bench conferences redacted.  This included two portions containing McGill's testimony that were previously introduced and the testimony of the police officer who was the alleged victim of the assault charges upon which McGill was acquitted;

(b)    **Live witness** P.G. County police officer Michael Bernardon, to testify about statements made by William Little, McGill's codefendant in the Maryland cases;

(c)    McGill's statement to police concerning April 1989 incident;

(d)    The judgment of the Maryland Court of Appeals affirming the convictions in the 1990 robbery case;

(e)    The probable cause statement concerning the Zales Jewelry theft, even though neither McGill nor counsel had ever seen it before; and

(f)    Documents concerning the alleged forged GED certificate.

198

### B.    Standard of Review

Evidentiary issues are reviewed under an abuse of discretion standard, *U.S. v. White*, 116 F.3d 903, 919 (D.C. Cir. 1997).  Because counsel objected repeatedly to all of this examination and evidence, plain error does not apply.

### C.    Argument

While Fed.R.Evid. 608(b) gives some license to cross-examine a witness about prior bad acts which reflect on character for truthfulness, it also provides that extrinsic evidence of these acts may not be introduced.  *White*, 116 F.3d at 920; *U.S. v. Morrison*, 98 F.3d 619, 628 (D.C. Cir. 1996); *cert. denied*, 520 U.S. 1131 (1997).  It does not matter if the witness does not give the cross-examiner the answer he seeks; he "must accept the answer given by the witness." *Deary v. City of Gloucester*, 9 F.3d 191, 197 (1st Cir. 19930).

In this case the government was essentially allowed to retry the Maryland cases, introducing the entire trial transcript in one case.  It was also allowed to introduce extrinsic evidence of the alleged Zales Jewelry "theft" and even a 10 year old allegedly forged GED (despite no evidence it was submitted by McGill).  Given the extraordinary time and energy spent on this other conduct, as well as the government's emphasis on such evidence in its closing, such repeated errors cannot be deemed harmless.

## XI.    McGILL'S SENTENCING ISSUES

### A.    Introduction

McGill was sentenced to life on all counts,[95] except the 924(c)(1)(A) count

on which he received a consecutive 10-year sentence. McGill contends that there

were numerous errors in his sentencing - the mandatory 10-year sentence on the

§ 924(c) count was imposed in violation of his right to a jury trial, the sentencing

guideline calculation was flawed in that it doubled counted the possession of a gun,

the district court erred in declining defense objections to the application of the old

crack sentencing guideline and the career offender guideline. In light of these

errors and other factors, McGill submits his life sentence was unreasonable.

### B.    The *Apprendi* Violation

18 U.S.C. § 924(c)(1)(A)(iii) provides for a ten-year mandatory minimum

sentence if the firearm is discharged, which is what the district court imposed, as

recommended by the presentence report. There is, however, only a five-year

mandatory minimum for simply using or carrying. McGill was not indicted for,

and the jury did not convict him of discharging the firearm.  As such, the ten year

sentence violated his Sixth Amendment right to a jury trial, *see Apprendi v. New*

*Jersey*, 530 U.S. 466 (2000); *Southern Union Company v. United States*, 2012 WL

2344465 (2012).  Since McGill's counsel did not object, he concedes a plain error

---

[95] On Count 3, the D.C. Code offense, the sentence was 30 years to Life.

200

review is appropriate, but given the obviousness of the error and the doubling of the consecutive sentence, reversal is still appropriate.

### C.    Sentences Exceeding Permissible Maximums

The district court sentenced McGill to *life* on counts 4 and 5 relating to the shooting of Charles Shuler.  Since Shuler did not die, the maximum sentence under 18 U.S.C. § 1959(a)(1)(3) (Count 4) was 20 years[96] and under 18 U.S.C. § 1512(a)(3)(B)(i) (Count 5) was 30 years.  McGill's counsel objected to the maximum life sentences on these counts, [02-045 Doc. 226] and, thus, is a legal question reviewed by this Court *de novo.*

### D.    Sentencing Guideline Miscalculation

The presentence report erroneously increased the offense level of the offense by two levels for possession of a dangerous weapon, [PSI:¶-122] despite Application Note 4 to U.S.S.G. § 2K2.4 which prohibits adding to the offense level of the underlying offense if a separate mandatory minimum sentence is imposed for a 924(c)(1)(A) count.  McGill's counsel did not object, and so a plain error standard applies.  Whether McGill was prejudiced depends on other issues.

---

[96] Shuler was paralyzed; had McGill been indicted for maiming him and had the jury so found, the maximum sentence would have been 30 years, 18 U.S.C. § 1959(a)(1)(2).

### E.    Arguments to Reject Guidelines

McGill's counsel objected to the applications of both the then existing sentencing guideline 100-1 cocaine/crack ratio and the career offender guideline, U.S.S.G.§ 4B1.1.  [Doc. 226; Tr.12/15/06: 9].  The district court never discussed either of these arguments; indeed he did not discuss his sentencing decisions at all, imposing sentence immediately after McGill finished speaking. Thus, the district court violated 18 U.S.C. § 3553(c) by failing to state his reasons for rejecting these requests. *See Rita v. U.S.*, 551 U.S. 338, 356 (2007).  This is significant because not only had the Supreme Court made the Sentencing Guidelines advisory in *U.S. v. Booker*, 543 U.S. 220 (2005), but subsequent decisions made clear that a district court can, as a policy matter, reject application of both the 100-1 cocaine/crack disparity, *Kimbrough v. U.S.*, 552 U.S. 85 (2007) and the career offender guideline, *Vazquez v. United States*, 130 S. Ct. 1135 (2010) (reversing lower court decision to contrary).  Although this Court's review is for an abuse of discretion, *Gall v. U.S.*, 552 U.S. 38, 46 (2007), the failure of the district court to articulate its reasons, makes that task impossible.

The issue of the 100-1 cocaine/crack disparity is particularly relevant, as it has been almost universally repudiated.  In November of 2007, the Sentencing Commission amended the guidelines to reduce that disparity, U.S.S.G. App. amend. 706, and subsequent amendments allowed persons convicted under the old

disparity to seek a reduction in sentence on that basis, U.S.S.G. App. amend. 712, 713, 716. Congress took a further step in 2010 with the Fair Sentencing Act, 124 Stat. 2372, which statutorily altered the disparity including raising the amounts of crack needed to trigger mandatory minimum sentences. The Supreme Court in *Dorsey v. U.S.*, 2012 WL 2344463, recently held that the benefits of that act could inure to persons who committed acts before the effective date, but who were sentenced afterwards.

### F.    Reasonableness

Finally, McGill asserts that cumulatively these errors, as well as the factors enumerated in 18 U.S.C. § 3553(a), caused his sentence to be "unreasonable," and subject to review by this Court. This Court in reviewing a sentence for reasonableness, may rely on a presumption that a guideline sentence is reasonable, *Gall*, *supra*. In this case, however, there were errors in calculating the maximum sentences, and in calculating the guidelines. In addition, the district court ignored McGill's requests to reject the 100-1 cocaine/crack disparity and application of the career offender guideline. For all these reasons, McGill submits that, should this Court reject his arguments that his convictions were erroneous, that his case must then be remanded for resentencing.

XII.      McGILL'S JOINDER WITH OTHER APPELLANTS' ISSUES

In addition to the joint issues set forth in Sections I – IV and VI, *supra*, McGill joins (1) Seegers' prosecutorial misconduct argument set forth in Section XVII, *infra*; (2) Simmons' argument regarding the sufficiency of the evidence as to the narcotics conspiracy set forth in Section XXII, *infra*; and (3) Simmons' argument regarding the sufficiency of the evidence as to the RICO conspiracy set forth in Section XXIII, *infra*.

XIII.      **THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE PROSECUTION TO CONTINUALLY CROSS-EXAMINE OLIVER BY READING HIM KEY TESTIMONY OF GOVERNMENT WITNESSES AND ASKING HIM TO COMMENT ON THE TRUTH OF THEIR TESTIMONY AGAINST HIM.**

A.      **Standard of Review**

Alleged prosecutorial misconduct, which involves a mixed question of law and fact, is reviewed *de novo*. *United States v. Schmitz*, 634 F.3d 1247, 1267 (11th Cir. 2011) (allowing "were they lying" questions was error). With respect to harmless error, the issue is whether prosecutors' improper cross-examination prejudicially affected substantial rights of the accused. *Id*. *See United States v. Hasting*, 461 U.S. 499, 506 (1983) ("it is the essence of the harmless-error doctrine that a judgment may stand only when there is no 'reasonable possibility that the [practice] complained of might have contributed to the conviction'").

204

### B.    Discussion of Issue

Over objection, the district court permitted the prosecutor to repeatedly cross-examine Oliver by asking him to comment on the truth or falsity of testimony of key prosecution witnesses, particularly the most damaging prosecution witness, Victoria Robles.  Prosecutors were permitted to read to Oliver the most damning bits of testimony of government witnesses, sometimes at great length, and then demand he comment on that testimony.  Oliver was repeatedly forced to state that testimony of government witnesses was false and then explain why the witness would lie.  The district court applied a blatant double standard: it sustained AUSA Kirschner's objections when Oliver's lawyers sought to cross-examine a government witness about another witness' inconsistent testimony, or when Oliver testified on direct about the testimony of another witness.  *E.g.*, [Tr.12/11/03pm:105-06; 2/10/04am:130-31] ("Objection. The witness is testifying about the testimony of other witnesses."); [Tr.3/18/04am:64-65]  What was sauce for the goose was not sauce for the government.

With one exception, every federal court that has considered the question has condemned questioning the defendant about the truthfulness or credibility of other witnesses.  *Schmitz* at 1268 (collecting circuit cases).  Several reasons undergird this position.  First, it is well established that the "'determinations of credibility are for the jury, and not for witnesses.'"  *United States v. Boyd*, 54 F.3d 868, 871 (D.C.

Cir. 1995), quoting *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987). Consequently, questions that ask defendants to comment on another witness' veracity invade the province of the jury. *Schmitz* at 1268. Moreover, such questions "have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility … and in determining the ultimate issue of guilt or innocence." *Iowa v. Graves*, 668 N.W.2d 860, 871 (Iowa 2003). Indeed, such improper questioning "distract[s] the jury from the central task of determining what version of events is accurate in order to determine a defendant's guilt or innocence." *Schmitz* at 1269.

Second, such questions create the risk that jurors may conclude that, acquit the defendant, they must find the witness has lied. A witness' testimony, however, can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved. *Schmitz* at 1268 ("were-they-lying questions ignore other possible explanations for inconsistent testimony"; such questions "ignore all of these innocent explanations, and put the testifying defendant in a 'no-win' situation: The defendant must either accuse another witness of lying or undermine his or her own version of events.").

206

As the Iowa Supreme Court observed (668 N.W.2d at 872-73),

> ***the predominate, if not sole, purpose of such questioning is simply to make the defendant look bad***...The accused's answer is unimportant because the accused is in a no-win situation. If the defendant says the other witness *is* lying, then the defendant is put in the position of calling someone a liar...If the defendant says a contradictory witness is *not* lying, then a fair inference is that the ***defendant*** is lying. But, as any trial lawyer knows, there may be many explanations for differing descriptions of the same event...It is unjust to make the defendant give an opinion as to who is lying when, in fact, it is possible that neither witness has deliberately misrepresented the truth. It is also unreasonable to expect the defendant to sift through the variables of human communication to offer an alternative explanation for contradictions in witnesses' testimony.

*Accord United States v. Sullivan*, 85 F.3d 743, 750 (1st Cir. 1996) ("It is not the place of one witness to draw conclusions about, or cast aspersions upon another witness' veracity."); *Hunter v. Maryland*, 919 A.2d 63, 589-90 (Md. 2007) (listing same five reasons why such questioning of the defendant is improper and inherently unfair); *State v. Maluia*, 108 P.2d 974, 978 (Haw. 2005) (same); *New Mexico v. Soto*, 162 P.3d 187, 192-93 (N.M. 2007) ("unfairly questioning a defendant to make him look bad in front of the jury is inconsistent with the prose-cutor's duties to seek justice and ensure a fair trial").

Third, the Federal Rules of Evidence do not permit such questions. *Schmitz* at 1268-69 (the rules "preclude a witness from testifying as to the credibility of another witness;" moreover, such questions "'force a witness to testify as to

something he cannot know, *i.e.*, whether another is intentionally seeking to mislead the tribunal'"); *United States v. Harris*, 471 F.3d 507, 511 (3d Cir. 2006) (same).

Fourth, such questions are "designed to pit the testifying witness against every other adverse witness, suggesting to the jury that someone is deliberately deceiving the court and the jury must choose the culprit … Even worse, the defendant's answer often does not matter because the predominate purpose of such questions is to make the defendant look bad." *Schmitz* at 1269.

There is an additional reason (not identified in case law) why such questioning is improper, which is well-illustrated by this case. A prosecutor's reading back to defendant the highlights of the government's case, in the course of an extensive cross, gives the government the unfair advantage of effectively repeating and summarizing the most damaging parts of its case in the guise of cross-examination.

Kirschner set up this highly prejudicial cross by first getting Oliver to agree that Robles was a credible witness, a theme he harped on. Oliver admitted he was still talking to Robles, that he "had no problems" with her, and he still had her name tattooed on his arm. [Tr.2/9/04am:134] Later, when Oliver said Robles was lying about something, Kirschner would remind Oliver how he sometimes relied on Robles' testimony too. *E.g.*, [Tr.2/9/04pm:75] So if Oliver said Robles was lying about something, he appeared to be trying to have it both ways. In actuality,

there was nothing inconsistent about Oliver saying Robles was lying about some things and truthful about others. Oliver was also forced to speculate, in an effort to explain why his former mate would lie about him. *E.g.*, [Tr.2/9/04pm:98]

Robles was a sympathetic witness in certain respects, and it was particularly damaging to Oliver to have to say she testified falsely. *State v. Emmett*, 839 P.2d 781, 787 (Utah 1992) (such questions are improper because they put "the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury"). After laying this trap, Kirschner started quoting the most damaging parts of Robles' testimony and asking Oliver to comment on that testimony. [Tr.2/9/04pm:61-69] (reading Robles' grand jury testimony about conversation between Oliver and Handy concerning murder of a little boy witnessed by his mother; Oliver allegedly told Handy he needed to kill the mother to prevent her from snitching); [Tr.2/9/04pm:72-75] (reading Robles' testimony about uncharged incident with no date where Oliver and Handy allegedly came running into their apartment after shooting at an unidentified person). Counsel Joe Bernard objected to this type of testimony. ("I thought you can't use one person's testimony and cross examine another about the veracity of the first person. We have been overruled when we tried to do that.") The district court: "That's not what he is doing. Your objection is overruled." [Tr.2/9/04pm:77] Of course, the prosecutor was doing precisely

209

what Bernard said.   The prosecutor continued to engage in the same improper tactic throughout the remainder of his cross.   *E.g.*, [Tr.2/9/04pm:76-84] (reading Robles' testimony concerning the murder of Floyd and asking Oliver whether or not he had those conversations with Robles); [Tr.2/9/04pm:98] (reading Robles' testimony concerning Oliver's alleged statement to her that he was "gonna get that N [Rah-Rah] one day" and "how bad you wanted to kill him because of what he did to Lucky"); [Tr.2/9/04pm:99] (questioning Oliver about Veal's testimony regarding Rah-Rah murder conspiracy); [Tr.2/9/04pm:99-100] (asking Oliver why Robles and Veal would both lie about Rah-Rah if they don't know each other); [Tr.2/10/04am:42] (questioning Oliver about testimony of Officer Prince); [Tr.2/10/04am:56] (questioning Oliver about testimony of Fleming ("Biggums")).

The district court's error in permitting Kirschner's improper cross of Oliver was not harmless.   This is obvious from (1) the number of times the prosecutor engaged in this improper tactic - virtually throughout the cross of Oliver; (2) the importance and damaging nature of the witness testimony read back to Oliver by the prosecutor, effectively giving him a chance to summarize his case on cross; and (3) the fact that the government's evidence on the three murder charges against Oliver was hardly overwhelming.

> Where there is uncertainty as to the effect on the verdict, the error cannot be deemed harmless; rather, the court must treat the error as having affected the verdict. ...  Indeed, even where erroneously admitted evidence is

210

> apparently cumulative of lawful evidence, if it is 'at least debatable' that the erroneously admitted evidence 'tipped the scales' towards a guilty verdict, a reviewing court should not deem the error harmless.

*United States v. Cunningham*, 145 F.3d 1385, 1394-96 (D.C. Cir. 1998) (quoting

*United States v. Pryce*, 938 F.2d 1343, 1349-50 (D.C. Cir. 1991)).  *Soto*, 162 P.3d

at 194 (reversing conviction because State failed to show error was harmless

beyond a reasonable doubt); *Hunter*, 919 A.2d at 72-73 (prejudicial effect of

improper "were they lying" questions shown by the number and combination of

questions themselves; court is unable to say beyond a reasonable doubt that error

did not affect the verdict); *Graves*, 668 N.W.2d at 877-81 (reversing conviction,

*inter alia*, because prosecutor's misconduct was not isolated and was "extremely

significant to the central issues in the case").

## XIV.    THE DISTRICT COURT PERMITTED PROSECUTORS TO MISLEAD THE JURY BY MISREPRESENTING EVIDENCE CONNECTED TO THE MURDER OF DEMETRIUS GREEN— IN WHICH OLIVER HAD NO ROLE—AS RELATING INSTEAD TO OLIVER'S ALLEGED INVOLVEMENT IN THE MURDER OF RICHARD SIMMONS.

### A.    Standard of Review

Appellate courts review objected-to allegations of prosecutorial misconduct

*de novo*.  *United States v. Schmitz*, 634 F.3d 1247, 1267 (11th Cir. 2011).  If this

Court finds that prosecutors misrepresented evidence to the jury, or drew

misleading inferences from the evidence, then it must consider whether the

remarks deprived the defendant of a fair trial.  *Marshall v. Hendricks*, 307 F.3d 36, 63-64 (3d Cir. 2002).

### B.    Discussion of Issue

The evidence concerning the Richard Simmons murder has been summarized in the Statement of Facts.  The government improperly sought to bolster its weak case against Oliver by misleading the jury with irrelevant grand jury testimony by Robles about the murder on Forrester Street - in another area of D.C. - of a "little boy" named Demetrius Green, witnessed by Green's mother. The government suggested Robles' grand jury testimony actually related to the *Simmons* murder, which also involved a murder witnessed by the victim's mother, despite the fact that the Simmons murder did not occur anywhere near Forrester Street and Simmons was not a "little boy."  Oliver objected and sought to exclude, as irrelevant and prejudicial, Robles' grand jury testimony, which related to the murder of Green, a crime not charged in appellants' trial and one in which Oliver was not involved.[97]   The objection was wrongly overruled by the district court. [Tr.11/26/03am:62-63]   The prosecution made repeated, misleading use of this evidence, on Robles' direct testimony, on cross of Oliver, and in summation.

---

[97]   The Green murder was charged against Handy in the overall indictment tried in *Moore*.  In *Moore*, Veal testified that Handy later claimed he had murdered Green.  The evidence also showed that Handy was accompanied by **Taron** Oliver, who was also selling marijuana near the scene of the murder.  *United States v. Moore*, 651 F.3d 30, 98 (D.C. Cir. 2011).

212

Oliver objected to the prosecutor's misleading summation on this point, but the objection and motion to strike were overruled. [Tr.3/22/04pm:57-58,74-76]

Prosecutors may not use "improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). As it is impossible to dismiss this prosecutorial misconduct as harmless error, Oliver's three convictions (Counts 53, 54 and 87) based on the murder of Richard Simmons should be reversed.[98] *E.g.*, *United States v. Watson*, 171 F.3d 695, 698 (D.C. Cir. 1999) (prosecutor's misstatement of defense witness's testimony improper because it amounted to statement of fact to jury not supported by record); *United States v. Simpson*, 479 F.3d 492, 503-05 (7th Cir. 2007) (prosecutor's closing argument "invited the jury to make an improper inference from the evidence"); *United States v. Wilson*, 135 F.3d 291, 299-302 (4th Cir. 1998) (prosecutor's improper closing argument indicating defendant murdered someone during soured drug deal was not harmless error because remarks were not supported by record, misled jury, were prominent and well-developed, and general curative instructions insufficient to correct error).

During direct testimony of Robles, she was questioned extensively about her grand jury testimony, which was more favorable to the government than her

---

[98] These counts should also be reversed because of the improper cross of Oliver about the Richard Simmons murder (Section XIII), and other errors which relate to all counts.

testimony at the trial.   Much of her grand jury testimony was admitted as

substantive evidence.   In the grand jury, Robles claimed to have overheard an

undated conversation between Oliver and Handy in which Oliver told Handy that

"'the little boy's mother was out there … You got to get her, too, because she will

snitch.'"    [Tr.11/26/03am:69]    Oliver's counsel objected to this testimony.

According to Robles' grand jury testimony, this incident occurred on Forrester

Street and the victim was a "little boy."   It was undisputed that Demetrius Green, a

15 or 16 year old boy, was murdered on Forrester Street in front of his mother.

This story was in the press and the Green murder was charged against Tim Handy

in the overall indictment - but not against any defendant in appellant's trial.   The

defense truthfully asserted that Oliver had nothing to do with Green's murder; in

any event, that murder was not charged against Oliver and the government did not

seek to admit Robles' grand jury testimony as Rule 404(b) evidence.   Rather, the

government asserted it was direct evidence of Oliver's involvement in the

*Simmons* murder.   According to the government's cockamamie theory, the

conversation Robles thought she overheard between Oliver and Handy related to

the murder of Simmons, not Green.   The government brushed aside the undisputed

facts that a 15 or 16 year old boy named Green was murdered on Forrester Street,

S.W., and that Simmons was neither a boy nor was he murdered on or near

214

Forrester Street.[99]  Indeed, the government ignored these inconvenient facts when presenting Robles' grand jury testimony to the petit jury and in closing argument, in order to hoodwink the jury into believing its cockamamie theory that Robles' grand jury testimony *actually* related to the murder of Simmons, not Green.  The district court's admission of this evidence is astonishing.  Even Kirschner, the proponent of the evidence, admitted Robles might be confusing what she heard

---

[99]    The Presentence Report, ¶77, states that on 12/7/97, on Forrester St., S.W., Handy killed Green because of competition for marijuana sales.  "Following the murder, Rodney Moore encouraged Handy to get Oscar Veal to kill the witnesses to the murder.  Handy solicited Veal to kill the witnesses, but Veal did not follow through."  The PSR, ¶98, states: "Several people, including a 12 year old boy, witnessed the murder [of Green].  Handy was arrested for the murder, based in part on eyewitnesses.  Handy and *Taron* Oliver (a co-conspirator now deceased) solicited the assistance of Oscar Veal in killing the witnesses, including the 12-year old boy .... On several occasions, [Taron] Oliver drove Veal around the Forrester Street area, looking for the 12 year old boy [Scorpio Phillips] and the other witnesses."  The PSR makes no mention of Deon Oliver in connection with the Green murder.  Thus, the prosecutor's evidentiary theory is contradicted by the PSR, which is based on the government's case files and the evidence at trial.

In the *Moore* trial, Handy was charged (in Counts 56 and 57 and Racketeering Act 48) with the murder of Green.  Overt Acts 95 and 96 charged that *Taron* took Veal over to Forrester Street to kill witnesses to the Green homicide.  There was no evidence or even an allegation at the trial that ***Deon*** had anything to do with the Green murder or the alleged conspiracy to kill witnesses to that murder.

Veal testified in appellants' trial that several people came to him to solicit his help in killing three witnesses to the Green murder.  Deon was ***not*** among them.  [Tr.12/9/03am:20-26]

The Green murder occurred 6 months after the murder of Simmons. Shortly after Green's murder, Taron and Handy were in the apartment of Deon and Robles. Taron spoke to Robles about the mother being a witness.  [Tr.2/10/04pm:44-48,96-97]

215

about the Green murder with the murder of Simmons. [Tr.11/26/03am:60-64][100]

The district court initially sustained Oliver's objection to the evidence on this ground, telling Kirschner, "since even you don't think it's literally true what she said [in the grand jury], I just don't see how you - I don't see how it would do anything other than confuse the jury." [Tr.11/26/03am:62-63] The district court's initial reaction was correct. Unfortunately, the court changed its mind without explanation shortly thereafter and admitted the evidence. Even more inexplicable was the district court's order directing the grand jury transcript be redacted to *exclude any references to the fact that the murder occurred on Forrester Street.* This was done at Kirschner's suggestion, so the jury would not be "confused" by the references to Forrester Street as the location of the murder, and thus doubt the government's preposterous evidentiary theory! [Tr.11/26/03 am:64,69-70] This was truly an Alice in Wonderland trial.

The defense had trouble crossing Robles with respect to this grand jury testimony because she claimed to have no recollection of it, even after reading it. [Tr.12/1/03am:123-24] On cross, she did recall hearing some unidentified people on the street discussing the murder of a 15 or 16 year old, and that the boy's

---

[100] In fact, Robles' testimony did not mix up the two murders. She was clearly recollecting the Green murder alone. However, the conversation she recalled overhearing was between Taron and Handy, not Deon and Handy. [Tr.2/10/04pm:44-48] (Deon's testimony.) This is consistent with the factual recitation by Probation in the PSR and with the evidence at the two trials.

mother was a witness to the murder, but did not recall hearing that it happened on Forrester Street.  But she denied hearing Handy or Oliver say that they were over in S.W. on Forrester Street and killed a young boy.  [Tr.12/1/03am:83-84]  She also said the government suggested to her in a debriefing session that Oliver must have been on the scene of the murder of the "little boy."  She said the prosecutor put words into her mouth in the grand jury, inducing her to say Oliver was there when in fact she had no idea.  [Tr.12/1/03am:83-89]  This cross-examination underlined the unreliability of Robles' recollection of the alleged conversation between Oliver and Handy described in the grand jury.  But it did not dissuade Kirschner from continuing to urge the jury to interpret Robles' confused grand jury testimony as a recollection of Oliver's confession to involvement in the *Simmons* murder.

The prosecution's gambit here was a no-lose proposition, if the government's only interest was in gaining a conviction.  If the jury believed Robles' recollection related to the murder of Green, and that Oliver was involved in that and advised Handy to also kill Green's mother, so much the worse for Oliver.  As the records of both trials and the PSR show, however, Oliver had nothing to do with the Green murder or the attempt to kill witnesses to that murder. The government never alleged otherwise.

Kirschner extensively crossed Oliver about Robles' grand jury testimony relating to the Forrester Street murder, artfully trying to make it appear that Robles' testimony related to the Simmons murder, not the Green murder. [Tr.2/9/04pm:61-69]   He juxtaposed reading Robles' grand jury testimony to Oliver - itself improper cross, see Section XIII - with questions about the Simmons murder. In effect, Kirschner was arguing his far-fetched evidentiary theory to the jury.  When Kirschner observed to Oliver that Margarita Simmons witnessed her son's murder, Oliver responded that Margarita had testified that Oliver was not even on the scene of the murder.  Kirschner's next question was as follows

> Q.    She was the mother of the boy, ***and she will snitch***, and she did snitch, didn't she?

[Tr.2/9/04 pm:69]  The italicized words were an exact quote of Robles' grand jury testimony relating to the ***Green*** murder.   Kirschner was straining so hard to shoehorn Robles' grand jury testimony about the Green murder into his theory of guilt in the Simmons murder that he ignored the fact that Margarita's testimony ***exculpated*** Oliver.

In closing argument, the government relied heavily on Robles' grand jury testimony about the conversation allegedly overheard between Oliver and Handy relating to the murder of a "little boy" witnessed by his mother, who needed to be killed to prevent her from snitching.  [Tr.3/22/04pm:57-58]  Oliver vigorously objected to this argument, and moved the district court to strike and for a mistrial,

218

again pointing out that Robles' testimony related to the uncharged murder of Green, not Simmons. The motion was denied. [Tr.3/22/04pm:74-76]

In his rebuttal closing, the prosecutor again emphasized this irrelevant, misleading evidence. He flatly stated, without qualification or explanation, that Oliver and Handy talked about the need to kill Margarita, [Tr.3/29/04pm:66], but there was *no* such evidence. The prosecutor again relied upon the grand jury testimony of Robles relating to the murder of a "young boy" on Forrester Street, S.W. without telling the jury that.[101] Such reliance was improper as it was not a "reasonable inference from the evidence presented" that Robles' grand jury testimony actually related to the murder of Simmons, a much older adult, on H Street, N.E. *See United States v. Earle*, 375 F.3d 1159 (D.C. Cir. 2004) (serious error warranting new trial for prosecutor to make statements in closing argument unsupported by the evidence or to misstate admitted evidence). The repeated emphasis on this misleading evidence by the prosecution, over timely objection, together with the other serious errors in the conduct of the trial, plainly requires that the Simmons murder and gun counts be reversed. "'In a case where the evidence at trial is conflicting or ambiguous, the danger that an error will affect the jury's verdict is almost always substantial.'" *Cunningham*, 145 F.3d at 1396

---

[101]  An improper argument made during the prosecution's rebuttal is particularly prejudicial as the defendant has no opportunity to reply. *Simpson*, 479 F.3d at 504; *United States v. Hale*, 448 F.3d 971, 986 (7th Cir. 2006).

(quoting *United States v. Smart*, 98 F.3d 1379, 1392 (D.C. Cir. 1996)). *See also*, *United States v. Farmer*, 583 F.3d 131, 147-48 (2d Cir. 2009) (flagrant prosecutorial abuse in overusing defendant's nickname, "Murder," requires new trial on attempted murder charge, ***despite defendant's failure to object at trial***, where "court did nothing to curb the abuse or mitigate the prejudice" and where evidence supporting attempted murder conviction was far from overwhelming).

**XV.     THE EVIDENCE WAS INSUFFICIENT TO CONVICT OLIVER OF AIDING AND ABETTING THE JUNE 2, 1999 FIRST-DEGREE MURDER OF WILLIAM FLOYD BY PROVIDING THE GUN USED BY JOHN RAYNOR TO SHOOT FLOYD, AS THERE WAS *NO* EVIDENCE OLIVER KNEW WHAT RAYNOR WAS GOING TO DO WITH THE GUN, OR THAT HE SHARED RAYNOR'S INTENT TO KILL FLOYD.  COUNTS 68, 69 AND 94 MUST BE REVERSED**

### A.     Standard of Review

In reviewing a sufficiency challenge, this Court reviews the evidence *de novo*, considering the evidence in the light most favorable to the prosecution. *United States v. Wahl*, 290 F.3d 370, 374 (D.C. Cir. 2002).

### B.     Discussion of Issue

Even accepting the government's version of the evidence, *viz.*, that Raynor shot and killed Willie Floyd with a gun he obtained from Oliver, there was not a scintilla of evidence to show that Oliver knew, or even suspected, that Raynor was going to shoot anyone with his gun, much less shoot Oliver's close friend, Floyd. All evidence points in the other direction.

220

**Steve Graham,** the only government witness to the murder, actually exculpated Oliver. He said Floyd and his friend Albino Buck were putting their hands down their pants like they had guns. Floyd was acting like he was going to do something to Raynor. Raynor then asked Oliver if he had a joint. Oliver said yes and handed it to Raynor. [Tr.12/15/03pm:67-68][102] A photograph was introduced showing Floyd reaching into his pants at the time he was shot. [Tr.2/4/04am:8-9] This implies that Raynor was acting in self-defense when he asked for a gun; thus, Oliver could not be found guilty if he thought that the principal, Raynor, was acting in self-defense when he handed Raynor the gun. ***Graham flatly stated that Oliver did not know Raynor intended to shoot Floyd***. *Id.* Later, Graham witnessed a conversation between Gray and Raynor in which Gray was upset because Raynor couldn't go to 7th Street anymore, where Raynor ran things, and this would hurt profits. [Tr.2/4/04am:64-66] (A taped phone conversation is played in which Gray and Graham discuss the Floyd murder.) [Tr.2/4/04am:58-59]

**Vicky Robles,** another key government witness, also exculpated Oliver on this charge, although her version of the events differed from Graham's. She said Oliver was Floyd's close friend and that he was extremely upset about this murder. He cried when he told her about it. He had gone out with a bunch of friends,

---

[102] Oliver also testified he saw Floyd putting his hand into his pocket. [Tr.2/10/04pm:67]

including Floyd, that very morning.     [Tr.12/1/03am:65-72;  3/18/04am:81-82]

Oliver told her Raynor did it because the "young dudes" were disrespecting him.

Oliver said Raynor took his gun like he was looking at it (the young dudes were

comparing guns) and then shot Floyd.   Oliver told her he was afraid the police

would find the gun and think he shot Floyd.  She testified on cross that she heard

from more than one source that Oliver wasn't part of it; and that Raynor snatched

the gun from someone else.  [Tr.11/26/03am:52-57; 12/1/03am:74-75] (cross)  She

said that the prosecution intimidated her more than the defense; she knew they

could take her children away and put her in jail.   She had no lawyer when

debriefed by the government.   They arranged for Section 8 housing for her (she

was homeless) and gave her money.   [Tr.12/1/03am:91-93; 3/18/04am:50-51,58-

60]

   **Maurice Andrews** testified Raynor said he told Oliver to let him hold the

gun and that's when Raynor shot Floyd.   Oliver wasn't present for the argument

between Raynor and Floyd the night before, which Andrews witnessed.  Floyd was

"a little boy" of only 15-16.  Andrews heard Raynor vow to kill Floyd, but he and

Kevin Gray didn't take him seriously.  The next day Gray called Andrews and told

him that Raynor had killed Floyd.  Andrews said the shooting of Floyd provided no

benefit to Gray's group.  [Tr.10/22/03am:54-68; 10/27/03am:5-19]   On redirect,

however, the government got Andrews to say Raynor had to shoot Floyd because

222

he disrespected him and everyone in the neighborhood was there.   Raynor's reputation was important to his role in the organization because he was supplying half of the "little guys" around there.  [Tr.10/27/03pm:125-26]

Plainly, Oliver cannot be found guilty as an aider and abettor of Raynor without any awareness of what Raynor was going to do with his gun.  *United States v. Wilson*, 160 F.3d 732, 738-39 (D.C. Cir. 1998) (evidence that defendant told co-defendants where to find witness they had been seeking and subsequently murdered insufficient to sustain defendant's aiding and abetting murder conviction); *Wilson-Bey v. United States*, 903 A.2d 818, 830 (D.C. 2006) (aider and abettor must be shown to have acted with the mental state necessary to convict him as a principal, i.e., with premeditation, deliberation and intent to kill).  As noted by *Wilson-Bey* at 831-34, federal courts interpreted the federal aiding and abetting statute to require proof that the aider and abettor intended that the principal succeed in committing the charged offense and rejected a rule that would permit conviction of the aider and abettor without showing that he shared the principal's intent.

The Floyd murder was charged both under the D.C. Code (Count 68) and under § 1959(a)(1), murder in aid of racketeering (Count 69).  Oliver got a life sentence only under the § 1959 count.  The district court should have granted Oliver's Rule 29 motion on this count on the ***additional*** ground that the

223

government failed to prove that this murder furthered the aims of the Gray/Moore organization. There was undisputed evidence from an interception of Gray's phone conversation, as well as testimony by Andrews, that Gray was ***upset*** at the murder because it would *hurt* the organization's business, not help it. Government witnesses testified that Raynor would have to lie low and couldn't return to the neighborhood where the murder took place and where he controlled the traffic in drugs on 7th Street. Thus, according to the government's own witnesses, Floyd's murder provided no benefit to the criminal enterprise. [Tr.10/27/03am:15-16; 12/15/03pm:64-66] Rather, Raynor acted out of personal pique at being disrespected by Floyd. Accordingly, the Court should reverse Counts 68, 69 and 94 (the related § 924(c) gun charge) on sufficiency grounds.

* * * * *

Oliver's Count 1 drug conspiracy and the Count 3 RICO conspiracy convictions should also be reversed because they include several overt acts and racketeering acts based on the Simmons and Floyd murders, and because of the errors which apply to all counts of conviction. Moreover, there was considerable spillover prejudice form the wrongly obtained convictions for the Simmons and Floyd murders. Likewise, the Count 83 gun charge should be reversed because it is predicated on the Count 1 drug conspiracy.

224

# XVI.    OLIVER'S JOINDER WITH OTHER APPELLANTS' ISSUES

In addition to the joint issues set forth in Sections I through VI, *supra*, Oliver adopts and incorporates herein Seegers' argument regarding prosecutorial misconduct set forth in Section XVII, *infra*, and all other applicable arguments raised by other appellants individually.

# XVII.    PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS DENIED SEEGERS A FAIR TRIAL

## A.    Standard of Review

Review of improper prosecutorial arguments is for substantial prejudice where an objection was lodged and plain error where a defendant fails to object. *United States v. Moore*, 651 F.3d 30, 50 (D.C. Cir. 2011). Under either standard, three factors guide the determination of whether reversal is warranted: "(1) … closeness of the case; (2) … centrality of the issue affected …; and (3) … steps taken to mitigate the error's effects." *United States v. Becton*, 601 F.3d 588, 598 (D.C. Cir. 2010).

Denial of motions for mistrial based upon improper prosecutorial arguments are reviewed for abuse of discretion. *Id.*

225

## B.     Improper Remarks[103]

Setting the tone, government counsel began her closing argument by improperly describing an alleged victim as having "his whole life ahead of him" with "hopes and dreams for his future." [Tr.3/22/04pm:7]  Another individual was described as unaware "that these are the last steps he will ever take." [Tr.3/22/04pm:9]   Later, she improperly vouched for one of the cooperating witnesses against Seegers.  [Tr.3/22/04pm:45-46 ("You know … Weetie [Eugene Williams] was telling you the truth.")]

At the conclusion of her argument, government counsel stated:

> How can we … calculate the devastation and grief … these men … caused?  In their relentless pursuit of money and power … think about the lives … they have crushed.  Think about the victims of their drug dealing. Kilos and kilos of poison being released onto the streets. Think about the users … used by these men so that they could become richer …
>
> … Think about the victims who survived … about the scars…you can't see …. for the rest of their lives, those men [will] think about what these men … did to them.
>
> Finally, … think about the murder victims … seven brothers, fathers, wives, daughters, all gunned down so … these men could become richer and more powerful.
>
> The days of power and money are over…

---

[103] Space limitations prevent Seegers from listing all instances of improper prosecutorial argument.

[Tr.3/23/04am:73-74]   Objections to the improper appeal to jurors' emotions, passions and prejudices, as well as the "community conscience" argument, were overruled.  [Tr.3/23/04am:76-77]

The government's rebuttal was even more improper.  Government counsel began by stating the jury should realize appellants were scared to death of cooperating witnesses because their attorneys conducted rigorous cross-examination and that he would bring "everybody back to the truth." [Tr.3/29/04am:63-64]   Appellants' objections were overruled.  [*Id*.]   He then described an incident that occurred during appellants' trial as "Filegate." [Tr.3/29/04am:70]

Thereafter, government counsel set out the wholly improper, recurring theme of his three-hour rebuttal: the "playbook."  [Tr.3/29/04am:71]  Describing numerous letters found in a defense witness' cell (but authored by another) as a "guide" utilized by appellants and their counsel to put together a "false defense," government counsel presented what he entitled "chapters" and offered a description of the letters' author from "the dust jacket."  [Tr.3/29/04am:71,79-80] Appellants' objections were overruled.  [Tr.3/29/04am:71,81-85]

According to government counsel, "Chapter One" involved appellants convincing a jury "it could have been anybody but" them, which showed disrespect

227

for the truth. [Tr.3/29/04am:71]  "Chapter Four" detailed how to stop cooperators by killing them.  [Tr.3/29/04am:74]

"Chapter Eight" was presented as "How to Follow a False Script." [Tr.3/29/04am:76-77]  Not only did government counsel improperly claim Seegers followed a false script, he also made unfounded allegations of criminality on the part of one of Seegers' defense counsel without any basis in the record for doing so.  Discussing a statement signed by Seegers' witness John Moye, government counsel implied defense counsel had falsified evidence and called it "a script." [Tr.3/29/04pm:53-55]  Seegers' objections were overruled.  [*Id.*]

Referring to the PowerPoint closing given by Seegers' other counsel (which he continuously described as "slick")[104], government counsel argued that numerous photographs of Lincoln Hunter were shown only because Moye hadn't told the truth, adding "… beat … up the victim for being victimized, divert … smoke … mirror, slick presentation."  [Tr.3/29/04pm:56]  Seegers' objection was not ruled upon.  [*Id.*]  Following up and referring to his earlier argument regarding "Chapter Eight," government counsel stated, "… let's convince these twelve people that it could have been anybody but ***your client***," thereby accusing Seegers' counsel of collusion without any shred of evidence to support that allegation.

---

[104]  "… Franklin Seegers' defense argument or why let evidence get in the way of a good slide show."  [Tr.3/29/04pm:46; s*ee also* Tr.3/29/04pm:52-53,56,61]

228

[Tr.3/29/04pm:57]    Thereafter, government counsel improperly offered his personal opinion that Seegers shot Hunter. [Tr.3/29/04pm:63]    Finally, immediately following McGill's removal and revelation of his stun belt, he advised that he would be "switch[ing] gears" because of the occurrence, and stated McGill's actions were another play from the "playbook." [Tr.3/29/04pm:85-86] Defense objections were overruled. [Tr.3/29/04pm:86]

No curative instructions were given during the government's closing arguments. After the jury was dismissed, appellants' counsel moved for mistrial based upon the government's "playbook" theme during rebuttal; all motions were denied. [Tr.3/29/04pm:96-100]

## C.    Argument

A federal prosecutor occupies a position of trust as the representative of a sovereignty "whose obligation to govern impartially is as compelling as its obligation to govern at all." *Moore* at 51 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). His interest in a criminal prosecution, therefore, is not to win, but rather to see that justice is done. *Id.* In his earnest and vigorous prosecution he may - within limits - strike hard blows, but not foul ones. *Moore* at 51, 53.

Sensationalism is clearly designed to inflame the passions and prejudices of the jury. *See Moore* at 53; *see also Gaither v. United States*, 413 F.2d 1061, 1079 (D.C. Cir. 1969); *United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000).

229

Remarks "designed to inflame the passions or prejudices" of jurors are not permitted. *Id.*; *see also Moore* at 51.

Hyperbole in prosecutorial arguments is disfavored. *See United States v. North*, 910 F.2d 843, 895 (D.C. Cir. 1990). Moreover, counsel has a duty to confine arguments to within proper bounds and may not make unfounded and inflammatory attacks on opposing counsel. *United States v. Young*, 470 U.S. 1, 8-9 (1985). "In summarizing evidence supporting conviction, a prosecutor may not take artistic license…construct a more dramatic version of…events, [or] provide conjecture about a victim's state of mind and defend…a prosecutorial misconduct claim by maintaining the statements are 'fact-based.'" *Moore* at 53. Whether arguments are improper requires contextual review. *United States v. Catlett*, 97 F.3d 565, 572 (D.C. Cir. 1996).

Prosecutors' vouching for the credibility of witnesses and expressing personal opinions regarding guilt pose two dangers: (1) the possibility of jeopardizing a defendant's right to be tried solely on the basis of evidence presented (by conveying that evidence known only to the prosecutor supports the charges); and (2) his opinion, which carries the imprimatur of the government, may induce the jury to trust the government's judgment over its own view of the evidence. *Young* at 1048. Likewise, it is improper for a prosecutor to appeal to

jurors' "community conscience" to inflame and/or incite their emotions and fears. *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991).

Government counsels' improper remarks were not isolated; they were pervasive. During closing argument, government counsel improperly asked the jury to step into the shoes of murder victims, who had hopes and dreams and were taking their last steps. In addition, she vouched for the credibility of one of its central witnesses against Seegers (Williams, a crack addict) stating that the jury knew he was telling the truth. In order to inflame passions and prejudices, she concluded by appealing to the jurors' community conscience by remarking that the devastation and grief caused by appellants was incalculable and that they had released "kilos and kilos of poison" onto the streets. Finally, she asked jurors to once again place themselves in the victims' shoes and stated that "brothers, fathers, wives [and] daughters" had been gunned down.

The rebuttal argument was worse. For more than three hours, government counsel used hyperbole to improperly weave a story that appellants and their counsel had been using a "playbook" that provided instruction on how to best present a defense. Over and over again, government counsel referred to "the playbook," a term he alone had coined. He impugned the integrity of Seegers' defense counsel by implying they falsified evidence and colluded to present a "false defense." After Seegers' closing argument revealed that Hunter's medical

231

records confirmed he lied about where he was shot, government counsel, apparently finding it necessary to bolster Hunter's credibility, stated his ***personal*** belief that Seegers shot Hunter. Finally, he prejudiced all of the other appellants when he stated that McGill's stun belt revelation was just another page out of the "playbook."

The government's case against Seegers was not strong and was centered around the testimony of two, highly impeached cooperating witnesses, including Hunter and Williams. Hunter was the main "violence" witness against Seegers and claimed Seegers shot him in the back of the head before killing Diane Luther. As the government's own evidence proved, however, Hunter was not shot in the back of the head.[105] Seegers presented two witnesses to refute Hunter's testimony. One witness testified he saw Hunter shoot Luther (Moye) and another testified Hunter had confessed to shooting Luther (Willie Fears). Moreover, Hunter's own statements to a judge absolved Seegers of shooting him and killing Luther.[106]

The only evidence that Seegers was dealing drugs for the alleged conspiracy was Raymond Sanders' testimony that he heard Seegers received money and drugs

---

[105] Government Exhibit DL-501a.

[106] Government counsel argued Hunter had always maintained Seegers was the shooter; that was not correct. *See* Seegers Exhibits 5 and 6.

from Rodney Moore and Williams' testimony that Seegers sold drugs near his home during an unspecified time period.[107]

The improper prosecutorial arguments and use of the "playbook" theme related to issues central to Seegers' case. Specifically, they: (1) vouched for the credibility of two main witnesses against Seegers regarding the violence and conspiracies with which he was charged; (2) asserted he and his counsel colluded to present a false defense; (3) improperly constructed a more dramatic version of the evidence it had presented; and (4) accused Seegers and other appellants of continuing to conspire utilizing what the government referred to as "chapters" from a "playbook." In addition, their appeal to the community conscience of jurors was wholly improper and designed to infect the consideration of every issue presented.

The improper prosecutorial arguments were not invited in any way. In addition, Seegers was not afforded an opportunity to respond to the vast majority of improper remarks because they were made during rebuttal. As a result, the last impression left on the jurors before deliberations was those improper remarks. Further, despite numerous objections, the district court permitted government counsel to continue their improper arguments unimpeded and without interruption, which Seegers submits signaled to the jury the remarks made were appropriate. Finally, the district court provided no curative instructions to mitigate prejudice.

---

[107]    Seegers allegedly joined the charged conspiracy in November 1996. Williams did not provide any timeframe for his allegation.

233

Seegers submits the district court abused its discretion when it denied his motion for mistrial as the government's hyperbolic use of the "playbook" theme caused irreparable prejudice as set forth above. He further submits that he suffered substantial prejudice due to improper prosecutorial arguments as set forth above and reversal of his conviction is required.

## XVIII.    SEEGERS WAS DENIED DUE PROCESS AS A RESULT OF *BRADY/GIGLIO* VIOLATIONS

### A.    Standard of Review

Whether the government breached its *Brady* obligations is a question of law that is reviewed *de novo*. *United States v. Johnson*, 519 F.3d 478, 488 (D.C. Cir. 2008).

Denial of motions for mistrial is reviewed for abuse of discretion. *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004).

### B.    Argument

The ultimate aim of our criminal justice system is not only to secure convictions, but also to ensure the rights of the accused are protected. *See Harvey v. Horan*, 285 F.3d 298 (4th Cir. 2002) (Luttig, J., *concurring*); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). So fundamental is that twofold aim that our forefathers drafted substantive and procedural due process requirements into the Fifth and Fourteenth Amendments, thereby mandating that prosecutions "comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S.

234

479, 485 (1984). "Fundamental fairness" is not merely an academic ideal, but is "essential to the very concept of justice." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982) (internal citations omitted).

Although ours is an adversarial system, the government's "chief business" in a criminal prosecution "is not to achieve victory, but to establish justice." *See Brady* at n.2. While "there was a time when concealment and gamesmanship were…part and parcel of the adversarial process of … criminal justice" under common law, "we decidedly rejected this system long ago." *Harvey* at 317-318. The Supreme Court has long held that the government's "overriding interest" is that "justice be done," and, with that basic tenet in mind, has recognized a prosecutor serves the law above all else. *See United States v. Agurs*, 427 U.S. 97, 110-11 (1976) (internal citations omitted).

Obviously, the government has an obligation to prosecute its cases zealously, however its "primary obligation is to try each case fairly and with due regard for the accused's rights." *United States v. Carter*, 566 F.2d 1265, 1271 (5th Cir. 1978); *cert. denied*, 436 U.S. 956. When the government's conduct violates notions of fundamental fairness and is "shocking to the universal sense of justice," substantive due process is denied. *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960).

This standard of fairness requires "defendants be afforded a meaningful opportunity to present a complete defense." *Trombetta* at 485. "To safeguard that right … what might loosely be called the area of constitutionally guaranteed access to evidence" was developed. *Id.* (quoting *Valenzuela-Bernal*, *supra* at 867); *See also*, *Harvey*, *supra*; *United States v. Moussaoui*, 382 F.3d 453, 474 (4th Cir. 2004). "Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused," thereby "ensuring the integrity of our criminal justice system." *Trombetta*, at 485.

Procedural due process demands that prosecutors produce to a criminal defendant all potentially exculpatory evidence or impeachment evidence. *United States v. Celis*, 608 F.3d 818, 828 (D.C. Cir. 2010). When a prosecutor fails to provide favorable, material evidence, irrespective of good faith or bad faith, it is commonly called a "*Brady* violation." *Brady* at 87; *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). Evidence is considered "favorable" if it would exculpate the defendant or bears upon the credibility of a government witness. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *United States v. Bagley*, 473 U.S. 667, 682 (1985). In determining whether the withheld material is "material," its effect is evaluated cumulatively. *Kyles v. Whitley*, 514 U.S. 419, 436-38 (1995). "If there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," the evidence is considered

"material."  *Id.* at 432-34.  A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *Bagley* at 682.

Due to its unique position, the government has a duty to learn of favorable, material evidence known to those acting on its behalf.  *See Kyles* at 436-38.  It may not, therefore, be excused for failing to disclose what it does not know but could have easily learned.  *See id.* at 438-40.  "The disclosure obligation exists … not to police … prosecutors, but to ensure the accuracy and fairness of trials by requiring … adversarial testing of all … evidence bearing on guilt or innocence."  *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (internal citations omitted).  Where the government relies on known felons, its obligation to turn over evidence bearing on that individual's credibility "must include…prison records."  *Id.*  That obligation includes obtaining and reviewing the witness' corrections file and treating the contents thereof in accordance with its *Brady/Giglio* obligations.  *Id.*

In late January 2004, an investigator working for Seegers was researching inmate transfer records in anticipation of defense witnesses' testimony (including those of Lincoln Hunter, who had completed his testimony two months earlier).  [Tr.1/27/04am:7-12;Tr.1/29/04pm:94-98; Seegers' Motion for Mistrial]  While reviewing those files, he discovered a Psychological Evaluation and Disciplinary Report regarding Hunter.  [*Id.*]  The government did not provide those documents to Seegers, despite his having requested those types of documents as early as 2000

and in spite of the government's *Brady/Giglio* obligations. [*Id*.] During argument regarding Seegers' request, the government proffered that it had subpoenaed and received certain files from the Department of Corrections; inmate transfer files were not among the items listed. [Tr.1/27/04am:7-12] Seegers immediately moved for mistrial, or, in the alternative, other relief.[108]    [1/29/04:94-98;2/2/04pm:130-33,145,150-53;    Seegers'    Motion    for    Mistrial;    Seegers' Supplemental Motion; Seegers' Motion for Reconsideration] Those requests were denied. [Tr.1/27/04am:7-12]

The government had a duty to provide Seegers with the Psychological Evaluation and Disciplinary Report as they were favorable to him as both exculpatory and impeachment evidence. *See Brady*, *supra*; *Bagley*, *supra*. The documents were contained in Hunter's corrections file, which the government had a duty to review. *See Carriger* at 480. In fact, it provided similar documents regarding some of its other witnesses. It admitted that it did not request the files that contained the evaluation and report.

To characterize the Psychological Evaluation and Disciplinary Report as just "material" would be a vast understatement; they were critical. Hunter was the key witness against Seegers. The diagnoses set forth in the Psychological Evaluation, for example, included Adjustment Disorder with Disturbance of Conduct, Severe

---

[108]    Seegers adopts and incorporates, by reference, all arguments and facts set forth in the his pleadings filed in the district court regarding this issue.

Psychosocial Stressors and Antisocial Personality Disorder.  In addition, the staff psychologist noted that Hunter was known for a "bold, direct manner, physical courage for combat and dominance and … a lust for power and competitive aggressiveness" and was "applying schizophrenic solutions to most of his inner conflicts."  Further, the psychologist stated that Hunter was aggressive, defiant of authority, and "***when dealing with women, [has] a built in anticipated resistance to sexual rejection***." (Emphasis added.)  Finally, the doctor concluded that Hunter was "a threat to society."   The jury should have been able to consider the documents, as they were critical to both Hunter's credibility and any determination regarding Seegers' guilt or innocence in light of his defense theory.   The government's failure to provide the, therefore, was a violation of its *Brady/Giglio* obligations.

At trial, Seegers set forth various forms of alternative relief, in the event the district court denied his request for mistrial, among them the opportunity to either re-open his cross-examination of Hunter or call him as a defense witness.  The district court abused its discretion when it denied those motions.

The government's violation of its *Brady/Giglio* obligations and the district court's denial of his motion for mistrial or alternative relief caused unfair prejudice to Seegers.  Seegers' defense centered on self-defense and defense of another, Diane Luther, against the violent aggression of Hunter. The government was fully

239

aware that its central witness against Seegers was Hunter, and that cross-examination of him would be of the utmost importance to Seegers' defense. As it provided many documents from corrections' files during a discovery process that spanned several years, it most certainly had possession, custody and/or control of similar documents regarding Hunter. Moreover, it admitted that it hadn't even requested the file that contained the relevant documents. Those documents contained expert opinions that bolstered Seegers' defense and were not only appropriate, but also important, impeachment evidence. In addition, the district court's failure to take any curative action at all, despite Seegers' requests, violated Seegers' right to a fair trial. Further, the government's case against Seegers was not strong – it relied heavily upon Hunter.

Finally, the government took advantage of the jury's inability to weigh the Psychological Evaluation and Disciplinary Report. In its rebuttal argument, the government painted Hunter as a weak victim that Seegers and his counsel were "beating up." [Tr.3/29/04pm:56] Had Seegers been provided those documents, the jury would have been provided a far more accurate picture of Hunter when they were used to impeach him. Seegers submits that had the government abided by its *Brady/Giglio* obligations, he would not have been convicted of any charge arising from the Hunter shooting.

240

# XIX.    THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED SEEGERS AND J.ALFRED'S MOTIONS FOR SEVERANCE AND MISTRIAL

## A.    Standard of Review

Denial of motions to sever is reviewed for abuse of discretion.  *United States v. Moore*, 651 F.3d 30, 95 (D.C. Cir. 2011).  Likewise, denial of motions for mistrial is also reviewed for abuse of discretion.  *United States v. McLendon*, 378 F.3d 1109, 1112 (D.C. Cir. 2004).  The single most important factor in that review is the extent to which a defendant was unfairly prejudiced.  *Id.*

## B.    Argument

### 1.    Seegers' Misjoinder

Trial courts have a continuing duty to grant severance where circumstances indicate a failure to sever would unfairly prejudice a defendant.  *Schaffer v. United States*, 362 U.S. 511, 516 (1960).  Severance should be granted where there is serious risk a joint trial would compromise a defendant's specific trial right or prevent a jury from making a reliable judgment regarding guilt. *Zafiro v. United States*, 113 S. Ct. 933, 938 (1993).  Where co-defendants with markedly different degrees of culpability are jointly tried in complex cases, "the ***risk of prejudice is heightened***." *Id.* (emphasis added).  Mass trials call for the "use of every safeguard to individualize each defendant." *Kotteakos v. United States*, 66 S. Ct. 1239, 1252 (1946).  In multi-defendant conspiracy cases " 'the liberal rules of evidence and …

241

wide latitude accorded the prosecutor" sometimes "operate unfairly against an individual defendant …'"  *United States v. Mardian*, 546 F. 2d 973, 977 (D.C. Cir. 1976) (quoting *Glasser v. United States*, 315 U.S. 60, 76 (1942)).

Although separate trials may be inconvenient, "our Government is not one of mere convenience or efficiency.  It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials.  ***About them we dare not become careless or complacent when that fashion has become rampant over the earth***."  *Kotteakos* at 1252 (emphasis added).   Where a single conspiracy allegedly arising from separate, smaller conspiracies is strung together, the danger of transference of guilt is "so great that no one really can say prejudice to substantial right has not taken place." *Id*.

Cautionary instructions often suffice to mitigate prejudice, unless a dramatic disparity of evidence exists.  *See United States v. Slade*, 627 F.2d 293, 309 (D.C. Cir. 1980); *but see Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J. concurring) ("the naïve assumption that prejudicial effects can be overcome by instructions…all practicing lawyers know to be unmitigated fiction.").  Where a dramatic disparity in the weight of the evidence exists, the danger of guilt improperly rubbing off on other defendants persists.  *United States v. Kelly*, 349 F.2d 720, 756-59 (2d Cir. 1965), *cert. denied*, 384 U.S. 947 (1966); *accord Mardian* at 977 (severance required when evidence against other defendants is 'far

242

more damaging' than against movant).  It is difficult for an individual defendant's case to "stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together." *Krulewitch* at 799-800 (internal citations omitted). *Zafiro* at 545.

Seegers filed timely pretrial motions for severance, asserting continued joinder to his co-defendants would prejudice his right to a fair trial.[109]  [Docs. 400,1415]  The "birds of a feather" in Seegers' case were charged with multiple murders, numerous attempted murders, various other heinous crimes and voluminous drug counts allegedly occurring over a twelve-year period.  Seegers, however, was charged with crimes allegedly occurring over a one-week period in November of 1996. [*Id.*]  Despite that dramatic disparity in the weight of the evidence, his motions were denied.  [Docs. 443,1548]  As circumstances warranted, Seegers moved for severance on multiple occasions during trial; those motions were also denied.[110]

Much of the trial was consumed with evidence against Seegers' co-defendants; by contrast, the evidence presented against him was *de minimus*. *Mardian* at 979-81; *United States v. Sampol*, 636 F.2d 621, 642-51 (D.C. Cir. 1980).  Graphic and voluminous evidence against the alleged leaders of the

---

[109]    Seegers adopts and incorporates, by reference, all facts and arguments set forth in those motions.

[110]    *See*, *e.g.*, [Tr.1/14/04am:48; 2/2/04am:7-9]

conspiracies (Gray and Moore) was presented in an attempt to persuade the jury that appellants were very dangerous. The vast majority of it was wholly unrelated to Seegers. Limiting instructions were provided several times after cooperating witnesses made general statements regarding appellants that did not apply to Seegers. *E.g.*, [Tr.12/11/03am:105; 1/13/04pm:98] Throughout a six-month trial, however, the jury received many limiting instructions and admonishments; it would be impossible for a reasonable juror to have retained all of them.

Over a period of six months, approximately eight to ten full days (spread out over three months) dealt with evidence related to Seegers. Throughout the remainder of the trial, the jury was subjected to overwhelming evidence related to Gray and Moore and, to a far lesser extent, Seegers' co-defendants at trial.

The unfair prejudice to Seegers was never more apparent than when, despite being unable to return verdicts regarding the murder of Diane Luther, the jury convicted Seegers for crimes related to the shooting of Lincoln Hunter - when both occurred during a single event where Seegers was allegedly the lone gunman. Had the guilt of his co-defendants not spilled over onto Seegers, he would not have been convicted of those or any of the other crimes with which he was charged.

Further, the government itself treated Seegers' case as *de minimus*. It argued factual misstatements concerning Hunter's medical records - its own evidence - and claimed ignorance that Hunter's inmate transfer file contained a psychological

evaluation and disciplinary report.   [Tr.3/22/04pm:41;DL-501a; Tr.1/27/04am:7-12]   Moreover, it proceeded through an entire line of questioning unsupported by ballistics evidence.   [DL-601a; Seegers' Exhibit 13; Tr.1/21/04am:54-55,71-77; 1/21/04pm:17-32]   As a result, the jury was misled, misinformed, or, at the very least, confused by the presence of that evidence, resulting in a tainted fact-finding process and the sacrifice of Seegers' right to a fair trial.

Moreover, the presentation of voluminous and damaging evidence regarding co-defendants resulted in guilt "rubbing-off" on Seegers as contemplated by *Kelly* and *Slade*.  His convictions therefore must be reversed.

### 2.    Seegers and J.Alfred's Motions for Severance and Mistrial[111]

A defendant may move for mistrial where there is a legitimate claim of serious prejudicial error such that he is unable to obtain a fair trial.  *United States v. Phibbs*, 999 F.2d 1053, 1066 (6th Cir. 1993).  Motions for severance are proper where a co-defendant's conduct prejudices a defendant.[112]  *United States v. Hart*, 273 F.3d 363 (3d Cir. 2001).

Where several defendants are tried together, the misconduct of one does not always result in mistrial.  *United States v. Aviles*, 274 F.2d 179, 193 (2d Cir.), *cert.*

---

[111]   Seegers and J.Alfred adopt and incorporate herein by reference the legal authorities and argument contained in Section V., *supra*.

[112]   The record is replete with Seegers' and J.Alfred's motions for severance and mistrial.

*denied*, 362 U.S. 974 (1960).   In such situations, courts must proceed with particular care for the rights of "passive defendants."   *West* at 289 (internal citations omitted).   A "delicate balancing" must be achieved between the passive defendants' rights and the realities of judicial administration.   *See United States v. Bamberger*, 456 F.2d 1119, 1128 (3rd Cir.), *cert. denied*, 406 U.S. 969 (1973).   The most important consideration is the extent to which the passive defendants suffered prejudice.   *See generally United States v. Foster*, 557 F.3d 650, 656 (D.C. Cir 2009).   Where prejudice to passive defendants appears, a trial judge has a continuing duty to grant severance.   *See Schaffer v. United States*, 362 U.S. 511, 516 (1960).

Throughout every proceeding, Seegers and J.Alfred conducted themselves appropriately and with respect.   They did not subject the district court, jury, Marshals, counsel, or witnesses to outbursts, vulgarity, intimidation or threats.   The actions of their co-defendants, however, undeniably distracted, affected and concerned a jury already worried about security.   Space limitations prevent Seegers and J.Alfred from detailing each prejudicial action of their co-defendants, but some examples are highlighted below.[113]

As the district court explained a witness' delay to the jury, Simmons blurted, "Motherfucker just mad because a black man had a fucking store."

---

[113]   Additional inflammatory acts occurred outside the presence of the jury, which are not discussed herein.

246

[Tr.1/27/04am:25]   The jury was immediately excused.   On another occasion, Simmons spoke during Oliver's cross-examination, distracting not only the jury, but also government counsel, who interrupted Oliver to inform the district court of the outburst.   Prior to excusing the jury, the district court instructed Simmons to shut his mouth.   Rather than doing so, he exclaimed that Oliver should be permitted to say what he wanted and referenced testimony by government witnesses.   Only after that exchange was the jury excused.   [Tr.2/9/04am:135-38]

McGill was more prolific and theatrical than Simmons.   Although McGill had been vocal during trial, things disintegrated greatly during the government's rebuttal argument.   While he was being forcibly removed from the courtroom by Marshals for voicing his objection to statements made by government counsel, McGill informed the jury that appellants were equipped with 50,000-watt devices, lifted his shirt and exposed the very security device that all parties wished to remain unknown:  the stun belts.   [Tr.3/29/04pm:85]  By doing so, McGill merely underscored that the district court found appellants dangerous.   While the district court did succinctly offer a limiting instruction, it was insufficient to prevent unfair prejudice to appellants.   [*Id.*] The significance of the event was highlighted to the jury when McGill was never again permitted to be in their presence.

Finally, it would be impossible to overstate the prejudice suffered by Seegers and J.Alfred as a result of Oliver's actions. The record is replete with

247

Oliver's inappropriate behavior, and Seegers and J.Alfred incorporate them herein by reference.

What the government later referred to as "Filegate" was linked to Oliver. [Tr.3/29/04am:70]   Specifically, the government alleged Oliver attempted to intimidate one of Seegers' witnesses (Willie Fears) just prior to his testimony. Fears, the father of William Floyd (allegedly murdered by members of the Gray/Moore conspiracy), was handed Oliver's file folder – containing photographs of Floyd's murder scene - by a third person on the morning he was scheduled to testify. [Tr.1/29/04am:85-87]   The government advised it intended to raise "bias" and "possible collusion" during Fears' cross-examination.  [Tr.2/2/04am:84]  In an attempt to diminish the substantial prejudice to Seegers that would result, his counsel examined Fears about the incident.  He denied seeing the folder's contents. [Tr.2/2/04am:89-92,94-97]  During cross-examination, the government made clear that its theory was the file was designed to intimidate Fears.  [Tr.2/2/04pm:83-91] As a result, through no fault of Seegers or J.Alfred, the jury was left with the impression that the testimony of Fears (an important witness for Seegers) was tainted.

Other incidents involving Oliver also unfairly prejudiced Seegers and J.Alfred, including:  (1) frequently referring to appellants as a group during his testimony; (2) continuous, usually one-sided, interactions with appellants in the

248

presence of the jury that supported the theory they were connected despite government evidence to the contrary; (3) his unsolicited testimony he had been accused of threatening the central witness against Seegers, Hunter; [Tr.2/9/04pm:134-35] (4) testifying that appellants were considered so dangerous the government originally sought the death penalty; [Tr.2/5/04pm:17-18] (5) highlighting the significance of the prosecution by testifying about television coverage and the Chief of Police's statement that appellants' case was the largest in the District of Columbia's history; [Tr.2/5/04pm:17] and (6) alleged attempts to intimidate other government witnesses at appellants' trial. *E.g.*, [Tr.3/29/04pm:73]

As a result of their co-defendants' vocal outbursts in the presence of their jury, which was already sensitive to security issues, Seegers and J.Alfred suffered unfair prejudice when (1) the testimony of an important witness was tainted; (2) the jury was made aware that appellants had been subjected to the death penalty, the case warranted media coverage, and the Chief of Police considered it the largest case in his department's history; (3) the existence of their stun belts was revealed; and (4) the jury was subjected to vulgar and inflammatory language. As a result, their convictions must be reversed.

## XX.      THE EVIDENCE WAS INSUFFICIENT TO CONVICT SEEGERS

### A.      Standard of Review

This Court must accept a guilty verdict if it concludes "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

### B.      Argument

Seegers adopts and incorporates herein by reference the legal authority presented in J.Alfred and Simmons' arguments related to sufficiency of the evidence.

#### 1.      The Charges

Seegers maintains that the evidence adduced at trial was insufficient to convict him of the narcotics conspiracy (Count 1), RICO conspiracy (Count 3), assault with intent to murder (Count 48), attempted murder in aid of racketeering (Count 49), and use of a firearm (Count 85) offenses with which he was charged.

##### a.      *Ruling on Motion for Judgment of Acquittal*

Seegers moved for judgment of acquittal.  Despite insufficient evidence to convict him, his motion was denied by the district court.  [Doc. 2281 ¶6(A)(1)]  In its Memorandum Opinion, the court found sufficient evidence to convict Seegers of the narcotics and RICO conspiracies based on the testimony of Eugene Williams [Id.; Tr.11/13/03am:118-19,127], narcotics evidence seized from his home

250

subsequent to an arrest, his role as an "enforcer" for a member of the Gray/Moore conspiracy, [Doc. 2281 ¶6(A)(1); Tr.11/13/03am:119] and the testimony of witnesses, including Lincoln Hunter, of his role in and motive for Lincoln Hunter. [Doc. 2281 6(A)(1)]

### b.    *The Evidence was Insufficient to Support Conviction*

Seegers' convictions must be reversed as none of the evidence relied upon by the district court supports them.

The government alleged Seegers joined the conspiracies in *November 1996*. [Tr.3/30/04am:44-46] The district court's decision was, in large part, based upon the testimony of Williams. Williams did testify that Seegers distributed drugs and acted as an enforcer. However, he did not provide a time period for such drug distribution and claimed Seegers was in his home in late 1995, when in fact Seegers was incarcerated until mid-1996.    [Tr.11/13/03am:118-19;126-27] Impossibly, Williams claimed Seegers acted as an enforcer for the Gray/Moore conspiracy within the District of Columbia in late 1995 while he was incarcerated outside the jurisdiction. [Tr.11/13/03am:119; 3/30/04am:44-46] In any event, Williams' testimony regarding drug distribution and Seegers' purported role as an enforcer cannot support any of Seegers' convictions because he allegedly did not join any Gray/Moore conspiracy until *November 1996*.

Moreover, the physical evidence seized in Seegers' home, while arguably evidence of possession with intent to distribute is, by itself, insufficient to support his conviction of the charged conspiracies. Even were it assumed that the drugs belonged to Seegers, nothing in the record indicates that they were in any way related to the charged conspiracies.

Further, with regard to the Hunter shooting (alleged as both a substantive offense and racketeering acts under the RICO conspiracy): (1) the government's ballistics evidence showed that the casings found at the crime scene were identical to shells found in Hunter's own apartment [Tr.1/21/04pm:17-32]; (2) Hunter's medical records – introduced by the government – proved that Hunter lied about the shooting [DL-501a]; and (3) Hunter himself had previously absolved Seegers of any responsibility for the shooting [Seegers' Exhibits 5 and 6]. Had Seegers been properly acquitted of crimes related to Hunter's shooting, his § 924(c) conviction also would not stand.

### C.    Conclusion

Seegers submits that based upon the evidence presented, no rational trier of fact could have found him guilty of the essential elements of the charged narcotics and RICO conspiracies beyond a reasonable doubt because the evidence failed to establish that he performed any overt acts in furtherance of those conspiracies in or after November of 1996, as alleged by the government.

## XXI.        SEEGERS' JOINDER WITH OTHER APPELLANTS' ISSUES

In addition to the joint issues set forth in Sections I through VI, *supra*, Seegers adopts and incorporates herein:  (1) McGill's Sentencing arguments set forth in Sections XI(B), XI(D), XI(E), and XI(F), *supra*, the arguments made by McGill are equally applicable to the sentence he received); (2) Simmons' argument set forth in Section XXII, *infra*; (3) Simmons' argument set forth in Section XXIII, *infra*; and (4) all other applicable arguments raised by other appellants individually.

## XXII.    THE DISTRICT COURT ERRED WHEN IT DENIED SIMMONS' MOTION FOR JUDGMENT OF ACQUITTAL ON THE DRUG CONSPIRACY ALLEGED IN COUNT 1

The government failed to produce sufficient evidence to sustain a conviction against Simmons for the narcotics conspiracy alleged in Count 1 of the indictment. The indictment alleged a single overarching conspiracy in which Simmons was claimed to have played a major role over a long period of time.  Instead the evidence established multiple *ad hoc* conspiracies composed of different members playing different roles over different of periods of time and with differing purposes.  The evidence reflected that Simmons was sometime a member of these varied conspiracies and at other times he was a competitor.  Such evidence does not support a conviction for the single conspiracy alleged in the indictment.

## A.     Standard of Review

A reviewing court must determine whether the evidence, considered in the light most favorable to the government, is "sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." *U.S. v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001).   This standard of review applies to all of appellant's challenges that follow with the exception of the denial of his *pro se* motions.

## B.     The Evidence Established Multiple Conspiracies Rather Than the Single Conspiracy Alleged in the Indictment

If the indictment charges a single overarching conspiracy and the proof at trial shows several conspiracies, a defendant is entitled to the entry of a judgment of acquittal.  *Kotteakos v. U.S.*, 328 U.S. 750, 768 (1946).

To determine whether the evidence presented at trial supports a single or multiple conspiracies, the court, must look at "whether the defendant shared a common goal, any interdependence among the participants, and any overlap among the participants in the allegedly separate conspiracies."  *United States v. Gaviria*, 116 F.3d 1498 (D.C. Cir. 1997).  In Simmons' case, the proof offered at trial demonstrated the existence of multiple *ad hoc* conspiracies rather than the single one alleged in the indictment.  *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988).

254

The government evidence failed to establish proof of any agreement between the appellant and others with regards to the single overarching conspiracy for which he was then on trial. *See*, *e.g.*, *Iannelli v. United States*, 420 U.S. 770, 777 (1975). More than the common goal of narcotics distribution is required to establish a single conspiracy. *United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996) (goal plus interdependence and overlap among participants). Even if the government were attempting to establish an implied agreement, no single conspiratorial act can constitute participation in a conspiracy. *United States v. Lively*, 803 F.2d 1124, 1129 (11th Cir. 1986). Nor do freelance activities of co-conspirators make them new members of the conspiracy. *Tarantino* at 1393. Moreover, the individual disparate actions advanced by the government in this case actually demonstrate temporary *ad hoc* conspiracies with different (and sometimes contradictory) goals and participants, rather than the single conspiracy in which the appellant was convicted.

### C.    The Government Evidence at Trial Was a Variance From the Indictment

Simmons submits that the presentation of at least two separate drug conspiracies (Gray/Moore and Fleming/Simmons), rather than the single narcotics conspiracy alleged in the indictment, is a material and prejudicial variance between the evidence and the indictment that requires reversal. *See United States v. Childress*, 58 F.3d 693, 709 (D.C. Cir.1995). Variance is grounds for reversal if

255

the appellant can show that the variance is material and that it substantially prejudiced him, such as by causing the jury to "transfer evidence from one conspiracy to a defendant involved in another." *Graham* at 1471.

Whether the prosecution has proven a single conspiracy or multiple conspiracies is a question for the jury. *United States v. Carson*, 455 F.3d 336, 375 (D.C. Cir. 2006). The reviewing court is required to view "the evidence in the light most favorable" to the government, asking "whether `any rational trier of fact could have found the essential elements of [conspiracy] beyond a reasonable doubt.'" *Graham* at 1471. To evaluate the evidence relating to the single-versus-multiple-conspiracies issue, the court looks at "several factors, including whether participants shared a common goal ….; interdependence between the alleged participants in the conspiracy; and, though less significant, overlap among alleged participants." *Graham* at 1471; accord *United States v. Mathis*, 216 F.3d 18, 23 (D.C. Cir. 2000).

The prejudice to Simmons is that such evidence of drug activity of similar, but separate, distribution agreements and drug sales is only improperly admitted evidence of a likely disposition to engage in the Gray/Moore conspiracy. The danger of disposition to commit a crime evidence has long been recognized and often condemned. *Drew v. United States*, 331 F.2d 85, 89 (D.C. Cir. 1964).

**D.     The Evidence Established Only a Buyer-Seller Relationship**

Simmons submits that at best the evidence reflects that he was an occasional buyer or seller of controlled substances with members of the Gray/Moore conspiracy. A buyer/seller relationship alone does not prove a conspiracy, *United States v. Thomas*, 114 F.2d 228, 241 (D.C. Cir. 1997), even if it involves significant drug quantities. *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993). Nor is knowledge of the conspiracy sufficient to transform the relationship into a conspiracy. *United States v. Rivera*, 273 F.3d 751 (7th Cir. 2001).

Without an agreement or concert of action, transactions by themselves do not prove a conspiracy. *United States v. Morris*, 836 F.2d 1371, 1374 (D.C. Cir. 1988) (reversing drug conspiracy conviction). *See also*, *United States v. Delgado*, 631 F.3d 685 (5th Cir. 2011) (reversing drug conspiracy conviction); *United States v. Deluits*, 722 F.2d 902 (1st Cir. 1983) (same); *United States v. Wexler*, 522 F.3d 194 (2d Cir. 2009) (same); *United States v. Thomas*, 284 F.3d 746 (7th Cir. 2002) (same).

**XXIII.     THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANT SIMMONS' MOTION FOR JUDGMENT OF ACQUITTAL ON THE RICO CONSPIRACY COUNT (COUNT 3)**

Simmons submits that the government proof at trial failed to prove the existence of either an "enterprise" or "a pattern of racketeering activity" which is

257

required under 18 U.S.C. § 1961.   Without such proof, there is insufficient

evidence to support a charge of conspiracy to commit a RICO offense.

### A.    The Government Produced Insufficient Evidence to Justify Submission of the RICO Conspiracy Count to the Jury

Under 18 U.S.C. § 1962(c), it is unlawful for an individual "employed by or

associated with any enterprise engaged in, or the activities of which affect,

interstate or foreign commerce, to conduct or participate directly or indirectly in

the conduct of such enterprise's affairs through a pattern of racketeering

activity....".  *See also*, *United States v. Turkette*, 452 U.S. 576, 580 (1981).

18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to

violate" subsection (c). The government meets its burden of proof to show the

existence of an agreement to participate in an unlawful enterprise by showing that

the defendant agreed personally to the commission of two or more predicate acts

defined by the RICO statute. *See United States v. Crosby*, 20 F.3d 480, 481 (D.C.

Cir.), *cert. denied*, 513 U.S. 883 (1994).

A RICO enterprise and a pattern of racketeering are not the same thing.  An

enterprise is an entity separate and apart from the pattern of activity in which it

engages. *United States v. Turkette*, 452 U.S. 576, 583 (1981); *United States v.

Perholtz*, 842 F.2d 343, 362 (D.C. Cir. 1988).

In order to establish the existence of an enterprise, the government must

establish that "the associates are bound together by some form of organization and

structure so that they function as a continuing unit." *Perholtz* at 363.  In proving the enterprise, the government must show: "(1) a common purpose among the participants, (2) organization, and (3) continuity." *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999).  This distinction is critical because it is the "enterprise" element of the RICO offense that distinguishes a RICO violation from the individual crimes set forth in the predicate offenses.

Failure of the government to establish the existence of a structure distinct from that inherent in the commission of the predicate acts undermines the conclusion that an enterprise existed.  In this jurisdiction, the existence of the enterprise can be established by proof of a pattern or racketeering activity.  *United States v. White*, 116 F.3d 903 (D.C. Cir.) *cert. denied*, 522 U.S. 960 (1997); *Perholtz* at 363.  Simmons submits that in his case the government evidence failed to prove a cognizable pattern that establishes a distinct enterprise.

### 1.     Failure to Prove Existence of an Enterprise

In order to prove the existence of a RICO enterprise, the government must establish that "the associates are bound together in some form of organization and structure so that they function as a continuing unit, distinguishable from an ordinary conspiracy." *Perholtz* at 363.

In proving an enterprise, the evidence must show (1) a common purpose among the participants, (2) organization, and (3) continuity. *Perholtz* at 363;

*Richardson* at 625. This burden is satisfied only by evidence of an association having an ascertainable structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts that constitute the pattern of racketeering activity. *See United States v. Tillett*, 763 F.2d 628, 631 (4th Cir. 1985).

Simmons submits that ordinarily any two criminal acts will necessarily be surrounded by some degree of organization and no two individuals will ever jointly perpetrate a crime without some degree of association apart from the commission of the crime itself. This however, is not a RICO violation. The enterprise requirement of RICO requires proof of some continuing structure separate from the racketeering activity and distinct from the organization which is necessarily incident to the racketeering. *United States v. Bledsoe*, 674 F.2d 647, 663 (8th Cir.), *cert. denied*, 459 U.S. 1040 (1982).

Under RICO § 1962(c) and (d), the existence of an enterprise is an essential element of a RICO claim. Indeed, "[t]he central role of the concept of enterprise under RICO cannot be overstated." *United States v. Neapolitan*, 791 F.2d 489, 500 (7th Cir. 1986). The existence of an enterprise "at all times remains a separate element which must be proved by the Government." *Turkette* at 583.

Yet the only enterprise that is demonstrable from the government's evidence in the present case involving Simmons is the artificial stringing together of *ad hoc* criminal acts. This does not demonstrate an enterprise.

2.      <u>Failure to Prove The Existence Of A Structure Distinct From That Inherent in the Commission of the Predicate Acts</u>

Simmons was charged with three predicate acts, which serve as the basis for the RICO conviction:  the murder of Richard Simmons, the murder of Thomas Walker and the attempted murder of 'Rah Rah.'  Even a cursory examination of the facts surrounding each of these events clearly demonstrates that they were not connected to an enterprise, nor did they constitute a pattern and could not represent a unique structure that is required by RICO.

Even assuming the veracity of the ten government witnesses who outlined for the jury Kenneth Simmons' activities during the period, the government evidence fails to establish an overall hierarchy, organization or structure that governed or led to the commission of the individual crimes for which appellant was convicted.  There is nothing that distinguishes these individual crimes in which the appellant participated from a series of ordinary conspiracies or *ad hoc* encounters which resulted in criminal activity.  While there is some amount of association involved with the crimes alleged, this is no more than normally required for traditional, non-RICO, criminal activity.  There is nothing in the

261

testimony in this case which can legitimately be viewed as describing an enterprise that involved Kenneth Simmons.

Stringing together a set of violent acts and presenting them together in a RICO theory of liability in the indictment with an undefined and ultimately non-existent structure is contrary to the intention of the statute itself which requires a structure independent of the individual criminal actions.

3.    The Government Evidence Failed to Prove the Overt Acts Were Done in Furtherance of the Conspiracy and that Simmons Participated in Them "On an Ongoing Basis"

In RICO prosecutions, the government must prove that the overt acts alleged were done in furtherance of the alleged RICO conspiracy.  *United States v. Shabini*, 513 U.S. 10 (1994).  The acts must also present themselves "on an ongoing basis."  *United States v. Sanders*, 928 F.2d 940, 943 (10th Cir. 1991). Appellant was alleged to have engaged in three RICO overt acts.  The government evidence at trial failed to demonstrate that Simmons participated in any acts on an ongoing basis that were committed in furtherance of the conspiracy alleged in the indictment.  Rather, two of the overt acts were, by the government's own theory, the result of personal pique–the Rah Rah attempted murder and the murder of Thomas Walker.  The third act, the murder of Richard Simmons was, even under the government's theory, done to protect the reputation of Walter Fleming–a person who was not part of the Gray/Moore conspiracy.  Thus, none of the acts

262

were committed in furtherance of the RICO conspiracy or in support of the RICO enterprise.

As this Court has held, continuity as a required element of a pattern of racketeering activity "may be proved by establishing either a closed period of repeated conduct or a threat of future criminal activity." *W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (internal quotation marks omitted). A closed period of repeated conduct, in turn, may be proven through "a series of related predicates extending over a substantial period of time." *H.J. Inc. v. NW. Bell Tel. Co.*, 492 U.S. 229, 242 (1989).

The predicate acts for which Kenneth Simmons was convicted are related only because he played some role in their commission. That is insufficient. The evidence may establish conspiracies to murder, but not a RICO conspiracy.

## XXIV. THE DISTRICT COURT ERRED WHEN IT DENIED APPELLANT SIMMONS' MOTION FOR JUDGMENT OF ACQUITTAL ON THE WEAPONS CHARGES (18 U.S.C. 924(c)(1)(A)(III)) IN COUNTS 87 AND 95

Simmons submits that the government produced insufficient evidence to support his convictions for use of a firearm in connection with the murders of Richard Simmons and Thomas Walker. There was no question at trial that appellant was not involved in the act of shooting either of the victims. There was no allegation that he had actual possession of a weapon for either crime. Rather,

the government theory at trial was that because he arranged for the murders, he was guilty of using a weapon as an aider and abettor. Simmons submits that even under this theory, the government evidence failed to support the essential elements of these offenses.

### A.    The Government's Theory of Liability

At the trial below, it was the government's theory that Simmons retained other people to kill the Walker brothers, Richard Simmons and Rah Rah. The government never claimed that Simmons participated in any of the actual shootings. Nor did the government ever claim that it was Simmons who supplied, provided funds for purchase or knew of the weapons to be used. Thus, appellant was convicted for use of the firearms during the Richard Simmons and Walker homicides under some type of aiding and abetting theory. Simmons suggests that the evidence presented is insufficient to support a 924(c) conviction under this theory.

Section 924(c) requires that a person be convicted of the offense of use of a firearm only upon evidence that he used a firearm during the offense or aided and abetted the possession of a firearm for that offense. In *Bailey v. United States*, 516 U.S. 137, 148 (1995), the Supreme Court concluded that the statute requires the government to prove "active employment of the firearm." While the word "use" in the statute is broadly construed, *Smith v. United States*, 508 U.S. 223 (1993), in

order to be convicted of aiding and abetting a 924(c) offense, the defendant must act with the knowledge or specific intent of advancing the "use" of the firearm in relation to the offense. *United States v. Sorrells*, 145 F.3d 744, 753 (5th Cir. 1998). There is no evidence in this record to establish that element in the present case for Kenneth Simmons in Counts 87 and 95. Assuming for purposes of argument that he knew of the proposed homicide plans, such knowledge by itself is insufficient for a conviction based on a theory of aiding and abetting. *See United States v. Spinney*, 65 F.3d 231 (1st Cir. 1995) (reversing 924(c) conviction in bank robbery case in which defendant participated in planning); *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994) (reversing 924(c) conviction where defendant likely knew firearms would be used but did not perform "some act that directly facilitated or encouraged the use or carrying of a firearm.").

By close analogy, the District of Columbia Court of Appeals in reversing a 22 D.C. Code § 4504(b)(PFCV) conviction has concluded that a defendant's participation in the "larger scheme of an armed robbery" is insufficient to sustain a conviction even under an aider and abettor theory for firearm use liability. *Lancaster v. United States*, 975 A.2d 168, 175 (D.C. 2009). Thus, in the robbery context, the government is required to prove some act on the part of the defendant that assisted the robbers in their possession of firearms during the robbery. *See also Fox v. U.S.*, 11 A.3d 1282, 1288 (D.C. 2011) (reversing firearm use conviction).

There was no evidence produced by the government that Simmons assisted the persons who actually shot the victims in Counts 87 and 95 in their use or possession of firearms for those offenses and his convictions under an aiding and abetting theory should be reversed.

## XXV.    THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT SIMMONS' 1959(a)(1) HOMICIDE CONVICTIONS

Simmons submits that the counts which alleged homicides in aid of a racketeering enterprise (Counts 54 and 71) should not have survived the motion for judgment of acquittal because the government's evidence failed to establish that the acts were committed in furtherance of the racketeering enterprise.

### A.    Insufficiency of the 1959 charges

Section 1959 requires a jury to find two elements in addition to the violent criminal activity.  The first is "an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). The second is that a defendant committed the violent crime with one of three motives: (1) "as consideration for …. anything of pecuniary value" from such an enterprise, (2) "as consideration for a promise … to pay" something of value from such an enterprise, or (3) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." *Id.*  This third element – the only one at issue here - may be shown if "the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he

266

committed it in furtherance of that membership." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992); *accord United States v. Tse*, 135 F.3d 200, 206 (1st Cir. 1998); *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994).

Simmons submits that there was insufficient evidence that these violent crimes were done in order to maintain or increase his position(s) in the enterprise. Here the murder of Richard Simmons was done in furtherance of the Fleming/Simmons drug conspiracy and the murder of Thomas was a result of a personal pique that arose out of nightclub fight. *See*, *e.g.*, *United States v. Ferguson*, 246 F.3d 129, 134-37 (2d Cir. 2001) (affirming dismissal because no proof violent acts expected of members or part of membership aspirations); *United States v. Polanco*, 145 F.3d 536, 540 (2d Cir. 1998) (conviction reversed because supplier of weapons to drug gang not part of enterprise).

The motive of maintaining or increasing one's position in an enterprise may be reasonably inferred where the defendant commits the crime "in furtherance of" enterprise membership or where the defendant "knew it was expected of him by reason of his membership in the enterprise." *U.S. v. Carson*, 455 F.3d 336, 369 (D.C. Cir. 2006). Such a motive has been found where the defendant murdered individuals on suspicion that they were cooperating with police and thereby jeopardizing the enterprise, *see United States v. Dhinsa*, 243 F.3d 635, 672 (2d Cir. 2001), or murdered individuals to "maintain or increase his own reputation as an

enforcer in the enterprise," where the defendant "frequently carried out violent crimes against those who threatened the organization," *Carson* at 370.  None of theses reasons applied to the 1959 charges here.

A jury could not possibly determine beyond a reasonable doubt that the murders charged to appellant were committed in furtherance of his gang membership.  The evidence in this case falls short of that required, for example, in *United States v. Thai*, 29 F.3d 785, 818-19 (2d Cir. 1994) (reversing conviction because jury's finding of intent would have been based upon "pure speculation" and "guesswork").

## XXVI.    THE DISTRICT COURT ERRED IN DENYING THE *PRO SE* MOTIONS OF APPELLANT SIMMONS WITHOUT A HEARING

Simmons filed a number *pro se* motions alleging government misconduct that included a request for a new trial or dismissal of the indictment for prosecutorial misconduct [Doc. 2291] and disclosure of grand jury materials. [Doc. 2295].  These motions were denied by orders dated December 4, 2006. [Docs. 2303,2304,2305]

Simmons also filed several *pro se* motions requesting withdrawal of his trial counsel. [Docs. 1999,2215,2243,2275]  These motions were filed after the return of the verdict, while motions for new trial were pending and prior to sentencing.

The decision by the district court to deny these motions without requiring a response to the colorable claims of misconduct by the government or ineffectiveness of counsel was error.

### A.    Standard of Review

Claims for ineffectiveness of counsel are reviewed pursuant to the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Lathern*, 665 F.3d 1351, 1353 (D.C. Cir. 2012).

### B.    Simmons' *Pro Se* Allegations of Government Misconduct

In his August 2, 2006 *pro se* motion, Simmons claimed that the murder of Richard Simmons was never presented to the grand jury; that the government utilized trial testimony of Walter Fleming that it knew was false; that the government had engaged in an improper opening statement by claiming that he sold drugs at one location and produced no evidence to prove that claim; that he could not be guilty of possession of handguns in furtherance of the drug charges if the handguns were those recovered from his store after his arrest and that the affidavit in support of the search warrant for his store contained the incorrect assertion that appellant was overheard on the Gray wiretaps. [Doc. 2291]

### C.    Simmons' *Pro Se* Allegations of Ineffectiveness of Counsel

In all of the *pro se* motions requesting withdrawal of counsel, Simmons alleged that his trial counsel were ineffective because they were not adequately

prepared and failed to investigate the case to the fullest. These were based on what appears to be jail supplied form motions for which Simmons provided no details.

However, on August 11, 2004, Simmons filed a motion which contained allegations of ineffectiveness that were specific to his case. [Doc. 1999] The district court took no action on this motion. The allegations were repeated nearly a year later in another motion to discharge his counsel that was filed on June 28, 2005. [Doc. 2215] These included the following claims:

> 3.    There was a conflict amongst both counsel's and myself throughout the entire trial proceedings.

> 4.    They refused to interview or use key witnesses that would have changed the outcome of the juries verdict.

> 5.    They refused to discuss with me all information concerning the grand jury proceedings to impeach testifying witnesses.

> 6.    I gave both attorneys information that clearly showed that Kevin Gray and I were adversaries that was not used to rebut the testimony of a key government witness.

> 7.    Throughout the trial, they physically distanced themselves from me by removing themselves from the defense table.

> 8.    The attorneys removing themselves from me gave the jury a negative impression about my character.

9.      I asked them to challenge the indictment and they refused without explanation.  I asked them to challenge the indictment from the very beginning when your Honor dismissed Mr. Mitchell S. Baer, my former counsel.

[Doc. 2215]

## D.    The Review of *Pro Se* Claims

*Pro se* complaints are held to less stringent standards than formal pleadings drafted by lawyers.  *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  In this Court, *pro se* pleadings are liberally construed,  *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999), even in pleadings that are inartfully pleaded, *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), or confusing.  *Anyanwutaku v. Moore*, 151 F.3d 1053 (D.C. Cir. 1999).

## E.    The Claims of Government Misconduct Should Have Been Examined by the District Court

Simmons believes that the district court erred in ignoring the *pro se* claim of government misconduct without benefit of even a response or a hearing on the allegations raised.

In his motions, Simmons made colorable claims that the government had abused the grand jury process in the Richard Simmons murder allegation based on the testimony of Walter Fleming at trial; that the government used testimony of Walter Fleming that it knew was false and that it had made knowingly false statements to the district court during the course of his case on the subject of

271

handgun possession, drug sale locations and interception of his conversations on the Gray/Moore wiretap recordings.  These allegations have, in the past, been the basis for reversals of convictions.[114]    They should not have been ignored.

One of the most often used tests is whether it is beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *Haines* at 520-21; *Estelle* at 106.  In the present record, no such claim can be made of the allegations of government misconduct which appellant advanced in his post trial motions.

### F.    The Claims of Ineffectiveness of Counsel and Substitution of Counsel Should Have Been Examined by the District Court

The Sixth Amendment provides that, "In all criminal prosecutions, the accused shall enjoy . . . the Assistance of Counsel for his defense."  That right is designed to assure fairness in the adversarial criminal process.  *Wheat v. United States*, 486 U.S. 153, 158 (1988).  This Court has recognized that if the relationship deteriorates below a certain level, that guarantee is implicated.  *United States v. Graham*, 91 F.3d 213, 221 (D.C. Cir. 1996).   Simmons suggests that the deterioration fell far below that required by the Sixth Amendment.

---

[114]    *See*, *e.g.*, *United States v. Stevens*, 771 F. Supp. 2d 556 (D.Md. 2011)(dismissal of indictment for misleading statements by government to grand jury); *United States v. Peralta*, 763 F. Supp. 14 (S.D.N.Y. 1991)(dismissal of indictment for government misconduct before grand jury).

Simmons presents two questions then: (1) Did the district court err in denying the *pro se* motion to replace counsel without any inquiry and (2) Did the district court err in denying the *pro se* motion claiming ineffectiveness of counsel claim without any hearing to base its conclusion. Both questions are distinct, but interrelated. *United States v. Smith*, 640 F.3d 580, 589 (4th Cir. 2011). Simmons believes that answer to both questions is yes.

### 1.    The Substitution of Counsel Motions

*Graham* recognized that a trial court has clear responsibility to determine the defendant's reasons for dissatisfaction with current counsel. *Id.* at 221. Unless clear from the face of the record, the trial court has an obligation to inquire into the specific basis for the defendant's claims. *See*, *e.g.*, *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1992). This inquiry should be conducted on the record. *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991).

While the *pro se* motions included specific allegations - conflicts with counsel and a physical separation between appellant and counsel which created a negative jury impression, and the refusal to discuss grand jury information for impeachment purposes - the district court conducted no such hearing and the orders denying the *pro se* motions are without any factual findings.

273

2.    The Claims of Ineffectiveness of Counsel

On at least two occasions, Simmons filed written motions for replacement of counsel based on specific claims of ineffectiveness.  As indicated above, these claims included a failure to interview or call defense witnesses; a refusal to challenge pre-trial the indictment for perceived defects and refusal to pursue the defense theory that Simmons and Gray were adversaries rather than co-conspirators.  Any one of these defects is a potential ineffectiveness of counsel claim under *Strickland*.

When counsel's trial decisions are uninformed because of inadequate preparation, a defendant is denied the effective assistance of counsel.  *United States v. DeCoster*, 487 F.2d 1197, 1201 (D.C. Cir. 1973).  When a record upon which ineffectiveness is raised poses more questions about counsel's preparation and investigation than answers, the matter should be remanded.  *DeCoster* at 1201.  Simmons' attempt to made a record for ineffectiveness claims for review in this Court, *see United States v. Cyrus*, 890 F.2d 1245 (D.C. Cir. 1989) was prevented by the district court's automatic denial.

The district court's failure to make a record to address these specific claims of ineffectiveness requires, at a minimum, remand.  *United States v. Rashad*, 331 F.3d 908 (D.C. Cir. 2003); *United States v. Harris*, 491 F.3d 440, 443 (D.C. Cir. 2007).

274

## XXVII.    SIMMONS' JOINDER WITH OTHER APPELLANTS' ISSUES

In addition to the joint issues set forth in Sections I through VI, *supra*, Simmons adopts and incorporates herein:  (1) McGill's sentencing argument set forth in Section XI, *supra*; (2) Seegers' prosecutorial misconduct argument set forth in Section XVII, *supra*; (3) Seegers and J.Alfred's severance argument set forth in Section XIX, *supra*; and other applicable arguments raised by other appellants individually.

## XXVIII.    THERE WAS INSUFFICIENT EVIDENCE LINKING JAMES ALFRED TO THE MURDERS OF JOSEPH THOMAS AND CARLOS CARDOZA

### A.    Standard of Review

This Court must accept the jury's guilty verdict if it concludes that "***any*** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "In making [that] determination, the prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005) (internal quotation marks omitted).  *United States v. Shabban*, 612 F.3d 693, 696 (D.C. Cir. 2010).  "This review, although deferential, is not servile: 'We do not … fulfill our duty through rote incantation of

275

these principles followed by summary affirmance.  We must ensure that the evidence adduced at trial is sufficient to support a verdict as a matter of law.  A jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation.  *United States v. Harrison*, 103 F.3d 986, 991 (D.C. Cir. 1997) quoting *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990).

### B.    The Charges

James Alfred (hereinafter "James") was linked to the Thomas murder in Counts Three (RICO Conspiracy, Act 36, First Degree Murder), Thirty (First Degree Murder), Thirty-One (CCE Murder), and Seventy-Six (§ 924(c)).  He was linked to the Cardoza murder in Count Three (Act 54, Conspiracy to Commit Murder).

### C.    The District Court's Ruling on Motion for Judgment of Acquittal

James filed a Motion for Judgment of Acquittal.  Despite the contradictory and underwhelming evidence, the motion was denied.  [Doc. 2281, Memorandum Opinion 8-10]

In regard to the Thomas murder, the district court found sufficient evidence to convict because James had a motive, he "likely shared [a different] motive of his brother," he facilitated the murder by helping locate the victim, he participated in a

celebration following the murder, and a witness testified that two or three years after the murder, James told him, "We got Gangster to hit Froggy." [*Id.* at 9]

In regard to the Cardoza murder, the district court wrote, "The jury heard testimony that James Alfred helped search for Carlos Cardoza …" when he knew others were looking to murder him. This evidence was therefore sufficient to conclude he was guilty of aiding and abetting. [*Id.* at 10]

### D.     Insufficient Evidence of Thomas Murder

All convictions related to the Thomas murder must be reversed. To start, each fact relied upon by the district court is either not supported by the record or is not proof of guilt. While Thomas allegedly shot James' unnamed girlfriend at some unknown time ostensibly providing a motive, many others had greater motives, including Ronald Alfred and China. [Tr.10/21/03pm:29-33] Also, James did not help locate Thomas; he would only say if he had seen Thomas "or something like that." Ronald was the one who sent people out to look for Thomas. [Tr.10/21/03pm:33-34] And contrary to the district court's findings, James was not a part of the celebration. He happened to be at Fresh Gear along with Andrews, Gray, Howard, Ronald, George and Gangster at some point following the murder. But it was Andrews, Gray, and Frank who "went and got a bottle and started to celebrate. [Tr.10/21/03pm:47] Finally, the district court wrote that James "confirmed he had ordered the murder", yet no other evidence established

277

that James had a role in ordering the murder and the record, in fact, contradicts this. It was Ronald who gave the orders and who paid Gangster, Frank and Kevin, not James. [Tr.10/21/03pm:34,38]  In fact, James was not even present when Ronald told Gangster to go kill Thomas. [Tr.1/9/04pm:85; 1/12/04pm:67-69]

But what is fatal to each of these convictions is that there was no testimony that James had knowledge that anyone wanted to murder Thomas. While Andrews testified that Ronald said he wanted Thomas killed, there is no testimony that James knew this. Nor was there any other evidence that James knew that anyone else wanted to murder Thomas. While Andrews testified James told others in conversations at Fresh Gear that he saw Thomas on occasion, there was no evidence that he actively searched for Thomas so that others could kill him.

In order to uphold the convictions of First Degree Murder while Armed, CCE Murder, and the 924(c) offense, the government was required to prove that he aided and abetted those offenses, i.e., that he had sufficient knowledge and participation to allow a reasonable juror to infer that he "knowingly and willfully participated in the offense in a manner that indicated he intended to make it succeed." *United States v. Teffera*, 985 F.2d 1082, 1086 (D.C. Cir. 1993). In other words, the government was required to prove that James intended to bring about Thomas' murder. There was no such evidence.

278

The facts of this case are indistinguishable from those in *United States v. Wilson*, 160 F.3d 732, 737-739 (D.C. Cir. 1998) where this Circuit held there was insufficient evidence to support a conviction of conspiracy. In that case, Judd reported back to others who were seeking to murder the victim as to the victim's whereabouts on two occasions on the day of the murder. Judd returned to the area of the murder and later informed two people that he was the person who informed the others that the victim was in the area. The Court observed Judd only knew that the two brothers were looking for the victim but notably lacking was any testimony that Judd knew that the brothers were looking for the victim in order to kill him. Because Judd's action showed at best only general knowledge of a planned crime, there was insufficient evidence to support a conviction on either a conspiracy or aiding and abetting theory.[115]

In this case, there was no testimony that James knew about the others' plan to kill Thomas. Because the evidence was insufficient to sustain the conviction, this Court must reverse the findings of guilt on Racketeering Act 36, first degree murder in Count Three, Count Thirty (First Degree Murder), Count Thirty-One (CCE Murder), and Count Seventy-Six (§ 924(c)).

---

[115] Wazir testified that two or three years after the murder Alfred told him "We got Gangster to hit Froggy." But the evidence from those on the scene contradicts this. Frank Howard testified that on the day of the murder he and gray saw Thomas. Howard went back to Fresh Gear to get Ronald and Gangster. There was no testimony that James was even there when Ronald sent gangster to Robison Place to kill Thomas. [Tr.1/9/03pm:85; 1/12/03pm:67-69]

### E.    Insufficient Evidence of Cardoza Murder

The district court cited one factor in its decision that there was sufficient evidence to convict James of conspiracy to murder Cardoza: that the jury heard testimony that he helped search for Cardoza.  But, at most, the record indicates that James was merely present when there were discussions concerning the finding Cardoza and that he was not actively involved in the search.

Maurice Andrews testified:

> Q:    So basically Bam may have said where he may have spotted Carlos Cardoza, maybe coming up and down Georgia Avenue?
>
> A:    Yeah. He'd tell Kevin whether he seen him or not.
>
> Q:    And that was on Georgia Avenue?
>
> A:    Wherever he seen him he'd tell Kevin.
>
> ****
>
> Q:    Now was Bam involved in the actual search for Carlos Cardoza?
>
> A:    No, he was not.
>
> Q:    So he wasn't part of your posse going around looking for Carlos Cardoza, is that right?
>
> A:    No, he was not.

[Tr.10/23/03pm:61-62]

Oscar Veal testified:

Q:    And you never saw James Alfred doing anything physically in terms of searching for Carlos Cardoza, is that correct?

A:    That is correct.

Q:    So anything you testified about was just your supposition or what you guessed; is that correct?

A:    Yes, ma'am.

Q:    And you have nothing to base it on, is that correct?

A:    That is not correct.

Q:    That's not correct?

A:    No, ma'am.

Q:    What do you have to base it on?

A:    The fact that I know that Kevin and Boo were discussing finding Carlos Cardoza.

Q:    I understand that.

A:    I know that Bam was present when they were having this discussion.

Q:    Yes.

A:    I seen him talking. I didn't overhear what they were talking about.  That's why I say I can't say specifically for sure that he actively said something but he –

Q:    So you cannot – go ahead

281

> A:    But I do know for sure that he was present and that he had knowledge of what we were all planning to do.
>
> Q:    Okay.  So all you can tell this jury is that he was present and he had knowledge, and nothing more; is that correct?
>
> A:    yes, ma'am.

[Tr.12/3/03pm:20-21]

In order for James to be guilty of conspiracy the government had to prove that he "entered into an agreement … to commit a specific offense," that he "knowingly participated in the conspiracy with the intent to commit the offense, and that "at least one overt act was committed in furtherance of the conspiracy. *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996).  In order to sustain the district court's finding of aiding and abetting as to Racketeering Act 54, Conspiracy to kill Carlos Cardoza, the government was required to prove beyond a reasonable doubt that James had sufficient knowledge and participation to allow a reasonable juror to infer that he knowingly and willfully participated in the offense in a manner that indicated he intended to make it succeed.  In other words, the government was required to prove that James intended to bring about Cardoza's murder.

The only evidence of James' alleged role in the murder was that he was "merely present" when there were alleged talks about finding Cardoza, but that

282

James took no active role in the search for Cardoza. An inference of criminal participation cannot be drawn merely from presence; a culpable purpose is essential. "In *Hicks v. United States*, 14 S. Ct. 144 (1893), the Supreme Court recognized that the accused's presence is a circumstance from which guilt may be deduced if that presence is meant to assist the commission of the offense or is pursuant to an understanding that he is on the scene for that purpose. And we have had occasion to say that 'mere presence would be enough if it is intended to and does aid the primary actors. Presence is thus equated to aiding and abetting when it is shown that it designedly encourages the perpetrator, facilitates the unlawful deed - as when the accused acts as a lookout - or where it stimulates others to render assistance to the criminal act. But presence without these or similar attributes is insufficient to identify the accused as a party to the criminality." *Bailey v. United States*, 416 F.2d 1110, 1113-14 (D.C. Cir. 1969). Indeed, courts have found that evidence that guilt from some sort of general knowledge that criminality may be afoot is insufficient to sustain a conviction for aiding and abetting a specific crime. *Teffera* at 1086-87.

Clearly, the government has not sustained its burden as to the Cardoza killing. There was no evidence that James' presence did anything to assist in the commission of the offense; the government's key witnesses denied that James was

283

involved in the search for Cardoza, leaving only evidence of mere presence. Thus, the finding of guilt on this racketeering act must be vacated.

### F.    The Case Must Be Remanded for Re-Sentencing

Absent findings of guilt associated with the Thomas and Cardoza murders, James Alfred is left with convictions for narcotics conspiracy (Count One) and three counts of Unlawful Use of a Communication Facility.[116] The life sentence on Count One should be vacated since it was driven by the finding of guilt on the Thomas murder. [117]

Absent the murder conviction, the offense level for Count One is based solely on the drug amounts which results in a level 34 with a corresponding term of imprisonment of 151 to 188 months. [Sentencing Hearing Tr.12/15/06:20] With a sentence of 188 months, to run concurrent with the remaining telephone counts, James will be eligible for release in the very near future.[118]

---

[116] The Thomas and Cardoza murders encompassed two of the three charged racketeering acts in Count Three, as well as Counts Thirty, Thirty-One, and Seventy-Six. Because Count Three required a finding that James agreed that he or some other member of the enterprise would commit at least two racketeering acts, the entire count must fail.

[117]    U.S.S.G. § 2D1.1(d)(1) instructs that if a victim is killed under circumstances that could constitute murder, § 2A1.1, First Degree Murder, is to be applied.

[118]    James was arrested and detained continuously since August 7, 2000. With a sentence of 188 months and reduction for good time credits, he will be eligible for release after serving approximately 160 months, or 13.3 years.

# XXIX.     JAMES ALFRED'S JOINDER WITH OTHER APPELLANTS' ISSUES

In addition to the joint issues set forth in Sections I through VI, *supra*, J.Alfred adopts and incorporates herein: (1) Seegers' prosecutorial misconduct argument set forth in Section XVII, *supra*; (2) McGill's sentencing argument set forth in Section XI, *supra*; and (4) all other applicable arguments raised by other appellants individually.

# XXX.     RONALD ALFRED'S INDIVIDUAL ISSUES

## A.     Erroneous Admission and Treatment of Pre-Conspiratorial Acts

The government conceded R.Alfred did not enter this conspiracy before May 15, 1995.   [Tr.11/24/03pm:6]   *Accord* [Doc. 1947 at 27 ¶16] ("joined the organization in 1995").   Yet its Indictment also listed as "Overt Acts" the government's claims that R.Alfred, in *1989*, possessed a kilogram of cocaine, and in *1991*, possessed a firearm.  [Doc. 1947, at 10 ¶¶3&9]  The final Indictment, read aloud and later given to the jury, said these two listed Overt Acts "directly relate to the charges" against the defendants.  [*Id.* at 10].  Indeed, R.Alfred's 1989 and 1991 charged "Overt Acts" were listed *immediately after this specific instruction*.

R.Alfred filed a pretrial Motion to Dismiss Portions of the Indictment, and a Motion to Reconsider; both were denied.  R.Alfred's ancient pre-conspiracy acts thus were not only considered, but also treated as Overt Acts supporting his conviction.  The indictment's treatment of R.Alfred's 1989 and 1991 acts as Overt

Acts in furtherance of a conspiracy he allegedly joined in 1995 was reversible error. *See United States v. Vesaas*, 586 F.2d 101, 102-04 (8th Cir. 1978) (indictment "self-contradictory," and "[f]or reversal ... we need only to start and finish where the error commenced; to-wit, the incoherent indictment").

The district court also granted a government motion *in limine* to hide from jurors R.Alfred's ***acquittal*** of this 1989 charge, involving cocaine in a Jeep. The government relied on *United States v. Thomas*, 114 F.3d 228, 249-50 (D.C. Cir. 1997), but as this Court itself has noted, *Thomas* was a narrow ruling. *United States v. Bailey*, 319 F.3d 514, 518 (D.C. Cir 2003) (*Thomas* "goes off on narrow factual grounds"). With officers describing R.Alfred's 1989 arrest, cross-examination revealing his acquittal was appropriate to correct jury speculation. *Bailey* at 518 ("It seems plausible that not a few jurors would have speculated that conviction followed"). *Accord United States v. Jones*, 808 F.2d 561 (7th Cir. 1986). Moreover, cross-examination was independently admissible to show bias, since testifying Officer Egan had professional interests in redeeming himself after losing a case he himself described as one of the largest drug seizures in U.S. Park Service history. Unlike *Thomas*, where the impeachment issue "was not raised below," and deemed "waived," *Thomas* at 250, R.Alfred specifically raised and preserved these issues here. [Doc. 1622]

Officer Egan then testified he could identify R.Alfred as the 1989 Jeep driver, based on three "looks" he got 14 years earlier. [Tr.11/3/03am:21-22] The defense asked if Egan's earlier attempts to identify R.Alfred as the driver had been accepted, but the district court sustained an objection, instructing jurors to disregard this and commenting that "questions from lawyers aren't evidence." [Tr.11/3/03am:23] R.Alfred was also barred from asking Egan if he might be upset or biased if he lost a big case. [Tr.11/3/03am:24]

Exclusion of this cross-examination was error. "The efficacy of cross-examination as a test of the dependability of testimony is too well understood to require extensive explanation." *Lindsey v. United States*, 133 F.2d 368, 369 (D.C. Cir. 1942); *accord Alford v. United States*, 282 U.S. 687, 691 (1931). "[T]he exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "While the district court must have some discretion over the matter, appellate courts have found preclusions to be error." *United States v. Stock*, 948 F.2d 1299, 1301 (D.C. Cir. 1991) (error found where cross-examination "would have added color and depth to Cunningham's account"). *Accord United States v. Pryce*, 938 F.2d 1343, 1345 (D.C. Cir. 1991) ("abuse of the trial court's discretion to limit cross-examination on matters affecting credibility"; conviction reversed). *See also Lindsey*, at 369 ("it is only after a party

has had an opportunity substantially to exercise the right of cross-examination that discretion [even] becomes operative").

Evidence of R.Alfred's 1989 acquittal should not have been excluded, and cross-examination also should have been allowed. *Stock*, at 1302 ("cases upholding a court's exclusion of ***extrinsic*** evidence offered to impeach a witness, on the ground of the issue's being 'collateral', do not govern the scope of cross-examination"); *United States v. Whitmore*, 359 F.3d 609, 620 (D.C. Cir. 2004) ("there is nothing improper in asking questions relating to extrinsic matters in the hope of undermining the witness's credibility").[119]

With regard to R.Alfred's 1989 activity, this was ***not*** collateral, but listed in the Indictment as an Overt Act. And in contrast to a court's broader discretion to limit "new matters first broached on cross, the trial judge may not restrict the right of cross-examination by the defense on a matter brought out before the jury on direct until that right has been 'substantially and fairly exercised.'" *United States v. Pugh*, 436 F.2d 222, 225 (D.C. Cir. 1970). Here, where the government called Officer Egan ***on direct***, to identify R.Alfred as the driver and implicate him in this 1989 Overt Act, restricting R.Alfred's cross-examination was improper. *United*

---

[119]  This was not the only time cross-examination was improperly restricted on the theory that impeachment raised collateral matters. When R.Alfred sought to cross-examine triggerman Omar Wazir about an alternative scenario for the Kairi Ball murder – asking Wazir if he separately arranged with Kevin Gray to kill Kairi Ball – the district court told Wazir, "you don't have to answer." [Tr.10/29/03pm:160-61]

*States v. Whitmore*, 359 F.3d 609, 616 (D.C. Cir. 2004) (courts "must be cautious ... particularly where a party is seeking to impeach a witness whose credibility could have an important influence on the outcome of the trial").

Unfortunately, more error followed. The government was allowed, over objection, to introduce a DEA-7 form claiming this 1989 substance tested positive for cocaine. [Tr.1/8/04am:4-5] The witness providing these test results, DEA chemist Jerry Walker, did not perform the tests – in fact, the 1989 sample ***predated his employment with the DEA***. [Tr.1/8/04am:66] Walker had never seen the substance, or even a photograph. [Tr.1/8/04pm:69] Yet Walker presented this testimony – in violation of R.Alfred's constitutional rights under the Confrontation Clause, *see*, *e.g.*, *Bullcoming*; *Melendez-Diaz*; *Crawford*, *supra*[120] – and was even allowed to vouch for the credibility of the absent chemist who performed the tests, [Tr.1/8/04am:71; 1/8/04pm:19-21], telling jurors DEA lab tests are 100% accurate. [Tr.1/8/04pm:28] When Walker acknowledged this 1989 substance had had not been kept, [Tr.1/8/04am:113], R.Alfred attempted to ask if this meant no independent tests were possible, but this cross-examination too was barred. [Tr.1/8/04am:120]

In sum, the jury was expressly allowed to find an "Overt Act" ***6 years before*** R.Alfred even allegedly entered the conspiracy – blurring proper lines – based on

---

[120] Confrontation Clause challenges are reviewed *de novo*. *Moore* at 69.

289

conduct that had yielded an ***acquittal*** (which was hidden from the jury), and proven by witnesses appearing in violation of the Confrontation Clause and improperly shielded from cross-examination. Prejudice to R.Alfred was obvious. This was not an irrelevant drug allegation; it was an Overt Act. Moreover, the 1989 incident (over objection) was prominently displayed on the government's summary chart. [Tr.12/10/03pm:126; 12/11/03pm:8] The government later returned to this incident repeatedly during closing and rebuttal closing, citing this 1989 "brick" as proof R.Alfred was a major drug dealer[121] – with the defense unable even to mention R.Alfred's acquittal. Painting R.Alfred as a major drug dealer was also key to the government's overall strategy of convincing this jury that R.Alfred joined Gray's conspiracy, and assisted in violent acts to further that conspiracy's drug interests.

The government also introduced evidence of R.Alfred's pre-conspiracy firearms possession. Again, government witnesses went ***beyond*** charges of which R.Alfred was convicted, telling the jury one such incident involved ***two separate*** crime scenes, and even ***a shooting at police*** – despite government assurances this information would never come out. Again, prejudice was obvious. What jurors

---

[121]    Beyond this "brick" seized by authorities, the government's drug allegations against R.Alfred largely rested on the word of unreliable cooperators – "Alpo" in the 1980s, and other dubious sources later; most of the latter gave only second-hand descriptions of what was "heard," or described conduct before May 15, 1995.

heard about R.Alfred could hardly be worse: that he was a drug kingpin who had previously shot at police.

This alleged misconduct, arising *years before* R.Alfred *even allegedly* entered this conspiracy, and never tied to any alleged co-conspirators, somehow constituted Overt Acts in furtherance of *that same conspiracy*. Neither the government nor the district court explained how this was even logically possible. Yet the Indictment confusingly forced this jury to consider these as charged "Overt Acts" anyway. Any generalized instruction that pre-conspiratorial acts should not be considered for substantive purposes was thus lost on these jurors – since the Indictment instructed them they *must* consider R.Alfred's pre-1995 acts in connection with the charges. Jurors were left unguided to try to reconcile the irreconcilable.

Issues of whether a jury was properly instructed are questions of law, reviewed *de novo*, *United States v. Perkins*, 161 F.3d 66, 69 (D.C. Cir. 1996), and subject to harmless error analysis. As noted above, this evidence never should have been admitted at all.[122] But since it was, proper instructions were crucial. While general 404(b) instructions were given, the district court refused to specify for the jury the acts that could not be considered as part of the conspiracy.

_____

[122] Indeed, even if R.Alfred *had* testified, these acts never should have come in – since his 1989 case yielded an acquittal, his 1991 gun conviction involved only a misdemeanor, and even as to his 1994 conviction, only the conviction (not the underlying acts) would be admissible under Rule 609.

[Tr.3/22/04am:51-52]  R.Alfred's proposed Special Jury Instruction [Doc. 1779], which would have specified these pre-1995 acts, and identified the limited purposes for which they could be properly considered, was refused. [Tr.3/22/04am:51]  R.Alfred's counsel then reiterated:

> [O]vert acts 3 and 9, which are the first two listed in the retyped indictment, having to do with the alleged possession of a kilogram of cocaine in '89, and possession of a gun in '91.  In light of the instruction that's being given, that Mr. Alfred is not alleged to have joined the conspiracy until ... sometime after May 15, 1995, ... it would be confusing to the jury if they are included in the indictment .... [W]e feel they're prejudicial.

[Tr.3/22/04AM:52-53]  R.Alfred's renewed request to strike these Overt Acts was denied.  [Tr.3/22/04AM:53]

This is not a situation such as *United States v. Lemire*, 720 F.2d 1327 (D.C. Cir. 1983), where there was only a "possibly confusing nature of a small portion of the instructions."  *Id.* at 1339 n.16.  Focus on pre-indictment conduct by R.Alfred permeated this trial, with prosecutors repeatedly emphasizing R.Alfred's pre-indictment acts during closing arguments.  And the indictment's description of ***pre-conspiracy*** conduct ***as Overt Acts***, and lack of further guidance from the district court, was inherently confusing.  The conflicting guidance this jury received about R.Alfred's charged offenses is reversible error in the context of this case.

292

### B.    Improper Admission of Post-Conspiracy "Drug" Evidence

*During* the alleged conspiracy period, the only non-testimonial evidence of illegal drugs against R.Alfred[123] consisted of a "picture of a small Ziplock bag of crack cocaine," [Tr.1/14/04am:37], described as seized from R.Alfred's apartment. But the government introduced this photo *after* its chemist had testified; R.Alfred thus moved to strike and sought a mistrial.  When the district court inquired if a DEA-7 existed for these "drugs," the prosecutor sheepishly responded, "I'll have to check." [Tr.1/14/04am:38]   Once the prosecutor confirmed he would inquire "whether this one was submitted for analysis," [124] the court refused to strike the evidence.  But after evidence closed, R.Alfred's counsel again moved to strike, and sought a missing witness instruction [Doc. 1779], since the government by then agreed there were no lab tests.  [Tr.3/22/04am:47-48]  Both requests were denied. [Tr.3/22/04am:47-49;  3/23/04pm:25].    In  closing,  the  government  then compounded this error, *falsely* telling the jury that DEA chemist Jerry Walker "confirmed that all of the drugs were in fact drugs."  [Tr.3/23/03am:55-56]   In

---

[123] Most of the testimonial evidence came from witnesses like Caprice Whitley (the one who denied being a pathological liar).  Whitley, who said she learned jail was a place where one cannot shower more than once daily, had never even mentioned R.Alfred during initial debriefings with the DEA. [Tr.11/25/03am:128-29; Tr.11/25/03pm:16]

[124] The district court noted, "I don't think the results of a field test are admissible." [Tr.1/14/04am:38]  *Accord United States v. Crockett*, 586 F. Supp. 2d 877 (E.D. Mich. 2008).

reality, neither Walker nor any other chemist ever tested this substance. The only physical evidence of "drugs" seized from R.Alfred during the entire conspiracy period was thus never proven to be drugs – yet the jury was told otherwise.

### C. Improper Bolstering of Post-Conspiracy Allegations of Violence

The government repeatedly and improperly bolstered Oscar Veal's testimony by asking about his religious conversion after agreeing to cooperate, violating Fed.R.Evid. 610. This evidence was not merely incidental. Not ten pages into Veal's direct testimony, to defuse Veal admission to ***seven RICO murder*** counts,[125] the government asked about his religious conversion; objections were overruled. [Tr.12/1/03pm:15-17] Later, the government's direct examination returned to Veal's religion, [Tr.12/1/03pm:25-26], and then again. [Tr.12/3/03am:7] The government finally circled back, culminating Veal's direct by getting him to say the main reason he agreed to cooperate was because he converted to Islam, [Tr.12/3/03am:52-53], since Veal said he had grown up with church-going people, and now in prison, "God showed me there was a way out of it." [Tr.12/3/03am:53-54]

This evidence was highly improper, and provided this seven-time murderer with his only redeeming quality. *United States v. Sampol*, 636 F.2d 621, 666 (D.C. Cir. 1980) (improper to reference religious views to enhance credibility). The

---

[125] In one of his murders, Veal had just seen a victim hugging his happy kids at school; he then circled back to kill him. [Tr.12/3/03am:96]

district court denied R.Alfred's post-trial motion, [Doc. 1995:21], by claiming religious beliefs are admissible to show a witness' motive, *United States v. Simmons*, 431 F. Supp. 2d 38, 57 (D.D.C. 2006), but offered no authority for this exception – which would surely swallow the rule, since religion can be a "motive" for anything.

The effect on R.Alfred was particularly prejudicial, since Veal's accusations essentially provided the government's only direct evidence claiming R.Alfred aided and abetted the murders of Cardoza and Watkins, and attempted murder of Sanders, plus related § 924(c) counts. This bolstering of Veal's credibility was improper and clearly prejudiced R.Alfred, warranting reversal.

## D.    Ineffective Assistance of Counsel

"[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Claims of ineffectiveness should be reviewed *de novo*. *Cf. United States v. Toms*, 396 F.3d 427, 433 (D.C. Cir. 2005) (declining to settle standard of review, but noting other Circuits' *de novo* review). R.Alfred was denied effective assistance of counsel here, due to unwaived conflicts of interest, and deficiencies at both trial and sentencing.

Under *Strickland*, ineffectiveness claims must meet a two-part test. "First, the defendant must show that counsel's performance was deficient ... Second, the defendant must show that the deficient performance prejudiced the defense."

*Strickland* at 687.  This second (prejudice) prong is presumed if a conflict of

interest existed that adversely affected the lawyer's performance.  *Id.* at 692 (citing

*Cuyler v. Sullivan*, 466 U.S. 335 (1980)).

      1.    <u>Conflicts of Interest</u>

R.Alfred suffered from attorney conflicts of interest that he never waived.

R.Alfred's first appointed counsel in this case was Thomas Abbenante.

Unfortunately, Abbenante ***simultaneously*** represented Alberto Martinez –

a witness who provided some of the most damaging evidence against R.Alfred.

Just before the government began opening statements, R.Alfred's trial

counsel first learned of this conflict, and expressed their total surprise:

> We just got Jencks on Alberto Martinez yesterday and--
> and so for the first time yesterday we learned that his
> lawyer was Thomas Abbenante, beginning in at least
> 1992, and my understanding today is continuing through
> the present.   It's also my understanding that Mr.
> Abbenante was appointed by this Court to represent
> Ronald Alfred, my client, and that representation lasted
> for a while.  We don't know the exact length of it, but ...
> there's never been any waiver of the conflict.

[Tr.10/11/03pm:4]  The government's response showed they were well-aware of

these circumstances, but unilaterally decided not to disclose this potential conflict

earlier.   [Tr.10/11/03pm:5]   Later, R.Alfred's trial counsel supplemented this

objection, confirming Abbenante had represented Martinez since 1992 – ***over a

decade***.  [Tr.10/23/03pm:166-81]

Shortly before Martinez testified, R.Alfred objected again, reaffirming how this conflict was never waived. He noted how Martinez's still-current lawyer, Abbenante, had met extensively with R.Alfred in this case, handing his initial appearance, his bond hearing, and representing R.Alfred for many months as his first-appointed lawyer, before quitting to help Martinez now in his cooperation efforts against R.Alfred. [Tr.11/3/03am:26-33]

All defense objections, however, were overruled. [Tr.11/3/03am:36]

Abbenante then continued *participating* as *Martinez's* counsel as he cooperated against R.Alfred. Abbenante's one client testified against (and gained sentencing advantages from incriminating) a man who had also been his client.

Even in a trial filled with cooperators, Alberto Martinez ("Alpo") stood apart. This was a cooperator so experienced that a movie was even produced about his life – "Paid in Full." [Tr.11/3/03pm:39] Alpo had owned ten cars, and a 40-foot yacht, [Tr.11/4/03am:14], but later admitted responsibility for at least 14 murders, [Tr.11/3/03pm:60] – including seven in D.C., [Tr.11/3/03pm:81], and two slayings of females Alpo decided were informants. [Tr.11/3/03pm:67-68] Alpo had plea deals in Virginia and DC, involving a Continuing Criminal Enterprise charge of being the boss of a drug organization. [Tr.11/3/03pm:20] Avoiding the death penalty, [Tr.11/3/03pm:24], Alpo had testified frequently, already earning one substantial sentencing reduction. [Tr.11/3/03pm:21-22]

Alpo dropped names of major drug dealers in Harlem, New York, and D.C., describing himself as a major drug dealer, living large, keeping 30-40 kilograms of cocaine at a time in stash houses. [Tr.11/3/03pm:75-94] Alpo dramatically described his regular enforcer/killer kept on hand, his "crew," his "soldiers," and their various killings. [Tr.11/3/03am:98-108] None of this had anything to do with the instant charges, but this evidence added to the atmosphere of fear the government sought to paint, with Alpo bragging he handled 100s of kilograms of cocaine a week.

Alpo then turned to R.Alfred, identifying him as one of his customers from 1988 until Alpo was incarcerated in 1991, [Tr.11/3/03pm:6-8], – a window *ending four years before* R.Alfred even *allegedly* joined the instant conspiracy. Alpo then asserted massive quantities of drugs R.Alfred supposedly dealt with him. Although Alpo *had not once mentioned R.Alfred in his first grand jury appearance*, [Tr.11/3/03pm:83], *or in his Virginia trial either*, [Tr.11/4/03pm:10], Alpo now described R.Alfred as a "top five customer of mine." While acknowledging on cross-examination that his only evidence against R.Alfred was his words, [Tr.11/3/03pm:94], Alpo claimed R.Alfred had bought 150-200 kilograms of cocaine from him. [Tr.11/3/03pm:34]

298

The prejudicial effect of this testimony – painting R.Alfred as a major drug kingpin[126] – is obvious.  Claims of massive drug dealing and connections to a known mob boss, coming from a colorful (even famous) witness still actively represented by R.Alfred's own former lawyer, was huge.  In closing, the government argued this testimony *right out of the box* when describing R.Alfred, claiming R.Alfred "was a big drug dealer in his own right," and reminding jurors Alpo estimated selling "150-200 keys" to R.Alfred.  [Tr.3/22/04pm:22-23]  In rebuttal closing, the government reiterated how "you heard about Alpo providing him with tons and tons of drugs."  [Tr.3/29/04am:35]  Prosecutors utilized a one-two punch of Alpo's testimony, plus the 1989 "brick", as key proof R.Alfred was surely a major drug dealer – because its *post*-1995 drug proof was *thin*.

Abbenante's *active* assistance to Alpo was not the only way R.Alfred was harmed by this conflict.  Before Abbenante withdrew as R.Alfred's counsel, and at a time when he was *jointly representing* R.Alfred and Martinez, Abbenante urged R.Alfred to become a cooperator, and brought R.Alfred into a room with a known government cooperating witness, Omar Wazir – apparently hoping Wazir could

---

[126]  No testimony from any other witness suggested anything close to this level of drug activity by R.Alfred, either before or during the alleged conspiracy period.

299

convince R.Alfred to plead guilty and cooperate too.[127]  That did not happen, but R.Alfred was then laid bare – no longer free to testify at trial without fear of impeachment from debriefings.  At trial, Wazir then testified and used this meeting against R.Alfred, describing how prosecutors arranged for R.Alfred and his attorney to meet Wazir in jail.  [Tr.10/29/03pm:188-91]  This testimony was highly prejudicial:   Wazir claimed R.Alfred asked him about his case, and whether R.Alfred's own name had been implicated in the Kairi Ball and Thomas murders.  [Tr.10/29/03pm:30]  Over objection, the prosecutor also asked Wazir about various other murders in the indictment that Wazir claimed R.Alfred had *not* asked him about, implying R.Alfred knew the ones in which he was involved.  [Tr.10/30/03am:112-115]

R.Alfred's trial counsel attempted to ameliorate this damage by calling Abbenante himself as a witness, to describe Wazir's interactions with R.Alfred in this meeting, and Wazir's stated willingness to say what the government wanted.  But R.Alfred now was boxed in after following Abbenante's guidance, and left with a Catch-22:  The government claimed Abbenante's testifying at trial opened the door to cross-examination about R.Alfred's plea discussions, [Tr.1/28/04am:18-19], and the district court agreed – so when cross-examination

---

[127]  Abbenante was apparently anxious to make this happen – even taking the highly unusual step of leaving R.Alfred *alone* in a room with this ***known cooperator***.

ensued, the jury learned from Abbenante how R.Alfred had discussed the possibility of ***pleading guilty to the instant charges***.  [Tr.1/28/04am:37]   The government then also called Wazir back on rebuttal, where Wazir was allowed to say he told R.Alfred the deck was stacked against them, and "we didn't have a chance" fighting these charges.  [Tr.3/15/04pm:81-82]

A defendant can prevail on a conflict of interest claim – a form of ineffective assistance of counsel – by showing his lawyer labored under an actual conflict of interest, and that the conflict had some negative effect on his defense.  *United States v. Thomas*, 114 F.3d 228, 252 (D.C. Cir. 1997).  Here, an actual conflict was obvious.   Abbenante could not represent both Alpo and the very person the government wanted Alpo to testify against.  *See United States v. Weaver*, 265 F.3d 1074, 1077 (D.C. Cir. 2001); *United States v. Taylor*, 139 F.3d 924, 930 (D.C. Cir. 1998).

"An actual conflict of interest exists where a lawyer is 'required to make a choice advancing his own [or another client's interest to the detriment of his client's interest.'"  *Thomas* at 252.  Faced with this choice, Abbenante chose Alpo and abandoned R.Alfred.  Abbenante did not walk away from both clients or seek neutrality, but actively decided to help one of his clients against the other.  Through Abbenante's continued counsel during his testimony, Alpo had the advantage of a lawyer who knew R.Alfred and his defense case (both its strengths

and weaknesses) intimately, since Abbenante was the first lawyer appointed to represent R.Alfred, and had represented R.Alfred for months after his initial arrest, including during debriefings. Abbenante was able to actively advise Alpo how to navigate his testimony and avoid cross-examination pitfalls, giving him (and thus the government) unwarranted strategic advantages against his former client, the key target of Alpo's testimony. Alpo's ancient pre-conspiracy allegations never should have been admitted at all, but this admission was particularly prejudicial to R.Alfred given the conflict of interest caused by Abbenante's continued representation of Alpo. And as noted, Abbenante's earlier arrangement for R.Alfred to meet alone with a known cooperator also caused substantial prejudice.

No evidentiary hearing was held below on these issues, and this case should be remanded for such a hearing. *Cf. Taylor*, *supra* (district court abused its discretion by not holding an evidentiary hearing on counsel's alleged conflict of interest). Remand is appropriate if R.Alfred presents a colorable claim of ineffectiveness, "unless the trial record alone conclusively shows that the defendant either is or is not entitled to relief." *Moore* at 85. The record here does not rule out the possibility of a conflict of interest. Indeed, beyond Abbenante, R.Alfred's trial counsel, Idus Daniel, also is listed on the public docket as counsel of record for Melvin Wallace – another government cooperating witness who testified at R.Alfred's trial – in *United States v. Melvin Wallace*, No. 1:99-cr-215

302

(RCL)(D.D.C.).   R.Alfred raised these various conflicts below upon learning of them, but his challenges were largely ignored.   Accordingly, remand is warranted.

       2.    <u>Trial</u>

R.Alfred's trial lawyers also failed to provide effective assistance.   Even giving counsel some deference,[128] R.Alfred's defense case was disorganized and haphazard, with important witnesses missed.

As the government's case drew to a close, R.Alfred's counsel requested late writs for defense witnesses; the district court lamented how the defense had "four years to get ready" and missed a December 5 deadline.   [Tr.1/23/04am:13-14] Ultimately, the district court relented, but counsel continued to add witness names. On February 12, 2004, counsel noted how "[t]here are several other people Mr. Alfred has us looking for ... we are attempting to locate and attempting to get subpoenas on ..."  [Tr.2/12/04pm:147-48]   On February 20, the scramble to find witnesses continued; counsel now listed 19 additional R.Alfred witnesses, many still not located or subpoenaed, and asked government counsel to help. [Tr.2/20/04am:181-84&205-15]   Other defendants' witnesses were called in to fill R.Alfred's witness gaps.   As the defense cases wound down, R.Alfred placed on the record his desire to call Marvin Dixon and James Brown (Gumby). [Tr.3/12/04pm:85]   By March 15, R.Alfred counsel reiterated how "Mr. Alfred has

_____

[128]   Some deference may be warranted, since R.Alfred lawyer Wartel had to miss trial one day while his wife's labor was being induced.   [Tr.2/4/04am:98-100]

requested that we find several other witnesses," such as Darrell Darby – but the district court ended it there:  "All right, then you've rested ...  the time to find them has expired."  [Tr.3/15/04am:96-97]  When R.Alfred suggested Darby may have been served, the district court responded, "If you have proof of any service ... show me the proof; otherwise, sit down and shut up."  [Tr.3/15/04am:97]

Later, Wartel identified these absent witnesses – including Darby, whom he proffered would testify R.Alfred was in Atlanta during the Thomas murder and setting up a successful business there during the 1996 Olympics, and Kimberly Rice, who would testify R.Alfred was with her on the night of the Cardoza murder.  [Tr.3/22/04am:4]  R.Alfred's later *pro se* motion listed Darby and two other desired witnesses who could have supported this 1996 alibi.  R.Alfred also alleged "failure to interview Kim Wright, Angela Zengler, Raymond Sanders and a host of other witnesses who had information relevant to the 1996 murder," plus failure by "counsel to secure the appearance of defense witnesses," such as Rodman David Lee, who could have provided "a strong defense to the Narcotics conspiracy."[129] *See United States v. Lucas*, 513 F.2d 509 (D.C. Cir. 1975) (duty to secure witnesses).

---

[129]  This *pro se* motion was filed in R.Alfred's old case.  [1:00-cr-228-Doc. 26:2-3]  Lee, never called as a witness, was apparently represented by a former partner of R.Alfred's trial lawyer Idus Daniel.  [Tr.2/20/04am:181]

3.    <u>Sentencing</u>

Ineffectiveness also existed at R.Alfred's sentencing.  After raising a few limited Guideline objections, R.Alfred's trial counsel was replaced.  Substitute counsel Arcangelo Tuminelli then raised no new objections; he simply asked for more time to review transcripts and said R.Alfred "disputes everything and admits nothing."  [Doc. 2345]  Rather than asserting meaningful specifics, Tuminelli largely complained about his client and asked to be relieved. [Doc. 2356]  At R.Alfred's sentencing hearing, after his motions to continue and withdraw were denied, Tuminelli argued little.[130]  No objection to the government's § 851 notice was filed, and obvious objections were missed.

As a result, R.Alfred's sentence was illegal.  For example, R.Alfred received 10 (not 5) years on Count 76, although the indictment charged (and the jury found) only "use" of this firearm – ***not*** discharge.  [Doc. 1880:13]  This enhanced § 924(c) sentence, issued in 1997, was based on judicial fact-finding alone, clearly violating *Apprendi*, yet no challenge was raised.  A life sentence was imposed on Count One despite Guidelines that appear lower.  Tuminelli also wrongly conceded R.Alfred faced three mandatory life sentences statutorily.  [Tr.11/20/07:14].  This was

---

[130]  Tuminelli cited two Guideline objections ***prior*** counsel had raised (role adjustment; objection to language in PSR), and said these issues ***need not be resolved***.  [Tr.11/20/07:6]  He then argued one issue R.Alfred had raised *pro se* (Count One as a lesser-included offense of Count Three).  Tuminelli made no other sentencing arguments.

untrue, but counsel's concession rendered this sentencing a lay-down – Tuminelli did not even attempt § 3553(a) arguments, wrongly calling such efforts pointless. [Tr.11/20/07:15]   Basic arguments apparent to competent counsel were missed, and remand for evaluation of ineffectiveness (and a new sentencing) is warranted.

### E.   Insufficient Evidence on Certain Counts

Proof was legally insufficient on certain counts.   Count 66, for example, charged R.Alfred with killing Carlos Cardoza *as a witness*.   No evidence showed R.Alfred knew or was told Cardoza was a potential witness.   When a Rule 29 motion raised this ground, [Tr.1/23/04am:28], the government responded by simply discussing Cardoza's murder generally, never addressing this specific flaw, [Tr.1/23/04pm:16-17], – yet the motion was denied.   [Tr.1/23/04pm:28; 3/22/04am:63].   Post-trial motions [Doc. 1995:18-19 (identifying § 1512(a)(1)(C)'s elements)] also were denied.   This was error.

Proof of attempted murder of Sanders also was legally insufficient.   This was a charge arising from Veal's testimony about hoping to kill *someone* in a green Jeep – Veal never knew who.   The evidence, even viewed in the government's best light, merely showed that Veal, after cooperating, saw and identified the target Jeep; this Jeep's tags were then traced to the wife of Sanders, a supposed drug dealer.   That was it; further links were speculative.   This charge did

not survive a Rule 29 motion in the *Moore* trial, but R.Alfred's Rule 29 motion here was denied.  [Tr.1/23/04pm:28; 3/22/04am:63]  This was error.

Finally, no lab evidence proved R.Alfred's involvement in "crack" cocaine or cocaine base.  *See United States v. Brisbane*, 367 F.3d 910 (D.C. Cir. 2004).

### F.    Adopted Arguments

In addition to the joint issues set forth in Sections I through VI, *supra*, R.Alfred also adopts and incorporates herein the severance, prosecutorial misconduct, Fair Sentencing Act, and other applicable arguments raised by other appellants individually.  The charges against Oliver and McGill did not overlap R.Alfred's, and their severance would have prevented R.Alfred from being prejudiced by spillover evidence, and their trial antics and testimony described above.

## XXXI.    CUMULATIVE EFFECT OF TRIAL ERRORS

The combined effect of the aforementioned errors prejudiced appellants as noted, depriving them of a fair trial.  *See United States v. Celis*, 608 F.3d 818, 847 (D.C. Cir. 2010); *Egan v. United States*, 287 F.2d 958, 971 (D.C. Cir. 1923) (cumulative effect of errors may deprive defendant of fair trial, even if errors are insufficient individually to warrant reversal).  Appellants raised below this issue of cumulative error, [Doc. 1995], and it represents an independent basis for vacating appellants' convictions.

The prejudice appellants faced from these cumulative errors is obvious – and lasted from the beginning of this case to the end. For example, appellants first faced an improper "Army Ranger" overview witness, vouching for tainted witnesses who never could have carried this case on the backs of their own credibility. Those witnesses were then given *carte blanche* to discuss almost limitless "other crimes" evidence, errors which were then compounded by improper closing arguments and jury instructions. Multiple Confrontation Clause violations occurred, the jurors heard about and even physically saw the "50,000 watts" stun belt at ***the climactic moment*** of the trial, and the jurors retired after being told of the government's convictions obtained in the parallel *Moore* trial. And, once they did retire, of course, appellants' Sixth Amendment rights were then violated on multiple levels – even beyond the individualized errors separately raised by each appellant.

Appellants submit that each of the errors raised herein warrant reversal on their own. They further submit that the cumulative effect of those errors further prejudiced the appellants and denied them their rights to a fair trial.

## CONCLUSION

For the foregoing reasons, appellants request that their convictions entered by the district court be reversed, their sentences be vacated and their cases be remanded for further proceedings as appropriate.

## REQUEST FOR ORAL ARGUMENT

The Appellants respectfully request that the Court grant oral argument in their consolidated appeal, as the issues and law presented are complex and would best be served by the granting of oral argument.

Respectfully submitted,

/s/
Richard Keith Gilbert, Esq.
601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, DC  20004
(202) 898-0857
rkgesq@juno.com
*Counsel for Keith McGill*
(Appointed by the Court)


/s/
Kristen Grim Hughes, Esq.
1390 Chain Bridge Road
Suite 350
McLean, VA  22101
(703) 798-4444
kghughes@hotmail.com
*Counsel for Keith McGill*

/s/
David Smith, Esq.
English & Smith
526 King Street, Suite 213
Alexandria, VA  22314
(703) 548-8991
dsmith@englishandsmith.com
*Counsel for Deon Oliver*
(Appointed by the Court)

RETURETA & WASSEM, PLLC


By:    /s/
Manuel Retureta, Esq.
1614 20th Street, NW
Washington, DC  20009
(202) 450-6119
mjr@returetawassem.com
*Counsel for Franklin Seegers*
(Appointed by the Court)


/s/
Dennis M. Hart, Esq.
601 Pennsylvania Avenue, N.W.
Suite 900, South Building
Washington, DC  20004
(202) 347-1820
d.m.hart@att.net
*Counsel for Kenneth Simmons*
(Appointed by the Court)

/s/ _____
Mary E. Davis, Esq.
Davis & Davis
1350 Connecticut Avenue, NW
Suite 202
Washington, DC  20036
(202) 234-7300
medavisdc@aol.com
*Counsel for James W. Alfred*
(Appointed by the Court)


/s/ _____
Gregory S. Smith, Esq.
Law Offices of Gregory S. Smith
913 East Capitol Street, S.E.
Washington, D.C. 20003
(202) 460-3381
gregsmithlaw@verizon.net
*Counsel for Ronald C. Alfred*
(Appointed by the Court)

Dated:  June 28, 2012

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the Court's July, 21, 2011 Order because:

[ X ] this brief contains [*69,235*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>June 28, 2012</u>          <u>/s/ Manuel Retureta</u>
                                    *Counsel for Appellant Franklin Seegers*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 28th day of June, 2012, I caused this Page-Proof Brief of Appellants to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Leslie A. Gerardo
> Mary B. McCord
> Elizabeth Trosman
> OFFICE OF THE U.S. ATTORNEY
> 555 4th Street, Room 8104
> Washington, DC  20530
> (202) 252-6829
>
> *Counsel for Appellee*

I further certify that on this 28th day of June, 2012, I caused the required copies of the Page-Proof Brief of Appellants to be hand filed with the Clerk of the Court.

/s/ Manuel Retureta
*Counsel for Appellant Franklin Seegers*

# ADDENDUM

# <u>AUTHORITIES SET FORTH IN ADDENDUM</u>

## <u>STATUTES</u>

124 Stat. 2372 (Fair Sentencing Act ............................................. Add. 1
18 U.S.C. § 924(c) ...................................................................... Add. 2
18 U.S.C. § 1512(a) .................................................................... Add. 4
18 U.S.C. § 1959(a) .................................................................... Add. 6
18 U.S.C. § 1961 ........................................................................ Add. 7
18 U.S.C. § 1962 (c) and (d) ...................................................... Add. 8
18 U.S.C. § 3553(a) and (c) ....................................................... Add. 9

## <u>FEDERAL RULES OF CRIMINAL PROCEDURE</u>

Federal Rule of Criminal Procedure 12 ...................................... Add. 12
Federal Rule of Criminal Procedure 13 ...................................... Add. 14
Federal Rule of Criminal Procedure 14 ...................................... Add. 14
Federal Rule of Criminal Procedure 23(b) ................................. Add. 15
Federal Rule of Criminal Procedure 29 ...................................... Add. 15
Federal Rule of Criminal Procedure 35 ...................................... Add. 17
Federal Rule of Criminal Procedure 43(a) .................................. Add. 18
Federal Rule of Criminal Procedure 52 ...................................... Add. 19

## <u>FEDERAL RULES OF EVIDENCE</u>

Federal Rule of Evidence 105 ..................................................... Add. 19
Federal Rule of Evidence 403 ..................................................... Add. 19
Federal Rule of Evidence 404(b) ................................................ Add. 19
Federal Rule of Evidence 608 ..................................................... Add. 20
Federal Rule of Evidence 609 ..................................................... Add. 20
Federal Rule of Evidence 702 ..................................................... Add. 21
Federal Rule of Evidence 801 ..................................................... Add. 21

## <u>SENTENCING GUIDELINES</u>

U.S.S.G. § 2A1.1 ........................................................................ Add. 23
U.S.S.G. § 2D1.1(d)(1) ............................................................... Add. 23
U.S.S.G. § 2K2.4 - Application Note 4 ....................................... Add. 23
U.S.S.G. § 4B1.1 ........................................................................ Add. 24
U.S.S.G. § 5K1.1 ........................................................................ Add. 25

**124 Stat. 2372** (FAIR SENTENCING ACT OF 2010)

An Act To restore fairness to Federal cocaine sentencing.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

SECTION 1. SHORT TITLE.
This Act may be cited as the "Fair Sentencing Act of 2010".

SEC. 2. COCAINE SENTENCING DISPARITY REDUCTION.

(a) CSA.--Section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) is amended--

<< 21 USCA § 841 >>

(1) in subparagraph (A)(iii), by striking "50 grams" and inserting "280 grams"; and

<< 21 USCA § 841 >>

(2) in subparagraph (B)(iii), by striking "5 grams" and inserting "28 grams".

(b) IMPORT AND EXPORT ACT.--Section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)) is amended—

<< 21 USCA § 960 >>

(1) in paragraph (1)(C), by striking "50 grams" and inserting "280 grams"; and

<< 21 USCA § 960 >>

(2) in paragraph (2)(C), by striking "5 grams" and inserting "28 grams".

…

Add. 1

**18 U.S.C. § 924**

**(c)(1)(A)** Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--

　　　　　　　**(i)** be sentenced to a term of imprisonment of not less than 5 years;

　　　　　　　**(ii)** if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

　　　　　　　**(iii)** if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

　　　　　　**(B)** If the firearm possessed by a person convicted of a violation of this subsection--

　　　　　　　**(i)** is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, the person shall be sentenced to a term of imprisonment of not less than 10 years; or

　　　　　　　**(ii)** is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.

　　　　　　**(C)** In the case of a second or subsequent conviction under this subsection, the person shall--

　　　　　　　**(i)** be sentenced to a term of imprisonment of not less than 25 years; and

**(ii)** if the firearm involved is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life.

**(D)** Notwithstanding any other provision of law--

**(i)** a court shall not place on probation any person convicted of a violation of this subsection; and

**(ii)** no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed.

**(2)** For purposes of this subsection, the term "drug trafficking crime" means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46.

**(3)** For purposes of this subsection the term "crime of violence" means an offense that is a felony and--

**(A)** has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

**(B)** that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

**(4)** For purposes of this subsection, the term "brandish" means, with respect to a firearm, to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person.

➡ **§ 1512(a).**

    **(1)** Whoever kills or attempts to kill another person, with intent to--

        **(A)** prevent the attendance or testimony of any person in an official proceeding;

        **(B)** prevent the production of a record, document, or other object, in an official proceeding; or

        **(C)** prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

    **(2)** Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to--

        **(A)** influence, delay, or prevent the testimony of any person in an official proceeding;

        **(B)** cause or induce any person to--

            **(i)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;

            **(ii)** alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;

            **(iii)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

            **(iv)** be absent from an official proceeding to which that person has been summoned by legal process; or

**(C)** hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

**(3)** The punishment for an offense under this subsection is--

**(A)** in the case of a killing, the punishment provided in sections 1111 and 1112;

**(B)** in the case of--

**(i)** an attempt to murder; or

**(ii)** the use or attempted use of physical force against any person;

imprisonment for not more than 30 years; and

**(C)** in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years

Add. 5

**18 U.S.C. § 1959**

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished--

(1) for murder, by death or life imprisonment, or a fine under this title, or both; and for kidnapping, by imprisonment for any term of years or for life, or a fine under this title, or both;

(2) for maiming, by imprisonment for not more than thirty years or a fine under this title, or both;

(3) for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both;

(4) for threatening to commit a crime of , by imprisonment for not more than five years or a fine under this title, or both;

(5) for attempting or conspiring to commit  or kidnapping, by imprisonment for not more than ten years or a fine under this title, or both; and

(6) for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine under this title, or both.

**18 U.S.C. § 1961**

As used in this chapter--

**(1)** "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code; Section 201 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581-1592 (relating to peonage, slavery, and trafficking in persons)., section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960

(relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States, (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B);

## 18 U.S.C. § 1962

(c) It shall be unlawful for any person  by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**18 U.S.C. §3553. Imposition of a sentence**

    **(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

        **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

        **(2)** the need for the sentence imposed--

            **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

            **(B)** to afford adequate deterrence to criminal conduct;

            **(C)** to protect the public from further crimes of the defendant; and

            **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

        **(3)** the kinds of sentences available;

        **(4)** the kinds of sentence and the sentencing range established for--

            **(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

                **(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

                **(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement--

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced. [FN1]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

…

**(c) Statement of reasons for imposing a sentence**.--The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence--

**(1)** is of the kind, and within the range, described in subsection (a)(4) and that range exceeds 24 months, the reason for imposing a sentence at a particular point within the range; or

**(2)** is not of the kind, or is outside the range, described in subsection (a)(4), the specific reason for the imposition of a sentence different from that described, which reasons must also be stated with specificity in a statement of reasons form issued under section 994(w)(1)(B) of title 28, except to the extent that

the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32. In the event that the court relies upon statements received in camera in accordance with Federal Rule of Criminal Procedure 32 the court shall state that such statements were so received and that it relied upon the content of such statements.

**Federal Rule of Criminal Procedure 12**

(a) Pleadings. The pleadings in a criminal proceeding are the indictment, the information, and the pleas of not guilty, guilty, and nolo contendere.

(b) Pretrial Motions.

(1) In General. Rule 47 applies to a pretrial motion.

(2) Motions That May Be Made Before Trial. A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue.

(3) Motions That Must Be Made Before Trial. The following must be raised before trial:

(A) a motion alleging a defect in instituting the prosecution;

(B) a motion alleging a defect in the indictment or information--but at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense;

(C) a motion to suppress evidence;

(D) a Rule 14 motion to sever charges or defendants; and

(E) a Rule 16 motion for discovery.

(4) Notice of the Government's Intent to Use Evidence.

(A) At the Government's Discretion. At the arraignment or as soon afterward as practicable, the government may notify the defendant of its intent to use specified evidence at trial in order to afford the defendant an opportunity to object before trial under Rule 12(b)(3)(C).

(B) At the Defendant's Request. At the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to

Add. 12

move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16.

(c) Motion Deadline. The court may, at the arraignment or as soon afterward as practicable, set a deadline for the parties to make pretrial motions and may also schedule a motion hearing.

(d) Ruling on a Motion. The court must decide every pretrial motion before trial unless it finds good cause to defer a ruling. The court must not defer ruling on a pretrial motion if the deferral will adversely affect a party's right to appeal. When factual issues are involved in deciding a motion, the court must state its essential findings on the record.

(e) Waiver of a Defense, Objection, or Request. A party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c) or by any extension the court provides. For good cause, the court may grant relief from the waiver.

(f) Recording the Proceedings. All proceedings at a motion hearing, including any findings of fact and conclusions of law made orally by the court, must be recorded by a court reporter or a suitable recording device.

(g) Defendant's Continued Custody or Release Status. If the court grants a motion to dismiss based on a defect in instituting the prosecution, in the indictment, or in the information, it may order the defendant to be released or detained under 18 U.S.C. §3142 for a specified time until a new indictment or information is filed. This rule does not affect any federal statutory period of limitations.

(h) Producing Statements at a Suppression Hearing. Rule 26.2 applies at a suppression hearing under Rule 12(b)(3)(C). At a suppression hearing, a law enforcement officer is considered a government witness.

**Federal Rule of Criminal Procedure 13**

The court may order that separate cases be tried together as though brought in a single indictment or information if all offenses and all defendants could have been joined in a single indictment or information.

**Federal Rule of Criminal Procedure 14**

(a) Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

(b) Defendant's Statements. Before ruling on a defendant's motion to sever, the court may order an attorney for the government to deliver to the court for in camera inspection any defendant's statement that the government intends to use as evidence.

**Federal Rule of Criminal Procedure 23**

**(a) Jury Trial.** If the defendant is entitled to a jury trial, the trial must be by jury unless:

> **(1)** the defendant waives a jury trial in writing;

> **(2)** the government consents; and

> **(3)** the court approves.

**(b) Jury Size.**

> **(1) In General.** A jury consists of 12 persons unless this rule provides otherwise.

> **(2) Stipulation for a Smaller Jury.** At any time before the verdict, the parties may, with the court's approval, stipulate in writing that:

>> **(A)** the jury may consist of fewer than 12 persons; or

>> **(B)** a jury of fewer than 12 persons may return a verdict if the court finds it necessary to excuse a juror for good cause after the trial begins.

> **(3) Court Order for a Jury of 11.** After the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror.

**Federal Rule of Criminal Procedure Rule 29.**

**(a) Before Submission to the Jury.** After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

**(b) Reserving Decision.** The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

**(c) After Jury Verdict or Discharge.**

    **(1) Time for a Motion.** A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later.

    **(2) Ruling on the Motion.** If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

    **(3) No Prior Motion Required.** A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge.

…

**Federal Rule of Criminal Procedure 35**

   **(a) Correcting Clear Error.** Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error.

   **(b) Reducing a Sentence for Substantial Assistance.**

      **(1) In General.** Upon the government's motion made within one year of sentencing, the court may reduce a sentence if the defendant, after sentencing, provided substantial assistance in investigating or prosecuting another person.

      **(2) Later Motion.** Upon the government's motion made more than one year after sentencing, the court may reduce a sentence if the defendant's substantial assistance involved:

         **(A)** information not known to the defendant until one year or more after sentencing;

         **(B)** information provided by the defendant to the government within one year of sentencing, but which did not become useful to the government until more than one year after sentencing; or

         **(C)** information the usefulness of which could not reasonably have been anticipated by the defendant until more than one year after sentencing and which was promptly provided to the government after its usefulness was reasonably apparent to the defendant.

      **(3) Evaluating Substantial Assistance.** In evaluating whether the defendant has provided substantial assistance, the court may consider the defendant's presentence assistance.

      **(4) Below Statutory Minimum.** When acting under Rule 35(b), the court may reduce the sentence to a level below the minimum sentence established by statute.

   **(c) "Sentencing" Defined.** As used in this rule, "sentencing" means the oral announcement of the sentence.

**Federal Rule of Criminal Procedure 43. Defendant's Presence**

**(a) When Required.** Unless this rule, Rule 5, or Rule 10 provides otherwise, the defendant must be present at:

**(1)** the initial appearance, the initial arraignment, and the plea;

**(2)** every trial stage, including jury impanelment and the return of the verdict; and

**(3)** sentencing.

**(b) When Not Required.** A defendant need not be present under any of the following circumstances:

…

**(3) Conference or Hearing on a Legal Question.** The proceeding involves only a conference or hearing on a question of law.

**(4) Sentence Correction.** The proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c).

**(c) Waiving Continued Presence.**

**(1) In General.** A defendant who was initially present at trial, or who had pleaded guilty or nolo contendere, waives the right to be present under the following circumstances:

**(A)** when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial;

**(B)** in a noncapital case, when the defendant is voluntarily absent during sentencing; or

**(C)** when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom.

     **(2) Waiver's Effect.** If the defendant waives the right to be present, the trial may proceed to completion, including the verdict's return and sentencing, during the defendant's absence.

## Federal Rule of Criminal Procedure 52

     (a) Harmless Error. Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

     (b) Plain Error. A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.

## Federal Rule of Evidence 105.

     If the court admits evidence that is admissible against a party or for a purpose--but not against another party or for another purpose--the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly.

## Federal Rule of Evidence 403

     Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

## Federal Rule of Evidence 404(b)

     Other Crimes, Wrongs, or Acts --Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**Federal Rule of Evidence 608 (b).**

**Specific Instances of Conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:

**(1)** the witness; or

**(2)** another witness whose character the witness being cross-examined has testified about.

By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.

**Federal Rule of Evidence 609**

**(a) In General.** The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:

**(1)** for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:

**(A)** must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant; and

**(B)** must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant; and

**(2)** for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving--or the witness's admitting--a dishonest act or false statement.

**(b) Limit on Using the Evidence After 10 Years.** This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release

Add. 20

from confinement for it, whichever is later. Evidence of the conviction is admissible only if:

        (**1**) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and

        (**2**) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

## Federal Rule of Evidence 702

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (**a**) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (**b**) the testimony is based on sufficient facts or data;

    (**c**) the testimony is the product of reliable principles and methods; and

    (**d**) the expert has reliably applied the principles and methods to the facts of the case.

## Federal Rule of Evidence 801.

    (**a**) **Statement.** "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.

    (**b**) **Declarant.** "Declarant" means the person who made the statement.

    (**c**) **Hearsay.** "Hearsay" means a statement that:

        (**1**) the declarant does not make while testifying at the current trial or hearing; and

        (**2**) a party offers in evidence to prove the truth of the matter asserted in the statement.

Add. 21

**(d) Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:

**(1) A Declarant-Witness's Prior Statement.** The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

**(A)** is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition;

**(B)** is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or

**(C)** identifies a person as someone the declarant perceived earlier.

**(2) An Opposing Party's Statement.** The statement is offered against an opposing party and:

**(A)** was made by the party in an individual or representative capacity;

**(B)** is one the party manifested that it adopted or believed to be true;

**(C)** was made by a person whom the party authorized to make a statement on the subject;

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

**U.S.S.G. §2A1.1.**

(a) Base Offense Level: 43

<[Commentary to Guideline is located in Historical Note field. The following credit reflects amendments to both Guideline and Commentary.]>

**U.S.S.G. §2D1.1 (d)**

(1) If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder) or § 2A1.2 (Second Degree Murder), as appropriate, if the resulting offense level is greater than that determined under this guideline.

**U.S.S.G. § 2K2.4. - Application Notes**

**4. Weapon Enhancement.--**If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense. A sentence under this guideline accounts for any explosive or weapon enhancement for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under 1.3 (Relevant Conduct). Do not apply any weapon enhancement in the guideline for the underlying offense, for example, if (A) a co-defendant, as part of the jointly undertaken criminal activity, possessed a firearm different from the one for which the defendant was convicted under 18 U.S.C. 924(c); or (B) in an ongoing drug trafficking offense, the defendant possessed a firearm other than the one for which the defendant was convicted under 18 U.S.C. 924(c). However, if a defendant is convicted of two armed bank robberies, but is convicted under 18 U.S.C. 924(c) in connection with only one of the robberies, a weapon enhancement would apply to the bank robbery which was not the basis for the 18 U.S.C. 924(c) conviction.>

**U.S.S.G. § 4B1.1. Career Offender**

(a) A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

(b) Except as provided in subsection (c), if the offense level for a career offender from the table in this subsection is greater than the offense level otherwise applicable, the offense level from the table in this subsection shall apply. A career offender's criminal history category in every case under this subsection shall be Category VI.

| Offense Statutory Maximum | Offense Level [FN*] |
|---|---|
| (1)  Life | 37 |
| (2)  25 years or more | 34 |
| (3)  20 years or more, but less than 25 years | 32 |
| (4)  15 years or more, but less than 20 years | 29 |
| (5)  10 years or more, but less than 15 years | 24 |
| (6)  5 years or more, but less than 10 years | 17 |
| (7)  More than 1 year, but less than 5 years | 12. |

[FN*] If an adjustment from § 3E1.1 (Acceptance of Responsibility) applies, decrease the offense level by the number of levels corresponding to that adjustment.

(c) If the defendant is convicted of 18 U.S.C. § 924(c) or § 929(a), and the defendant is determined to be a career offender under subsection (a), the applicable guideline range shall be determined as follows:

(1) If the only count of conviction is 18 U.S.C. § 924(c) or § 929(a), the applicable guideline range shall be determined using the table in subsection (c)(3).

(2) In the case of multiple counts of conviction in which at least one of the counts is a conviction other than a conviction for 18 U.S.C. § 924(c) or § 929(a), the guideline range shall be the greater of--

**(A)** the guideline range that results by adding the mandatory minimum consecutive penalty required by the 18 U.S.C. § 924(c) or § 929(a) count(s) to the minimum and the maximum of the otherwise applicable guideline range determined for the count(s) of conviction other than the 18 U.S.C. § 924(c) or § 929(a) count(s); and

**(B)** the guideline range determined using the table in subsection (c)(3).

**(3)** Career Offender Table for 18 U.S.C. § 924(c) or § 929(a) Offenders

§ 3E1.1 Reduction Guideline Range for the 18 U.S.C. § 924(c) or § 929(a) Count(s)

| | |
|---|---|
| No reduction | 360-life |
| 2-level reduction | 292-365 |
| 3-level reduction | 262-327. |

**U.S.S.G §5K1.1**

Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

**(a)** The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

**(1)** the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

**(2)** the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

**(3)** the nature and extent of the defendant's assistance;

Add. 25

**(4)** any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

**(5)** the timeliness of the defendant's assistance.